**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MADLEN TAMMO, NAJJAW MANSOOR, YOUKHNA AMO, SHAMERAN BARNABAS, CHAMOUN LAZAR, LAZAR ODICHO, CHERINA YOUNAN, JAMILA ISAAK, SHARLET YOUNAN, KAREN NORTHSHIELD, THOMAS NORTHSHIELD, individually and for the estate of ERIC JOSEPH NORTHSHIELD, DENA NORTHSHIELD, ANNE NORTHSHIELD, BENJAMIN NORTHSHIELD, TAMMY NORTHSHIELD, HEIDI NORTHSHIELD, SUSAN NORTHSHIELD, STEVEN ISAAC, NAREEM SHOREES, and SAMARA JOHNSON,

Plaintiffs,

v.

ERICSSON INC., ERICSSON AB, TELEFONAKTIEBOLAGET LM ERICSSON, RAFIAH IBRAHIM, and BÖRJE EKHOLM,

Defendants.

Case No. 1:26-cv-____

JURY TRIAL DEMANDED

**COMPLAINT FOR**
**<u>VIOLATION OF THE ANTI-TERRORISM ACT</u>**

Ryan R. Sparacino
Geoffrey P. Eaton
Eli J. Kay-Oliphant
Tejinder Singh
Shuman Sohrn
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
tejinder.singh@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

THE DEFENDANTS ..... 10

JURISDICTION AND VENUE ..... 15

SOURCING ..... 17

FACTUAL ALLEGATIONS ..... 19

I. AL-QAEDA AND AL-QAEDA-IN-IRAQ COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST AMERICANS IN IRAQ, SYRIA, AND AFGHANISTAN AS PART OF AL-QAEDA'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST ..... 19

A. Al-Qaeda Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East ..... 21

B. Al-Qaeda Comprised A Globally Integrated Terror Network That Relied Upon A Cooperative, Corporate Model Internally And With Other Allied Foreign Terrorist Organizations To Facilitate Its Terrorist Campaign Against The United States ..... 42

1. Al-Qaeda's Integrated Global Network ..... 43

2. Al-Qaeda's Doctrinal Emphasis Of "Unity" Amongst Islamists ..... 46

3. Al-Qaeda's Multi-National Corporate Model ..... 47

II. DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING FINANCIAL ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE BY MAKING PROTECTION PAYMENTS TO THEM ..... 53

A. Defendants Operated In Insecure And Corrupt Iraqi And Afghan Contracting Environments That Encouraged Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ..... 53

1. Al-Qaeda, Islamic State, And Their Allies Operated Sophisticated Protection Money Networks In Iraq And Afghanistan ..... 54

a. Al-Qaeda and Al-Qaeda-in-Iraq Ran a Sophisticated Protection Money Operation in Iraq from 2004 through 2014 ..... 58

b. Islamic State Ran a Sophisticated Protection Money Operation in Iraq from 2014 through at least 2022 ... 61

2. Multinational Corporations Commonly Structured Their Operations In Iraq And Afghanistan To Funnel Protection Money Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State ... 63

B. Defendants Made Protection Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State In Iraq And Afghanistan ... 76

1. Defendants Pursued An Enterprise-Wide Corruption Scheme, Which Defendants Applied In A Substantially Similar Manner In Iraq And Afghanistan ... 77

a. Defendants Pursued an Enterprise-Wide Corruption Scheme ... 77

b. Defendants Deployed The Same Manner And Means To Operationalize Their Enterprise-Wide Scheme in Iraq and Afghanistan ... 84

2. Defendants Made Protection Payments To Terrorists In Iraq ... 86

a. Leaked Ericsson Documents and Subsequent Public Statements Confirm Ericsson's Knowing Participation In Terrorist Protection-Money Networks In Iraq. ... 90

b. Defendants Used Strategic Partners, Consultants, Subcontractors, and Slush Funds to Funnel Protection Payments to Terrorists in Iraq ... 93

c. Defendants Admitted That Ericsson Likely Purchased Security From Al-Qaeda And Islamic State In Iraq ... 113

d. Independent Media Reports Corroborate Plaintiffs' Interpretation of Ericsson's Conduct in Iraq ... 114

e. The Terms and Rates That Governed Lafarge S.A.'s Participation in Islamic State's Protection Networks In Iraq Confirmed That Defendants Also Participated In The Same Protection Networks as Lafarge ... 119

3. Attack Disparity Data Independently Provides Sufficient Basis To Conclude Defendants Made Protection Payments To Terrorists In Iraq And Afghanistan ... 123

C. Each Defendant Facilitated Ericsson's Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ... 125

1. LM Ericsson ... 126

a. LM Ericsson Created And Led Ericsson's Enterprise-Wide Illicit Payments Scheme From The Late 1990s Through 2022 ... 127

b. LM Ericsson Secured Ericsson AB's Ability To Win The Iraq Work, And Ericsson Inc's Ability To Profit From The Iraq Work ... 130

c. LM Ericsson Approved Ericsson AB's Initial Choice To Participate In Al-Qaeda's, Al-Qaeda-in-Iraq's, And Islamic State's Protection Networks. ... 130

d. LM Ericsson Supervised Ericsson AB's Subsequent Conduct While Participating in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's Protection Networks ... 133

e. LM Ericsson Authorized Ericsson AB's Associated Protection Payments. ... 133

f. LM Ericsson Operationalized Ericsson AB's Protection Payment Scheme In Iraq ... 134

g. LM Ericsson's CEO Personally Directed Aspects of Defendants' Protection Money Scheme In Iraq ... 135

h. LM Ericsson Embraced Defendant Ibrahim, When It Should Have Fired Her, In Order To Enable The Continued Operation Of Defendants' Protection Money Scheme In Iraq ... 135

2. Ericsson AB ... 140

3. Ericsson Inc. ... 143

4. Börje Ekholm ... 149

5. Rafiah Ibrahim ... 149

D. Defendants' Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Had A Substantial Nexus To The United States ... 150

a. Defendants' Conduct Relied On American Contacts ... 150

b. Defendants' Conduct Targeted The United States ... 164

E. Defendants' Protection Payments To Al-Qaeda And Al-Qaeda-In-Iraq Aided And Abetted Al-Qaeda And Al-Qaeda-In-Iraq Acts of International Terrorism Against Americans In Iraq, Syria, And Afghanistan ... 165

Funds Raised In Iraq And Syria By Al-Qaeda And Al-Qaeda-In-Iraq Funded Al-Qaeda And Al-Qaeda-In-Iraq Attacks In Iraq, Syria, And Afghanistan ... 165

F. Defendants' Protection Payments To Islamic State Aided And Abetted Islamic State Acts of International Terrorism Against Americans In Iraq, Syria, Turkey, Afghanistan, Central Asia, and Africa ....... 166

1. Islamic State Relied Upon Protection Money Payments And Donations To Fund Its Terrorist Attacks Against Americans In Iraq, Syria, Turkey, Afghanistan, Central Asia, and Africa ....... 166

2. Defendants' Value Flow To Islamic State Financed The Islamic State Attacks That Killed And Injured Plaintiffs In Iraq, Syria, Turkey, Belgium, And Niger From 2014 Through 2017 ....... 167

3. Defendants' Value Flow To Islamic State Also Financed Islamic State's External-Operations Branch, Which Directed The March 22, 2016 Attacks In Brussels That Killed And Injured Plaintiffs ....... 172

III. DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING OPERATIONAL ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE THROUGH DEFENDANTS' OBSTRUCTION OF UNITED STATES COUNTERTERRORISM OPERATIONS TARGETING AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE ....... 177

A. The U.S. Government Prevented Acts Of International Terrorism Against Americans In Iraq, Syria, Turkey, Europe, Africa, And Afghanistan By Conducting Counterterrorism Operations In The United States And The Middle East That Targeted Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ....... 178

1. U.S. Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Relied Upon A Whole-Of-Government Approach In Which The Department Of Justice And Other Agencies Shared Information In Order To Prevent Terrorist Attacks ....... 178

2. U.S. Counterterrorism Operations Designed To Protect Americans From Attack By Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State In Iraq, Syria, Turkey, Europe, Africa, And Afghanistan Relied Upon The Effectiveness Of The U.S. Government's Anti-Corruption And Anti-Money Laundering Efforts ....... 189

B. Defendants Provided Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State By Obstructing United States Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ....... 198

C. Each Defendant Facilitated Ericsson's Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ....... 203

1. LM Ericsson ........ 203

2. Ericsson AB ........ 204

3. Ericsson Inc. ........ 205

4. Börje Ekholm ........ 211

5. Rafiah Ibrahim ........ 213

D. Defendants' Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Had A Substantial Nexus To The United States ........ 215

E. Defendants' Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Aided And Abetted The Terrorists' Acts Of International Terrorism Against Americans In Iraq, Syria, Turkey, Europe, Africa, And Afghanistan ........ 219

IV. DEFENDANTS FRAUDULENTLY CONCEALED THEIR ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, THE TALIBAN, AND ISLAMIC STATE ........ 220

V. DEFENDANTS KNEW THEY WERE AIDING AND ABETTING ATTACKS ON AMERICANS BY AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE ........ 233

A. Defendants' Conduct Suggests That They Were Aware Their Protection Payments And Obstruction Of United States Counterterrorism Operations Aided And Abetted Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Attacks Against Americans ........ 233

B. Defendants Knew They Operated In A Hyper-Corrupt Environment In Which Corporations Commonly Made Protection Payments To Terrorists ........ 235

1. Defendants Knew The Iraqi Business Climate Was Hyper-Corrupt ........ 237

2. Defendants Knew Corruption In Iraq Was Inextricably Connected To Terrorism ........ 241

3. Defendants Knew They Did Business In Geographies That Were Insecure And Targeted By Terrorists ........ 243

4. Defendants Knew Multinational Corporations' Illicit Transactions In, Or Relating To, Iraq, Afghanistan, Syria, And Turkey Were Routinely

Designed To Route Protection Payments To Al-Qaeda And Islamic State Branches Operating In The Middle East And Beyond ........................ 247

5. Defendants Knew Al-Qaeda's And Islamic State's Terrorist Campaigns In Iraq And Afghanistan Were Inextricably Linked .................. 253

C. Defendants Knew Their Illicit Transactions Aided Terrorist Attacks By Causing Financial Assistance To Flow To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Protection Payments To Them........... 254

1. Defendants Knew Their Illicit Transactions With Iraq-Related Intermediaries Caused Protection Payments To Flow To Terrorists............ 259

a. Defendants Knew Their Illicit Transactions With Iraqi Partners Caused Protection Payments To Flow To Terrorists............................................... 276

b. Defendants Knew Their Illicit Transactions In Iraq With Local Consultants Caused Protection Payments To Flow To Terrorists ................ 278

c. Defendants Knew Their Illicit Transactions with Security, Transportation, and Logistics Contractors in Iraq, Syria, Jordan, Turkey, Qatar, the U.A.E., And Lebanon Caused Protection Money to Flow to Terrorists.......................................................................................... 280

2. Defendants Knew Their Uncontrolled Iraqi Slush Funds Caused Cash-Based Protection Payments To Flow To Terrorists, And Intended For Their Officers, Employees, Agents, Partners, Consultants, And Contractors To Use Slush Funds To Covertly Route Protection Money To Terrorists.............................................................................................. 283

a. Defendants Knew, And Intended, That Their Uncontrolled Iraqi Slush Funds Would Facilitate Covert Protection Payments To Terrorists............. 283

b. Defendants Knew, And Intended, That Their Cash-Related Practices In Illicit Iraqi Transactions Would Facilitate Covert Protection Payments To Terrorists.............................................................................................. 286

3. Defendants Knew Their Deliberately Deficient Internal Controls Were An Intentional Tactic To Help Conceal Their Protection Payments To Terrorists ................................................................................................. 287

D. Defendants Knew Their Obstruction Of United States Counterterrorism Operations Provided Operational Assistance To Al-Qaeda And The Taliban ............................................................................................................ 289

1. Defendants Knew Their Conduct Obstructed U.S. Government Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State ........................................................................................ 289

2. Defendants Knew Their Obstruction Of U.S. Government Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State Aided Attacks Against Americans ... 293

E. Defendants Knew Al-Qaeda's Role ... 298

1. Defendants Knew Al-Qaeda Waged A Terrorist Campaign Against The United States ... 298

2. Defendants Knew Protection Payments Aided Al-Qaeda ... 307

a. Defendants Knew Their Cash-Based Protection Payments Aided Al-Qaeda ... 307

b. Defendants Knew "Free Goods"-Based Protection Payments Aided Al-Qaeda ... 313

3. Defendants Knew Protection Payments Aided Al-Qaeda-In-Iraq ... 313

F. Defendants Knew Islamic State's Role ... 317

1. Defendants Knew Islamic State Waged A Terrorist Campaign Against The United States ... 317

2. Defendants Knew Protection Payments Aided Islamic State ... 322

VI. DEFENDANTS' ASSISTANCE WAS SUBSTANTIAL ... 329

A. Defendants Provided Support Tailored To The Violence At Issue Here ... 329

B. The Amount Of Protection Money, Fraudulent Concealment Of Defendants' Relationship With Terrorists, And Obstruction Of United States Counterterrorism Operations, Were All Significant ... 338

C. Defendants Had Culpable Mental States ... 341

D. Defendants Had A Close Relationship To The Tortfeasors ... 343

E. The Duration Of Support Was Long ... 346

VII. ISLAMIC STATE USED DEFENDANTS' ASSISTANCE TO COMMIT ACTS OF INTERNATIONAL TERRORISM THAT KILLED AND INJURED PLAINTIFFS IN IRAQ, SYRIA, TURKEY, EUROPE, AND AFRICA ... 346

A. Islamic State Committed, Planned, And Authorized The Attacks That Injured Plaintiffs In Iraq, Syria, Turkey, Europe, And Africa From 2014 Through 2017 ... 346

B. Al-Qaeda Polyterrorists Facilitated Al-Qaeda's Acts Of International Terrorism In Iraq, Afghanistan, Pakistan, Syria, and Turkey ... 346

1. Abu Musab al-Zarqawi ... 348

2. Sulayman Khalid Darwish ... 350

3. Muhsin al-Fadhli ... 351

4. Abu Hamza al-Muhajir (aka Abu Ayyub al-Masri) ... 353

5. Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani ... 354

6. Ezedin Abdel Aziz Khalil (aka Yasin al-Suri) ... 355

7. Umid Muhammadi ... 356

8. Mustafa Hajji Muhammad Khan ... 357

9. Adel Radi Saqr al-Wahabi al-Harbi ... 358

10. Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni ... 359

11. Abd al-Rahman Mustafa al-Qaduli ... 359

12. Abu Afghan al-Masri ... 360

VIII. ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST AMERICANS IN IRAQ, SYRIA, TURKEY, EUROPE, AFRICA, AND AFGHANISTAN AS PART OF ISLAMIC STATE'S AND AL-QAEDA'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST ... 361

A. Islamic State Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East ... 361

B. Islamic State Adopted Al-Qaeda's And Al-Qaeda-In-Iraq's Networks, Infrastructure, Ideology, Tactics, Techniques, And Procedures, And Followed Al-Qaeda's Model As A Globally Integrated Terror Network That Facilitated Cooperation Between Islamic State Branches ... 364

1. Islamic State Emulated Al-Qaeda ... 365

2. Islamic State Operated As An Integrated Global Network ... 366

3. Islamic State Followed A Multi-National Corporate Model ... 366

C. Al-Qaeda-in-Iraq And Islamic State Committed, Planned, And Authorized Attacks Against Americans Throughout Iraq .................................................. 368

IX. THE ISLAMIC STATE ATTACKS .................................................................. 368

Islamic State's July 1, 2014 Insurgent Attack in Nineveh, Iraq (Najjaw Mansoor) ....... 369

Islamic State's February 23, 2015 Kidnapping Attack in Syria (Abdal, Amo, Lazar, Odicho, Younan, and Enwiya Families) ................................................ 369

Islamic State's March 22, 2016 Complex Suicide Bombing Attack at Brussels Airport in Belgium (Northshield Family) ........................................................ 373

Islamic State's June 28, 2016 Complex Suicide Bombing Attack at Atatürk Airport in Turkey (Steven Isaac and Nareem Shorees) .................................... 379

Islamic State's October 4, 2017 Complex Attack in Tongo Tongo, Niger (Samara Johnson) .......................................................................................... 380

Accrual of Plaintiffs' Claims Under 18 U.S.C. § 2333(d) ............................................ 383

CLAIMS FOR RELIEF .......................................................................................... 384

COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants: Aiding and Abetting Liability, Attack Predicate] ......................................... 384

COUNT TWO: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants: Aiding-and-Abetting Liability, RICO predicate] ......................................... 386

COUNT THREE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants: Primary Liability, 18 U.S.C. § 2339A Predicate] ....................... 389

COUNT FOUR: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants: Primary Liability, 18 U.S.C. § 2339B Predicate] ......................................... 391

COUNT FIVE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a) [All Defendants: Primary Liability, 18 U.S.C. § 2339C Predicate] ......................................... 393

JURY DEMAND ................................................................................................ 394

PRAYER FOR RELIEF ........................................................................................ 395

## INTRODUCTION

1. This lawsuit seeks damages under the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, on behalf of American civilians—including service members who were killed or wounded while serving their country—in Iraq, Syria, Turkey, Belgium, and Niger between 2014 and 2017, as well as their families. While many of these men and women worked to support humanitarian efforts in the Middle East and Africa, they were attacked by Islamic State, one of the Foreign Terrorist Organizations ("FTOs") — al-Qaeda, al-Qaeda-in-Iraq, and Islamic State — which Ericsson Inc. ("Ericsson Inc."), Ericsson Aktiebolag ("Ericsson AB"), Telefonaktiebolaget LM Ericsson (individually, "LM Ericsson" and collectively with Ericsson Inc. and Ericsson AB, "Ericsson" or "Corporate Defendants"), Rafiah Ibrahim, and Börje Ekholm ("Ibrahim" and "Ekholm," respectively, and together "Individual Defendants") (the Corporate Defendants and Individual Defendants collectively being "Defendants") helped finance and logistically aid.

2. Specifically, from at least 2004 until at least February 15, 2022, Defendants – themselves and through their strategic partners, consultants, and subcontractors – made substantial protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in both America-sourced U.S. dollars and in free state-of-the-art U.S. communications devices and technologies like cell phones and tablets, which provided encryption while doubling as cash equivalents. Starting no later than 2013, Ericsson also intentionally obstructed vital U.S. government counterterrorism operations, including by lying to the U.S. government repeatedly about the terrorists' operations and Ericsson's related conduct. In doing so, Ericsson provided key "cover" and "concealment" to – and thereby logistical aid and support for – al-Qaeda's and Islamic State's fundraising rackets while these FTOs were killing and kidnapping Americans.

3. After the U.S. military's post-9/11 invasions of Afghanistan and Iraq, al-Qaeda and its regional branches, led by al-Qaeda-in-Iraq (which evolved into Islamic State, aka ISIS and ISIL, in 2014), collaborated to expel the United States from the Middle East by sponsoring waves of terrorist attacks against Americans throughout the region. To date, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State have collectively killed, or helped kill, well more than 2,500 U.S. service members and wounded roughly 30,000 more, primarily in Iraq and Afghanistan, but also in Syria and other countries in the Middle East, Europe, Asia, and Africa.

4. Reliable funding was vital to the terrorists' campaigns. By 2005, al-Qaeda's branches in Iraq and Syria – most notoriously, al-Qaeda-in-Iraq under the leadership of notorious terrorist Abu Musab al-Zarqawi – began systematically extracting protection payments from international businesses operating in the Iraqi and Syrian geographies in which al-Qaeda-in-Iraq posed a threat. The terrorists motivated companies to pay by presenting them with a choice: either meet the terrorists' demands and help fund terrorist attacks, or else spend even more money on expensive security measures.

5. LM Ericsson, Ericsson AB, and Ericsson Inc. agreed to the terrorists' demands. Under Ericsson's business model, LM Ericsson's and Ericsson AB's primary goal in Iraq between 2003 and 2022 was to sell goods, technologies, and services manufactured, provided, or serviced by Ericsson Inc. because Ericsson AB's large-scale infrastructure projects in Iraq required Ericsson Inc.'s goods, technologies, and services. To maximize their profits, Defendants funded the terrorists to leave them alone. The payments saved Ericsson money: it was cheaper to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State than to invest in the security necessary to mitigate the terrorists' threats. And the payments generally worked as intended. Paying the

terrorists reduced the frequency with which Defendants faced the threat of terrorists attacking their assets in the region, and it allowed them to cut corners on security, too.

6. LM Ericsson, Ericsson AB, and Ericsson Inc. financed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through such protection payments from at least 2004 until at least 2019. Below, Plaintiffs identify: contracts on which Defendants made payments; identities of subcontractors they used to facilitate the flow of money; indications of how they concealed payments on their books; and examples of specific payments made by each. Some details varied over time (*e.g.*, different subcontractor buffers) while others endured (*e.g.*, the use of a corrupt consultant as a buffer for more than a decade). Throughout, however, Ericsson's objective was the same – to ensure that Defendants' funds reached the terrorists so that Ericsson's lucrative Iraq-based projects, and attendant profits, continued flowing.

7. On behalf of Ericsson Inc., LM Ericsson and Ericsson AB often (but not always) paid these designated FTOs through Ericsson's local strategic partners, consultants, and subcontractors, in an effort to reduce the risk those illegal payments would be traced back to Ericsson. Many projects in Iraq involved chains of subcontractors – in which a prime contractor funneled both the work and the money through layers of additional corporate entities – and Ericsson exploited that structure to facilitate payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Indeed, Ericsson often hired local subcontractors intending for those companies to deliver "security" for Defendants' projects by paying off al-Qaeda-in-Iraq and Islamic State using either transfers through intermediaries or payments from uncontrolled slush funds.

8. Protection payments like the ones Ericsson made have been closely studied by U.S. military intelligence agencies, and Congress, which have confirmed that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State depended on Western companies making such payments, and

that the amounts paid in Iraq typically were worth at least 10 percent to 20 percent – and often much more – of the thing being "protected" or the income being earned.

9. Defendants also likely facilitated Ericsson Inc.'s direct transfer of high-tech, U.S. military-grade, U.S. origin communications technologies to al-Qaeda in its Afghanistan stronghold from 2008 through 2017. One Confidential Witness, a retired U.S. Army Colonel, stated:

> Ericsson in Iraq and Afghanistan would consciously leave free communications equipment, including trucks, trailers, signal communications equipment, operation based sustainment equipment, phones, radios, computers, laptops, desktops, signals pieces, satellite nodes and capabilities.

According to the same Confidential Witness, who directly observed Ericsson Inc. in Iraq and Afghanistan, Ericsson Inc. "likely" made protection payments directly to al-Qaeda in Afghanistan through a "free goods" scheme in which Ericsson Inc. personnel consciously purchased protection directly from al-Qaeda in Afghanistan by transferring Ericsson Inc.'s high-tech, U.S.-origin communications devices – including cellular phones, satellite phones, laptop computers, and more sophisticated technology used by Americans in Afghanistan – to al-Qaeda. Notably, according to this Confidential Witness, Ericsson Inc.'s "likely" transfers of U.S.-origin cell phones, laptops, and other devices to al-Qaeda were transmitted ***directly from Ericsson Inc. to al-Qaeda*** in Afghanistan because, this Confidential Witness assessed, Ericsson Inc. and al-Qaeda used a coordinated "dead drop" approach to accomplish the "free goods" transfers without anyone between Ericsson Inc. and al-Qaeda.

10. Defendants bribed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State so that the FTOs would allow LM Ericsson and Ericsson AB to sell Ericsson Inc.'s U.S.-sourced technology, goods, and services in Iraq. By doing so, Ericsson participated in one of the FTOs' longest running and most effective terrorist finance schemes: the collection of protection money from

corrupt multinational corporations that were willing to place their own business interests above the national security interests of the United States and the safety of American lives in the Middle East. By offering a percentage of their profits as well as free U.S.-manufactured technology and goods to the terrorists as tribute, Ericsson redirected terrorist violence away from Defendants' Middle Eastern operations – and toward honest businesses and people, including Plaintiffs.

11. It is impossible to overstate the culpability of Ericsson's conduct, as illustrated by a few examples: after Islamic State seized Mosul, Defendants rejected the "the strong recommendation" of their top lawyer in the Middle East to invoke force majeure and exit the area "because," Ericsson calculated, "it would be 'premature' and 'destroy [Ericsson's] business.'" Instead, LM Ericsson, Ericsson AB, and Ericsson Inc. paid off Islamic State, literally using the word "please" and "thank[ing]" ISIS for its "cooperation" with Ericsson.

12. As another example, in 2017, Defendants chose to move their goods in Iraq using the "Speedway" as opposed to the "legal way" – the former involved payoffs to terrorists and greater profits for Defendants, while the latter avoided enriching terrorists but burdened Ericsson with lower profit margins from its Iraq business. LM Ericsson, Ericsson AB, and Ericsson Inc. rejected following what their own employees called the "legal way."

13. As yet another example, in 2014, Defendants and Asiacell (one of their "strategic partners" in Iraq) effectively offered up one of their Iraqi subcontractors as a human sacrifice to Islamic State. As that subcontractor explained: "Ericsson put pressure on my company, and my company put pressure on me," resulting in his capture and detention by Islamic State. In the victim's own words, Defendants "destroyed" him when they effectively "sold" him to Islamic State. Transacting business with terrorists at the cost of innocent human lives, while repugnant to most, was business as usual for Ericsson in Iraq.

14. Confidential Witnesses also confirm key aspects of Plaintiffs' allegations.

15. Ericsson's protection payments aided and abetted terrorism by funding al-Qaeda's and Islamic State's attacks against Americans in Iraq, Afghanistan, Syria, Turkey, Central Asia, and Africa. Although Defendants made most of their payments in Iraq, those payments aided al-Qaeda, al-Qaeda-in-Iraq, and the Islamic State in Iraq, Afghanistan, Syria, Turkey, Central Asia, and Africa, facilitating attacks on Americans in all those places. That is because these FTOs maintained global operations, under which financial, technical, and logistical resources raised in one area flowed through to the others to support their transnational campaign against Americans.

16. Ericsson's conduct supported al-Qaeda's and Islamic State's global terrorist campaign against Americans in Iraq, Afghanistan, Syria, Turkey, Central Asia, and Africa. When Ericsson paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State not to attack them, they were not reducing the overall threat of terrorist violence; they were redirecting the attacks to other targets – including Plaintiffs and their family members. At the same time, Ericsson's financing intensified the terrorist campaigns waged by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State against those very targets. Protection money was quantitatively significant – by most accounts, al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's largest (or second largest) funding source overall – and such FTOs' substantially similar and highly disciplined process for extracting it made for an especially potent form of terrorist finance. Even relatively low-dollar protection payments had an outsized effect on al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist capabilities by subsidizing salaries and weapons for multiple terrorists. Ericsson's decision to make larger, regular, six- and seven-figure payments had an even greater effect: it translated directly into substantial numbers of terrorists, weapons, and bombs that al-Qaeda, al-Qaeda-in-

Iraq, and Islamic State used to kill and injure Americans in Iraq, Afghanistan, Syria, Turkey, Central Asia, and Africa.

17. Defendants necessarily knew that by making protection payments to terrorists, they were playing a role in violent terrorism. As practiced by criminal foreign telecom companies like Ericsson, the entire point of corporate protection payments is to appease violent actors so that they will not direct violence at the corporation's valuable physical assets (such as infrastructure sites) and goods (such as product shipments). Thus, any corporation that makes protection payments necessarily intends that the money will reach the violent actor. More specifically, robust public information explained to contractors that terrorist organizations in Iraq were soliciting protection payments from corporations to fund their ongoing campaigns of terrorist violence against Americans. And the specific FTOs at issue here – al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – were globally notorious for putting their resources, including protection money funds, to violent ends. That is why the U.S. government publicly designated them as FTOs in the first place.

18. Consistent with that understanding, the U.S. government has long opposed the payment of protection money to terrorist organizations. An Assistant Attorney General said it plainly in a 2007 criminal resolution concerning similar conduct: "corporations are on notice that they cannot make protection payments to terrorists." A Deputy Attorney General similarly noted in 2022 that "business with terrorists cannot be business as usual." Multiple agencies set up task forces designed to interrupt the flow of protection money to terrorists in Iraq and Afghanistan, and U.S. officials stated repeatedly that such payments were illegal and counterproductive. Applicable regulations and financial rules also required companies to ensure that their contracting practices – including the money spent by their subcontractors – did not finance

terrorism. Defendants violated those requirements and concealed their payments in part because they knew the U.S. government considered such payments to be illegal. Thus, Ericsson paid off terrorists even while knowing that the U.S. government publicly opposed protection payments and tried to stop them.

19. Ericsson's aid to terrorists did not end at money, although that was plenty. Defendants provided key logistical aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2004 through at least February 15, 2022 by providing critical cover and concealment for their protection rackets. LM Ericsson and Ericsson AB did so by paying off the terrorists while simultaneously keeping secret their knowledge of the protection rackets that were instrumental in financing attacks on Americans in Iraq, Afghanistan, Syria, Turkey, Central Asia, and Africa. Defendants did so even when they had affirmative legal obligations requiring disclosure to the U.S. government and Defendants' shareholders, among others.

20. By fraudulently concealing the FTOs' protection rackets when they had a duty to share what they knew, LM Ericsson, Ericsson AB, and Ericsson Inc. also provided vital operational aid to the functioning of al-Qaeda's, al-Qaeda-in-Iraq's and Islamic State's protection rackets – independent of the U.S. dollars that Defendants paid such FTOs – by depriving the U.S. government, LM Ericsson's shareholders, and Plaintiffs of actionable intelligence and accurate information, which prevented U.S. military, intelligence, law enforcement, shareholder, and litigation pressure that would otherwise have made it harder for the terrorists to extract comparable value from their protection rackets in Iraq. Specifically, Ericsson knew who was soliciting money on behalf of terrorists; knew which subcontractors were funneling corrupt payments to the terrorists; and knew which geographies were focal points for terrorists – but instead of disclosing that information, Ericsson held it close for its own

benefit. This conduct was in direct conflict with the position of the U.S. government and terrorism scholars, who have long emphasized that public-private cooperation is a key tool in the U.S. government's counterterrorism strategy to protect American lives. The corollary is equally true: corporate obstruction aids the FTOs' terrorist attacks against Americans.

21. Ericsson's misconduct is now coming to light. The first domino fell in 2019, when LM Ericsson pleaded guilty to violating the Foreign Corrupt Practices Act ("FCPA"), paying more than $1 billion in combined penalties to the DOJ and SEC as part of a Deferred Prosecution Agreement ("DPA") relating to its decades-long, enterprise-wide pattern of bribery and corruption throughout the world.

22. In February 2022, Defendants admitted that their money may have flowed to anti-American terrorists from at least 2011 through at least 2019. Defendants announced that they had "identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes" and admitted that their "[i]nvestigators could not determine the ultimate recipients of these payments." Indeed, Ericsson itself concluded that "[b]y avoiding official customs by transporting through areas controlled by militias, including ISIS, it cannot be excluded that [an Ericsson subcontractor] engaged in … potential illicit financing of terrorism to carry out transportation operations for Ericsson."

23. After Ericsson's recent admission regarding funding the terrorists, the U.S. government has concluded that LM Ericsson breached its DPA, and is now actively investigating LM Ericsson a second time, because Ericsson's conduct made a mockery of U.S. law and regulators, including the DOJ and SEC. Other governments are also investigating. For example, in April 2022 the Swedish judiciary announced the opening of an investigation into "possible

corruption crimes that … Ericsson is suspected of being involved in, linked to the payment of bribes to ISIS." It is highly likely that these investigations will reveal additional evidence of Ericsson's longstanding support for terrorists and terrorist groups.

24. Plaintiffs are U.S. nationals who were killed or wounded in Iraq, Syria, Turkey, Belgium, and Niger between 2014 and 2017 in terrorist attacks committed by Islamic State. Plaintiffs also include the estates and family members of those U.S. nationals. Plaintiffs are entitled to recover for their injuries under the ATA because Defendants engaged in acts of international terrorism and also aided and abetted Islamic State's terrorist attacks and campaigns in Iraq, Syria, Turkey, Belgium, and Niger. 18 U.S.C. § 2333(a), (d)(2). With this statute, Congress sought "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Justice Against Sponsors of Terrorism Act ("JASTA") § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 (2016). This case falls within the heartland of the ATA's prohibitions.

## THE DEFENDANTS

25. Defendant LM Ericsson is publicly traded on the NASDAQ under the ticker ERIC. LM Ericsson is incorporated in the Kingdom of Sweden ("Sweden"), and its principal place of business is in Stockholm, Sweden.

26. Defendant Ericsson Inc. is a wholly owned subsidiary of Ericsson Holding II, Inc., which is a wholly owned subsidiary of LM Ericsson. It is incorporated in Delaware, and its principal place of business is in Plano, Texas. Ericsson Inc. has an agent and maintains an office in this District.

27. Defendant Ericsson AB is a wholly owned subsidiary of LM Ericsson. It is incorporated in the Kingdom of Sweden, and its principal place of business is in Stockholm, Sweden. Ericsson AB has appointed Ericsson Inc. as its agent for service of process in the United States.

28. Defendant Rafiah Ibrahim ("Ibrahim") is a purported "advisor" to LM Ericsson CEO (and co-defendant) Börje Ekholm, a role that Ericsson claims she has served since August 31, 2019. Ibrahim is a foreign national and is known to have recently resided in the United Arab Emirates. Ibrahim first joined Ericsson in 1996 and held several high-profile positions during her tenure. Immediately before becoming an advisor to Ekholm, Ibrahim was a Senior Vice President and Ericsson's Head of Market Area Middle East and Africa, as well a member of LM Ericsson's Executive Team—positions she assumed on July 1, 2014.

29. Defendant Börje Ekholm ("Ekholm") is the President and CEO of LM Ericsson and has served in that role since January 16, 2017. Ekholm has been a member of LM Ericsson's board of directors since 2006. Ekholm is a United States citizen who has led LM Ericsson from the United States while a resident of Connecticut from 2017 until at least 2022 and of Colorado thereafter. On March 29, 2022, LM Ericsson's shareholders voted not to discharge Ekholm (and the other members of LM Ericsson's board) from liability arising from Ericsson's alleged conduct in Iraq.

30. Ericsson AB and Ericsson Inc. are LM Ericsson's two largest operating subsidiaries.

31. Ericsson AB manufactures communications equipment, including mobile broadband, routers, switches, software, and network equipment for microwave, transport, and

internet protocol. Ericsson AB also sells Ericsson products and services all over the world, including directly to Ericsson's customers and to certain of LM Ericsson's other subsidiaries.

32. In addition to acting in their capacities as employees of Ericsson AB, several executives and other employees of Ericsson AB acted as agents of LM Ericsson in conducting Ericsson business in Iraq. From 2000 through 2022, LM Ericsson was a multinational telecommunications equipment and service company headquartered in Stockholm, Sweden. From 2000 through 2022, LM Ericsson functioned as the holding company for a multinational telecommunications equipment and service behemoth that operated all over the world through its many subsidiaries and affiliated entities. Although LM Ericsson purports not to conduct operating activities, LM Ericsson employees have been implicated in widespread unlawful activity relating to its operating companies' operations.

33. LM Ericsson admitted in its DPA that its "subsidiaries," including Ericsson AB and Ericsson Inc., "acted as divisions of the parent, rather than separate and independent entities." Deferred Prosecution Agreement at A1-A2, *United States v. Telefonaktiebolaget LM Ericsson,* No. 1:19-cr-00884 (S.D.N.Y. Dec. 6, 2019), ECF No. 6.

34. Consistent with that admission, LM Ericsson's global business operated as a singular "One Ericsson" organization, combining Ericsson's manufacturing, R&D, and other arms under the control of LM Ericsson headquarters in Stockholm to deliver complete products and services to its global customers. In 2007, for example, an LM Ericsson employee publicly explained that LM Ericsson's business strategy was to achieve long-term growth based on the interrelationships of the various technological products offered by LM Ericsson's subsidiaries to operators of mobile networks and fixed communication systems throughout the world, which LM Ericsson marketed through "portfolio" and "bundled" offerings.

35. In 2012, similarly, LM Ericsson's CEO at the time publicly observed that **Ericsson's globally integrated "One Ericsson" business model** drew on Ericsson's global employees, technologies, and services – including those in the U.S. – to optimize value for Ericsson's operations and LM Ericsson's shareholders. In the same speech, LM Ericsson's CEO in 2012 explained that "[a]ny strategic decision" that Defendants adopted was "buil[t] on" Ericsson's "three" "competitive advantages":

**a.** **Ericsson's "technology leadership"** which was "the foundation for our Company";

**b.** **Ericsson's "service leadership,"** through which Defendants leverage Ericsson's "global scale[,] which [was] unique" because Defendants offered their potential telecom customers worldwide the "unique possibility to" drive value by "working in an efficient way globally, using IT support," and benefiting from Defendants' "use [of] the [O]ne Ericsson [business model] across the globe"; and

**c.** **Ericsson's "commercial management,"** which was "a key" for Defendants given that they "work[ed] as [O]ne Ericsson" "globally to keep control [of] where the commercials" – i.e., the contractual bids, relationships, and projects worldwide in which LM Ericsson and Ericsson Inc. collaborated with other Ericsson entities as "One Ericsson," – are going."

36. Ericsson Inc. was a wholly owned subsidiary of LM Ericsson that operated in the United States, served as Ericsson's vital technology hub in the United States, and regularly sold goods (through LM Ericsson) to customers in the Middle East. Throughout this period, Ericsson Inc. manufactured and serviced core communications network products including, but not limited to, antennas, transmitters, switching systems, and other gear used to build wireless telecommunications networks. Ericsson Inc. primarily served network operators, transportation companies, utilities, and broadcasters, and specialized in offering full-spectrum consulting, network build-out, network optimization, and network management and maintenance services.

37. Under its "One Ericsson" approach, to which Defendants always adhered, LM Ericsson, Ericsson AB, and Ericsson Inc. routinely collaborated with one another through cross-functional teams based and led in the United States by U.S. personnel who reported to LM

Ericsson, Ericsson AB, and Ericsson Inc. management. Ericsson's U.S.-based cross-functional teams developed products for Ericsson Inc., helped LM Ericsson win and execute bids on behalf of Ericsson Inc. and Ericsson AB, and enabled Ericsson Inc.'s services and technologies to benefit Ericsson AB and LM Ericsson. LM Ericsson and Ericsson AB sold bundles of goods and services across the world, including in Iraq and Syria, and the services portion of those bundles was provided, in whole or in part, by Ericsson Inc. in the United States.

38. Ericsson's cross-functional teams were also responsible for assessing Ericsson's legal and compliance risks worldwide flowing out of extreme risk geographies like Iraq, including Defendants' anti-corruption and associated terrorist finance risks, technology- and diversion-related anti-terrorism risks, and overlapping corporate social responsibility portfolios, *e.g.*, sustainable development and corporate responsibility, in which these concerns were core considerations. On May 13, 2014, for example, LM Ericsson's Group Vice President of Sustainability and Corporate Responsibility, Elaine Weidman-Grunewald, explained how Ericsson Inc. in the United States and LM Ericsson in Sweden partnered closely with their respective divisions around the world through Ericsson's reliance upon cross-functional teams:

> When I set up [LM Ericsson's Sustainability and Corporate Responsibility Program], it was really important to me that key functions in the [C]ompany were part of it. So I didn't run it just as part of the corporate responsibility program. I really made sure over this two-year period that we had, for example, executives from our sourcing department, security, our government affairs, our different business units, sales and marketing, so we had cross-functional representation on the team. That was part of the business learning program. The whole idea … to running a sustainability function within a company is you have to integrate across the organization and into the relevant functions. I see my role as guiding that, but if sourcing doesn't run the responsible sourcing program or if the product lines don't run with the design from [the beginning], it won't really work. You can never get the scale or the impact having just a separate sustainability organization. That's not my goal. It's really about integration into the business.

39. Ericsson Inc. was essential to LM Ericsson's and Ericsson AB's ability to market their full-spectrum, turnkey network communications systems in the Middle East. Among other reasons, Ericsson Inc.'s personnel, expertise, products, and intellectual property holdings meant that it was impossible for LM Ericsson and Ericsson AB to service their customers in the Middle East without Ericsson Inc. For example, LM Ericsson's ability to market its radio base stations, including the RBS 6000, to customers in the Middle East depended upon LM Ericsson's access to Ericsson Inc.'s American technologies and services. Similarly, one of its contracts with Iraqi mobile provider Korek required ASR 9000 routers supplied by American manufacturer Cisco.

40. Ericsson Inc. was also essential to providing the bundled services that Ericsson AB marketed to its customers in the Middle East, including those in Iraq. On information and belief, given how LM Ericsson and Ericsson AB structured their service offerings to rely on Ericsson Inc. personnel in the United States as a core component of Defendants' "One Ericsson" strategy, LM Ericsson and Ericsson AB would not have been able to provide the turnkey offerings they provided to their Iraqi customers, as alleged in this complaint, without the services provided to LM Ericsson and Ericsson AB – and their end-point customers in Iraq – by Ericsson Inc.'s services personnel.

41. In light of LM Ericsson's written admission that all its subsidiaries operated as mere divisions of LM Ericsson, and not as independent entities, all the conduct here attributed to Ericsson AB, Ericsson Inc., or any other LM Ericsson subsidiary, was performed at the direction and for the benefit of, and is ultimately attributable to, LM Ericsson. All profits from LM Ericsson's subsidiaries ultimately flow to LM Ericsson.

## JURISDICTION AND VENUE

42. This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.

43. This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

44. Plaintiffs' claims arise under federal law — the Anti-Terrorism Act, 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act — and 18 U.S.C. § 2334(a) authorizes service of process upon a defendant in any district where that defendant resides, is found, or has an agent. Ericsson Inc. has an agent in this District. *See supra* ¶ 26. Ericsson AB has appointed Ericsson Inc. as its agent for service of process in the United States. *See supra* ¶ 27.

45. Ericsson AB and Telefonaktiebolaget LM Ericsson are each incorporated in the Kingdom of Sweden, with their principal places of business in Stockholm. *See supra* ¶¶ 25, 27. Neither is subject to the jurisdiction of the courts of general jurisdiction of any State of the United States. As to each of them, this Court's jurisdiction rests on Federal Rule of Civil Procedure 4(k)(2).

46. Each Defendant purposefully directed its conduct at the United States, and each has contacts with the United States as a whole more than sufficient to support the exercise of personal jurisdiction consistent with the Due Process Clause of the Fifth Amendment. Defendants' protection payments depended at every stage on American technology, American personnel, American banks and the American financial system, American legal protections, and a sustained corporate and lobbying presence in this District; and Defendants made those payments to organizations they knew would use them to attack Americans. *See infra* ¶¶ 453–484.

47. In enacting the Justice Against Sponsors of Terrorism Act, Congress found that persons and entities "that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts

of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." JASTA § 2(a)(6), Pub. L. No. 114-222, 130 Stat. 852, 852 (2016).

48. Venue is proper in this District under 18 U.S.C. § 2334(a) because Defendant Ericsson Inc. has an agent in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## SOURCING

49. The factual allegations that follow are based on an extensive investigation drawing on a broad array of public and non-public information, including, but not limited to:

**a.** evidence obtained from witnesses with direct and indirect knowledge of the alleged facts, including five (5) Confidential Witnesses;

**b.** LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, Ibrahim's and Ekholm's admissions, including, but not limited to, such admissions made in the DPA;

**c.** leaked internal LM Ericsson, Ericsson AB, and Ericsson Inc. company data;

**d.** LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, Ibrahim's and Ekholm's public and private statements, including emails and quotes memorialized by Ericsson investigators;

**e.** reports and recommendations by LM Ericsson's and Ericsson AB's compliance personnel;

**f.** declassified military and intelligence agency reporting;

**g.** U.S. diplomatic and military cables (as published online);

**h.** Congressional factfinding;

**i.** Executive branch public statements and reports to Congress;

**j.** United Nations and Financial Action Task Force ("FATF")[1] reports;

**k.** media accounts; and

**l.** Plaintiffs' recollections.

50. Plaintiffs' Confidential Witnesses have offered an array of first-hand perspectives on various aspects of the terrorist-financing scheme alleged below. Those witnesses include a former senior official employed by LM Ericsson and Ericsson AB with direct experience regarding Ericsson's enterprise-wide strategy to boost profits through illicit payments in high-risk jurisdictions; a former Ericsson Inc. employee with direct knowledge of Ericsson Inc.'s provision of essential support from the United States to LM Ericsson and Ericsson AB in the Middle East, including Iraq; a former U.S. official stationed in Iraq with direct knowledge of the smuggling routes and strategies relevant to Iraqi transportation routes in the post-Saddam era; a former security contractor who deployed to Iraq in 2003-2004 with the U.S. military and returned in 2006-2007 as a contractor; and a retired U.S. Army Colonel who deployed to Iraq in 2003-2004 and to Afghanistan in 2008 and concluded that Ericsson Inc. likely purchased protection from al-Qaeda in Afghanistan by directly transferring U.S.-origin communications technologies directly to al-Qaeda through a "dead drop" approach that eschewed the usual buffers that Defendants seek to interpose between Ericsson and the terrorists with whom they did business.

51. The following allegations are based in part on those witnesses' observations and recollections, corroborated by public and non-public documents and press reports.

[1] The FATF is an inter-governmental global money laundering and terrorist financing watchdog. It develops standards to ensure a coordinated global response to prevent organized crime, corruption and terrorism. *See* https://www.fatf-gafi.org/about/.

## FACTUAL ALLEGATIONS

### I. AL-QAEDA AND AL-QAEDA-IN-IRAQ COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST AMERICANS IN IRAQ, SYRIA, AND AFGHANISTAN AS PART OF AL-QAEDA'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST

52. Ericsson's conduct occurred against the backdrop of three decades of al-Qaeda history, during which al-Qaeda and its branches in Afghanistan, Iraq, Syria, and elsewhere perpetrated a globalized terrorist campaign in which such FTOs needed Defendants' money to kill and injure Americans. In this section, Plaintiffs describe that background, which is broken out into four eras: (1) 1992 through 2002, when al-Qaeda emerged as a threat and executed a series of attacks targeting Americans overseas and in the United States, culminating in 9/11 and the immediate American campaign in Afghanistan thereafter; (2) 2003 through 2007, when al-Qaeda focused its terrorist campaign on Iraq as the top theater in which to attack and kill Americans; (3) 2008 through 2013, when al-Qaeda greatly accelerated its terrorist campaign in Afghanistan; and (4) 2014 through 2022, when Islamic State emerged as an al-Qaeda splinter group and conducted its own globalized terrorist campaign targeting Americans in Iraq, Afghanistan, Syria, Europe, and Africa.

53. Defendants' payments supported acts of international terrorism that killed and injured Plaintiffs. In this section, Plaintiffs identify the terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them. Each worked in concert and shared resources, personnel, and operational plans.

54. In Iraq, due to the mutually reinforcing ties between al-Qaeda and al-Qaeda-in-Iraq, support for the one benefited the other. Defendants' protection payments to al-Qaeda and al-Qaeda-in-Iraq thus had crosscutting effects: they enabled wide-ranging terrorist attacks

against Americans in Iraq and Syria, executed mostly by al-Qaeda-in-Iraq in Iraq and Syria, but supported by (and sometimes jointly committed with) al-Qaeda.

55. In Afghanistan, al-Qaeda and its allies also coordinated, causing the U.S. government to conclude that the resulting terrorist superstructure was a "Syndicate" composed of al-Qaeda, the Taliban (including its Haqqani Network),[2] and other allied FTOs. Osama bin Laden himself conceived of al-Qaeda as the leader of a terrorist coalition, including the Taliban, across Pakistan and Afghanistan. Due to the mutually reinforcing ties between al-Qaeda and al-Qaeda-in-Iraq, on the one hand, and the Taliban, on the other, support for the one benefited the other. Defendants' protection payments to al-Qaeda and al-Qaeda-in-Iraq thus had crosscutting effects: they enabled wide-ranging terrorist attacks against Americans in Iraq, Afghanistan, Syria, and Turkey that were committed, planned, and/or authorized by al-Qaeda. (Islamic State followed this approach, as well, so Defendants' payments to Islamic State produced similar crosscutting effects on ISIS's capabilities in all three countries, as well as in Turkey and Africa.)

56. Each of the terrorist entities identified below used indiscriminate violence against American armed forces members serving in Iraq and Syria, as well as American civilians in Iraq, Syria, and Turkey, to achieve political ends. Their primary goal was to intimidate and coerce—using mass destruction, assassinations, and kidnapping—the U.S. government to withdraw its personnel from Iraq and Syria. The terrorists also sought to intimidate the elected and U.S.-recognized government of Iraq, and the government of Turkey, to, among other things, end their cooperation with the United States and help expel the United States from the region. Islamic State also used indiscriminate violence against civilians in Western Europe, including Americans

[2] The Haqqani Network has always been, and remains, a part of the Taliban. In this Complaint, all references to the "Taliban" include the Haqqani Network.

there, in order to coerce the European governments participating in the military campaign against Islamic State into abandoning it.

57. None of the terrorist entities involved in the attacks detailed herein adhered to the Geneva Conventions or the laws of war. Among other violations, they refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons. None was associated with a recognized government. None was waging a civil war, and none had a legitimate claim to sovereignty over Iraq, Syria, Turkey, Belgium, or Niger.

### A. Al-Qaeda Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East

58. Osama bin Laden established and operationalized al-Qaeda in the late 1980s. Ever since, al-Qaeda has been a global terrorist organization notoriously targeting Americans.[3]

59. From the early 1990s through approximately 1998, al-Qaeda was based primarily in Africa, where it developed its various economic theories and associated terrorist tradecraft, including operationalization of protection rackets and the leveraging of intermediaries to move money so as to evade detection and obfuscate the true parties-in-interest.

60. In 1996, bin Laden issued a *fatwa* authorizing attacks against Americans worldwide. In 1998, bin Laden issued another *fatwa*, in which he instructed al-Qaeda operatives "to kill the Americans and their allies – civilians and military," while commanding that this was "an individual duty for every Muslim who can do it in any country in which it is possible to do it." That same year, al-Qaeda committed simultaneous attacks targeting U.S. embassies in Kenya and Tanzania, which it facilitated through an array of cells around the world. Thereafter,

[3] Al-Qaeda translates as "the base" in Arabic. This name is a reference to bin Laden's vision of al-Qaeda serving as a consortium of allied jihadist groups under his leadership.

al-Qaeda relocated the bulk of its terrorists from Africa to camps in Afghanistan that al-Qaeda had established in 1996.

61. On October 8, 1999, the United States designated al-Qaeda as an FTO, and it has maintained that designation ever since.

62. In 2000, al-Qaeda committed an attack against the USS Cole, a U.S. Navy destroyer, while it was docked in Yemen, which attack al-Qaeda executed from its base in Afghanistan.

63. From its headquarters in Afghanistan, al-Qaeda planned and executed the September 11, 2001 terrorist attacks against the United States.

64. In the wake of the 9/11 attacks, the United States demanded that the Taliban stop harboring al-Qaeda and turn Osama bin Laden over to U.S. custody. The Taliban refused. Instead, eight days after 9/11, Taliban leader Mullah Omar issued an "Order" decreeing that "[a]ll the infidel powers of the world have united against the [Taliban]" and instructing Taliban mujahedin to be "ready" to "mak[e] sacrifices" to "defeat" the "infidel powers."

65. On October 7, 2001, the United States initiated Operation Enduring Freedom and invaded Afghanistan. The operation's purpose was to destroy the Taliban regime and degrade Afghanistan's utility as a base of operations for anti-American terrorists, including al-Qaeda.

66. U.S. forces quickly defeated the Taliban contingent in Kabul. By November 2001, the Taliban fled Kabul, and it abandoned Kandahar, its historical stronghold in southern Afghanistan, the following month. Rank-and-file Taliban fighters dispersed back into the countryside, while the Taliban leadership – including Mullah Omar – scattered with most taking refuge in Pakistan but some decamping to Iran and Iraq. One such al-Qaeda terrorist was Abu Musab al-Zarqawi, who had joined al-Qaeda in Afghanistan in the late 1990s.

67. In the decades after 9/11, al-Qaeda continued to wage its campaign of anti-U.S. terrorism, attacking Americans in Afghanistan, Iraq, Syria, and Turkey, in an effort to intimidate the United States into withdrawing from the Middle East.[4]

68. From the mid-2000s throughout the 2010s, al-Qaeda was ascendant in Afghanistan, Pakistan, Iraq, and Syria, and al-Qaeda's leadership in Afghanistan and Pakistan – which many people dubbed "al-Qaeda core" or "AQC"[5] – remained key to the funding, training, and logistics of its branches (like al-Qaeda-in-Iraq) and affiliates (like the Taliban).[6] Plaintiffs outline al-Qaeda's relevant history in this section.

69. Afghanistan and Iraq were the first two primary theaters of mass anti-American terror by al-Qaeda and its branches during the first decade after 9/11. In the second decade after 9/11, however, al-Qaeda and its branches expanded from Afghanistan and Iraq into Syria, among other places, following the same al-Qaeda playbook, using al-Qaeda's resources, and deploying al-Qaeda's personnel. Terrorists recruited into al-Qaeda's expanding branch network, including

---

[4] Bin Laden claimed, inter alia, that "[t]he American people [were] the ones who pa[id] the taxes which fund[ed] the planes that bomb [al-Qaeda] in Afghanistan, … and … Iraq."

[5] At all times, al-Qaeda comprised far more than simply al-Qaeda core. In this Complaint, references to "al-Qaeda" mean—consistent with the scope of the U.S.'s FTO designation—the entire network, while references to "al-Qaeda core" mean al-Qaeda's Afghanistan, Pakistan, and Iran-based senior leadership.

[6] Al-Qaeda's web of relationships are commonly described as "branches," "franchises," "affiliates," "alliances," and the like. As used in this Complaint, an al-Qaeda "branch" comprises another designated terrorist organization for which the leadership and members are formally part of al-Qaeda through, *inter alia*, their oath of loyalty to al-Qaeda and Osama bin Laden, and later, Ayman al-Zawahiri, and an al-Qaeda "affiliate" comprises another designated terrorist organization for which the leaders and members have closely integrated with al-Qaeda to the point of being fused, but have not formally pledged an oath of allegiance. Al-Qaeda-in-Iraq and Jabhat al-Nusra were al-Qaeda branches, while the Taliban (including its Haqqani Network) were al-Qaeda affiliates. Even then, however, al-Qaeda's intricate terrorist superstructure included additional overlap points. For example, it was not uncommon for terrorists who served an al-Qaeda affiliate to be members of al-Qaeda itself, even if the broader organization had not sworn an oath to al-Qaeda. For example, Sirajuddin Haqqani was both a sworn member of al-Qaeda and a leader of an al-Qaeda affiliate (the Taliban).

in Syria, ultimately became part of al-Qaeda, taking an oath of allegiance to it, which al-Qaeda accepted. Although there is substantial temporal overlap, Plaintiffs address Iraq and Syria in that order, roughly tracing the explosion of protection money strategies across all al-Qaeda-affiliated terrorist groups, which began in the mid-2000s.

70. In Afghanistan and Pakistan, al-Qaeda and the Taliban, including its Haqqani Network, operated as part of an al-Qaeda-led "Syndicate" of terrorists, working in Afghanistan and Pakistan as joint venture partners sharing the common purpose of conducting terrorist attacks against Americans to expel the United States from Afghanistan.

71. In December 2001, the United Nations passed Resolution 1386, authorizing the International Security Assistance Force ("ISAF," often called the "Coalition"), whose mandate was to assist the newly formed Afghan government in rebuilding the country.

72. From late 2001 through late 2002, al-Qaeda relocated most of its leadership to Pakistan, Iran, and Iraq, and was busy planning long-term terrorist campaigns against America in Afghanistan and Iraq, which al-Qaeda correctly anticipated the United States would invade.

73. As 2003 began, al-Qaeda viewed its campaigns in Iraq and Afghanistan as linked in the following two primary objectives. *First*, reconstitute al-Qaeda's leadership outside of the areas within Afghanistan that were vulnerable to immediate attack by America, and help the Taliban regenerate itself as an anti-American terrorist group based in Pakistan, so that al-Qaeda would have a reliable haven from which to plan and facilitate terrorist attacks against Americans throughout the Middle East. *Second*, prepare for, and eventually launch, a new terrorist campaign against Americans in Iraq. Both goals dominated al-Qaeda strategy from 2003 through 2007.

74. With respect to Afghanistan, in 2003, Mullah Omar formed the Quetta Shura, a leadership council that functioned as the Taliban's governing body. Thereafter, the Taliban regenerated as a deadly terrorist group intent on expelling the United States from Afghanistan, overthrowing the U.S.-backed and recognized government of Afghanistan, and re-establishing Islamist rule.

75. With respect to Iraq, in early 2003, al-Qaeda anticipated the U.S. invasion of Iraq and prepared for Iraq's emergence as a primary theater for al-Qaeda's anti-American jihad. Even though al-Qaeda and its ally the Taliban would successfully rebuild themselves by 2005-2006 into a formidable terrorist threat to Americans in Afghanistan, al-Qaeda core's attention was also substantially focused on Iraq in 2003 because it believed—by virtue of the rapid growth in American troop presence there—Iraq was the theater that offered al-Qaeda the best opportunity to attack and kill Americans *en masse* from 2003 through 2007.

76. On March 19, 2003, the United States invaded Iraq. U.S. troops seized control of Baghdad within weeks, and on April 9, 2003, Saddam Hussein's government fell. Shortly thereafter, the Coalition Provisional Authority ("CPA") began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

77. Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003. After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function. American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy.

78. As it did in Afghanistan, al-Qaeda responded to America's involvement in Iraq with a campaign of terror that leveraged al-Qaeda core's expertise, funds, logistics, and financial management skills with local al-Qaeda branches' fighters and funding streams, through a

continuous two-way carousel of terrorist value flow between al-Qaeda core in Afghanistan and Pakistan, and al-Qaeda's branches in Afghanistan, Iraq, and Syria.

79. Al-Qaeda built its campaign of anti-American terror in Iraq in three primary ways. First, al-Qaeda unleashed a flood of propaganda and *fatwas* calling for violent attacks on Americans in Iraq. Second, al-Qaeda relied upon a secret agreement it had with the Islamic Revolutionary Guard Corps ("IRGC") to secure a direct land corridor, through Iran, that connected Iraq and al-Qaeda's sanctuaries in Afghanistan and Pakistan. Third, al-Qaeda intensified its support for its eventual Iraqi branch led by Zarqawi.

80. Al-Qaeda spent most of 2003 building up its presence inside Iraq, with a focus on indoctrination, propaganda, recruiting, operationalizing the Sunni insurgency, and the development of the illicit networks necessary to smuggle terrorists, money, and weapons into Iraq to attack Americans there. On April 25, 2003, al-Qaeda issued a *fatwa* that declared jihad in Iraq and called on all pious Muslims to help attack and kill Americans there. In the summer of 2003, Zarqawi directly communicated to Osama bin Laden and Ayman al-Zawahiri in writing that Zarqawi's group in Iraq wished to be officially designated as "al-Qaeda-in-Iraq." In that message, Zarqawi described a new terrorist force to attack the United States under al-Qaeda's banner and led in-country by Zarqawi. Zarqawi asserted that his terrorist campaign against the U.S. in Iraq was the real "field of jihad" and sought bin Laden's blessing for an expanded terrorist campaign against Americans in Iraq and throughout the Middle East. Zarqawi therefore requested al-Qaeda core's strategic aid in Iraq. By late 2003, Sunni jihadist networks throughout Iraq were nesting their operational-level activities under the ideological, strategic, and financial umbrella of al-Qaeda, which flowed a river of aid to the nascent Sunni insurgency.

81. On or about November 2003, Osama bin Laden personally approved al-Qaeda's direct role in funding Sunni terrorists in Iraq, when he authorized regular monthly payments of $1.5 million, ordinarily denominated in U.S. dollars, to finance the leadership cells and "start-up" costs of al-Qaeda affiliated terrorists in Iraq. Al-Qaeda continued making such payments to al-Qaeda's terrorist allies in Iraq throughout bin Laden's tenure, and on information and belief, al-Qaeda continued making regular payments of a similar amount to al-Qaeda-in-Iraq until the latter split from al-Qaeda in 2014, which payments were at all relevant times supervised by senior personnel from al-Qaeda "core" in Afghanistan and Pakistan.

82. By late 2003, al-Qaeda had established a deadly Sunni terrorist insurgency against Americans in Iraq, every member organization of which was an al-Qaeda-affiliated U.S.-government-designated FTO, which al-Qaeda led alongside Zarqawi.

83. From 2004 onward, al-Qaeda remained a persistent threat in Iraq while vastly expanding its activities in Afghanistan and Syria. By then, Zarqawi had more than 1,000 well-trained terrorists under his command throughout Iraq. While his coalition of Sunni terrorists conducted attacks throughout Iraq, their primary area of operations were: (a) the Sunni Triangle, a central Iraqi region traced by Tikrit in the north, Ramadi in the southwest, and Baghdad in the southeast; (b) northern Iraq, including Mosul and Kirkuk, which sat astride key facilitation routes used by al-Qaeda and al-Qaeda-in-Iraq; and (c) the Iraqi/Syrian border, which al-Qaeda and al-Qaeda-in-Iraq cultivated as part of their network to move foreign fighters from dozens of countries into Iraq, who often entered Iraq via Syria.

84. In a January 2004 letter to al-Qaeda attributed to Zarqawi by the U.S. government, Zarqawi asked for al-Qaeda's expanded aid and support for his terrorist campaign against Americans in Iraq, and wrote:

> We need to create armies of mujahidin … to fight the enemy—the Americans … We are continuing to train ourselves and strengthen our ranks. We will strike at them with suicide operations and car bombs. … If you are of the same opinion, if you adopt it as your program, … and you are convinced by the idea of fighting the infidels, we will be your soldiers, under your banner, obeying your orders …

85. Powered in substantial part by the reliable, potent, and hard-to-trace U.S. dollars afforded to al-Qaeda by its protection rackets in Iraq, al-Qaeda launched a devastating terrorist campaign in Iraq in 2004 that was designed to expel America from Iraq and the Middle East, which al-Qaeda and its branches have pursued ever since.

86. In the spring of 2004, al-Qaeda further escalated its support for the Sunni terrorist insurgency in Iraq from its safe havens in Iran, Afghanistan, and Pakistan. On March 24, 2004, al-Qaeda called for Muslims "to take part in jihad against the United States in Iraq."

87. In April 2004, Zarqawi led a large group of terrorists against American forces in Fallujah, Iraq. In so doing, he quickly became the face of the Sunni insurgency in Iraq, which enabled him to rapidly scale up al-Qaeda's enterprise there. Boasting about his ability to transit between Iran, Iraq, and Syria in support of his attacks against Americans there, on May 25, 2004, Zarqawi declared: "I am global, and no land is my country."

88. By late 2004, al-Qaeda-in-Iraq had effectively seized Ninewa and Anbar provinces and was conducting attacks throughout Iraq. Even when Coalition forces experienced success in one area, *e.g.*, Fallujah, al-Qaeda-in-Iraq's resources allowed the group to seamlessly reconstitute its headquarters elsewhere. In late 2004, for example, al-Qaeda surged in Mosul in response to U.S. pressure on the terrorists in Fallujah.

89. In October 2004, the United States launched a concerted campaign against al-Qaeda's presence in Iraq that focused on Zarqawi and his network.

90. On October 15, 2004, the United States designated al-Qaeda-in-Iraq as a Specially Designated Global Terrorist ("SDGT"), and it has maintained that designation ever since. The next day, the U.S. military launched a major counterterrorism campaign against al-Qaeda in its Fallujah stronghold in Anbar Province.

91. On October 17, 2004 – the day after the start of the comprehensive American campaign to oust al-Qaeda from Fallujah – Zarqawi's group, Tawhid wal Jihad, publicly declared that it was joining al-Qaeda in order to coordinate the Sunni terrorist campaign against Americans in Iraq under one in-theater leader, a "prince," (i.e., Zarqawi) who was acting on behalf of, and supported by, al-Qaeda's *emir* (i.e., bin Laden), to whom al-Qaeda-in-Iraq and each al-Qaeda-in-Iraq operative swore an oath of loyalty (the *bayat*). Zarqawi did so in a boldly titled public oath, entitled "The Tawhid wal Jihad Movement, its Emir [Zarqawi], and its Fighters Have Joined the Cause of al-Qaeda and Sworn Allegiance to Sheikh Osama bin Laden," in which Zarqawi declared, "We announce that Tawhid and Jihad, its princes and soldiers, have pledged allegiance to the leader of the mujahedin, Osama bin Laden," and he signed "Abu Musab Al-Zarqawi, commander of the Tawhid wal Jihad movement." Unambiguously and publicly confirming Tawhid wal Jihad's status as an al-Qaeda affiliate, Zarqawi announced that Tawhid wal Jihad would now be known as "al-Qaeda in the Land of Two Rivers," i.e., al-Qaeda-in-Iraq.[7] Zarqawi's declaration recognized bin Laden's authority, publicly embraced al-Qaeda's

[7] This was Zarqawi's second loyalty oath to al-Qaeda, because he was already a long-standing member of al-Qaeda who had sworn fealty to bin Laden, and Tawhid wal Jihad was already al-Qaeda's widely recognized affiliate in Iraq. The date chosen for the announcement, however, demonstrated the tight nexus between al-Qaeda and al-Qaeda-in-Iraq with respect to Sunni extremists' efforts to rally against the U.S. presence in Iraq.

terrorist campaign against Americans in Iraq, and urged all others to do so.[8] That same day, bin Laden formally accepted Zarqawi's and al-Qaeda-in-Iraq's public declaration of fealty and commitment to al-Qaeda's global organization. In his acceptance announcement, bin Laden's first directive to his new branch in Iraq was to grow al-Qaeda's presence in Iraq while partnering with local Iraqis: "My greatest wish is for you to keep the resistance alive and growing, to increase the number of local Insurgents and give the Iraqis more decision-making powers."

92. Zarqawi's and bin Laden's public proclamations on October 17, 2004 formally merged al-Qaeda with al-Qaeda-in-Iraq, through a relationship in which the latter was a branch of the former. Such status endured until al-Qaeda-in-Iraq's departure from al-Qaeda in February 2014. Though al-Qaeda-in-Iraq had many brandings over time,[9] it was one organization – Iraq's al-Qaeda branch – and pursued a consistent mission at all times between October 2004 and February 2014: support the terrorist campaign against America led by al-Qaeda, including its emir, by targeting Americans in Iraq and Syria and facilitating al-Qaeda operations in Afghanistan and Pakistan for the purpose of permitting al-Qaeda to create a "jihad wave"

[8] Zarqawi's declaration provided: "O Sheikh of the mujahidin, if you cross the sea, we shall cross it with you. If you give orders, we shall listen; if you forbid, we shall obey. You are the designated leader for the armies of Islam against all infidels, Crusaders, and apostates."

[9] Zarqawi's al-Qaeda branch has had various names since its creation, including Tawhid wal Jihad, aka al-Tawhid & al-Jihad (from inception to October 2004), al-Qaeda in the Land of Two Rivers, aka al-Qaeda-in-Iraq (from October 2004 through January 2006), the Mujahideen Shura Council (from January 2006 through October 2006), the Islamic State of Iraq (from October 2006 through April 2013), Islamic State in Iraq and Syria, aka ISIS, aka Islamic State in Iraq and the Levant, aka ISIL (from April 2013 through June 2014) and finally the Islamic State (from June 2014 through present). While the names changed, at all relevant times, the organization built by Zarqawi with Iran's backing pursued attacks against Americans in Iraq. In this Complaint, Plaintiffs collectively refer to all such groups, prior to al-Qaeda's split from ISIS in February 2014, as "al-Qaeda-in-Iraq" or "AQI" and Plaintiffs refer to the group post-February 2014 split as "Islamic State," "ISIS," or "ISIL."

stretching from Afghanistan to Iraq that would support an al-Qaeda-led caliphate that would grow throughout the Middle East, including Afghanistan, Iraq, and Syria.

93. Al-Qaeda's merger with al-Qaeda-in-Iraq was mutually beneficial. For al-Qaeda core and its leader bin Laden, al-Qaeda-in-Iraq was immediately the most active and violent branch of al-Qaeda's global franchise, and by late 2004, bin Laden had determined that Iraq should be a central front of al-Qaeda's terrorist campaign against Americans in the Middle East. Zarqawi concurred regarding the centrality of Iraq to al-Qaeda's terrorist campaign against Americans in the Middle East and declared, in the fall of 2004: "The spark has been lit here in Iraq and its heat will continue to intensify—by Allah's permission—until it burns the Crusader Armies in Dabiq." By referencing Dabiq, Zarqawi explicitly connected al-Qaeda's terrorist campaign against the United States in Iraq with a global conflict against America through which Islam would triumph over the West in Armageddon.

94. From late 2004 through 2014, al-Qaeda-in-Iraq deployed a vast network of terrorists throughout Iraq, which was estimated at approximately 15,000 members. A substantial percentage of its members were foreign fighters who came from outside Iraq and often had prior relationships, experience, training, or indoctrination with or from al-Qaeda core, which always sourced terrorist talent for al-Qaeda-in-Iraq until their split in 2014.

95. Al-Qaeda-in-Iraq maintained notorious strongholds in Anbar province in Western Iraq and Ninewa Province in northern Iraq, including their respective capitals, Ramadi and Mosul. For example, the U.S. government described Mosul as the "strategic center of gravity" for al-Qaeda-in-Iraq, and one senior commander of U.S. forces observed that "If AQI had a Pentagon, it would be in Mosul."

96. Al-Qaeda-in-Iraq also maintained large cells throughout Iraq, which were in each instance commanded by hand-selected Zarqawi lieutenants, including in Baghdad (Umar Bazyani), northern Iraq (Husain Salim), and Anbar (Abu Azzam Abdallah). Zarqawi also prioritized building cells at key transport and smuggling nodes for al-Qaeda and al-Qaeda-in-Iraq and stood up al-Qaeda-in-Iraq cells in an array of other Iraqi cities and provinces including Samarra (on the approach to Baghdad), Diyala (near the border with Iran, and a critical waypoint on the road to Lebanon), and al-Qaim (on the border of Syria).

97. Like other al-Qaeda branches, al-Qaeda-in-Iraq relied upon a hierarchical organization in which there was both top-down leadership as well as local initiative headed by provincial leaders in order to conduct terrorist operations throughout Iraq.

98. Al-Qaeda-in-Iraq modeled al-Qaeda's corporate approach, including al-Qaeda's reliance upon top-down bureaucracies to manage the terrorist finances, logistics, recruiting, and communications of al-Qaeda and al-Qaeda-in-Iraq terrorists as a precursor to al-Qaeda's desired global caliphate. Like its parent al-Qaeda, al-Qaeda-in-Iraq also maintained detailed corporate structures, bylaws, committees, and the like, who, in turn, used al-Qaeda-in-Iraq letterhead, forms, receipts, and permission slips.

99. Al-Qaeda-in-Iraq operated provincial shadow governments that roughly tracked the provincial structure of the Iraqi government. Al-Qaeda-in-Iraq divided each province into geographic sectors, each of which had an administrator who oversaw smaller highly bureaucratized operational units, such as "brigades," "battalions," or "groups."

100. Al-Qaeda-in-Iraq organized its bureaucracy similarly at the province and sector levels, both of which relied upon administrative emirs who operationalized its cross-cutting

terrorist logistics, finance, and attack planning needs, including bureaucracies governing "movement and maintenance," "legal," "military," "security," "medical," "spoils," and "media."

101. At all times, al-Qaeda-in-Iraq relied upon the same al-Qaeda-designed corporate structures, including an array of committees governing the group's media, terrorist attack planning, and financial affairs. Through its emulation of al-Qaeda's model, al-Qaeda-in-Iraq also, among other things, paid salaries to its members, provided comprehensive training to its recruits, had detailed expense reimbursement processes, and required prospective members or guests to fill out a detailed application form before joining.

102. Through al-Qaeda-in-Iraq's emulation of al-Qaeda's organizational approach, al-Qaeda-in-Iraq ensured that funds raised in one part of Iraq could be redeployed to other parts of Iraq, or facilitate the flow of al-Qaeda and al-Qaeda-in-Iraq terrorists between Iraq, Syria, Iran, and other Persian Gulf countries from 2004 through 2014.

103. Through al-Qaeda-in-Iraq's emulation of al-Qaeda's organizational approach, al-Qaeda-in-Iraq relied upon local fundraising schemes, including protection rackets, as a key source of funding for operations in Iraq and Syria, and flowing money, fighters, and logistical aid to al-Qaeda in Afghanistan, Pakistan, Iran, and the Persian Gulf from 2004 through 2014.

104. On December 17, 2004, the U.S. State Department designated al-Qaeda-in-Iraq as an FTO, and it has maintained that designation ever since.

105. By the start of 2005, al-Qaeda-in-Iraq had cemented al-Qaeda's control over the Sunni insurgency targeting Americans in Iraq. This represented a tectonic shift in the Sunni insurgency, which was dominated thereafter by al-Qaeda-linked terrorists, often non-Iraqi Arabs who served as polyterrorists for al-Qaeda core and al-Qaeda-in-Iraq under bin Laden's franchise model.

106. In June 2005, al-Qaeda core transmitted instructions to Zarqawi concerning the overall goals of the Iraqi campaign and means to achieve them. Al-Qaeda emphasized two points above all. *First*, Iraq remained central to al-Qaeda's global strategy, and al-Qaeda core's instruction to al-Qaeda-in-Iraq was to continue to focus on reestablishing the caliphate in Iraq; as al-Qaeda core put it: "The victory of Islam will never take place until a Muslim state is established in the manner of the Prophet in the heart of the Islamic world, specifically in the Levant, Egypt, and the neighboring states of the Peninsula and Iraq." *Second*, al-Qaeda-in-Iraq's primary goal was to expel the United States from Iraq and the Middle East.

107. In July 2005, Zarqawi transmitted a detailed four-phase plan to al-Qaeda core in Afghanistan and Pakistan. Phase One was to expel the United States from Iraq. Phase Two was to develop an Islamic Emirate of Iraq to the point that al-Qaeda could declare a caliphate. Phase Three was to extend al-Qaeda's "jihad wave" to the other countries of the Middle East, including Afghanistan. And Phase Four was to initiate a direct clash with Israel.

108. Throughout 2005, al-Qaeda-in-Iraq expanded its suicide bombing networks in Iraq (and the broader Middle East, which supported it) side-by-side with the growth of its protection rackets in Iraq. Most of al-Qaeda-in-Iraq's suicide bombers were foreigners, usually Arabs, who were often personally selected by Zarqawi for their dedication to al-Qaeda's mission. Al-Qaeda-in-Iraq followed al-Qaeda's suicide bombing playbook, including al-Qaeda's tactic of having suicide bombers officially join the organization prior to the attack as a means of cementing their psychological commitment to what al-Qaeda terms its "martyrdom operations."

109. Ascendant throughout Iraq, al-Qaeda-in-Iraq leaders met in May 2006 to finalize their plans to establish a caliphate over several provinces in Iraq, including Anbar, Salahuddin, Diyala, and Ninewa provinces. At this meeting, Zarqawi instructed his al-Qaeda-in-Iraq

subordinates to communicate to their cells that all agents of the United States were to be killed immediately without prior approval from their superiors. The meeting ended with Zarqawi distributing cash payments, denominated in U.S. dollars, ranging from $500 to $10,000 to selected lieutenants, to finance their attacks.

110. Zarqawi did not live to see his caliphate. On June 7, 2006, American forces killed Zarqawi in an airstrike on an al-Qaeda-in-Iraq safehouse in Diyala Province.

111. Al-Qaeda quickly designated al-Qaeda polyterrorist (and Zawahiri lieutenant) Abu Ayyub al-Masri as Zarqawi's successor and leader of al-Qaeda-in-Iraq. Masri's rapid succession permitted al-Qaeda-in-Iraq to continue its advance across Iraq without skipping a beat (despite Zarqawi's righteous demise).

112. Indeed, by late 2006, al-Qaeda-in-Iraq was more powerful than ever and committing more – and more lethal – attacks against Americans throughout Iraq.

113. On October 12, 2006, al-Qaeda rebranded al-Qaeda-in-Iraq as the Islamic State of Iraq (or "ISI"), for which it announced a purported cabinet and governance structure, and claimed authority over the provinces of Anbar, Baghdad, Diyala, Kirkuk, Salah al-Din, and Ninewa, as well as parts of Babil and Wasit provinces. This announcement, fully supported by al-Qaeda core, was the first time any al-Qaeda affiliate had openly declared territorial control, and the elevation of Abu Omar al-Baghdadi to its leadership gave al-Qaeda-in-Iraq's leadership a partial Iraqi face (while al-Qaeda-in-Iraq's leader, Masri, was Egyptian, Abu Omar al-Baghdadi was Iraqi).

114. By the end of 2006, al-Qaeda-in-Iraq so dominated the Sunni insurgency that most of the remaining Sunni groups were assimilated into al-Qaeda-in-Iraq or, at a minimum,

compelled to facilitate al-Qaeda-in-Iraq attacks against Americans even if they remained nominally outside of the group.

115. Al-Qaeda's resurgence in Iraq also coincided with its renewal in Afghanistan and Pakistan. By early 2006, al-Qaeda and a rebuilt Taliban began staging terrorist attacks on American forces there with increasing frequency. These two developments created a vicious feedback loop, in which al-Qaeda-affiliated terrorists could fund, staff, and supply one another's attacks from their respective havens in Iraq, Iran, Afghanistan, and Pakistan.

116. By the start of 2007, the U.S. government recognized that al-Qaeda's presence in Iraq had grown so extensive as to threaten the viability of the reconstructed Iraqi state.

117. In February 2007, the U.S. "surged" tens of thousands of additional American personnel into Iraq to halt the explosive growth of al-Qaeda-in-Iraq. This was accompanied by a string of statements in which senior U.S. officials repeatedly identified al-Qaeda-in-Iraq as the driving force of the anti-American insurgency there. On February 27, 2007, the Director of the Defense Intelligence Agency, Lieutenant General Michael Maples, publicly characterized al-Qaeda-in-Iraq as "the largest and most active of the Iraq-based terrorist groups." On April 26, 2007, the top American commander in Iraq, General David Petraeus, called al-Qaeda-in-Iraq "probably public enemy number one." On July 12, 2007, the U.S. military spokesman in Iraq, Brigadier General Kevin Bergner, observed that AQI was responsible for 80% to 90% of suicide attacks, and stated that defeating AQI was a focus of U.S. operations.

118. From the start of the surge in early 2007, al-Qaeda-in-Iraq experienced meaningful pressure across multiple fronts in Iraq for the first time in its existence. As such, al-Qaeda and al-Qaeda-in-Iraq terrorists operated along two tracks in which some continued the

assault in Iraq, while others redeployed from Iraq to al-Qaeda's havens along the Afghanistan/Pakistan border.

119. At the same time, al-Qaeda core in Afghanistan had spent years patiently rebuilding itself, and its Taliban proxy, and stood poised to dramatically intensify its terrorist campaign in Afghanistan and Pakistan in 2007. These parallel dynamics meant that al-Qaeda had a ready-made safety valve for its al-Qaeda-in-Iraq terrorists if they needed to flee American forces in Iraq – the haven afforded to al-Qaeda "core" by the Taliban in Afghanistan and Pakistan. Indeed, starting in 2007 and continuing until 2014, al-Qaeda-in-Iraq terrorists flowed back to al-Qaeda's traditional havens in Afghanistan and Pakistan, where they joined al-Qaeda's pre-existing joint cells in Afghanistan or its training and bomb-making camps in Pakistan.

120. But in Iraq, throughout 2007, al-Qaeda-in-Iraq focused on accelerating its wave of terror across Iraq even while many of its terrorists also melted back to Afghanistan and Pakistan, and prioritized attacks against Americans in Ninewa Province (where al-Qaeda-in-Iraq sought to secure Mosul as its long-term base of operations), Anbar and Salah al-Din Provinces (which served as al-Qaeda-in-Iraq strongholds and key transit points), Diyala Province (which was an al-Qaeda-in-Iraq stronghold that keyed its national logistics chain as well as its ability to attack Baghdad), and Baghdad Province (which was a focal point of al-Qaeda-in-Iraq's "spectacular" attacks).

121. By fall 2007, the U.S. military's surge had begun to show success against al-Qaeda-in-Iraq, putting pressure on al-Qaeda-in-Iraq in Anbar Province and the belts around Baghdad upon which al-Qaeda-in-Iraq relied to attack Americans in Iraq's capital. These developments alarmed al-Qaeda "core" in Afghanistan and Pakistan, which viewed the attacks in Iraq as one of the centerpieces of their global campaign against America. As al-Qaeda-in-Iraq's

fighters began coming under pressure from both American forces and their allied Iraqi counterparts during the period known as the "Awakening," al-Qaeda core began plotting to secure the services of as many al-Qaeda fighters whom the core had "seconded" to al-Qaeda-in-Iraq as possible while simultaneously redoubling their support for al-Qaeda-in-Iraq.

122. Al-Qaeda and al-Qaeda-in-Iraq continued al-Qaeda's terrorist campaign against Americans in Iraq and Syria from 2008 through al-Qaeda-in-Iraq's split with al-Qaeda in February 2014, and continued to always support al-Qaeda's campaign against Americans in Afghanistan.

123. In 2009, al-Qaeda-in-Iraq leader Masri declared that "large, courageous, and targeted operations are necessary to break the bones of the infidels" (i.e., Americans) in Iraq. On June 30, 2009, Multi-National Force-Iraq withdrew from Iraqi cities as part of the plan for the eventual departure of most U.S. forces from Iraq. In response, al-Qaeda-in-Iraq launched a new wave of spectacular attacks throughout the rest of 2009 designed to show continued nationwide threat posed by al-Qaeda-in-Iraq while simultaneously advancing al-Qaeda's strategic narrative (for fundraisers and recruits) that al-Qaeda and al-Qaeda-in-Iraq were victoriously forcing America out of Iraq. Al-Qaeda's and al-Qaeda-in-Iraq's nationwide bombing campaign throughout 2009 showed to all that both FTOs remained potent threats to Western interests and businesses in Iraq, including the Iraqi companies they subcontracted. During this time, al-Qaeda and al-Qaeda-in-Iraq continued to boast thousands of terrorist operatives inside Iraq, who continued their terrorist campaign throughout the country.

124. The pace of al-Qaeda-in-Iraq's terrorist campaign increased throughout 2010.

125. Indeed, by 2010, every metric confirmed that al-Qaeda was far stronger than it had been when it executed its attacks on 9/11, principally because of the financial, operational,

logistical, training, and safe havens it derived from the interplay between al-Qaeda core in Afghanistan and Pakistan and al-Qaeda's key branches like al-Qaeda-in-Iraq, which facilitated a regular flow of fighters, logistical aid, funds, training, and other key aid to al-Qaeda core and, through al-Qaeda core, to other al-Qaeda affiliates, like the Taliban.

126. On April 19, 2010, Coalition forces killed al-Qaeda's and al-Qaeda-in-Iraq's top two leaders in Iraq, the polyterrorists Masri and Abu Omar al-Baghdadi. Then-Vice President Joe Biden observed at the time that "[t]heir deaths [were] potentially devastating blows to al Qaeda Iraq." After Masri was killed, he was succeeded by al-Qaeda and al-Qaeda-in-Iraq operative Abu Bakr al-Baghdadi al-Husseini al-Qurashi (commonly known as Abu Bakr al-Baghdadi), who led al-Qaeda-in-Iraq thereafter.

127. Al-Qaeda continued its dominance of al-Qaeda-in-Iraq's leadership after Masri and Abu Omar al-Baghdadi were taken out on April 9, 2010, when al-Qaeda installed another senior al-Qaeda core terrorist into al-Qaeda-in-Iraq's command structure by appointing longstanding bin Laden lieutenant Nu'man Salman Mansur al-Zaydi as al-Qaeda-in-Iraq's "Minister of War" for Iraq. In this role, Zaydi was effectively the number 2 al-Qaeda-in-Iraq terrorist, behind only Abu Bakr al-Baghdadi.

128. As of late 2010, al-Qaeda and al-Qaeda-in-Iraq endured in Iraq through their strongholds in Ninewa Province, from which the terrorists continued to successfully threaten and attack Americans throughout much of Iraq, including Ninewa, Anbar, Baghdad, and Diyala.

129. Al-Qaeda's fortunes in Iraq, and those of its affiliate there, further improved in 2011. In the spring of 2011, civil war erupted in Syria. This afforded al-Qaeda and al-Qaeda-in-Iraq an expanded chessboard. While Syria had long been a haven for al-Qaeda and al-Qaeda-in-Iraq (owing to the Assad regime's calculated embrace of both groups in an effort to help kill

Americans in Iraq), the Syrian geographies available to them were somewhat limited. From 2011 onward, however, the map expanded greatly for al-Qaeda and al-Qaeda-in-Iraq, which sought to rapidly grow into the void created by the violence.

130. In mid-2011, al-Qaeda instructed al-Qaeda-in-Iraq to establish an al-Qaeda/al-Qaeda-in-Iraq affiliate in Syria. Following al-Qaeda's instruction, al-Qaeda-in-Iraq supplied its resources, terrorists, and logistical networks in support of the creation of a new al-Qaeda affiliate in Syria, which the terrorists named Jabhat al-Nusra, meaning the "Victory Front." Among other things, al-Qaeda-in-Iraq leader Abu Bakr al-Baghdadi personally appointed al-Qaeda-in-Iraq terrorist, Abu Mohammad al-Jolani, as head of Jabhat al-Nusra.

131. In so doing, al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra relied upon the same al-Qaeda-crafted protection money playbook and strategies, al-Qaeda-designed organizational and management practices, and often even the same "polyterrorist" operatives who were simultaneously members of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra.

132. From 2011 through 2013, al-Qaeda-in-Iraq resumed its expansion across Iraq and Syria and boasted thousands of terrorist operatives dedicated to facilitating al-Qaeda's and al-Qaeda-in-Iraq's terrorist campaign against Americans in the Middle East.

133. In 2013, al-Qaeda and al-Qaeda-in-Iraq rebranded al-Qaeda-in-Iraq (which they began interchangeably calling "Islamic State of Iraq" in 2006) as Islamic State in Iraq and Syria (or "ISIS") or Islamic State in Iraq and the Levant (or "ISIL"). Specifically, on April 8, 2013, al-Qaeda and al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi announced that Islamic State in Iraq (i.e., al-Qaeda-in-Iraq) had merged with al-Qaeda's and al-Qaeda-in-Iraq's Syrian affiliate, Jabhat al-Nusra, and formed Islamic State of Iraq and Syria.

134. Even after being rebranded as ISIS (and publicly referring to itself as both ISIS and ISIL interchangeably), al-Qaeda-in-Iraq continued to be al-Qaeda's branch in Iraq until on or about February 2014, when al-Qaeda and ISIS formally separated. The following day, Abu Mohammed al-Jolani, the leader of Jabhat al-Nusra, rejected Baghdadi's announcement as premature, while professing Jabhat al-Nusra's continued fealty to al-Qaeda, which Jolani invited to mediate the dispute.

135. For the remainder of 2013, al-Qaeda core, led by Zawahiri and his lieutenants, attempted to mediate the disagreement between Baghdadi and Jolani. While al-Qaeda core was doing so, a substantial number of Jabhat al-Nusra terrorists joined al-Qaeda-in-Iraq.

136. Despite their disagreements, al-Qaeda-in-Iraq and Jabhat al-Nusra continued to closely cooperate on tactical matters in Iraq and Syria throughout 2013.

137. By the end of 2013, Western and Iraqi analysts were publicly and privately observing how al-Qaeda-in-Iraq had successfully regrouped into a terrorist force that was larger, more capable, and more threatening to the United States than it had been between 2003 and 2007. Among other concerns, such analysts often warned that: (1) al-Qaeda-in-Iraq's renewed strength could spill over beyond Iraq and further aid al-Qaeda attacks against Americans throughout the region, including in Syria and Afghanistan, based upon al-Qaeda's cross-pollination model; (2) al-Qaeda-in-Iraq's terrorist campaign could threaten Americans throughout Iraq with attacks that were more lethal and sophisticated than before; and (3) stakeholders should assume al-Qaeda-in-Iraq would continue growing, and that such growth would continue to fuel violence by other al-Qaeda branches (like al-Qaeda core) and affiliates (like the Taliban) around the world. All three warnings were correct on the merits and widely shared views amongst Western and Iraqi businesses, officials, media, and NGOs in Iraq.

138. By the end of 2013, al-Qaeda was ascendant in Afghanistan, Pakistan, Iraq, and Syria, and al-Qaeda core provided key funding, training, and logistical aid to its branches and affiliates. Indeed, its branch in Iraq, al-Qaeda-in-Iraq, ended the year by seizing Fallujah.

139. As 2014 began, al-Qaeda-in-Iraq was on the march in Iraq and Syria, having freshly seized most of Anbar Province, while moving forward to attempting a complete takeover of Ninewa Province (already an al-Qaeda-in-Iraq stronghold at the time). In January 2014, al-Qaeda-in-Iraq complemented its December 2013 seizure of Fallujah by seizing a comparable target in Syria, the city of Raqqa, which al-Qaeda-in-Iraq declared to be its capital upon seizure. In February 2014, al-Qaeda-in-Iraq split with al-Qaeda and rebranded itself as the "Islamic State."

### B. Al-Qaeda Comprised A Globally Integrated Terror Network That Relied Upon A Cooperative, Corporate Model Internally And With Other Allied Foreign Terrorist Organizations To Facilitate Its Terrorist Campaign Against The United States

140. Al-Qaeda's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, al-Qaeda's: (1) integrated global network, which disregarded national boundaries; (2) doctrinal emphasis on unity amongst Islamist groups, and cooperation with otherwise-hostile groups that were also targeting the United States, which comprised a "joint operations" model of terrorist campaigns that revolutionized terrorism; (3) multinational corporate model, which emphasized partnership between al-Qaeda branches and affiliates; (4) reliance upon protection money payments extracted from companies to finance terrorist operations; (5) use of Iranian territory as a safe haven and logistical pipeline through a secret deal with the Iranian regime to connect al-Qaeda operatives in Iraq, Iran, and Afghanistan; and (6) practice of flowing value from al-Qaeda-in-Iraq to al-Qaeda "core" and its partners in Afghanistan and Pakistan.

### 1. Al-Qaeda's Integrated Global Network

141. Al-Qaeda served as a global network and umbrella group that organized the anti-American terrorist campaigns of its branches (like al-Qaeda-in-Iraq, inclusive of Jabhat al-Nusra) and affiliates or allies (like the Taliban, including its Haqqani Network).

142. Al-Qaeda operated in both a centralized and decentralized manner, extracting advantage from what each approach offered. While al-Qaeda's core set the strategy, facilitated attacks, provided fighters and funding, and led the overall campaign, al-Qaeda's branches around the world had autonomy to conduct operations on a cellular level. This balanced approach modeled that of the U.S. military (which also relied upon a chain-of-command that facilitated local innovation) and made al-Qaeda far more formidable.

143. Throughout al-Qaeda's more than 25-year history, al-Qaeda has operated as a highly structured organization, rather than a loose network.

144. At all times, thousands of al-Qaeda operatives served al-Qaeda's global terrorist network.

145. After 9/11, the United States government launched a globalized war against al-Qaeda and its branches and affiliates, to which al-Qaeda replied with an equally globalized response. In the twenty years following 9/11, al-Qaeda and its branches and affiliates used shared strategies, training sites, terrorist operatives (who wore multiple organizations' hats and were known as "polyterrorists"), financiers, and the like, under al-Qaeda's multinational corporate approach. As a result, while al-Qaeda's footprint grew over time to encompass Syria and other countries in the Middle East, Africa, and Europe, al-Qaeda and its allies pursued consistent approaches that drew resources, personnel, and expertise, from a global latticework of cells in Afghanistan, Pakistan, Iraq, Syria, Lebanon, Jordan, and dozens of other nations on every continent but Antarctica. This was made possible by al-Qaeda's long-term role as a terrorist

innovation hub in which transnational al-Qaeda terrorists trained al-Qaeda branches and affiliates regarding terrorist practices, including terrorist fundraising tactics, techniques, and procedures.

146. Al-Qaeda's post-9/11 strategy reflected bin Laden's long-standing vision of al-Qaeda (and himself, specifically) as the leader of a grand terrorist coalition across Iraq, Afghanistan, and Pakistan. Due to the mutually reinforcing ties between al-Qaeda and its Sunni allies – including their practice of cross-donations to each other – support for one benefited all.

147. Under al-Qaeda's global network approach, al-Qaeda, al-Qaeda-in-Iraq, and their allies collaborated in Iraq, Syria, Afghanistan, Pakistan, the U.A.E., Europe, Africa, and elsewhere to carry out terrorist attacks against Americans worldwide from 9/11 through today.

148. Al-Qaeda exemplified how terrorist networks could harness the benefits of an increasingly interconnected, globalized environment to serve their agenda by operating as a multinational enterprise with operations in more than 60 countries. Al-Qaeda's global activities were coordinated using personal couriers and communication technologies emblematic of the era—cellular phones, encrypted e-mail, internet chat rooms, and online videos. Members of al-Qaeda traveled from continent to continent with the ease of a recreational or business traveler in an age marked by unprecedented mobility and migration, paid for with the funds al-Qaeda raised through, among other things, protection rackets, front businesses, and donations.

149. Indeed, al-Qaeda experts have long warned against attempts to treat al-Qaeda core in Afghanistan and Pakistan as a separate operational, financial, logistical, and doctrinal organization from al-Qaeda branches and affiliates like al-Qaeda-in-Iraq and Jabhat al-Nusra. Instead, to properly understand how al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra plan and execute attacks, one must consider al-Qaeda's relationships with its subsidiaries like al-Qaeda-in-Iraq and Jabhat al-Nusra, which operated from 2001 through 2014 as part of a single structure

in which al-Qaeda facilitated attacks by al-Qaeda-in-Iraq and Jabhat al-Nusra in their capacity as al-Qaeda subsidiaries serving as part of al-Qaeda's integrated global terrorist organization.

150. Al-Qaeda's global network approach also comported with its multinational corporate model. As a result, al-Qaeda, al-Qaeda-in-Iraq, and their allies regularly pursued fused terrorist finance and logistics strategies—*e.g.*, joint al-Qaeda and Haqqani Network cells in Europe, Afghanistan, or Pakistan, and/or allied terrorist finance and logistics strategies, such as when al-Qaeda and al-Qaeda-in-Iraq collaborated to distribute ransoms paid to either group to al-Qaeda's other global franchises and partners, or between their respective global cells and financiers for the shared purpose of routing funds, arms, and fighters to terrorist cells targeting Americans in the Middle East.

151. After 9/11, the al-Qaeda network demonstrated how terrorists could harness technology to disperse leadership, training, and logistics not just regionally but globally because establishing and moving cells in virtually any country was relatively easy in a world where more than 140 million people lived outside of their country of origin and millions of people crossed international borders every day.

152. Thus, al-Qaeda benefited from a flexible, transnational network structure, enabled by modern technology, in which terrorists worked together in fundraising, intelligence collection, training, logistics, planning, and in executing attacks. Under this approach, al-Qaeda terrorists with objectives in one country or region drew strength and support from branches in other countries or regions, producing a mutually reinforcing, dynamic al-Qaeda network structure.

153. Al-Qaeda's global network created a force multiplier effect for al-Qaeda terrorists by establishing links with other like-minded organizations around the globe. The resultant terrorist interconnectivity changed the nature of terrorism.

154. Al-Qaeda-in-Iraq, which was al-Qaeda's most important branch outside of Afghanistan/Pakistan, served as an indispensable component of al-Qaeda's global terrorist finance, logistics, operational, and communications infrastructure, and vice versa. Through their shared networks, al-Qaeda and al-Qaeda-in-Iraq greatly facilitated, and greatly enhanced the lethality of, both groups' attacks in Afghanistan, Iraq, Syria, and elsewhere. This outcome was the entire point of al-Qaeda's and al-Qaeda-in-Iraq's respective terrorism "business models." With respect to al-Qaeda, al-Qaeda core's terrorism "business model" sought to facilitate attacks against Americans around the world through al-Qaeda core's ability to leverage the resources of al-Qaeda-in-Iraq to facilitate attacks by al-Qaeda core (and other al-Qaeda branches and affiliates) around the world, which was a prime motivation for al-Qaeda core's support for al-Qaeda-in-Iraq in the first instance, and was also the direct result of bin Laden's transactional and franchise-based approach to transnational terrorism. Likewise, al-Qaeda-in-Iraq's terrorism "business model" also sought to facilitate attacks against Americans around the world through al-Qaeda-in-Iraq's ability to leverage both its own financial and logistical resources from its protection rackets in Iraq, and also the network of resources provided by al-Qaeda core in Afghanistan and Pakistan and elsewhere in the Middle East.

**2. Al-Qaeda's Doctrinal Emphasis Of "Unity" Amongst Islamists**

155. At all times, al-Qaeda emphasized unity with other Islamists – as long as they sought to attack America. Under this approach, al-Qaeda's strategy, under bin Laden and his successors, was to use its money, polyterrorists, and good offices to build bridges between and otherwise unite Islamists who targeted American in order to expel the U.S. from the Middle East.

156. Al-Qaeda's doctrinal emphasis on unity, and the cooperation with other terrorists demanded by it, served al-Qaeda's programmatic interests by positioning al-Qaeda as the leader of an anti-American vanguard, facilitating cooperation with potential Islamist allies who might

otherwise be enemies (like the IRGC), and promoting an ethos consistent with al-Qaeda's "joint cell" model (in which al-Qaeda terrorists ordinarily co-located with their branch or affiliate/ally, such as a joint al-Qaeda/Taliban cell in Afghanistan), through which al-Qaeda further expanded its reach.

### 3. Al-Qaeda's Multi-National Corporate Model

157. Al-Qaeda followed a corporate model in which it operated as a devolved network hierarchy where al-Qaeda core facilitated attacks, approved campaigns and geographies targeting Americans, provided training and technical expertise, supported logistics and smuggling, operated a transnational travel network of safe havens for operatives to move between Iraq/Syria and Afghanistan/Pakistan (often through Iran via al-Qaeda's deal with the IRGC), and enabled cross-pollination between al-Qaeda's branches and/or affiliates (*e.g.*, within and between al-Qaeda-in-Iraq, and the Taliban [including the Haqqanis] or Jabhat al-Nusra, for example).

158. After 9/11, al-Qaeda leaned heavily into its strategic doctrinal emphasis on corporate and cooperative game-theoretic principles, including concepts such as cooperation theory, franchising, and joint ventures. This reflected al-Qaeda's tactical and operational fusion with its affiliates in Afghanistan and Pakistan.

159. Under al-Qaeda's corporate model, al-Qaeda core leaned heavily into al-Qaeda's subsidiary branches (like al-Qaeda-in-Iraq) when the former was under pressure and the latter were not (as was the case from 2003 through 2008), and al-Qaeda core also served as a haven for those same subsidiaries when the tables were turned and the subsidiaries were under pressure while the core was stronger (as was the case from 2008 through 2014). Al-Qaeda's interdependence and joint ventures with its allies in Iraq and Syria continued throughout the period in which Plaintiffs were killed and injured.

160. **Oath of Allegiance.** Al-Qaeda required every al-Qaeda branch, like al-Qaeda-in-Iraq or al-Qaeda in the Arabian Peninsula ("AQAP"), to swear an oath of allegiance to al-Qaeda (which often swore a reciprocal oath to its counterpart), and al-Qaeda required both its branches and its allies or affiliates (like the Taliban, including its Haqqani Network) to follow al-Qaeda's playbook concerning terrorist operations, finance, logistics, doctrine, and communication.

161. **Structure.** Al-Qaeda's corporate approach was also reflected in its goal of establishing and maintaining a top-down global bureaucracy through which al-Qaeda "core" managed the terrorist finances, logistics, recruiting, and communications of al-Qaeda branches as a precursor to al-Qaeda's desired global caliphate. Accordingly, al-Qaeda created and maintained detailed bylaws and established formal governing committees and a chain of command among its leaders — who corresponded on al-Qaeda letterhead and used al-Qaeda-branded forms, receipts, and permission slips to conduct al-Qaeda's affairs.

162. At all times, al-Qaeda relied upon a substantial corporate structure with an array of committees governing the group's media, terrorist attack planning, and financial affairs. Through these structures, al-Qaeda implemented a corporate-style chain of command complete with a CEO, paid salaries to its members, offered vacation (when requested at least ten weeks in advance), provided comprehensive and organized training to its recruits, and required every prospective al-Qaeda member or guest to fill out a detailed application form or attend an al-Qaeda-sponsored camp.

163. Al-Qaeda's official organizational structure included a formalized hierarchy and official positions. Al-Qaeda was led worldwide by an emir, to whom all branches (and their members) pledged allegiance. Al-Qaeda's emir was advised by the Shura Council. Al-Qaeda also maintained a Military Committee, Political Committee, Media Committee, Administrative

and Financial Committee, Religious Committee, and Foreign Affairs Committee, each of which had a formal structure, objectives, and authorities.

164. Al-Qaeda's formal organizational structure ran from al-Qaeda "core" in Afghanistan and Pakistan to al-Qaeda's branches, including al-Qaeda-in-Iraq. Among other things, al-Qaeda's emir appointed a representative co-located with the leadership of each affiliate to act as a direct channel to al-Qaeda core in Afghanistan and Pakistan. Through its direct chain of command that emanated from al-Qaeda "core" to al-Qaeda's branches, including al-Qaeda-in-Iraq, al-Qaeda's branches reinforced their subordination to al Qaeda "core."

165. Al-Qaeda also ensured that its branches, including al-Qaeda-in-Iraq, followed an organizational structure similar to that of al-Qaeda core.

166. **Franchises.** After 9/11, al-Qaeda often conducted its attacks against the United States through al-Qaeda branches, like al-Qaeda-in-Iraq. In such cases, the attack in question was committed by al-Qaeda and its local branch.

167. Consistent with its adherence to a corporate-style structure, al-Qaeda also followed a "franchise" model around the world after 9/11, under which al-Qaeda "branches" (like al-Qaeda-In-Iraq and Jabhat al-Nusra) and "affiliates" or "allies" (like the Taliban, including its Haqqani Network), operated as part of al-Qaeda's network and cross-pollinated with all the other above-referenced FTOs.

168. Al-Qaeda "core" in Afghanistan/Pakistan established al-Qaeda branches (also known as "franchises") in Iraq (i.e., al-Qaeda-in-Iraq), Syria (i.e., al-Qaeda-in-Iraq and later Jabhat al-Nusra), and elsewhere, through which al-Qaeda raised funds and resources, which flowed from the affiliates in Iraq, Syria, and elsewhere, back to al-Qaeda "core" in Afghanistan to facilitate al-Qaeda attacks against Americans worldwide.

169. The value flowed both directions. For example, after al-Qaeda-in-Iraq's official accession to al-Qaeda's global organization, al-Qaeda core escalated the flow of funds, fighters, and logistical aid to al-Qaeda-in-Iraq, and al-Qaeda provided at least $1,000,000 per month in total value to al-Qaeda-in-Iraq thereafter.

170. Simultaneously, from 2004 through 2014, al-Qaeda-in-Iraq was al-Qaeda's top wholly owned subsidiary, and responsible for more support to al-Qaeda "core" than any other al-Qaeda branch or affiliate. Because of the parent/subsidiary and franchisor/franchisee relationship between al-Qaeda core in Afghanistan and Pakistan, and al-Qaeda-in-Iraq in Iraq and Syria, aid to one necessarily benefited the other. Indeed, this was the goal of bin Laden's corporate model in the first place: to maximize the potency of al-Qaeda's campaign against America by leveraging the financial, logistical, and operational capabilities of al-Qaeda's branches, and vice versa.

171. At all times, such two-way value flows – in which al-Qaeda core provided funds, logistical aid, and fighters to al-Qaeda-in-Iraq in Iraq and Syria, while al-Qaeda-in-Iraq also provided funds, logistical aid, and fighters to al-Qaeda core in Afghanistan and Pakistan – were a hallmark of al-Qaeda's relationships with its branches, including al-Qaeda-in-Iraq.

172. **Command and Control.** Under al-Qaeda's corporate model, when any al-Qaeda branch, like al-Qaeda-in-Iraq, facilitates attacks against Americans or the growth of al-Qaeda outside of such branch's al-Qaeda-assigned territory, the subsidiary must communicate directly with al-Qaeda core, receive al-Qaeda's authorization, follow al-Qaeda's plan, and strictly adhere to al-Qaeda doctrine.

173. These al-Qaeda rules applied, for example, when al-Qaeda-in-Iraq worked with Sirajuddin Haqqani to establish a two-way training pipeline between Iraq/Syria and

Afghanistan/Pakistan from 2005 through 2014 in which al-Qaeda, al-Qaeda-in-Iraq, Jabhat al-Nusra, the Taliban (including its Haqqani Network), and other al-Qaeda affiliates and "Syndicate" members, like Lashkar-e-Taiba, all jointly trained in cross-pollinating terrorist networking sessions that epitomized bin Laden's "first principles" view of al-Qaeda's terrorist business model.

174. Al-Qaeda's core also maintained a designated representative co-located with each al-Qaeda affiliate, including al-Qaeda-in-Iraq, who interacted with affiliate leadership and ensured that the relationship ran directly through the affiliate's leadership in Iraq and Syria to al-Qaeda core's leadership in Afghanistan and Pakistan.

175. **Cross-Pollination.** Al-Qaeda core's emphasis on command-and-control did not stifle innovation amongst its branches and affiliates. To the contrary, al-Qaeda also encouraged horizontal relationships amongst its branches and affiliates as long as it was mediated by al-Qaeda, *e.g.*, al-Qaeda-brokered cooperation between the Taliban and al-Qaeda-in-Iraq for the mutual benefit of both.

176. Al-Qaeda core's desire to serve as a hub for cross-pollination amongst al-Qaeda's various branches like al-Qaeda-in-Iraq reflected its "franchise" approach to anti-American terrorism. For example, from 2003 through 2014, al-Qaeda core facilitated substantial training programs conducted by al-Qaeda-in-Iraq terrorists at al-Qaeda camps in Afghanistan and Pakistan, which were for the mutual benefit of the al-Qaeda-in-Iraq terrorists providing the training (who used the opportunity to network, improve their own skills, and develop new fundraising relationships) as well as al-Qaeda-affiliated terrorists in the camps (*e.g.*, the Taliban, who learned from al-Qaeda-in-Iraq how to more effectively attack U.S. armor).

177. While Iraq was al-Qaeda's top focus from 2003 through 2006, Afghanistan was always at least a close second, which eventually surpassed Iraq as al-Qaeda's top priority after 2009. Afghanistan remained al-Qaeda's top focus until the United States fully withdrew from the country in 2021 (with Syria assuming co-equal importance once the violence there began).

178. Given that Iraq (inclusive of parts of Syria) and Afghanistan were at all relevant times al-Qaeda's top two priorities, al-Qaeda aggressively pursued cross-pollination of strategies, personnel, fundraisers, and the like between these geographies. In such a dynamic learning environment for the terrorists, successful strategies were quickly "ported" from one geography to another (the boundaries between which al-Qaeda and its branches generally rejected on principle and ignored in practice).[10] As a result, al-Qaeda's living/learning approach to cross-pollinating knowledge and practices amongst its branches had a devastating effect on Americans in Iraq, Syria, and Afghanistan.

179. **Finance.** Throughout its existence, and in keeping with its corporate model, al-Qaeda developed a comprehensive infrastructure designed to route money anywhere in the world that al-Qaeda and its franchises and partners needed resources.

180. True to its multinational corporate structure, al-Qaeda (the parent) devised and oversaw the financial bureaucracy of al-Qaeda-in-Iraq (the subsidiary) throughout Iraq, which al-Qaeda-in-Iraq operationalized and executed at the national, provincial, and local levels throughout Iraq. The resulting al-Qaeda and al-Qaeda-in-Iraq financial infrastructure was purpose-built to ensure that the protection money both received through any level of their Iraq-

[10] Al-Qaeda and its affiliates rejected nearly every major border and geographic concept relevant to today's Middle East as having been created by the infidels. Al-Qaeda and its allies, as a result, often organized themselves along transnational lines that crossed several countries' borders.

and Syria-related protection rackets was optimized to maximize the lethality of their terrorist campaign in Iraq, Syria, Afghanistan, and Pakistan, for example, by ensuring that al-Qaeda and al-Qaeda-in-Iraq senior leadership could redirect payments from one geography to another, as necessary, to maximize the tempo of their terrorist campaigns and ensure that protection payments to local or provincial terrorists were passed up both groups' chains, ultimately reaching al-Qaeda core in Afghanistan and Pakistan and al-Qaeda-in-Iraq's national finance emir.

181. **Safe Haven.** Al-Qaeda core's sanctuary in Afghanistan and Pakistan also served as a permanent safe haven for al-Qaeda branch and affiliate terrorists who needed to flee their own geographies whenever pressure from the United States grew too intense.

182. **Learning Organizations.** Al-Qaeda and its branches, including al-Qaeda-in-Iraq, were "learning organizations" in which operatives were allowed to criticize leaders and were encouraged to evaluate operations afterwards to learn from them and port their experiential wisdom (aka "lessons learned") throughout the broader al-Qaeda network.

## II. DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING FINANCIAL ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE BY MAKING PROTECTION PAYMENTS TO THEM

### A. Defendants Operated In Insecure And Corrupt Iraqi And Afghan Contracting Environments That Encouraged Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

183. LM Ericsson, Ericsson AB, and Ericsson Inc. operated lucrative businesses in which their profits depended upon transactions in, and transporting lucrative goods through, Iraq, Syria, and Turkey. LM Ericsson and Ericsson AB operated as one of the largest telecom companies in Iraq, which required regular transportation of goods throughout Iraq as well as Syria and Turkey. LM Ericsson, Ericsson AB, and Ericsson Inc. earned at least $1.9 billion combined in net profits in Iraq alone from 2003 through 2019 through large-scale U.S.-

government and U.S.-funded Iraqi government contracts and by providing logistical support to other companies in Iraq and Syria.

184. To increase their profit margins by redirecting terrorist attacks away from their business interests, LM Ericsson, Ericsson AB, and Ericsson Inc. knowingly facilitated protection money or "tax" payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists in Iraq and Syria between at least 2004 and at least 2019, and thereby provided millions in U.S. dollars to these FTOs each year.

185. The specifics of Ericsson's protection payments and obstruction of American counterterrorism efforts in the United States and the Middle East are discussed in Parts II, III, IV, V, and VI. To lay the groundwork for those allegations, the next two sections describe the contracting environment in geographies that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State between 2003 and 2022 and survey the evidence that illicit Iraq-related transactions by multinational corporations, including Defendants, commonly served as vehicles to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq and Syria.

### 1. Al-Qaeda, Islamic State, And Their Allies Operated Sophisticated Protection Money Networks In Iraq And Afghanistan

186. LM Ericsson's and Ericsson AB's and Ericsson Inc.'s protection payments and obstruction of American counterterrorism activities against al-Qaeda and Islamic State occurred in contracting environments in Iraq marked by widespread insecurity and endemic corruption.

187. From 2004 through 2022, al-Qaeda and al-Qaeda-in-Iraq (2004-2014) and Islamic State (2014-2022) successfully extracted protection payments throughout Iraq because they controlled or contested key transportation nodes relevant to shipping nearly anything nearly anywhere in the country including, but not limited to, key geographies astride transportation routes linking Iraq with Jordan and Syria (through Qaim, in western Iraq), Turkey (through

Mosul and Erbil, in northern Iraq), the Persian Gulf (through the western and southern approaches to Baghdad, in central Iraq), and Iran (through Diyala, in eastern Iraq).

188. Throughout this period, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State operationalized their protection rackets vis-à-vis commerce conducted throughout Iraq, not just the areas these terrorists controlled or contested. This was a function of geography and then-existing transportation routes. In short, most companies shipped their products and other materials overland from northern or western Iraq, rather than using the port at Umm Qasr in Southern Iraq. The terrorists controlled or contested key chokepoints relevant to all transportation routes, and thus financially benefitted from protection money payments for all types of commercial activity, ranging from shipments of lucrative goods (*e.g.* consumer electronics) to shipments of building supplies used for infrastructure projects (*e.g.* cell towers)—even when the projects in question were built in areas of Iraq far outside the terrorists' strongholds in Anbar, Baghdad, Ninewa, Kirkuk, and Diyala.

189. In the decade prior to the U.S. invasion of Iraq in 2003, the rule of law broadly collapsed in Iraqi society, as nearly all Iraqi elites engaged in corruption.

190. Following the 2003 invasion, al-Qaeda-affiliated clerics explicitly blessed corruption and criminality as long as it related to financing attacks against Americans in Iraq through a series of *fatwas* that turbocharged the willingness of Iraqis to engage in corruption.

191. These messages were favorably received throughout Iraq, as the security climate worsened after 2003 and corruption became entrenched to a level it had not achieved even under Saddam. From 2003-2020, Iraq was one of the most corrupt countries in the world – falling into a category some refer to as "hyper-corruption." In Transparency International's Corruption Perceptions Index – widely considered the most authoritative measure of country-level

corruption – Iraq ranked near the very bottom each year. In 2007, for example, Transparency International ranked Iraq 161st out of 163 countries. Such rankings reflected longstanding traditions of corruption that affected virtually every aspect of Iraqi civil society.

192. The U.S. government concurred. In a since-declassified study of al-Qaeda finance in Iraq in the mid-2000s, the U.S. military's Central Command ("CENTCOM"), which is responsible for U.S. operations throughout the Middle East, including Iraq, Afghanistan, Syria, and Turkey, observed that the "rampant corruption" that Saddam Hussein's regime programmatically pursued from the late 1990s until 2003 set the conditions for terrorists to later leverage corruption as a key source of terrorist finance and logistics flow.

193. When LM Ericsson, Ericsson AB, and Ericsson Inc. sought to profit off the Iraqi market, Defendants faced an equally corrupt business environment. When they sought to profit from economic transactions in Iraq's corruption-based economy – including those linked to U.S. government dollars directly through U.S. government contracts or indirectly through Iraqi government contracts funded by the U.S. government – they therefore faced unusually high corruption and money laundering risks, including the associated terrorism risks.

194. Western corporations operating in Iraq used the same corruption manners and means to route payoffs to corrupt government officials who could influence their business as they used to pay off terrorists who could also influence their business, and knowingly structured their transactions to exploit their corrupt business environments as the cost of doing business. They did so by laundering money through a latticework of local partners including, but not limited to, their local customers (for whom elite Western bribe-paying companies, not the customer, held the real power), and their subcontractors – hired for ostensible tasks such as security, transportation, logistics, sales, government relations, and business intelligence, among

others – that could make corrupt payoffs downstream while (in theory) maintaining plausible deniability for the corporations, like LM Ericsson, Ericsson AB, and Ericsson Inc., whose money they were diverting to terrorists.

195. Some protection payments passed through a single intermediary, but other projects had as many as five different companies in the contracting chain: a prime contractor, acting in a supplier and agent role (*e.g.*, Ericsson AB), would interface with the customer, usually the U.S. or Iraqi government, as well as any key stakeholders like the World Bank, to facilitate large-scale contracts involving the sale of goods or services manufactured by the supplier's affiliated manufacturer (*e.g.*, Ericsson Inc.); the prime contractor would then outsource performance or implementation of key aspects of the contract to a partner (including its customer) or a subcontractor; the partner or subcontractor would hire another partner or subcontractor, which would hire another in turn; and eventually some local company would perform the work on the ground on the prime contractor's behalf. This structure was commonplace for protection payments made by Western companies in terrorist-contested areas in the Middle East, who (for obvious reasons) preferred to funnel their payments to terrorists through intermediaries. This structure allowed the final subcontractor to make corrupt payments while the companies higher up in the chain denied involvement; it also ensured that there was always a demand for more work, as the jobs in question were rarely completed on time (if ever).

196. Ericsson was no stranger to such multi-layered illicit payment schemes. In its Deferred Prosecution Agreement, LM Ericsson admitted to making illegal payments in China that flowed from multiple Ericsson entities via sham contracts to consulting companies; from the consulting companies to individual "sales agents"; and from the sales agents to Ericsson's Chinese state-owned customers.

197. These same contracting practices typically led to poor-quality work that undermined U.S. reconstruction objectives in Iraq.

198. Enormous amounts of American taxpayer dollars disappeared into this web of corrupt contractors and subcontractors. With prime contractors abdicating their oversight role, in part to maintain plausible deniability over the protection payments they were encouraging, subcontractors rarely spent the U.S. dollars provided by their U.S. government, Iraqi government, and/or World Bank-funded customers on the intended projects.

199. Western contractors' exploitation of chains of unethical subcontractors in Iraq and Afghanistan was widely understood to be corrupt. A 2009 study for the U.S. Agency for International Development ("USAID") detailed that "perceptions of rampant corruption include corruption in the donor community, due to the high costs, bureaucratic procedures, and layers of contracting and subcontracting in many projects." A 2011 report by the U.S. Senate Committee on Foreign Relations likewise criticized the widespread "use of large numbers of contractors" as inviting "corruption through multiple subcontractors." The prevailing criticism of such practices led General Petraeus to issue formal contracting guidance in 2010 that emphasized the importance of "contract[ing] with vendors that have fewer sub-contractors. Excessive sub-contracting tiers provide opportunities for … insurgents to divert contract money from its intended purpose." Although not the only cause, Defendants' use of multiple contracting tiers enabled them to make enormous profits while delivering substandard work. It also, as alleged below, helped them fund al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for nearly two decades.

### a. Al-Qaeda and Al-Qaeda-in-Iraq Ran a Sophisticated Protection Money Operation in Iraq from 2004 through 2014

200. From 2004 until 2014, al-Qaeda and al-Qaeda-in-Iraq jointly managed and profited from a sophisticated, nationwide protection money operation in Iraq, through which al-

Qaeda and al-Qaeda-in-Iraq successfully extracted payments using their ability to control or contest vital transport nodes relevant to transporting nearly anything nearly anywhere in Iraq.

201. In 2003 and 2004, al-Qaeda, including its polyterrorist leader Abu Musab al-Zarqawi, spearheaded the development of al-Qaeda's and al-Qaeda-in-Iraq's protection rackets in Iraq and Syria, which Zarqawi and his allies operated to profit from protection "taxes" applied to commercial activities in any Iraqi territories that al-Qaeda and al-Qaeda-in-Iraq could contest – *i.e.*, most of the country. To do so, Zarqawi did not have to build these protection rackets from scratch. Instead, al-Qaeda just took them over from the incumbent owners (usually, middlemen affiliated with Saddam), declared that al-Qaeda was now in charge, and followed al-Qaeda's protection money playbook thereafter.

202. Al-Qaeda-in-Iraq's surge throughout Iraq in 2004 was powered by its wholesale adoption of al-Qaeda's protection money playbook, which bin Laden and his lieutenants pioneered in Africa and on which al-Qaeda trained its branches and affiliates in Afghanistan. For al-Qaeda, al-Qaeda-in-Iraq offered the first-ever test case of al-Qaeda's protection money tactics in an environment rich in Western firms, as opposed to prior rackets based in Sudan and Somalia, which tended to target Middle Eastern firms because no one else did business there.

203. By the summer of 2004, al-Qaeda (through Zarqawi and others) had fully operationalized al-Qaeda's protection rackets in Iraq and parts of Syria. To do so, al-Qaeda and its local branches communicated to companies doing business in these geographies that companies could absorb the expense of guards or take the easier and more profitable route of simply paying protection money to al-Qaeda and its branches, like al-Qaeda-in-Iraq.

204. Zarqawi and al-Qaeda-in-Iraq took to al-Qaeda's protection money scheme with a zeal that matched the intensity of the al-Qaeda terrorist campaign that it financed. Al-Qaeda and

al-Qaeda-in-Iraq collected "taxes" and "fees" throughout the life cycle of significant economic transactions in Iraq that involved transportation of valuable products (as Ericsson's business interests in Iraq ordinarily did). Those payments included, but were not limited to, "tolls" of $400-$500 per vehicle that were assessed at or near border crossings in Qaim, Erbil, Mosul, Diyala; similar "tolls" at key chokepoint geographies in and near Baghdad; "fees" assessed on a project basis; and/or "taxes" assessed based on targets' estimated income.

205. Al-Qaeda-in-Iraq followed the bin Laden protection money playbook by having a specific bureaucracy dedicated to collecting and redistributing protection money payments from companies with business interests in geographies that were controlled or contested by al-Qaeda or an al-Qaeda subsidiary. For example, al-Qaeda-in-Iraq operated what it euphemistically referred to as "Spoils Groups," which were terrorist finance and logistics cells that al-Qaeda-in-Iraq had specifically designated to facilitate al-Qaeda and al-Qaeda-in-Iraq operations through the collection and redistribution of protection money at an industrial scale.[11]

[11] An Al-Qaeda affiliate, the Taliban, including its Haqqani Network, followed a similar playbook, calling their protection money bureaucracy the "Contractors and Organisations Commission." Given that the Taliban's protection rackets, like those of al-Qaeda-in-Iraq, were inspired by al-Qaeda's teaching and derived from a literal al-Qaeda playbook, the terrorists' tactics, techniques, and procedures for their protection rackets in Iraq and Afghanistan were remarkably similar. They were different in at least two respects, however. First, the different groups sometimes used differing nomenclature. Second, al-Qaeda's terrorists in Iraq (*i.e.*, al-Qaeda-in-Iraq) charged a somewhat lower rate than al-Qaeda's terrorists in Afghanistan (*i.e.*, the Syndicate), with the former often charging 10%-20% (sometimes more) while the latter often charged 30%-40% (sometimes more). This was a simple reflection of the different terrorist market economic contexts in Iraq and Afghanistan. In Iraq, al-Qaeda-in-Iraq had to compete for the security dollar with Shiite terrorists, like Jaysh al-Mahdi, who had competing rackets. Al-Qaeda-in-Iraq (and later, Islamic State) chose to compete on price, and companies like Ericsson chose to pay al-Qaeda-in-Iraq and ISIS rather than invest in legitimate security. In Afghanistan, in contrast, there was no indigenous Shiite terrorist analogue to Jaysh al-Mahdi's role in Iraq, and al-Qaeda's Syndicate exercised a functional monopoly on the protection economy, which permitted the Taliban, as most monopolists do, to charge more.

206. By April 2005, al-Qaeda-in-Iraq's protection rackets had been running for more than a year, and Zarqawi was using them to rapidly expand al-Qaeda's terrorist campaign, opening up new fronts in Baghdad and Diyala Provinces. Protection rackets in Anbar Province alone, for example, yielded several million U.S. dollars per month, which flowed back to al-Qaeda-in-Iraq and, through it, al-Qaeda core as well.

207. Al-Qaeda's continued expansion throughout Iraq in 2006, through al-Qaeda-in-Iraq, was powered by the latter's protection rackets, which were in full bloom throughout the country. According to confidential U.S. government assessments at the time, al-Qaeda-in-Iraq was raising US$70 million to US$200 million a year from its criminal activities, including its protection rackets. Indeed, U.S. assessments also concluded that the income stream generated by al-Qaeda-in-Iraq's criminal rackets was so pronounced that al-Qaeda-in-Iraq ran a surplus, which al-Qaeda-in-Iraq used to fund al-Qaeda core in Afghanistan and Pakistan in keeping with its status as an al-Qaeda branch under the latter's corporatist model.

208. By the spring of 2006, and continuing through 2014, al-Qaeda-in-Iraq's terrorist finance network had grown so much that al-Qaeda-in-Iraq required additional bureaucracies in key provinces in order to adequately manage its money. These bureaucracies flowed money, including *khums* donations mandated as kickbacks to superiors, and created direct links between al-Qaeda-in-Iraq cell leaders and their operatives and agents who extracted, as one CENTCOM document put it, "money from the government contracting process," including from Western companies like Defendants.

#### b. Islamic State Ran a Sophisticated Protection Money Operation in Iraq from 2014 through at least 2022

209. Islamic State continuously ran a sophisticated protection money operation in Iraq and Syria from 2014 through at least 2022. Throughout, Islamic State's terrorist campaign in

Iraq, Syria, Turkey, Africa, Afghanistan, and Central Asia was powered by its protection rackets in Iraq and Syria. According to one confidential U.S. government report published in 2015, Islamic State raised hundreds of millions of U.S. dollars by extracting protection money from businesses in Iraq.

210. As Islamic State seized territory in Iraq, it intensified al-Qaeda-in-Iraq's longstanding protection rackets and formalized them into a purported system of universal taxation of goods and cash that transited territory where Islamic State operated, overseen by its Finance Council, that applied to all territory controlled or contested by Islamic State.[12]

211. Under Islamic State's taxation system, Islamic State established a series of "taxes" and "fees," which it collected from businesses with interests in geographies controlled or contested by Islamic State, as well as companies transporting goods through the same places via Islamic State checkpoints, all under the pretense of such payments serving as *zakat* (donations or taxes that the terrorists claimed were mandated under applicable Islamic principles).

212. Islamic State also expanded al-Qaeda-in-Iraq's prior taxation system on trucks, and eventually increased the rate to $1,000 per truck, which was ordinarily paid in U.S. Dollar-denominated transactions.

213. In late 2014, Islamic State reached what amounted to a global protection money agreement with every major Kurdish party in Iraq, which the two sides reached even though Islamic State terrorists were waging a relentless campaign against Kurds in neighboring Syria.

---

[12] Islamic State intensified such rackets along at least two axes. *First*, Islamic State expanded the outreach efforts to communicate to all businesses in ISIS-impacted geographies that Islamic State had a bureaucracy with which such businesses could engage. *Second*, Islamic State increased the rates previously charged by al-Qaeda-in-Iraq. While Islamic State did not deviate from the long-standing al-Qaeda strategy of competing against Shiite protection rackets in Iraq based upon price, Islamic State's tax increases did somewhat narrow the value gap between itself and Jaysh al-Mahdi (with ISIS remaining the lowest priced security solution).

Simply put, the leading Kurdish groups in Iraq prioritized their own local interests over that of the broader Kurdish cause and reached a protection money accord with Islamic State that has largely held from 2014 through today. Under this accord, Kurdish agents collected protection money for Islamic State.

214. As the Coalition expanded its airstrikes against Islamic State's oil and gas fields, Islamic State's protection rackets assumed even greater importance to its ability to launch attacks against Americans around the world. In September 2016, for example, Islamic State intensified its protection money-related collections to offset funding losses from elsewhere. Through these rackets, Islamic State generated millions in monthly cash flow – mostly denominated in U.S. dollars – from businesses in Iraq, which Islamic State styled as *zakat*, commercial taxes, income taxes, administrative fees, customs taxes, and/or road tolls.

215. Throughout 2017, Islamic State increasingly relied upon its protection rackets as Coalition pressure shrunk the geographic footprint of territory the terrorists controlled.

216. Islamic State's loss of its caliphate in late 2017 did not end its protection rackets, which continued largely unabated. Islamic State's control of, or ability to contest, the territories it seized in Iraq and Syria endured from 2014 through at least 2022 because Islamic State maintained control of key chokepoints throughout Iraq and Syria from which it exerted power over companies with business interests there.

### 2. Multinational Corporations Commonly Structured Their Operations In Iraq And Afghanistan To Funnel Protection Money Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State

217. Al-Qaeda and Islamic State used threats of terrorist violence to extract protection money from corrupt international companies doing business in the parts of Iraq, Syria, and Turkey in which LM Ericsson, Ericsson AB, and Ericsson Inc. did business. Such threats were especially frequent in (though not limited to) geographic areas that al-Qaeda-in-Iraq and ISIS

controlled. By 2004, al-Qaeda-in-Iraq had achieved control of wide swaths of central, western, and northern Iraq, and had havens in Syria, Iran, Afghanistan, and Pakistan. By 2005, al-Qaeda and al-Qaeda-in-Iraq had consolidated Sunni anti-American terror in Iraq and Syria under al-Qaeda's organization, which control (or ability to contest) al-Qaeda, through al-Qaeda-in-Iraq (until 2014), and Islamic State (from 2014 through present) leveraged on the ground in Iraq into protection payments. "In Iraq and Afghanistan," concluded a Congressional study in 2011, "U.S. funds have been diverted to insurgents … as a cost of doing business" and "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects." Al-Qaeda and al-Qaeda-in-Iraq perfected that practice by threatening businesses until (and sometimes even after) they met the FTOs' financial demands.

218. The FTOs' threats presented companies with a choice: alert the government and seek the U.S. military's aid while investing in legitimate security to protect their companies' projects, shipments, and facilities in Iraq, or instead save time and money by regularly paying al-Qaeda-in-Iraq (from at least 2004 through at least 2014) and Islamic State (thereafter)—usually monthly—to direct their attacks elsewhere. Contractors, including Defendants and Defendants' agents, typically chose the latter option. Simply put, many with business interests in Iraq paid off terrorists knowing full well the money would be used for bombs and weapons to take the lives of others.[13]

219. Al-Qaeda and al-Qaeda-in-Iraq consistently extracted protection money payments from Western companies with business interests in Iraq, like Defendants, and the subcontractors who served as their agents, throughout the period from 2004 through 2014, usually doing so

[13] The same outcome was true in Afghanistan, which was a feature, not a bug, of al-Qaeda-designed protection rackets: the point was to induce a similar response from Western companies facing similar incentives, performing similar work, in a similar threat environment.

monthly. The case of one long-standing business owner in Mosul named Abdali was typical: his business made regular monthly protection payments to al-Qaeda-in-Iraq, and later Islamic State, consistently from 2004 through 2017, which he justified as a cost of doing business.

220. Companies, including Defendants, rationalized their payments to al-Qaeda-in-Iraq and Islamic State by framing them as a necessary cost of business. But the payments were unnecessary – even from the standpoint of Defendants' own security needs – and counterproductive. In reality, Western businesses chose to pay not because of any reconstruction imperative in Iraq, but because it served their financial interests. By diverting money to al-Qaeda-in-Iraq and Islamic State, the payments lowered the projects' quality and undermined whatever alleged counterinsurgency benefits they might have otherwise delivered.

221. Confidential Witnesses confirmed the accuracy of this conclusion based on their own experiences in Iraq. According to one Confidential Witness, for example, it would have been extraordinarily tempting financially for any contractor or subcontractor to pay off terrorists in Iraq because "at least 70 percent" of every U.S. dollar allocated to a project "went to overhead and armed protection," with armed protection likely being the single largest expense within that 70 percent and much larger than the minimum amount of 10-20 percent – and often much more – always charged by al-Qaeda's, al-Qaeda-in-Iraq's, and ISIS's protection networks in Iraq.

222. According to another Confidential Witness, who also had extensive security-related experience in post-Saddam Iraq, no Western corporation could have had people on the ground in Iraq during the early years of Iraqi reconstruction without either using a "Western security firm" or paying protection money to terrorists, and any Western corporation with business in Iraq would have known that those were their only two options. The same

Confidential Witness further explained one of the prevailing, and widely known, strategies that Western contractors, like Ericsson, deployed to route protection money to terrorists in Iraq:

> The local militia, al-Qaeda, whomever, they all know you're there, you're not in their country without them knowing you're there, so eventually you're going to get approached, or if you have a savvy security team that has a local national with them, they'll use that local national to find out who the payoff guys are . . . If you were in Baghdad and you did not have western security you would have to pay, find someone to get your money to al-Qaeda or [Jaysh-al-Mahdi].

223. Although some contracts required the U.S. government to reimburse the prime contractor for local security costs, that did not eliminate the profit motive for Defendants to orchestrate protection payments. Even on "cost plus" contracts, where profits were pegged to a fixed percentage of the government's costs, such payments benefited the prime contractor in two significant ways. *First*, had Defendants implemented legitimate, more expensive security measures, that would have raised the cost of their proposals on the front end and jeopardized their ability to win as many contracts. By purchasing their security from the terrorists, Defendants artificially lowered the price of their bids, thereby helping them obtain the contracts in the first place. *Second*, protection payments offered a simpler and less time-consuming way of purchasing project security, which freed up internal resources and bandwidth for companies, like Defendants, to undertake more projects overall. Had they spent the time and effort – even apart from the expense – needed to implement legitimate security, they would have been able to perform fewer projects, and thus would have made less money on an aggregate basis.

224. As a negotiating ploy, al-Qaeda-in-Iraq and Islamic State terrorists occasionally threatened or even attacked employees or agents affiliated with corporations that were paying protection money, albeit less frequently than those that elected not to pay. For that reason, a corporation's experience facing actual or threatened attacks was not inconsistent with it having made protection payments. Often, such threats were merely an indication of ongoing

negotiations over price. On balance, though, corporations who paid al-Qaeda-in-Iraq and Islamic State bought themselves relative security (in the related geographies in Iraq and Syria) at an attractive price.

225. Multinational corporations, including Defendants, often routed money to al-Qaeda and Islamic State through their contractor networks, using contractors as their agents to guide the money home to the FTOs as intended. Just as delegating contract performance to corrupt subcontractors worsened the quality of the services provided, *see supra* II.A.1, so too did it create opaque pools of money from which to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

226. Multinational corporations, including Defendants, used their agents and subcontractors to supply their own security to the American and Iraqi customers who hired them by paying off Iraqi insurgents with protection money, resulting in American money sustaining al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. As explained below, Defendants both actively facilitated and benefited from such payments that their agents and subcontractors delivered on their behalf. *See infra* Part II.B.

227. Cargo Iraq, a now-infamous Iraqi security subcontractor, offers an example. Cargo Iraq was one of the largest private-security companies in Iraq, and it made its money on subcontracts to protect convoys ferrying goods and fuel between Iraq, Jordan, and Syria. In that capacity, Cargo Iraq worked for Ericsson in Iraq.

228. Cargo Iraq was profitable because it paid al-Qaeda-in-Iraq and Islamic State. Companies that outsourced security to Cargo Iraq were, in effect, knowingly hiring al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to provide security for company resources and shipments in terrorist-influenced geographies in Iraq and Syria. Decisions to hire Cargo Iraq for security

supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with money and intelligence that undermined American interests.

229. Middle East Shipping Services ("MESS") is another example. MESS was a Middle East shipping subcontractor based in Amman, Jordan, and used by numerous large U.S. and European corporations operating in Iraq. MESS's specialty was shipping product overland from Jordan, Turkey, and/or Syria into Iraq. In discussions with the State Department, MESS's CEO admitted that MESS paid U.S. Dollar-denominated protection money to anti-American terrorists in Iraq. For example, according to a 2004 State Department cable, as published online,

> Amman-based Middle East Shipping Services (MESS) … maintains offices in Baghdad, Basra and Umm Qasr inside Iraq … MESS provides transportation and shipping services for contractors within Iraq, most notably Bechtel Corporation. … [A]fter renting a warehouse in Baghdad, … MESS eventually had to pay 'protection money' to a group of Iraqis who accused the company of collaborating with coalition forces. Despite [MESS's] providing cash for 'protection,' the MESS warehouse was burned to the ground … [MESS never] approached the CPA for security assistance [because MES did not want to] confirm[] … that [MESS] was directly in league with U.S. troops.

230. Cargo Iraq and MESS illustrate a broader pattern in which companies, including Defendants, knowingly paid protection money to al-Qaeda-in-Iraq and Islamic State. The widespread existence of such protection-money payments has been confirmed by congressional investigators, U.S. and Iraqi officials, industry participants, and journalists.

231. For starters, Congress's Commission on Wartime Contracting documented the pattern of how "[i]n Iraq and Afghanistan, U.S. funds" were "diverted to insurgents" through "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects."[14]

---

[14] Notably, Congress made the same finding concerning both Iraq and Afghanistan, reflecting the common influence of al-Qaeda's protection money playbook, and the similar response of Western corporations and contractors to such playbook in both countries.

232. U.S. military officials also documented the pattern. A since-declassified 2007 study by CENTCOM concluded that the number one aspect of al-Qaeda-in-Iraq's "funding strategy" was to "[e]xploit the Coalition's civil-military reconstruction contracts by gathering information on reconstruction or economic development initiatives to gauge which Iraqi contractors [were] most likely to win Coalition contracts"; "[t]he contractors were then targeted for … extortion[] or co-opting to force them to contribute a part of their profits to AQI." As Major General Rick Lynch, commander of U.S. forces in central Iraq in 2007, explained: "I tell a lot of my soldiers: A good way to prepare for operations in Iraq is to watch the sixth season of '*The Sopranos.*' … You're seeing a lot of Mafioso kind of activity."

233. The Iraq Threat Finance Cell, an interagency group that drew on law-enforcement and intelligence assets to interdict insurgent funding sources, performed a series of sophisticated audits of Sunni insurgent financing, and reached the same conclusion. As former senior Treasury official Juan Zarate summarized in 2015, "the Iraq threat finance cell" was "created in 2006 to look at how Al Qaida in Iraq and the insurgents were funding themselves" and concluded that the terrorists "were engaged in" criminal activities which were "[a]ll the things we're talking about now" (in 2015 with respect to ISIS) "they were doing … then" (i.e., during al-Qaeda-in-Iraq's heyday in the mid-2000s).

234. Iraqi officials also confirmed the practice. For example, Fawzi Hariri, an Iraqi cabinet member who headed its Anbar Reconstruction Committee, publicly stated in 2007 that U.S. rebuilding funds certainly had gone into terrorists' pockets.

235. Those protection payments continued despite mounting concerns raised by U.S., British, and Iraqi leaders that multinational corporations who made protection payments financed terrorist attacks by al-Qaeda-in-Iraq, Islamic State, and their allies.

236. From 2004 (at the latest) through at least 2019, multinational corporations, including Ericsson, that cut corners in Iraq, Syria, and Afghanistan by paying off terrorists, routed their value transfers to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through two primary channels: (i) direct transactions with the FTOs, through which corporations, including Defendants, knowingly (and illegally) provided them with communications, economic, and technical aid; and (ii) payments to the FTOs routed through intermediaries that corporations, including Defendants, controlled and intentionally used, mafia-style, as a "buffer" between Defendants and these FTOs to which Defendants specifically intended to pay – and did pay – millions of U.S. dollars for "protection" from at least 2004 through at least 2019.

237. As to both of those channels, Defendants deliberately facilitated protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through illegal terrorist finance transactions that included: (1) cash payments to the FTOs, which were often U.S. Dollar-denominated and infamously called "commissions" as a euphemism for payoffs in Iraq and Syria since the 1990s; (2) "free goods" payments to the FTOs in the form of highly lucrative U.S.-manufactured goods that functioned as cash equivalents and were supplied "free of charge" through a notorious decades-long Iraqi and Syrian corruption scheme specifically intended to covertly route substantial value flow from corporations to violent actors; and (3) financial and technical aid to the FTOs through their facilitation of the FTOs' protection rackets, corrupt black market transactions, and illicit communications technologies acquisitions, all of which facilitated al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's attacks against Americans in Iraq, Afghanistan, Syria, Turkey, Europe, Central Asia, and Africa from 2004 through at least 2019.

238. In every instance, each Defendant intended al-Qaeda, al-Qaeda-in-Iraq and Islamic State to receive the value from Defendants, which flowed substantial U.S. Dollar cash

payments, and free goods payments in valuable U.S. manufactured and/or U.S.-sourced, and terrorism embargo-restricted, communications technologies and other cash equivalents that the FTOs used as weapons of terror or resold on black markets in Iraq and Syria (for $2,000 per American smartphone) to al-Qaeda-in-Iraq and Islamic State agents, in payments that Defendants intended to serve as protection payments or "taxes" with the specific intent, by Defendants, to cause the above cash flow to reach these FTOs in order to maximize Defendants' profits from the payoffs to the FTOs.

239. When using intermediaries, Defendants employed similar processes to funnel money to al-Qaeda-in-Iraq and Islamic State in Iraq. Defendants paid the money as protection: they decided that the cheapest way to shield their projects from attack was to pay al-Qaeda-in-Iraq and Islamic State to leave them alone and instead attack other targets – like Plaintiffs and their family members. As detailed in this section, similar payments were pervasive throughout the Iraqi and Syrian geographies that were contested by al-Qaeda-in-Iraq and Islamic State and supplied the FTOs – directly when they were the recipient, and indirectly when another of the two was the recipient through their mutual sharing – with a key stream of financing to fund their terrorist attacks across the parts of Iraq, Afghanistan, Syria, Turkey, Central Asia, and Africa controlled or contested by al-Qaeda-in-Iraq and/or Islamic State (and their local branches) from 2000 through 2022.

240. Defendants followed several shared strategies to operationalize their protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

241. *First*, Defendants negotiated payments with senior terrorists from these FTOs (*e.g.*, a regional representative of al-Qaeda-in-Iraq). Al-Qaeda emphasized a rigorous process for negotiating an appropriate level of protection money or "tax" paid by a multinational

corporation. In 2007, for example, CENTCOM concluded in a since-declassified study of terrorist finance in Iraq, among other things, that:

**a.** "AQI was able to stop vehicles, including tractor trailers, from entering or exiting the Waleed and Trebil border crossing in order to extort payments of up to $200."

**b.** "AQI collected intelligence on … the contracting process through a former contractor" and had sources who "reported the names of any individual awarded a major contract to local AQI leaders along with the cash value so that AQI extortion cells could determine the appropriate amount of money to demand from a given contractor without derailing the project."

**c.** "[T]he AQI amir for the Tamim and 5 Kilo districts of [Ramadi] was considered powerful enough by local contractors that no work could take place in the area without his approval, which usually came with the condition that he would receive up to 50% of the profit. Qutayba's situation was the norm and AQI extortion of Iraqi contracts was the standard practice in Ramadi and throughout much of Anbar. Under the new policies set down since the rise of [AQ/AQI polyterrorist Masri] AQI operatives refined their method of extortion to demanding protection money in return for 'guaranteeing' that new contracts were allowed to occur free of insurgent attacks."

242. The same CENTCOM study noted how "one of the primary financiers of AQI in Fallujah" "received $90,000 payments from tribal and religious figures who worked for Islamic NGOs" and "then had this money returned to various AQI cells in Fallujah to cover the purchase of vehicles and weapons." Other U.S. Army publications also confirmed how al-Qaeda-in-Iraq/Islamic State leaders "financed" cells through protection "money from contractors working for the coalition."

243. Following the bin Laden protection money playbook, the procedure through which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State extracted those payments in Iraq and Syria was straightforward. At in-person meetings conducted either directly with the corporation (inclusive of the corporation's agents) or through an intermediary, al-Qaeda, AQI, and Islamic State operatives negotiated the rate. Defendants usually agreed to pay.

244. Al-Qaeda practices confirm its branches' systematic tactic of extracting protection payments from large firms doing business in the geographies they contested in Iraq, such as

Defendants. In general, al-Qaeda terrorists kicked back a fixed percentage of any money seized in terrorist attacks as "*khums*" (an Islamic tax) to al-Qaeda's leadership; the remaining four-fifths was given to those on the frontline in Iraq. However, any money or property seized without fighting from Western projects or businesses – such as the fruits of successful negotiations with a European telecommunications company – was sent to the leadership to be spent on attacks against Americans by al-Qaeda and its regional branches in the Middle East.

245. Al-Qaeda created these rules and norms to ensure that protection money would benefit the broader al-Qaeda organization—both worldwide (*i.e.*, al-Qaeda core) and in Iraq, Afghanistan, Syria, and Turkey as the four most important terror zones to al-Qaeda core, al-Qaeda-in-Iraq, and Jabhat al-Nusra, rather than individual terrorists outside of senior leadership ranks. (Islamic State later followed the same al-Qaeda approach.)

246. *Second*, in addition to high-level negotiations with senior al-Qaeda-in-Iraq and Islamic State terrorists, Defendants also paid protection money to local al-Qaeda-in-Iraq and Islamic State cell leaders in the areas where they were operating.

247. Defendants sometimes made these more localized payments directly and sometimes routed such payments through Defendants' agents or subcontractors. Most often under this second approach, corporations routed their payments through "middlemen" known as "consultants" and/or subcontractors that arranged payment on their clients' behalf, through U.S. dollars routed through the corporation and usually falsely described as being for purported services (which were not provided) such as transportation, logistics, security, research, government relations, and legal counsel.[15] The consultants and subcontractors paid al-Qaeda, al-

[15] In Iraq, as in many hyper-corrupt jurisdictions, multinational corporations often rely upon in-country external legal counsel, often local litigation firms, who facilitate protection payments

Qaeda-in-Iraq, and Islamic State by making cash payments through the intermediaries, or corruptly routing value through illicit "free goods" deals designed to be monetized on the black market, or by providing embargoed U.S. technical and financial aid and communications technology to the FTOs. Under all three strategies, the logic of the payments was simple: they reduced the threat of attacks on the corporations' own projects at the least possible cost to those corporations.

248. Companies paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection money in relatively predictable percentages on each project they undertook in Iraq and Syria. The percentages could vary based on several factors, including contract size, location, and the particular al-Qaeda-in-Iraq and Islamic State terrorists involved. But overall, many analysts estimated that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State consistently levied a "tax" of *at least* 10 percent to 20 percent on every economically significant project. Often, the percentage was much higher.

249. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State always maintained potent protection rackets from 2004 through 2022. From the early 2000s through 2014, under the same scheme, protection payments to al-Qaeda-in-Iraq delivered protection payment-related value (*e.g.*, cash flow, illicit technologies flow) to al-Qaeda core and Jabhat al-Nusra because all three FTOs followed the bin Laden playbook on cross-pollination, which they applied to the protection rackets for a host of reasons, including ensuring the continued facilitation of all such groups'

styled as "settlements" and the like. This has always been a notorious aspect of the corruption economy in Iraq, which Defendants knew because they employed (or were served by) local Iraqi agents who had a sophisticated understanding of the Iraqi economy, including how bribes were commonly paid, and it was commonly known in Iraq that Middle Eastern law firms were a popular vehicle to route large-dollar payoffs.

relationships with one another. From 2014 through 2021, Islamic State continued these same protection money operations in Iraq and Syria.

250. Corporations, including Defendants, usually concealed their protection payments from their own shareholders, the U.S. government, and others, by inflating their costs and fraudulently describing their payments as legitimate security, transportation, consulting, and/or humanitarian expenses. For example, as one Iraqi company officer publicly explained in 2007, contractors often set their prices up to four times the going rate because they budgeted fifty percent (50%) for payoffs to terrorists in exchange for the safe passage of their supply convoys, so that of every $1 million he received, $500,000 flowed through to al-Qaeda and al-Qaeda-in-Iraq. Similar ratios continued after Islamic State assumed control of al-Qaeda-in-Iraq's protection money operation in Iraq in 2014 and continued through 2022.

251. As explained below, LM Ericsson, Ericsson AB, and Ericsson Inc. followed that practice and paid protection money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State including through their agents and subcontractors, using one or more of the methods described above. *See infra* II.B. In doing so, they knowingly both orchestrated and benefited from their agents' and subcontractors' protection payments on their behalf. Defendants actively orchestrated the payments by obtaining the underlying contracts to pay for the work (or licenses to conduct it) that needed "protection" from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; by retaining and outsourcing security to the corrupt strategic partners, consultants, and subcontractors they knew would pay money to terrorists; by encouraging their strategic partners, consultants, and subcontractors to make the payments, either explicitly or implicitly; by supplying the financing that the strategic partners, consultants, and subcontractors used to make the payments; and then by knowingly approving reimbursement of the payments. Such intermediaries' contracts with

Defendants typically required Defendants to review and approve their expenses, and Defendants knowingly accepted expense reports that hid or mischaracterized the payoffs. Throughout, Defendants had the right to control their consultants' and subcontractors' security activities and knew that their consultants and subcontractors were acting on their behalf. Similarly, through Defendants' offloading scheme, *infra* II.B.2.b, Defendants intentionally structured their relationships with their strategic partners to facilitate the latters' protection payments on Ericsson's behalf.

252. When Defendants' strategic partners, consultants, and subcontractors paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, they did so as part of their performance under their contracts with Defendants. The strategic partners, consultants, and subcontractors would have been unable to make protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State without Defendants' money and approval. Defendants supplied the funds for the protection payments because they, even more than their strategic partners, consultants, and subcontractors, financially benefited from them. Indeed, the core purpose of the payments was to benefit Defendants by shielding their projects from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attack at an affordable price. To obtain that benefit, Defendants needed and intended for their money and other value provided to reach al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

## B. Defendants Made Protection Payments To Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State In Iraq And Afghanistan

253. LM Ericsson, Ericsson AB, and Ericsson Inc. made protection payments to al-Qaeda and al-Qaeda-in-Iraq agents in Iraq from 2004 through at least 2014, and to Islamic State agents in Iraq from 2014 through at least 2019. And to conceal what they did, LM Ericsson, Ericsson AB, and Ericsson Inc. intentionally obstructed United States counterterrorism efforts

targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2013 until at least 2022, and Ekholm did so from 2017 until at least 2022 while serving as CEO. *See infra* Part III.[16]

### 1. Defendants Pursued An Enterprise-Wide Corruption Scheme, Which Defendants Applied In A Substantially Similar Manner In Iraq And Afghanistan

#### a. Defendants Pursued an Enterprise-Wide Corruption Scheme

254. LM Ericsson oversaw Ericsson's transactions in Iraq, through LM Ericsson's own officers, directors, employees and agents (including LM Ericsson's C-Suite, including Defendant Ekholm) as well as LM Ericsson's wholly owned subsidiary, Ericsson AB, and its branch in Iraq, known as Ericsson Iraq, which served as the in-country representatives for LM Ericsson and its subsidiaries around the world, including Ericsson Inc., under Ericsson's global "One Ericsson" business model. Employees of Ericsson AB frequently acted as agents for LM Ericsson.

255. At all times, Ericsson AB (on its own, and through its local branch, Ericsson Iraq) acted as Ericsson Inc.'s sales agent in Iraq and was responsible for securing lucrative contracts in Iraq that typically involved all Defendants.

256. Ericsson AB (on its own and via its local branch, Ericsson Iraq) ordinarily served in a *supplier* and *agent* role, as the Ericsson entity that negotiated with counterparts in Iraq and facilitated payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents.

257. Ericsson Inc. ordinarily served in a *manufacturer* and *principal* role, as the Ericsson entity that provided the goods and services that Ericsson AB (on its own and through Ericsson Iraq) sold to its customers in Iraq, including (for example) RBS 6000 base stations featuring software written in the U.S. and the Charging and Billing in One ("CBiO") system

---

[16] Even now, it remains to be seen whether LM Ericsson, Ericsson AB, and Ericsson Inc. will continue obstructing U.S. counterterrorism efforts through their unprecedented misconduct. For that reason, Plaintiffs do not wish to imply that Defendants' obstruction is over as of the date of this Complaint. Discovery will determine when, if at all, Ericsson ever changed course.

developed by Telcordia, a California company acquired by Ericsson in 2011. Those and other U.S.-related goods and services were the object of Ericsson's protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2004 through at least 2019.

258. LM Ericsson, Ericsson AB, and Ericsson Inc. sought to profit from the Iraqi marketplace and were willing to pay anyone to do so, including terrorists. While operating in Iraq, Ericsson AB understood the economic threat that insurgents posed to Ericsson's profitability and went to extreme lengths to assess how Ericsson employees would perform under terrorist threat.[17]

259. From at least 2000 through at least 2019, Ericsson relied upon a business model built upon illegal payments to third parties who could positively or negatively influence Ericsson's bottom line. Simply put, throughout this period, LM Ericsson, Ericsson AB, and Ericsson Inc. were corporate criminals engaged on a decades-long, international corporate crime spree that spanned the United States, Europe, the Middle East, Africa, and Asia.

260. According to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments to increase Ericsson profits in high-risk jurisdictions:

**a.** With respect to LM Ericsson and Ericsson AB, "the 'Tone-of-the-Top' management style at the Corporate level" sustained an "unofficial policy for, and willingness to, issu[e] and authoriz[e] payment orders" documenting Ericsson's bribes "in writing for most confidential [and] obscure payments to so called 'commercial agents'" in order to obscure illegal bribes through a web of obscure commercial intermediaries.

**b.** Under the global bribery strategy practiced by LM Ericsson and Ericsson AB, "payment orders" relating to Ericsson's "commercial agents," whom Ericsson relied upon to untraceably route illicit payments to intended recipients on Ericsson's behalf, "were

[17] For example, in 2000, LM Ericsson employees coordinated "mock hijackings" of other unwitting LM Ericsson employees, which at least once resulted in others calling law enforcement during an exercise.

archived in hiding, often in anonymous bank safes in Switzerland, thereafter subsequently to be destroyed."

**c.** LM Ericsson and Ericsson AB leadership ensured that LM Ericsson and Ericsson AB's management led the effort to ensure that "all" the features of Ericsson's global bribery strategy as described above were deployed "on a worldwide basis covering most so called emerging markets in the world."

**d.** "The system" that LM Ericsson and Ericsson AB operationalized to carry out Defendants' global bribery scheme "was called WCS, Worldwide Commission Scheme."

261. From 2000 through at least 2019, LM Ericsson and Ericsson AB engaged in a global bribery scheme, which relied on a litany of criminal tactics, including but not limited to:

**a.** fraudulent due diligence reports that concealed corrupt relationships;

**b.** sham contracts used to corruptly route value to illicit recipients;

**c.** fake invoices used to further conceal corrupt payments;

**d.** explicit contemporaneous written admissions as to LM Ericsson's and Ericsson AB's corrupt conduct;

**e.** the creation, maintenance, and use of off-the-books slush funds so that LM Ericsson, its subsidiaries and their respective agents could make corrupt payments;

**f.** deliberate mischaracterization of corruption-related expenses as being related to "travel," "consulting," "supply costs," "material consumption," "customer service," "cost of sales," "entitlements," "settlements," "fridge," and "marketing and sales support";[18]

**g.** willful failure to implement internal controls necessary to prevent corrupt payments; and

**h.** improper recording of LM Ericsson's, and its subsidiaries', corrupt payments on LM Ericsson's books and records, which were sent to shareholders and regulators in the U.S.

262. LM Ericsson's and Ericsson AB's global bribery scheme also routinely relied upon U.S.-based personnel, emails, bank accounts, and products.

---

[18] Ericsson subsidiaries' characterization of certain payoffs as being related to a "fridge" demonstrates the pervasiveness of the misconduct through LM Ericsson and its subsidiaries, as well as the obvious nature of the fraud (within Ericsson), given absurd "expenses" like "fridge."

263. Geoffrey S. Berman, former United States Attorney for the Southern District of New York, summarized Ericsson's global business model from 2000 through at least 2016: "Through slush funds, bribes, gifts, and graft, Ericsson conducted telecom business with the guiding principle that 'money talks.'"

264. When describing Ericsson's global business model from 2000 through at least 2016, former Assistant Attorney General, Brian A. Benczkowski, stated as follows: "Ericsson's corrupt conduct involved high-level executives and spanned 17 years and at least five countries, all in a misguided effort to increase profits. Such wrongdoing called for a strong response from law enforcement."

265. Steve Peikin, Co-Director of the SEC Enforcement Division, also summarized Ericsson's global business model from at least 2011 through at least 2017: "Ericsson engaged in an egregious bribery scheme for years, spanning multiple continents, by surreptitiously using slush funds and funneling money through sham intermediaries." The SEC found that "LM Ericsson … engag[ed] in a large-scale bribery scheme involving the use of sham consultants to secretly funnel money to government officials in multiple countries" and "Ericsson's subsidiaries … in Vietnam, Indonesia and Kuwait … maintain[ed] slush funds, us[ed] code names, and create[ed] sham transactions and invoices." According to the SEC, "[f]rom 2011 through early 2017, Ericsson subsidiaries paid approximately $62 million in bribes to [recipients] through third parties … to obtain or retain business" and, as a result, "Ericsson realized approximately $427 million in profits from business obtained through the use of these illicit payments."[19]

---

[19] Compl., ¶ 2, *SEC v. Telefonaktiebolaget LM Ericsson*, No. 1:19-cv-11214 (D.D.C. Compl. filed Dec. 6, 2019), ECF No. 1 ("Ericsson FCPA Compl.").

266. LM Ericsson's ability to operationalize – and later sustain – an enterprise-wide, decades-long, scheme to make illicit payments around the world depended upon the close collaboration of LM Ericsson, Ericsson AB, and Ericsson Inc. as "One Ericsson."

267. LM Ericsson relied upon Ericsson AB's ability to identify and promote openly **corrupt and criminal Ericsson AB regional managers** who were willing to engage in shocking acts of terrorist finance and corruption, which Ericsson viewed as the cost of doing business in Iraq and Afghanistan. Unsurprisingly, Ericsson AB entrusted Defendants' operations in Iraq and Afghanistan—the ***greatest anti-terrorism*** and ***anti-corruption*** risks worldwide from 2001 through 2022—to the head of Ericsson AB's Middle East branch.

268. The head of Ericsson AB's Middle East branch was a hardened white collar criminal who openly discussed Ericsson's criminal schemes with coworkers. For Ericsson, however, the presence of such a committed criminal at the very top of its Middle East organization was a feature, not a bug. Ericsson was bribing its way to greater profitability one despot, terrorist, or communist apparatchik at a time during this period. Moreover, Ericsson perceived the Middle East as the most exciting growth market in the world given the abundance of so-called "virgin" telecom markets throughout the region. After observing the success of its deep-seated commitment to bribery as a corporate strategy, and sizing up the gigantic opportunity before Ericsson thanks to the Middle East's nascent telecoms markets at the time, Ericsson made the predictable, and criminal, choice: go all-in on corruption as Ericsson's core strategy in the Middle East by empowering the least ethical, most criminal, greediest, regional leader Ericsson could find and commit the necessary resources to pay off everyone who needs it, while knowing, but not caring, about the inevitable acts of international terrorism that Ericsson's conduct would surely enable. Plaintiffs' allegation is plausible: Ericsson was on its crime spree

when it chose terrorist finance as an acceptable business strategy in the Middle East, and thus Ericsson's conduct reflected the necessary criminal intent.

269. Ericsson also relied upon widespread use of **sham consulting agreements** it routinely created to facilitate its corrupt payments in the Middle East. From 2011 through 2017, per the SEC, "Ericsson's practice involved either entering into agreements with third party consultants who had connections with or access to [the person who could help or hurt Ericsson's business], and/or paying for travel and entertainment expenses for [such persons] … to influence their decision-making"—and Ericsson's Djibouti, Saudi Arabia, Qatar, and Kuwait branches – all managed by the same Ericsson Middle East organizations that supervised Defendants' work in Iraq and Afghanistan—each of which adhered to "Ericsson's practice" of using "third party consultants" to route illicit payments to intended recipients from 2011 until 2017.[20]

[20] *See*, *e.g.*, *id.* ¶ 2 ("Ericsson's practice"); *id.* ¶ 5 (Ericsson AB's Qatar branch "created a sham consultancy agreement to disguise [an illegal] payment to [an Ericsson] consultant"); *id.* ¶ 14 ("Egypt"); *id.* ¶ 66 ("Kuwait"); *id.* ¶¶ 19-33 (SEC found, *inter alia*, that: (1) "the head of Ericsson's Middle East region … devised a plan to bribe the government officials"; (2) "[t]he head of Ericsson's Middle East region … falsely booked [] payments to the … Consultant in the books … under a cost of sales account, when they were, in fact, bribes"; and (3) Ericsson AB's Middle East Regional Branch in Dubai, U.A.E. used a sham consulting agreement to route a series of corrupt payments to a decisionmaker, which flowed through U.S. banks, in furtherance of Ericsson's "Djibouti Bribery Scheme"); *id.* ¶¶ 34-44 (SEC found, *inter alia*, that: (1) "the head of Ericsson's Middle East region signed [] consulting agreements and authorized the payments to the consultants while knowing or recklessly ignoring red flags which indicated a high probability that at least a portion of these commissions were intended for, or would be passed to, [unlawful recipients]"; (2) Ericsson AB's branch in Saudi Arabia used bogus "consulting" agreements to route a series of corrupt payments to a decisionmaker, which flowed through U.S. banks in furtherance of Ericsson's "Saudi Arabia Bribery Scheme"); *id.* ¶¶ 72-74 (SEC found that "the head of Ericsson's Middle East region," *inter alia*: (1) "agreed to make a payment to [a] Kuwait Consultant in the amount of $450,000 through a sham agreement"; (2) "asked the Kuwait Consultant to create a sham invoice to support the [corrupt transfer disguised as a] settlement payment"; and (3) "[Ericsson AB] employees, at the direction of the head of Ericsson's Middle East region, created a sham contract to disguise the [corrupt] payment to the consultant and approved a fake invoice for services in order to conceal the transaction").

270. Ericsson also deliberately operated a **built-to-fail compliance program,** which Defendants specifically intended to enable corrupt payments instead of preventing them so that Ericsson could continue to realize additional profits through its enterprise-wide corruption strategy. The SEC, for example, found that "Ericsson knowingly and willfully failed to implement adequate internal accounting controls with respect to retention of consultants and agents, payment of bribes, and making improper payments."[21]

271. Ericsson also routinely created **deliberately falsified books and records**, which Defendants specifically intended to conceal, rather than reveal, corrupt payments so that Ericsson could continue to realize additional profits through its enterprise-wide corruption strategy. The SEC, for example, found that "Due to Ericsson's failure to implement and enforce effective internal accounting controls, employees were able to disguise the true nature and purpose of certain transactions in Ericsson's books and records."[22] With respect to this conduct:

**a.** "[LM] Ericsson, through its employees and agents, including senior-level employees, paid millions of dollars to various agents, consultants, and service providers who were not approved or paid in compliance with [LM] Ericsson's internal procedures. Some of the payments were made in cash and were used to create slush funds, the purpose and recipients of which are unknown. Other payments were made pursuant to sham service provider agreements under which no legitimate services were provided to Ericsson, so as to continue to use and pay agents in contravention of [Ericsson]'s policies and procedures."

**b.** "In connection with these payments, Ericsson, through its employees and agents, including senior-level employees, knowingly and willfully created or facilitated the creation of fictitious contracts, invoices, and purchase orders for services that were not rendered and were never intended to be rendered; used secret codenames for certain expenditures; and bypassed Ericsson's standard vendor sourcing process, including by using hard copy, rather than electronic, documentation to evade detection. The payments were falsely or misleadingly characterized in Ericsson's books and records, including as

---

[21] *Id.* ¶ 83.

[22] *Id.* ¶ 90.

consulting expenses, cost of sales 'corporate marketing fees,' 'other external services' or 'service fulfillment of contract.'"[23]

272. LM Ericsson and Ericsson AB collaborated with Ericsson Inc. to execute a **whistleblower retaliation strategy** in order designed to prevent evidence of Ericsson's crimes, *e.g.*, its payments to ISIS, from emerging via whistleblower. LM Ericsson and Ericsson AB regularly used Ericsson Inc. to prevent discovery of their crimes through by intimidating the newly fired former Ericsson Inc. employees who serviced Ericsson AB customers in Ericsson AB's North Middle East Group, which included Afghanistan and Iraq, on behalf of Ericsson Inc., ***as well as*** LM Ericsson, Ericsson AB, and other Ericsson entities. They did so to enhance LM Ericsson and Ericson AB value by reducing the risk that their terrorist finance schemes in the Middle East would be detected, and Ericsson's outsized terrorist-finance-fueled profits would decline.

**b. Defendants Deployed The Same Manner And Means To Operationalize Their Enterprise-Wide Scheme in Iraq and Afghanistan**

273. From 2003 through at least 2019, LM Ericsson and Ericsson AB and Ericsson Inc. relied upon the same entities – *e.g.*, Ericsson's offices in the Middle East – and used the same schemes – *e.g.*, slush funds – at issue in Ericsson's Deferred Prosecution Agreement to route value to the necessary recipients, whether a corrupt government official in Djibouti, Islamic State in Iraq, or al-Qaeda in Afghanistan.

274. Ericsson AB divided its business units into geographies, which typically share leadership, personnel, processes, procedures, networks, customer relationships, and information

[23] *Id.* ¶¶ 91-92.

consistent with Defendants' "One Ericsson" approach, to which Ericsson AB faithfully adhered in the Middle East.

275. From 2000 until at least 2017, Ericsson's Middle East region has been, by nearly every metric, shown to be the most corrupt Ericsson business region in the world. For much of the relevant period, the head of Ericsson Middle East served as the ***ringleader*** for Defendants' corrupt payments throughout the region.

276. Ericsson's Middle East leadership openly embraced a comprehensive commitment to corruption as a strategy to boost Ericsson's profits from the Middle East. According to the SEC, for example, from 2011 through 2017:

**a.** "the head of Ericsson's Middle East region … devised a plan to bribe the government officials";

**b.** "[t]he head of Ericsson's Middle East region … falsely booked [] payments to the … Consultant in the books … under a cost of sales account, when they were, in fact, bribes";

**c.** "the head of Ericsson's Middle East region signed [sham] consulting agreements and authorized the payments to the consultants while knowing or recklessly ignoring red flags which indicated a high probability that at least a portion of these commissions were intended for, or would be passed to, [unlawful recipients]";

**d.** "the head of Ericsson's Middle East region … agreed to make a payment to [a] Kuwait Consultant in the amount of $450,000 through a sham agreement";

**e.** "the head of Ericsson's Middle East region … asked the Kuwait Consultant to create a sham invoice to support the [corrupt transfer disguised as a] settlement payment"; and

**f.** "the head of Ericsson's Middle East region" "direct[ed]" "[Ericsson AB] employees" to "create[] a sham contract to disguise the [corrupt] payment to the consultant and approved a fake invoice for services in order to conceal the transaction."[24]

277. LM Ericsson, Ericsson AB, Ericsson Inc, Ibrahim, and Ekholm facilitated Defendants' protection payments to al-Qaeda and its progeny in Iraq and Afghanistan in a manner that was often virtually identical to the features of Defendants' related scheme in Iraq:

[24] *Id.* ¶¶ 2, 5, 19-33, 34-44, ¶¶ 72-74.

pursue the same illicit goal (purchase security from al-Qaeda and its allies), using the same corrupt means as in Iraq (route protection payments to al-Qaeda through purpose-built buffers), for a similar business purpose (help Ericsson dominate a similarly-sized "virgin" telecoms market), subject to nearly identical anti-corruption and anti-terrorism risks (Iraq and Afghanistan were always, essentially, numbers 1 and 2 in both categories), to sell Ericsson's same U.S.-origin technologies, networks, and managed services solutions (*e.g.*, Ericsson AB's and Ericsson Inc.'s "global" "end-to-end" "managed services" solutions, which Defendants sold to customers in both Iraq, *e.g.*, Asiacell, and Afghanistan, *e.g.*, MTN).

278. In early 2009, Ericsson revised its Middle East organization structure by creating a North Middle East Account Unit, which combined the following five countries: Jordan, Iraq, Syria, Lebanon, and Afghanistan. Tarek Saadi—who later became one of Ibrahim's key deputies and whom the ICIJ reported acted as Ibrahim's bagman on a number of illicit payments in Iraq—was simultaneously appointed as the Account Unit Head for this region, which made sense given his prior experience as Ericsson's country-level manager for Jordan and Iraq for three years each.

### 2. Defendants Made Protection Payments To Terrorists In Iraq

279. From 2003 through 2022, Ericsson pursued growth in the Middle East market in general and in Iraq in particular.

280. After Baghdad fell in April 2003, LM Ericsson and Ericsson AB quickly went to work lobbying U.S. government representatives in Washington, D.C. to facilitate Ericsson's retention by the U.S.-controlled Coalition Provisional Authority, and later the U.S.-influenced Iraqi government, to build and sustain Iraq's post-war telecommunications infrastructure.

281. Iraq was a key market for Ericsson, which viewed Iraq as a "virgin" market, *i.e.*, a new market that required a complete rebuild from top to bottom, and therefore promised unusually robust profits for Ericsson. In 2009, for example, Bo-Erik Dahlström, LM Ericsson's

Head of Market Unit Middle East, publicly stated that "we regard [Iraq] as [] one of the most strategic markets for growth for Ericsson."

282. About their own profits, at least, Defendants were correct: collectively, Ericsson AB (or another LM Ericsson subsidiary acting at the direction and for the benefit of LM Ericsson) executed billions of dollars in contracts in Iraq and Syria from 2004 through 2022. For each such contract, Ericsson maintained a general policy of engaging in fraudulent transactions to aid al-Qaeda, al-Qaeda-in-Iraq, Islamic State, and other terrorists in Iraq and Syria by: (1) facilitating regular U.S. dollar-denominated protection payments to such FTOs to protect projects they implemented in terrorist-controlled or -influenced regions; and (2) obstructing U.S. counterterrorism policy by fraudulently concealing their protection money relationships with such FTOs in Iraq from U.S. government personnel whom Defendants knew served in key counterterrorism roles.

283. From 2004 through at least February 15, 2022, Ericsson maintained its general policy as described because doing so was vital to Ericsson's bottom line during a period when it was under tremendous competitive pressure and financial stress, and Iraq was a rare, consistent, financial bright spot for Defendants. That policy applied to each of the contracts Ericsson implemented in Iraq and Syria, including the contracts in either country that required transportation of goods or materials across or through either, as well as each of the fraudulent communications Ericsson caused to be published inside the United States concerning transactions, services, communications, and other conduct in furtherance of the illicit payments Ericsson made on Iraq-related contracts. Among those contracts were the following:

**a.** 2004 Asiacell Network Contract: On or about 2004, Wataniya Telecom, on behalf of Asiacell, contracted with LM Ericsson and Ericsson AB under a global frame agreement to expand Asiacell's network in central Iraq, including Baghdad and the surrounding

areas, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.[25]

**b.** 2004 Korek Network Expansion Contract: On or about 2004, Korek Telecom ("Korek") contracted with LM Ericsson and Ericsson AB to expand Korek's network in the Mosul and Kirkuk regions, in addition to Erbil, Dohuk and Sulaimaniya, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**c.** 2006 Korek Base Stations Contract: On or about 2006, Korek contracted with LM Ericsson and Ericsson AB to build RBS 6000 base stations throughout Korek's network in the Mosul and Kirkuk regions, in addition to Erbil, Dohuk and Sulaimaniya, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**d.** 2008 ITPC Network Deployment Contract: On or about 2008, the Iraqi Telecommunications and Post Company ("ITPC"), a state-owned company responsible for Iraq's fixed-line infrastructure, contracted with LM Ericsson and Ericsson AB to execute the initial deployment of ITPC's network infrastructure, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**e.** 2009 Asiacell Network Expansion Contract: On or about 2009, Asiacell contracted with LM Ericsson and Ericsson AB to expand Asiacell's network throughout certain geographies in Iraq, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**f.** 2009 Korek Billing System Contract: On or about 2009, Korek contracted with LM Ericsson and Ericsson AB to modernize Korek's billing systems throughout Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**g.** 2011 Korek Network Expansion Contract: On or about 2011, Korek contracted with LM Ericsson and Ericsson AB to expand Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**h.** 2011 Zain Iraq Network Management Contract: On or about 2011, Atheer Telecom Iraq Limited ("Zain Iraq") entered into a five-year, $900 million, managed services contract with LM Ericsson and Ericsson AB to optimize, modernize, and manage Zain Iraq's IT operations and its entire mobile network spanning 3,700 sites located throughout Iraq, including in several areas that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and beginning in 2014, Islamic State. Notably, this contract gave Ericsson management responsibility over subcontractors deemed necessary for Zain Iraq's network operations.

---

[25] On information and belief, while Wataniya Telecom exited Asiacell on or about 2007, Ericsson's services under this agreement continued thereafter until its work was completed.

**i.** 2012 Asiacell Business Transformation Partnership Contract: On or about 2012, Asiacell contracted with LM Ericsson and Ericsson AB to provide consultancy services covering Asiacell's "business transformation" under a three-year "partnership" agreement between Asiacell and Defendants, which work Defendants performed in Iraqi areas that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and beginning in 2014, Islamic State.

**j.** 2012 Korek Field Maintenance Contract: On or about 2012, Korek contracted with LM Ericsson and Ericsson AB to provide field maintenance services to Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**k.** 2013 ITPC Network Upgrade Contract: On or about 2013, the ITPC contracted with LM Ericsson and Ericsson AB to upgrade the ITPC's network infrastructure, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**l.** 2013 Korek Billing Contract: On or about 2013, Korek contracted with LM Ericsson and Ericsson AB to provide Ericsson's comprehensive suite of billing services to Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

**m.** 2014 Asiacell Base Stations Contract: On or about 2014, Asiacell contracted with LM Ericsson and Ericsson AB to support Asiacell's "Golden Province" initiative by upgrading Asiacell's core network infrastructure with new RBS 6000 base stations to prepare for LTE adoption, which work Defendants performed in Iraqi areas that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

**n.** 2015 Korek Spare Parts Services Management Contract: On or about 2015, Korek contracted with LM Ericsson and Ericsson AB to manage the inventory of spare parts necessary to the maintenance of Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled by Islamic State.

**o.** 2016 Asiacell Network Upgrade Contract: On or about 2016, Asiacell contracted with LM Ericsson and Ericsson AB to upgrade Asiacell's "backbone" network to facilitate Asiacell's value-added services, including, but not limited to, Asiacell's proprietary mobile payment system, "AsiaHawala," which work Defendants performed in Iraqi areas that were controlled by Islamic State.

**p.** 2016 Korek LTE Upgrade Contract: On or about 2016, Korek contracted with LM Ericsson and Ericsson AB to provide core network updates in preparation for Korek's adoption of LTE services throughout Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled by Islamic State.

**q.** 2017 Korek IP Network Contract: On or about 2017, Korek contracted with LM Ericsson and Ericsson AB to assist with IP network updates to Korek's network computing infrastructure through the provision of Ericsson services that depended upon Ericsson's ability to procure technology from another U.S. company, which was installed

throughout Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by Islamic State.

**r.** 2019 Asiacell Network Optimization Contract: On or about 2019, Asiacell contracted with LM Ericsson and Ericsson AB to provide a suite of network expansion, network design, and optimization services under a managed services agreement, which work Defendants performed in Iraqi areas that Islamic State controlled or contested.

284. On information and belief, LM Ericsson, Ericsson AB, and Ericsson Inc. were parties to, or otherwise provided goods or services pursuant to, every major Ericsson contract in Iraq from 2004 through 2022, including, but not limited to, each contract set forth above, and made protection payments to al-Qaeda, al-Qaeda-in-Iraq, and the Islamic State in connection with all such contracts.

285. According to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments in high-risk jurisdictions, she/he felt "ashamed having worked for" LM Ericsson and Ericsson AB because she/he believed that the following conclusions were "obviously" correct:

**a.** LM Ericsson and Ericsson AB "seemed to have bribed such terrorist organizations," i.e., al-Qaeda, al-Qaeda-in-Iraq, and Islamic State;

**b.** LM Ericsson and Ericsson AB paid such "bribe[s]" "for the purposes of being permitted to do businesses in territories controlled and administrated by them," i.e., al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; and

**c.** LM Ericsson's and Ericsson AB's "top management had … approved" protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

### a. Leaked Ericsson Documents and Subsequent Public Statements Confirm Ericsson's Knowing Participation In Terrorist Protection-Money Networks In Iraq.

286. Ericsson's public statements after its latest criminal scandal emerged in February 2022, and the revelations contained in Defendants' internal documents—first leaked and reported by the media on February 15, 2022—offer some indications of Ericsson's general policy of

protection payments in Iraq and obstruction of U.S. government counterterrorism operations, including, but not limited to:

**a.** Ericsson Admitted Its Conduct After the Ericsson Leak in 2022: After the leak went public in February 2022 and exposed their aid to FTOs, Ericsson has admitted, in sum and substance, that it facilitated the flow of protection payments in Iraq from at least 2011 through at least 2019, and that DOJ had concluded that LM Ericsson's conduct in Iraq constituted a "breach" of Ericsson's DPA.

**b.** The Ericsson Leak in 2022 Revealed Ericsson's Contemporaneous Office Discussions about Protection Payments to Terrorists: Prior to at least February 15, 2022, Ericsson concealed the fact that beginning in at least 2014, Ericsson's officers, employees, and agents frequently discussed Ericsson's protection payments, and the general consensus among them was that Ericsson paid Islamic State – either directly or through its Iraqi partners, consultants, subcontractors, or slush funds – to secure its projects in Iraq, including its transportation needs. Those discussions typically occurred in private, without official documentation. But the typical view of multiple Ericsson officers, employees, and agents—like that of other companies operating in Iraq—was that Ericsson had to pay terrorists to proceed with its work in unstable areas in Iraq.

**c.** The Ericsson Leak in 2022 Revealed Ericsson's Permission Letters to Terrorists in Iraq: Prior to at least February 15, 2022, Ericsson concealed the fact that it requested "permission letters" from terrorists in Iraq granting them formal authority to work in Iraq, similar to a request Ericsson submitted to Islamic State in 2014 via its strategic partners, like Asiacell, and subcontractors, like Orbitel. Al-Qaeda, al-Qaeda-in-Iraq, and ISIS issued such letters only to contractors that had made the necessary protection payments.

**d.** The Ericsson Leak in 2022 Revealed Ericsson's Indifference to Funding Consequences in Iraq: Prior to at least February 15, 2022, Ericsson concealed the fact that it had a documented track record of expressed indifference to where their money went in Iraq. For example, Ericsson admitted that, at best, it did not know, and until 2022 did not care, where its money went, as long as its profitable work remained unimpacted. That philosophy, prevalent throughout Defendants' operations, led Ericsson to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to maximize Ericsson's profits from customers in the Iraqi and Syrian geographies in which such groups operated.

**e.** The Ericsson Leak in 2022 Revealed Ericsson's Uncontrolled Iraqi Slush Funds: Prior to at least February 15, 2022, Ericsson concealed the fact that it operated, and benefited from, an uncontrolled slush fund in Iraq—which Defendants intentionally created and sustained by deliberately avoiding placing rigorous controls on what their partners, consultants, and contractors could do with Ericsson's money inside Iraq even though Iraq posed extraordinarily unique terrorist finance risk—as a strategy designed to create purpose-built buffers between Defendants and the terrorists they intentionally paid. Defendants did so to permit Ericsson to route payments to terrorists through Defendants' partners, consultants, contractors, and slush funds, which Ericsson encouraged while often avoiding the details.

**f.** The Ericsson Leak in 2022 Revealed Ericsson's Use of Incentives to Encourage Personnel to Make Protection Payments to Terrorists: Prior to at least February 15, 2022, Ericsson concealed the fact that it rewarded its officers, employees and agents who facilitated protection payments to terrorists, while simultaneously punishing persons who questioned their conduct.

287. Ericsson's payments were consistent with foreign-headquartered telecommunications companies' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage. *See supra* II.A.2. In following that standard practice, Ericsson caused protection payments to flow to terrorists that were, on information and belief, worth at least 10 percent to 20 percent of the value of Ericsson's Iraqi contracts—a common rate for protection payments to al-Qaeda-sponsored Sunni terrorists in Iraq and Syria. As a result, across its contracts, Ericsson made payments to al-Qaeda and al-Qaeda-in-Iraq worth at least several million dollars per year from 2004 through 2014, and made payments to Islamic State worth at least several million dollars per year from 2014 through at least 2019.

288. From 2014 through at least 2019, Ericsson likely routed more than $15 million to Islamic State and Jabhat al-Nusra pursuant to LM Ericsson's approval of Ericsson AB's agreement to purchase security from Islamic State and Jabhat al-Nusra in Iraq.

289. On information and belief, the sum and substance of Ericsson's protection agreements with al-Qaeda-in-Iraq and Islamic State from 2004 through at least 2019 were substantially like Lafarge's protection agreement with Islamic State in Syria with respect to, *inter alia*, the "rate(s)" that Ericsson agreed to pay Islamic State to purchase security in Iraq from ISIS, "tolls" assessed on Ericsson's convoys, "taxes" assessed on Ericsson's income, and other assorted fees and penalties.

#### b. Defendants Used Strategic Partners, Consultants, Subcontractors, and Slush Funds to Funnel Protection Payments to Terrorists in Iraq

290. From 2004 through at least 2019, Ericsson used a broad array of strategies to route protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State on Ericsson's behalf, including, but not limited to, protection payments to such FTOs that Ericsson routed through: (1) Ericsson's strategic "partners" in Iraq; (2) Ericsson's consultants; (3) Ericsson's security, logistics, and transportation subcontractors; and (4) Ericsson's slush funds, upon which Ericsson's employees and contractors relied. At all times, such conduct by Ericsson and its agents and allies was understood and intended by all concerned to purchase security from the FTOs to aid Ericsson's Iraq business.

291. **Ericsson's Strategic Partners.** Close cooperation between LM Ericsson, Ericsson AB, and Ericsson Inc. and their strategic partners in Iraq, like Asiacell and Korek, was a hallmark of Ericsson's protection money strategy in Iraq from 2004 through at least 2019.

292. From 2004 through 2022, Ericsson viewed Asiacell as one of its key strategic partners in Iraq, and Asiacell likewise viewed Ericsson as a key strategic partner of Asiacell.

293. Even though Ericsson AB and Ericsson Inc. were nominally the supplier and manufacturer, respectively, while Asiacell was the customer, their mutual agreement that the Ericsson-Asiacell relationship was between two partners was apt—particularly with respect to protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

294. From 2004 through at least February 15, 2022, while Ericsson and Asiacell served as partners to one another, Ericsson (through LM Ericsson and Ericsson AB) coordinated closely with Asiacell regarding any protection payments to al-Qaeda, al-Qaeda-in-Iraq, and ISIS.

295. When Asiacell made its protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Asiacell often did so through LM Ericsson, Ericsson AB, and/or Ericsson's

subcontractors. For example, according to leaked Ericsson internal documents, "[e]vidence suggests that Asiacell [] engaged in smuggling and potential illegitimate payments directly and through Ericsson."

296. True to their partnership, LM Ericsson and Ericsson AB were likewise willing to pay off terrorists on Asiacell's behalf. Indeed, more than one review published by, or funded by, the U.S. government determined that Asiacell paid al-Qaeda-in-Iraq hundreds of thousands of U.S. dollars per month in Ninewa province alone during a substantial part of the 2000s while it served as Ericsson's strategic partner there.

297. As a result, from 2004 through at least 2019, Ericsson and Asiacell were generally both involved, directly or indirectly, whenever protection money payments were made to terrorists in connection with Ericsson's projects for Asiacell.

298. According to leaked Ericsson internal documents, Defendants also relied upon U.S.-manufactured "free goods," including sophisticated free American consumer communications technologies like Apple iPads,[26] as cash equivalents to make corrupt payments to support Ericsson's ability to make protection payments in Iraq. The terrorists who received those high-tech, embargoed, free goods used them for vital communications support and as a fungible cash-equivalent that they could, and often did, monetize through the black markets that were endemic throughout the Middle East from 2003 through 2022. Ericsson also gave such free goods as alternative payments and gratuities to the Kurdish intermediaries upon whom Ericsson partially relied to route protection money to Islamic State, which furthered Ericsson's ability to

[26] Although iPads are generally manufactured in China, they contain significant U.S.-manufactured parts (including chips and glass screens) and are typically shipped or sold from the United States.

make protection payments by helping lubricate Ericsson's relations with its local allies—the entire point of the iPad gifts in the first instance.

299. On information and belief, Ericsson AB and Ericsson Inc. also each provided "free goods" payments to al-Qaeda-in-Iraq terrorists in Iraq in the form of Ericsson cell phones, which were valuable both as cash equivalents and for their utility as communications devices. They were particularly valuable as cash equivalents given their ubiquity in Iraq between 2005 and 2007. According to one Confidential Witness who had counterterrorism-facing responsibilities in Iraq, Ericsson mobile phones were the "only phones [he] ever saw" while there (other than the occasional satellite phone) and were used by U.S. government contractors, government personnel, and Iraqi nationals.

300. The Middle East, including Iraq, also featured a robust black market in Ericsson cell phones. The same Confidential Witness, for example, recalled seizing "multiple boxes of Ericsson phones" while stationed at a checkpoint on a major supply route. And as with everyone else in Iraq, Ericsson's cell phones were popular among and used by terrorists. According to this Confidential Witness, "[t]he terrorists always had a phone, and it was Ericsson 100 percent of the time." After any terrorist attack, it was protocol to search terrorists' bodies for the phone (among other items) because it could contain actionable intelligence. The same Confidential Witness even recounted how his/her team found the Ericsson cell phone that belonged to the terrorist/security guard who "blew himself up in the Iraqi Parliament" in 2007. That terrorist kept his Ericsson cell phone in his boot, which – after the explosion – was no longer attached to his body, and the Confidential Witness personally observed the Ericsson phone "wedged up [in the boot] against the severed foot."

301. The Ericsson leaks in 2022 also revealed that LM Ericsson and Ericsson AB—in their role as supplier, on behalf of themselves and key Ericsson divisions and manufacturers, like Ericsson Inc., that Ericsson promoted in Iraq—also used its strategic partners to deploy another popular tactic in the corporate corruption and illicit finance toolkit from 2003 through 2022 known by some as **"offloading."**

302. Offloading is a notorious corruption strategy that was always (and remains) especially popular with corrupt European and American multinational corporations that desire to make large streams of regular and predictable illicit payments to known recipients. In a typical version of an "offloading" transaction, criminal corporations, including Ericsson, negotiate with a trusted ally, like a strategic partner or captive subcontractor, to serve as an intermediary upon which the corporation can "offload" some aspect of that illicit payment stream. The offloading corporation is thus able to theoretically offload the legal exposure it would otherwise risk incurring onto its ally, which typically has significantly less (or even zero) legal exposure even it its conduct were detected by relevant local governing authorities. In exchange for taking on a role in the illicit payment stream, the offloading corporation typically provides a benefit to make it worth the ally's while, such as off-books cash payoffs, commercially unreasonable terms (in the ally's favor) on another aspect of their business relationships, free goods, and so on. As a result, when Western corporations and local partners engage in a pattern of transactions reflecting offloading tactics to facilitate corrupt payments by the Western company (usually the offloader) through a local partner (usually the intermediary), the local partner typically can expect to charge a fee of some sort, and yield a substantial profit from the offloading relationship (a win/win for both sides of this criminal coin).

303. Offloading was popular among multinational corporations during the United Nation's Oil-for-Food program from 1998 through 2003, several of whom used local businesses as intermediaries to make off-books payments to Saddam Hussein's regime, which funds were used to finance terrorism. Not surprisingly, Ericsson ordinarily hired consultants and subcontractors who had gained substantial illicit economy experience during the Oil-for-Food era that could help Ericsson operationalize and sustain an offloading scheme for terrorist finance, like what Ericsson pursued with Ericsson's Iraqi partners, Asiacell and Korek.

304. The history of Ericsson's behavior in Iraq, as first revealed during the 2022 Ericsson leaks, is consistent with Defendants' widespread implementation of an offloading strategy in Iraq. Ericsson relied on an offloading strategy to route some of their protection money value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Defendants did so by, among other things, routing cash payments through intermediaries. Moreover, on information and belief, Defendants also negotiated discounted pricing on certain commercial aspects of their deals with Asiacell and Korek to provide these customers with excess value for the purpose of, and with the specific intent to, facilitate Asiacell's and Korek's respective protection payments to terrorists on each of their own behalves and on behalf of their partner, Ericsson (while also permitting Asiacell and Korek to each keep some of that excess value for themselves as a fee for participating in Ericsson's offloading strategy).

305. When corporations, like Ericsson, embrace offloading as a corruption scheme, the criminal rot tends to spread far and wide throughout the organization, as it requires a team effort to sustain an offloading scheme at a large multinational corporation. Thus, offloading schemes tend to be practiced by only the most brazen of corporate criminals, as they are one of the maximalist ways (from an organizational perspective) a corporation can route illicit payments to

third parties. Simply put, one-off dirty consultants are far easier. But for large scale payments, offloading offers superior efficiency advantages for the criminal enterprise. Defendants practiced an all-of-the-above approach, in which they used more common illicit transfer strategies (*e.g.*, slush funds and corrupt consultants) while also embracing an offloading approach through their relationships with strategic partners and subcontractors.

306. Given LM Ericsson's "One Ericsson" model, which places tremendous scrutiny on the commercial terms at issue, Ericsson's offloading practices necessarily involved both LM Ericsson's C-Suite (which had to approve the egregious deals) and its cross-functional commercial, legal, compliance, and technical teams in the United States (which had to approve and operationalize those deals).

307. As a result of Defendants' adherence to such offloading practices, even corrupt value transfers to Asiacell and Korek that did not directly go to the terrorists – *e.g.*, a large off-books cash payment to officers, employees, or agents of Asiacell or Korek – still often flowed significant value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because LM Ericsson, Ericsson AB, and Ericsson Inc. (via Ericsson AB's role as Ericsson Inc.'s agent in Iraq) agreed with its Iraqi partners like Asiacell and Korek that everyone involved would help everyone else with their protection money needs. On information and belief, Ericsson regularly routed large-value protection payments through its partners via such an "offloading" strategy.[27]

308. **Ericsson's Consultants.** Ericsson leveraged its long-standing consultants in Iraq to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

[27] Given that offloading is the most effective way to conceal illicit payments (that's why it exists, after all), Plaintiffs have only scratched the surface, and discovery is likely to reveal additional instances of Defendants' offloading relationships.

309. According to leaked Ericsson internal documents, Defendants paid **al-Awsat Telecommunications Service Company ("al-Awsat")** to serve as a conduit in order to route tens of millions of dollars to others, through consulting work where: (a) the ultimate beneficiary could not be identified; (b) there was "deficient proof of work"; and (c) "the money ultimately ended up in a Jordanian bank account."[28] These were three classic indicia of a company routing value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq. According to leaked Ericsson internal documents,

> In interviews, [at least two witnesses] stated that Al-Awsat were paid 500k USD under the label "Security Service" without a clear scope of delivery. … In [an] interview [with Ericsson, a witness] stated that the amount was requested to be added by [chief of LM Ericsson's Iraq Country Unit] Tarek Saadi … In interviews with [Ericsson, one or more witnesses] has confirmed that no security services from Al-Awsat have been rendered, and in reference to the 500k USD … [i]t has not been possible to trace the ultimate beneficiary of this money.

310. According to leaked Ericsson internal documents, Defendants authorized al-Awsat and its proprietor, Jawhar Surchi, to execute agreements on Defendants' behalf. Indeed, according to those leaked documents, Surchi and al-Awsat were internally viewed as indistinct from Ericsson to such an extent over time that al-Awsat was no longer referred to by its name "al Awsat" but instead simply as "Ericsson."

311. According to leaked internal Ericsson documents, one or more Ericsson employees told LM Ericsson's investigators that Ericsson directed large U.S. Dollar-denominated "commission" and "security services" payments to al-Awsat "regardless of whether there were deliveries ongoing or not," which were classic indicia of a company routing value to al-Qaeda, AQI, and Islamic State through an intermediary. The devices themselves were also

[28] Notably, al-Awsat means "the middle" in Arabic, thus expressly and without irony referencing Ericsson's use of al-Awsat as a "buffer" between Ericsson and those whom Ericsson needed to pay off as the price of doing business in Iraq.

weapons in the hands of al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, which used cell phones, laptops, and other communications systems to, among other things, detonate bombs, gather intelligence, coordinate attacks, and barter for other black market goods, given such goods' status as valuable cash equivalents on the black market.

312. From at least 2005 through at least 2017, Ericsson relied upon the services of al-Awsat and its sister company, Alawsatiya, to route illicit funds through suppliers.[29] During this period, Defendants caused al-Awsat and Alawsatiya to be paid at least $10.5 million. According to Ericsson, "[t]he 10.5M USD paid to Alawsatiya into Al-Awsat's accounts was not reflected in their accounts at all, and therefore we are unable to ascertain who the ultimate beneficiary owner was for this money." On information and belief, al-Awsat and Alawsatiya diverted a substantial percentage of this money to al-Qaeda, al-Qaeda-in-Iraq, and ISIS from 2005 until at least 2017.

313. On information and belief, Ericsson retained other consultants from 2005 through at least 2019, which Defendants used to route protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, through these FTOs' agents in Iraq.

314. **Ericsson's Security, Logistics, and Transportation Subcontractors.** LM Ericsson, Ericsson AB, and Ericsson Inc. also relied upon LM Ericsson's security, logistics, and transportation suppliers, with whom Defendants contracted, to route Ericsson's protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2005 through at least 2019.

315. During this period, Ericsson relied upon, among others, **Security and Logistic Services ("SLS")**, which was a supplier to Ericsson, and **Cargo Iraq**, which was also an Ericsson contractor, albeit one that Defendants tried to conceal on their books.

[29] According to al-Awsat's owner, Jawhar Surchi, Alawsatiya was a "secondary contractor" that served as an extension of al-Awsat.

316. Ericsson intended for its security, logistics, and transportation suppliers to divert a substantial amount of the sums they were paid by Ericsson to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because the suppliers understood that Ericsson affirmatively desired that they pass on such money to the terrorists in order to secure a more favorable business environment in Iraq for Ericsson. And those suppliers did what Ericsson intended them to do.

317. **Ericsson's Slush Funds.** According to leaked Ericsson documents, Defendants maintained an **"uncontrolled slush fund"** that they operationalized through their employees and subcontractors. Ericsson "used" its longtime subcontractor SLS "to provide cash for transportation services." SLS did not provide legitimate transportation security services but chose to simply pay the terrorists. According to leaked Ericsson internal documents, Ericsson's "suppliers were used as an uncontrolled slush fund between 2016-2018" and Ericsson "cannot rule out that other suppliers [had] been used in [a] similar manner until today."

318. Ericsson's personnel in Iraq went to great lengths to create slush funds in every manner possible. For example, Ericsson's personnel working on Defendants' Asiacell contracts developed a scrapping scheme in which Ericsson employees used unrecorded cash from the sale of decommissioned equipment to pay for illicit off-books expenses.

319. Ericsson operated its scrapping scheme as a slush fund generation tactic from at least 2014 through at least 2017. According to Ericsson:

> A scrapping scheme was established, which involved selling decommissioned equipment owned by Asiacell on a swap project for 2000 sites, including Nokia and Huawei sites. Ericsson's Asiacell KAM [i.e., Key Account Manager] and Operations teams have been using the unrecorded cash as a 'slush fund' for other expenses. … Over 188K USD between 2014-2017 has been identified by the investigation. The spent included hotels, dinners, bonuses for contractors, parties, personal expenses, taxis and miscellaneous purchases. This process does not follow any of the four Ericsson routines for handling cash.

320. On information and belief, some of the sums described above, including but not limited to "bonuses for contractors" and "personal expenses" were euphemisms for payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and Defendants' scrapping scheme was another mechanism through which Ericsson created the purpose-built slush funds it needed for its payoffs, including to al-Qaeda and al-Qaeda-in-Iraq (in at least 2014) and to Islamic State (from at least 2014 through 2017).

321. The **2014 Asiacell Base Stations Contract**, *supra* ¶ 283(m), offers a good illustration of Defendants' general practice of making protection payments to terrorists in Iraq. Throughout the spring and summer of 2014, LM Ericsson faced an imminent financial crisis, causing it to announce major restructuring, impairments, and the need to substantially increase revenue. Against this backdrop of intense corporate pressure, in the summer of 2014, while Ericsson began working under the 2014 Asiacell Base Stations Contract, ISIS was rampaging across Iraq, including the northern Iraqi geographies in which Ericsson's work was being performed. Given ISIS's universal taxation practices, and use of such tax revenue to finance terrorism, every responsible company exited the areas seized by ISIS. Ericsson, however, stayed.

322. On June 10, 2014, Islamic State seized Mosul. The next day, instead of planning their departure, Ericsson was looking for contractors to work on a network upgrade project under the 2014 Asiacell Base Stations Contract. One or more of Ericsson's employees and/or agents expressed concern about the security environment in Iraq and encouraged Ericsson to invoke its "force majeure" clause in the Asiacell contract so that Ericsson would not have to work in or near Islamic State-held territory, and the issue was escalated to Ericsson's regional management.

323. According to leaked Ericsson internal documents, an "email review" of Defendants' emails showed that Ericsson "persever[ed] to maintain business continuity" in

northern Iraq "[i]n the weeks following the capture of Mosul by ISIS on 10 June 2014." For example, during this period, an LM Ericsson manager emailed one of Ericsson's subcontractors operating in Islamic State-controlled territory and instructed him as follows: "Kindly let's keep each other updated daily so that whenever there's any window to perform activity if the security situation allows, so that we grab any chance available."

324. Between on or about June 11, 2014 and on or about June 17, 2014, Tom Nygren, LM Ericsson's Vice President and General Counsel for the Middle East Region, strongly recommended that Defendants invoke force majeure and withdraw from the Iraqi geographies controlled by Islamic State.

325. But on June 18, 2014, Rafiah Ibrahim, Head of Ericsson's Middle East & Africa Region, and Tarek Saadi, then-head of Ericsson's Iraq Country Unit, rejected Mr. Nygren's recommendation. According to Ericsson, "[d]espite the strong recommendation from Tom Nygren," "Rafiah Ibrahim" "and Tarek Saadi" "decide[d] not to invoke force majeure because it would be 'premature' and 'destroy [Ericsson's] business.'"

326. According to Ericsson, Roger Antoun, an Ericsson manager who worked on the 2014 Asiacell Base Station Contract, said the proposal by Ericsson's employees to invoke force majeure was "escalated" to LM Ericsson's global headquarters and Mr. Antoun "raised it verbally as well." On information and belief, LM Ericsson's senior global leadership sided with Ms. Ibrahim and Mr. Saadi, and approved Defendants' continued business in Islamic State-controlled territory.

327. On July 13, 2014, LM Ericsson conducted a meeting of its regional leadership for the Middle East, during which meeting the participants openly discussed continuing to do business in Islamic State-controlled territory. At this meeting, Ericsson AB's senior executive

for the Middle East and Africa, Ms. Ibrahim, shared information with the group that Islamic State's abductions in Iraq were "impacting business." Ms. Ibrahim and Ericsson AB's senior Middle East management team, however, concluded that "for now," there would be "no changes," meaning that Ericsson would continue to do business in Iraqi territory controlled by Islamic State even though Defendants understood the risks in doing so.

328. The day after Ericsson AB's meeting, on July 14, 2014, according to leaked Ericsson documents, Ericsson asked Asiacell, which Ericsson viewed as one of its Iraqi "partners," to request "permission from 'local authority ISIS'" to permit Ericsson to continue to work in Mosul even after Islamic State fully seized the city in Summer 2014.

329. Later that summer, LM Ericsson, Ericsson AB, and Asiacell prepared a letter to Islamic State requesting the terrorist group's permission to continue working in northern Iraq. Among other things, Ericsson and its "partners" at Asiacell asked Islamic State to "[p]lease facilitate the mission of the technical team … of Ericsson which is contracted by Asiacell for the maintenance and setting up of the towers" and "thank[ed]" Islamic State for its "cooperation." According to a leaked Ericsson report, Ericsson could not rule out the possibility that this "facilitation" involved Ericsson's financing of terrorism in Iraq.

330. LM Ericsson, Ericsson AB, and Asiacell then caused an engineer named Affan – who had been working for Ericsson's subcontractor, Orbitel, on tower tests in Mosul – to personally deliver Ericsson's and Asiacell's permission letter to the terrorists at Islamic State's office in Mosul.

331. LM Ericsson, Ericsson AB, and Asiacell insisted that the work continue and sent Affan to deliver their letter to Islamic State even though LM Ericsson, Ericsson AB, and Asiacell

understood that Islamic State terrorists had previously detained several other workers performing services under Defendants' 2014 Asiacell Base Stations Contract.

332. LM Ericsson and Ericsson AB communicated directly with Affan prior to his interaction with Islamic State to instruct him to hand-deliver Ericsson's and Asiacell's permission letter to ISIS.

333. LM Ericsson and Ericsson AB also communicated with their Iraqi subcontractor, Orbitel, which employed Affan on Ericsson's behalf, in order to pressure Orbitel to deliver Ericsson's and Asiacell's letter to Islamic State. As Affan put it, "Ericsson put pressure on my company, and my company put pressure on me."

334. After Affan hand-delivered the joint Ericsson/Asiacell letter to Islamic State, he was contacted by Islamic State terrorists and instructed to appear at a meeting point. When Affan did so, he was detained by a sheikh, Haji Saleh, who was an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecommunications businesses in northern Iraq. Haji Saleh told Ericsson's senior manager in Iraq that Ericsson must pay millions of U.S. dollars to Islamic State in order to continue its work in Northern Iraq.

335. According to leaked Ericsson internal documents, an Islamic State "sheikh" – on information and belief, Haji Saleh – called Rabbah Dannawi, an Ericsson project manager in Iraq, and told Mr. Dannawi that Ericsson and its employees were "infidels," Islamic State was demanding that Ericsson pay a religious tax of millions of U.S. dollars, and Mr. Dannawi was "reachable" even in Oman or Lebanon. After Mr. Dannawi "hung up the phone," Affan frantically called back but no one from Ericsson returned his calls.

336. Ericsson, Asiacell, and Orbitel abandoned Affan for several weeks, while he was placed under house arrest by Islamic State. Describing how Ericsson treated him, Affan put it simply: "They sold me." Referring to Ericsson, Affan said: "They destroyed me."

337. After a few weeks, Islamic State terrorists told Affan that he was free to leave. Islamic State did so because Ericsson facilitated the payment of millions of U.S. dollars to Islamic State as a "business tax," which Islamic State had previously communicated to Ericsson must be paid for Defendants to do business in parts of northern Iraq that were controlled or contested by Islamic State. According to leaked Ericsson documents, an Ericsson manager admitted that Ericsson worked through Asiacell to make "arrangements to obtain the release of the hostage and to let Ericsson continue the work in Mosul." Based on his personal observations, Affan also concluded that Ericsson purchased security from Islamic State by paying protection money to it. On information and belief, Ericsson routed some of these payments to Islamic State through, among other terrorists, Haji Saleh, an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecom firms in northern Iraq.

338. Defendants did not merely pay "business taxes" to Islamic State. From at least 2014 through at least 2017, Ericsson also facilitated the payment of "customs taxes" to Islamic State, which Islamic State assessed on trucks traveling through or near territory controlled by Islamic State.

339. As part of the 2014 Asiacell Base Stations Contract, for example, Ericsson and its partner Asiacell had to transport expensive cell towers and equipment from Erbil in northern Iraq to Ramadi in western Iraq. According to leaked Ericsson documents, Defendants' transportation contractor, Cargo Iraq, had two options: the "legal way" and the "Speedway." While the "Speedway" was both longer (in terms of distance) and more expensive (in terms of illicit

protection payments, styled as "customs taxes," required to be made to Islamic State), it was actually much faster than the "legal way" because it avoided the lawful Iraqi checkpoints that the Iraqi government established throughout the country in an attempt to halt Islamic State's rapid advance at the time. The International Consortium of Investigative Journalists published a graphic, *see* Figure 1, depicting Ericsson's choice.[30]

[30] Sydney P. Freedberg, Maggie Michael and Amir Musawy, *The Ericsson List: Leak Exposes Ericsson's Secret Dealings With ISIS Amid Iraq Corruption Spree*, Int'l Consortium of Investigative Journalists (Feb. 27, 2022), https://tinyurl.com/5yjnnjyr ("ICIJ, *Ericsson List*").

## Dodging government checkpoints

An alternative route between Ramadi and Erbil avoided delays and high tariffs at government checkpoints and instead passed through some ISIS areas in 2016-2017, according to drivers and other locals interviewed by ICIJ and NDR.




Map showing an alternative route between Erbil and Ramadi in Iraq.

**Figure 1**

340. Ericsson instructed Cargo Iraq to take the "Speedway" because Ericsson calculated that doing so was better for its bottom line (notwithstanding the cost of payoffs to Islamic State). On information and belief, this was because, among other reasons, Defendants' contracts with Asiacell and Korek harshly penalized project delays. In short: Defendants bribed

Islamic State so that Ericsson could avoid paying substantial late fees to its Iraqi customers—which fees would have exceeded the amounts Ericsson had to pay Islamic State to take the "Speedway." Moreover, even without the prospect of costly project delays, taking the "Speedway" allowed Ericsson to avoid paying official customs taxes that the Iraqi government assessed at various checkpoints along the "legal way."

341. According to leaked Ericsson documents, Defendants regularly paid thousands of dollars per truck to transport their equipment on the "Speedway" through Islamic State's territory while providing services under the 2014 Asiacell Base Stations Contract. For example, in March 2017, according to such Ericsson documents, Ericsson paid $22,000 per truck for three loads on a single day. According to such leaked Ericsson data,

> Roger Antoun stated in an interview that Ericsson had paid an illegal 'Speedway' option to the transporter Cargo Iraq [] for faster transportation of equipment in Iraq. According to Roger Antoun, Cargo Iraq were engaged by Ericsson, on instruction by non-government customer Asiacell, for transportation during 2016 and 2017. With the specific purpose to circumvent the official customs. That had been increased to 25% from 10%-15% by the government since the ISIS invasion [in 2014]. Cargo Iraq were not registered as an Ericsson supplier and were paid in cash through Security and Logistic Services (SLS), a supplier to Ericsson. The timeframe and geographic areas covered by these transportations indicate that areas controlled by local militias, including ISIS, has been passed.

342. Collectively, LM Ericsson, Ericsson AB, and Ericsson Inc. facilitated at least several million U.S. dollars' worth of such "customs tax" payments to Islamic State terrorists to transport goods on the "Speedway" from at least 2014 through at least 2019. Indeed, the transactions above, which describe only one day in March 2017, resulted in at least $16,500 flowing from Defendants to Islamic State on a single route in a single day. Indeed, in a leaked report, Ericsson itself concluded that "[b]y avoiding official customs by transporting through areas controlled by militias, including ISIS, it cannot be excluded that Cargo Iraq engaged in … potential illicit financing of terrorism to carry out transportation operations for Ericsson."

343. The **2004 Asiacell Network Contract**, *supra* ¶ 283(a), offers another good illustration of Defendants' general practice of making protection money payments to terrorists in Iraq from at least 2004 through at least 2019. From 2004 through approximately 2008, Ericsson expanded Asiacell's network throughout central and northern Iraq, including in Baghdad and Mosul. Throughout, Defendants and Asiacell viewed one another as strategic "partners," in the same way they were a decade later.

344. While Defendants built out Asiacell's network in central Iraq from 2004 through 2008, al-Qaeda and al-Qaeda-in-Iraq ran sophisticated protection money operations that specifically focused on extracting business taxes and customs taxes from telecommunications companies that were doing business in central Iraq and/or shipping equipment through northern Iraq, both of which described Defendants' services to, and partnership with, Asiacell.

345. From 2004 through at least 2008, al-Qaeda and al-Qaeda-in-Iraq collectively extracted millions of U.S. dollars each year from persons affiliated with the 2004 Asiacell Network Contract. The U.S. government has determined that al-Qaeda-in-Iraq extracted large amounts of protection money from persons associated with the 2004 Asiacell Network Contract between about 2005 through about 2008 (at least), which included monthly six-figure payments of "business taxes" in al-Qaeda-in-Iraq-contested provinces, including Ninewa and Baghdad, where Ericsson performed under the 2004 Asiacell Network Contract.

346. Ericsson played a key role in the Asiacell-related protection money payments to al-Qaeda and al-Qaeda-in-Iraq from 2004 through at least 2008.

347. Defendants did not limit their protection money payments in Iraq to Asiacell-related work. Ericsson's corruption was programmatic throughout Iraq and extended specifically to Ericsson's work for Korek in Iraq. According to leaked Ericsson internal documents, Elie

Moubarak, Ericsson's account manager for Korek, engaged in "corruption and financial irregularities" in order to facilitate Ericsson's business in Iraq. On information and belief, LM Ericsson and Ericsson Inc. routed protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2005 through at least 2019 in connection with Ericsson's Korek-related work as described above.

348. In each instance above, LM Ericsson and Ericsson AB authorized and coordinated the payment(s) to the terrorists. Although LM Ericsson and Ericsson AB could have vetoed any such payment, they chose not to—just as Ericsson opted not to hire sufficient private security to protect its projects and equipment from terrorist attacks—because Ericsson prioritized profits over all else, including any risks that its substantial payments to violent terrorists would facilitate violent terrorism.

349. Indeed, the events alleged above are merely examples and reflect the tip of what is likely an historically large legal iceberg, as Ericsson went to unusual lengths to conceal its protection payments to terrorists. *See infra* Part IV. Discovery is therefore likely to reveal additional culpable (and illegal) relationships, strategies, and payments.

350. Ericsson's protection payments delivered substantial monetary value, usually in U.S. dollars, to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2004 through 2022. Given the size of Defendants' business in Iraq during that time frame, the frequency of its contracts, the nature of the Iraqi projects for which Defendants were contracted, and LM Ericsson's admissions about Defendants' conduct in Iraq, Ericsson's total protection payments – including cash payments through Ericsson's uncontrolled slush funds and value transfers through Defendants' agents, partners, consultants, and contractors – delivered at least several million U.S. dollars per

year in total value to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2004 through at least 2019.

351. From 2004 through 2014, the total value of the protection payments that Ericsson caused to flow through to al-Qaeda and al-Qaeda-in-Iraq likely exceeded $50 million—and may be far in excess of that number. Among other reasons, the U.S. military and media both confirmed in numerous reports that al-Qaeda-in-Iraq charged telecommunications companies in Iraq a "going rate" of $200,000 per month per province in order to receive al-Qaeda-in-Iraq's protection. At all times, al-Qaeda-in-Iraq claimed dominion over at least five provinces in Iraq, and thus it is extremely unlikely that Ericsson only paid a single $200,000 monthly fee to purchase security from AQI for all of Ericsson's projects nationwide.

352. Even applying that unrealistic assumption, however, Ericsson likely paid al-Qaeda-in-Iraq around $25 million, which is the result if one assumes that Ericsson merely paid the bare minimum $200,000 fee during each of the approximately 130 months when al-Qaeda-in-Iraq operated al-Qaeda's protection networks in Iraq from spring 2003 through spring 2014. Considering the publicly confirmed rates that AQI charged telecommunications companies like Ericsson in Iraq from 2004 through 2014, Plaintiffs' estimates regarding Ericsson's protection payments to al-Qaeda and al-Qaeda-in-Iraq are conservative.

353. Moreover, the vast sums Ericsson paid throughout from at least 2004 through at least 2019 facilitated the terrorists' financial reserves for at least several years thereafter. As a result, Islamic State was still likely benefitting from Ericsson's 2019 largesse, for example, in February 2022 when leaked Ericsson internal documents revealed Defendants' past aid to terrorists.

### c. Defendants Admitted That Ericsson Likely Purchased Security From Al-Qaeda And Islamic State In Iraq

354. Ericsson has, in sum and substance, admitted that it purchased protection from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2011 through at least 2019 and that it obstructed U.S. counterterrorism operations until at least February 15, 2022. In addition to the statements alleged above, *e.g.*, *supra* II.B, other examples of LM Ericsson's admissions (on behalf of itself and Ericsson AB and as Ericsson Inc.'s agent) include, but are not limited to:[31]

**a.** Via its CEO, Mr. Ekholm: "We . . . received communication from the DOJ about a breach notice related to our DPA, … it's our assessment that the resolution will likely result in monetary and other measures"[32]

**b.** "Ericsson has been active in Iraq since the lifting of a UN embargo led to the reopening of the telecoms equipment market. Since then, Ericsson has continued its work in the country, including during periods of civil unrest. Iraq is one of a number of countries where increased concerns about security and risk to colleagues' well-being is closely monitored. The company has processes in place to manage security risks, covering both employees and subcontractors."[33]

**c.** "[Ericsson's] investigating team [] identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes. Investigators could not determine the ultimate recipients of these payments. Payment schemes and cash transactions that potentially created the risk of money laundering were also identified."[34]

**d.** "[An] investigation [by Ericsson relating to unusual expenses] included the conduct of Ericsson employees, vendors and suppliers in Iraq during the period 2011-2019. It found serious breaches of compliance rules and the Code of Business Ethics. It identified evidence of corruption-related misconduct, including: Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; and improper use of sales agents and consultants. In addition, it found

---

[31] Consistent with its typical practice and its "One Ericsson" structure, LM Ericsson's public statements about misconduct in Iraq refer only to "Ericsson," and do not specify any other entity. *See* LM Ericsson, *Press Release: Update: Iraq Media Inquiries* (Feb. 15, 2022).
[32] Telefonaktiebolaget LM Ericsson (ERIC) CEO Börje Ekholm on Q1 2022 Results - Earnings Call Transcript (Apr. 14, 2022), https://tinyurl.com/mw2yzrv9.
[33] LM Ericsson, *Press Release: Update: Iraq Media Inquiries* (Feb. 15, 2022).
[34] *Id.*

violations of Ericsson's internal financial controls; conflicts of interest; non-compliance with tax laws; and obstruction of the investigation."[35]

**e.** "Ericsson terminated a number of third-party relationships and prioritized the Iraq country business for enhanced training and awareness activities, policies and procedures, and third-party management processes."[36]

**f.** Via its CEO, Börje Ekholm: LM Ericsson and its subsidiaries had identified "unusual expenses" relating to Iraq "dating back to 2018."[37]

**g.** Via its CEO, Mr. Ekholm: in sum and substance, LM Ericsson and its subsidiaries (as paraphrased by a reporter, with Mr. Ekholm's quote) "may have made illicit payments, but that the company had often struggled to identify the final beneficiary … [because] '[w]e [i.e., LM Ericsson and its subsidiaries] can't determine where money sometimes really goes, but we can see that it has disappeared.'"[38]

**h.** Via its CEO, Mr. Ekholm: "What we [i.e., LM Ericsson and its subsidiaries] are seeing is that transport routes have been purchased [by LM Ericsson and its agents] through areas that have been controlled by terrorist organisations, including ISIS."[39]

**i.** Via its CEO, Mr. Ekholm: LM Ericsson could not disprove that its money flowed to Islamic State: "The question on financing armed factions cannot be substantiated" one way or another.[40]

**j.** "[M]edia will focus on the conduct of business in unstable regions where terrorist organizations and corruption are present."[41]

### d. Independent Media Reports Corroborate Plaintiffs' Interpretation of Ericsson's Conduct in Iraq

355. Widespread media coverage confirms that Ericsson tried to pull a fast one on the U.S. government, Ericsson's shareholders, and American victims of terrorism, including Plaintiffs and their family members, and only came clean once a heroic whistleblower leaked the

[35] *Id.*
[36] *Id.*
[37] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq, Report Says; A Leaked Internal Report by the Swedish Business Shows Corruption and Terrorist-Linked Transactions Between 2011 and 2019* (Feb. 28, 2022), https://tinyurl.com/v93j5szx.
[38] ICIJ, *Ericsson List*.
[39] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq*.
[40] Greg Miller and Louisa Loveluck, *Justice Department Accuses Ericsson of Failing to Fully Disclose Alleged Fraud and Possible Payments to ISIS*, Washington Post (Mar. 2, 2022).
[41] LM Ericsson, *Press Release: Comment Regarding Recent Media Inquiries* (Feb. 8, 2022).

evidence of Ericsson's continued corporate crime spree and deception. Only then, once caught, did Ericsson admit its culpability. As the BBC's headline reported: "*Ericsson says it may have paid bribes to Islamic State terrorists*."[42] Other such reports include, but are not limited to:

**a.** Voice & Data, February 2022: "Ericsson [] said that its employees may have funded terrorism in Iraq and the Middle East. While it remains under investigation, the statements issued by [LM Ericsson] have all but confirmed it … Ericsson itself reported that the illicit payments might not have stopped until 2019 …. Notably, [LM Ericsson] has noted that during a period that lasted the entire 2010s, it found 'serious breaches' of compliance rules and the Code of Business Ethics. … A media statement [by LM Ericsson]… read, 'It identified evidence of corruption-related misconduct, including: Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; improper use of sales agents and consultants'. Let us break this down. 1. Making a monetary donation without a clear beneficiary: means that company funds … potentially … fund[ed] terrorist activities in Iraq and the Middle East. 2. Paying a supplier for work without a defined scope and documentation: a way to cover up the transfer of funds. 3. Funding inappropriate travel and expenses: using money to bribe ISIS for access to certain roads. This could also be used as a method to cover up fund transfers to terrorist beneficiaries. 4. Improper use of sales agents and consultants: this can mean a lot of things, such as sales agents being used as middlemen, to begin with. Furthermore, the investigating team also identified payments to intermediaries and the use of alternative transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes. This means that Ericsson intended to avoid Iraqi authorities, and as such, paid money to ISIS and other terrorist organizations controlling some routes at that time. Of course, the investigators could not determine the ultimate recipients of these payments. However, Ericsson did note that that did create a risk of money laundering. All of this points to a serious implication; Ericsson … funded terrorist activities during the time. However, Ericsson has said that none of its employees were 'directly involved' in funding any terrorist organization. Which really is not a great defense, to be honest." [43]

**b.** Guardian, February 2022: "Confidential documents have revealed how … [LM Ericsson] is alleged to have helped pay bribes to [] Islamic State … in order to continue selling its services after the militants seized control of large parts of Iraq. … The leak of

[42] BBC, *Ericsson Says It May Have Paid Bribes To Islamic State Terrorists* (Feb. 16, 2022) ("Ericsson['s] … boss said it may have paid off Islamic State (IS) in Iraq to access key transport routes. … Chief executive Börje Ekholm [said that] … an internal probe started in 2019 had found …. [that] [m]oney was paid to access areas in Iraq that were controlled by [Islamic State]").

[43] Voice & Data, *Ericsson Has to Sleep in the Bed it Made in Iraq* (Feb. 17, 2022), 2022 WLNR 4973266.

internal investigations at Ericsson, [] also found that the firm had put its contractors at risk and allowed them to be kidnapped by the militants ....”[44] “In addition to the findings about the alleged payments to [Islamic State], the investigations uncovered allegations [LM Ericsson] was involved in corruption in at least 10 countries across four continents. That would suggest a pattern of wrongdoing by Ericsson that is far wider than what the telecoms giant publicly admitted to in 2019, when it entered into a $1bn [] settlement with the [DOJ].”[45] “[Ericsson’s] [i]nvestigators concluded that the multinational firm was likely to have been involved in channelling bribes to [Islamic State] to allow its products to be transported across parts of Iraq that were held by the terrorists.”[46] “[Ericsson’s] payments [to Islamic State] … were [also] made through a slush fund run by contractors working for the Swedish multinational, according to [Ericsson’s] investigators.”[47] “The leaked documents also show how Ericsson jeopardised their contractors in Iraq in the pursuit of profits, as managers strove to continue the firm’s commercial operations even after [Islamic State] took control of Mosul. According to investigators, emails showed ‘this persistence resulted in the kidnapping of [contractors] while doing fieldwork for Ericsson’. The investigators added that even after the kidnapping, Ericsson sought to carry on doing business in the area.”[48]

**c.** *The National*, February 2022: “[LM Ericsson] has been accused of spending ‘millions of dollars’ to smuggle equipment into ISIS-controlled territory in Iraq … in a leaked internal report by the company … The ICIJ said that between 2011 and 2019, Ericsson made payments ‘to sustain its business in Iraq, financing slush funds, trips abroad for defence officials and payoffs through middlemen to corporate executives and possibly terrorists’. ‘The internal investigation describes a pattern of bribery and corruption so widespread, and company oversight so weak, that millions of dollars in payments couldn’t be accounted for — all while Ericsson worked to maintain and expand vital cellular networks in one of the most corrupt countries in the world.’”[49]

**d.** *Agence France Presse*, April 2022: “[LM Ericsson’s CEO] Börje Ekholm conceded in a newspaper interview … that some Ericsson employees may have bribed [Islamic State] members for road transport through areas controlled by [ISIS] in Iraq. The admission was made before the publication of a report by the [ICIJ] revealing that an internal Ericsson investigation from 2019 was never made public. The internal probe had identified possible corruption between 2011 and 2019 in the group’s Iraqi operations.”[50]

**e.** *National Iraqi News Agency*, April 2022: “The Swedish judiciary announced … the opening of an investigation into possible corruption crimes that … Ericsson is suspected

---

[44] Rob Evans and Michael Safi, *Revealed: Leaked Files Show How Ericsson Allegedly Helped Bribe Islamic State*, Guardian (Feb. 27, 2022).
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] The National, *Telecoms Company Ericsson Gave Millions to ISIS in Iraq*.
[50] Agence France Presse English Wire, *Sweden Opens Criminal Probe Into Ericsson Iraq Graft* (Apr. 20, 2022).

of being involved in, linked to the payment of bribes to ISIS elements in Iraq. According to [Swedish] Attorney General Lev Gortz, the investigation covers the period from 2011 to 2019. …. 'We have good reasons to believe that corruption may have been committed in Iraq during this period, …,' Gortz [said]. … [LM Ericsson's] CEO, Börje Ekholm, admitted in a newspaper interview [] that some Ericsson employees may have bribed ISIS elements to move overland through ISIS-controlled areas in Iraq."[51]

**f.** ICIJ, June 2022: "The [SEC] is probing … Ericsson over its conduct in Iraq following company admissions that it may have made payments to [] Islamic State … The announcement comes nearly five months after the [ICIJ] and 30 media partners … detail[ed] a widespread pattern of alleged corruption and graft, [and] revealed that [LM Ericsson] had paid tens of millions of dollars in suspicious payments from 2011-2019 to sustain its business in Iraq. … Days after the Ericsson List was published, U.S. prosecutors told [Ericsson] that it had breached [the DPA] by failing to fully disclose the misconduct in Iraq and that the department was weighing whether Ericsson or its executives would face new fines or prosecution for breaking terms of the deal."[52]

356. White collar crime scholars also confirmed that Ericsson's conduct comprised an admission of wrongdoing. As former federal prosecutor Michael Volkov, author of the widely-read *Corruption, Crime, and Compliance* blog, summarized on June 15, 2022:

> Ericsson is having a tough time. First, in 2019, Ericsson settled FCPA charges with [DOJ] and the SEC for … $1 billion … Second, Ericsson had an independent compliance monitor appointed for a three-year term under its deferred prosecution agreement. And then — last year, Ericsson was notified by DOJ that it failed to conduct a proper internal investigation in Iraq because it failed to disclose additional misconduct to DOJ, most of which centered on bribery payments made to ISIS terrorists … DOJ has another opportunity to resolve the Ericsson matter to confirm prior policy statements highlighting a tough stance on recidivists — those defendants that have multiple violations of the FCPA or violated deferred or non-prosecution agreements. … DOJ is lining up against Ericsson to bring a major enforcement action for violating their 2019 [DPA] by failing to disclose bribery conduct in Iraq involving illegal payments to ISIS. Last year, DOJ announced that Ericsson violated its [DPA] by failing to disclose deficiencies in its prior internal investigation. Specifically, DOJ claimed that Ericsson failed to provide certain documents and factual information about bribery conduct. The alleged violations focus on Ericsson's conduct in Iraq. … In March 2021, DOJ alerted Ericsson of

[51] National Iraqi News Agency, *Sweden Opens an Investigation Into Possible Corruption Crimes for Ericsson in Iraq* (Apr. 21, 2022).
[52] Maggie Michael, *US Securities Regulator Opens Probe into Ericsson's Conduct in Iraq*, Int'l Consortium of Investigative Journalists (June 9, 2022), https://tinyurl.com/cce5atpr.

> its multiple breaches of its settlement agreements for failing to disclose to the government that it paid bribes to ISIS to gain access to transport routes in Iraq.[53]

357. Similarly, Hogan Lovells LLP also concluded that Ericsson's Iraq-related conduct plausibly constituted an admission of Ericsson's payments to anti-American terrorists:

> An often-cited example of an entity engaging in illegal practices to rapidly expand their business is Telefonaktiebolaget LM Ericsson (Ericsson). Following investigations, Ericsson entered into a $1 billion criminal settlement with U.S. authorities in 2019. Ericsson admitted to a campaign of corruption through, amongst other material failures, improper payments to secure lucrative government contracts, and collusion to falsify its account books. There are perhaps further issues arising for Ericsson through its involvement in high-risk jurisdictions. In February 2022 it disclosed that an internal investigation had found that it may have been making payments to the Islamic State militia in Iraq since 2011. As part of a project to modernise LTE services in the region, Ericsson allegedly made payments to facilitate the transport of its goods through ISIS controlled areas, as well as for the 'protection' of its offices. …[54]

358. Despite Ericsson's use of careful phrasing in their public statements that merely appeared to imply a remote possibility that their illicit and corrupt payments might have ended up in terrorists' hands, even Defendants' admissions did not go nearly as far enough: Defendants

---

[53] Michael Volkov, *SEC Joins DOJ in Probe of Ericsson ISIS Bribery Payments*, Corruption, Crime & Compliance (June 15, 2022), 2022 WLNR 18715111.

[54] Crispin Rapinet, Liam Naidoo, Reuben Vandercruyssen, Nick Roper, *Corruption In The Telecoms Sector: Beware The Elephant In The Room*, Hogan Lovells LLP, Engage: Legal Insight and Analysis (Oct. 11, 2022), https://tinyurl.com/59tfb2yf. Hogan Lovells's legal analysis also confirms the plausibility of Plaintiffs' allegations concerning endemic corruption in the Middle Eastern telecoms sector more generally. *See id.* ("Corruption risks are significant within the telecommunications sector, and at least four of the top ten enforcement penalties under the FCPA have been imposed on telecommunications companies. Risks that have plagued the sector for decades are being investigated and penalised with increasing frequency … The sector risk, amongst other factors, requires relevant entities and compliance functions to frequently re-evaluate their processes to ensure effective internal compliance measures. … The telecommunications sector operates in a fast paced, competitive and global sphere …. To counter the risks of enhanced scrutiny, the shortcomings of Ericsson … serve as useful case studies of practices to avoid. We observe that there are particularly high risks when seeking to obtain licences and concessions for new contracts, especially for those with official counterparties, in developing jurisdictions. Ericsson serves as a reminder to prioritise compliance over the desire to obtain first mover advantage by engaging in corrupt practices.").

fatuously implied that it was some mystery where their illicit payments went, when Defendants were well aware that the only plausible conclusion is that Defendants' intermediaries paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State on Defendants' behalf.

**e. The Terms and Rates That Governed Lafarge S.A.'s Participation in Islamic State's Protection Networks In Iraq Confirmed That Defendants Also Participated In The Same Protection Networks as Lafarge**

359. Islamic State's protection agreement with Lafarge, S.A. of France, and its Syrian subsidiary (collectively, "Lafarge") strongly supports Plaintiffs' conclusion that Defendants routed at least several million U.S. dollars to al-Qaeda and al-Qaeda-in-Iraq from 2004 through 2014, and at least several million dollars to ISIS from 2014 through at least 2019.

360. On October 18, 2022, Lafarge admitted as to the terms of its protection deal with Islamic State and al-Qaeda's branch in Syria, Jabhat al-Nusra when Lafarge pleaded guilty to providing material support to foreign terrorist organizations by, among other things, "schem[ing] to pay ISIS and [al-Nusra Front] in exchange for permission to operate a cement plant in Syria from 2013-to 2014."[55] As Lafarge has admitted, and DOJ has confirmed, Lafarge "paid monthly 'donations' to armed groups, including ISIS and [al-Nusra Front], so that employees, customers and suppliers could traverse checkpoints controlled by the armed groups …; and eventually agreed to make payments to ISIS based on the volume of cement that LCS [LaFarge's Syrian subsidiary] sold to its customers, which Lafarge and LCS executives likened to paying 'taxes.'"
[56]

[55] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022), https://tinyurl.com/bdf3zrew.

[56] *Id.*

361. The evidence set forth in Lafarge's guilty plea – without anything more – would permit a reasonable fact finder to conclude that Defendants purchased security from Islamic State and Jabhat al-Nusra just like Lafarge. Indeed, to conclude anything otherwise requires one to ignore nearly every relevant data point to how Islamic State, al-Qaeda, and al-Qaeda-in-Iraq (inclusive of Jabhat al-Nusra, which was an al-Qaeda-in-Iraq alias) operationalized their respective protection money networks in Iraq and Syria from 2004 through at least 2019.

362. *First*, Lafarge and Ericsson were the only two large multinational corporations on earth that made the depraved choice to continue conducting business as usual on the ground inside Islamic State's caliphate from 2014 through 2017. ***For that reason alone***, it is more likely than not that Ericsson purchased its security in Iraq from Islamic State pursuant to terms that were substantially like those between was purchase could have negotiated terms with Islamic State that were better than those to which Lafarge agreed.

363. *Second*, Islamic State's ranks were heavily populated with former al-Qaeda-in-Iraq members, who knew that Ericsson purchased security from al-Qaeda-in-Iraq for at least a decade prior to 2014. Given Ericsson's likely status as one of the largest overall corporate financiers of al-Qaeda-in-Iraq from 2003 through 2014, it is not plausible that the full universe of Islamic State's thousands of terrorists in Iraq and Syria would tolerate an outcome where Ericsson paid al-Qaeda-in-Iraq for a decade but refused to pay ISIS thereafter.

364. *Third*, Ericsson presented greater upside to Islamic State as a potential participant in ISIS's protection networks than did Lafarge from 2014 through 2017. Ericsson had far more money, more project sites that needed protecting, valuable goods, technology, and cell phones—for which FTOs like ISIS had an insatiable appetite—that ISIS could accept in lieu of cash. Moreover, Ericsson presented ISIS with a scalable protection market opportunity that far

exceeded the potential global upside associated with Lafarge. Considering Ericsson's status as the number one overall potential business partner for Islamic State during its caliphate era from 2014 through 2017, the terms of Islamic State's protection agreement with Lafarge likely represented the floor of what Defendants had to pay.

365. Lafarge's deal with Islamic State proves Islamic State's "going rate" for guaranteeing protection to a multinational corporation operating within ISIS's Caliphate was approximately $400,000 per month: according to DOJ and Lafarge, "[f]rom August 2013 through October 2014, Lafarge and LCS paid ISIS and ANF, through intermediaries, the equivalent of approximately $5.92 million, consisting of fixed monthly 'donation' payments to ISIS and ANF, payments to ISIS-controlled suppliers to purchase raw materials, and variable payments based on the amount of cement LCS sold."[57]

366. Moreover, in 2017, the European Parliament published an official analysis of Islamic State's protection networks in the Middle East that strongly supports the conclusions above: in its analysis concerning the protection money networks created by al-Qaeda, refined by al-Qaeda-in-Iraq, and continued by Islamic State, the European Parliament concluded that "***[t]he case of the Swiss … conglomerate LafargeHolcim***" was "***typical of***" the al-Qaeda-in-Iraq/Islamic State protection money "***modus operandi***" in geographies the terrorists controlled.[58] Lafarge's "management wanted to remain operational despite the seizure of territory by [Islamic

[57] *See id.* ($5,920,000 divided by 14 months comes out to $422,857.14). For the avoidance of all doubt, Plaintiffs believe that Lafarge's payments to al-Qaeda, al-Qaeda-in-Iraq, Jabhat al-Nusra, and Islamic State began well before August 2013, and, accordingly, that Lafarge likely routed substantially more money to FTOs than was depicted by the dollar amount set forth in the plea.

[58] European Parliament, Directorate-General for External Policies, Policy Department, *The Financing of the 'Islamic State' in Iraq and Syria (ISIS)*, at 11 (Sept. 2017), https://tinyurl.com/yd3dy6rz. While this report was limited to Islamic State, Defendants knew, as did the European Parliament, that Islamic State followed the same protection money-related tactics, techniques, and procedures as did al-Qaeda through its branch, al-Qaeda-in-Iraq.

State]" and therefore "obtained" Islamic State's "permission to pass through checkpoints in exchange for paying taxes."[59] Referring to Islamic State, Lafarge "admit[ted] that 'unacceptable' arrangements had been made to protect its cement factory" and "recognised that its local branch belonging to Lafarge 'handed funds over to third parties in order to come to an arrangement with a certain number of armed groups," "targeted by sanctions', without being able to identify their ultimate recipient."[60]

367. From 2014 through at least 2017, Ericsson operated under nearly identical circumstances as Lafarge. Considering the European Parliament's conclusion that the Islamic State-Lafarge protection arrangement revealed by the Lafarge scandal was Islamic State's "modus operandi" for ISIS protection rackets throughout Islamic State's caliphate on both sides of the Iraqi-Syrian border. As a result, considering the European Parliament's analysis, Lafarge's and Ericsson's obvious similarities strongly supports Plaintiffs' allegations that: (i) Ericsson likely began making protection payments to Islamic State in 2014, and continued paying ISIS thereafter, until at least 2019 by making regular payments to ISIS throughout that five-year period; and (ii) Ericsson did so through Ericsson's use of illicit transactions with, or through, intermediaries, which were designed to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and ISIS.

368. On balance, given that Ericsson was far larger and wealthier than Lafarge, it is more likely than not that the rates that Islamic State and Jabhat al-Nusra charged Defendants to purchase their respective FTOs' protection in Iraq and Syria were equal to or greater than the rates ISIS charged Lafarge. Even if one merely assumes, however, that Islamic State and Jabhat

---

[59] *Id.*
[60] *Id.*

al-Nusra only charged Ericsson the same per month rate that ISIS charged Lafarge, Defendants' participation in Islamic State's protection network in Iraq necessarily caused a torrent of cash and free goods to flow from Defendants to ISIS and Jabhat al-Nusra.

369. For example, assume that Islamic State agreed to sell its protection to Ericsson for a monthly purchase price equal to the monthly rate that ISIS charged Lafarge during Islamic State's 42-month-long "caliphate" era from June 2014 until December 2017. Even such a conservative assumption, however, suggests that Ericsson likely paid Islamic State, at least, more than $17 million to buy security from ISIS monthly from June 2014 and December 2017.

### 3. Attack Disparity Data Independently Provides Sufficient Basis To Conclude Defendants Made Protection Payments To Terrorists In Iraq And Afghanistan

370. As one of the largest multinational corporate targets for any protection money network operating in Iraq and Afghanistan since 2001, Ericsson avoided attacks at an astonishing rate. As shown by the substantial disparities between attacks targeting Ericsson and attacks targeting others similarly situated, that this disparity-related evidence is so powerful that such data, alone, supports the factual conclusion that Ericsson "likely" operated in Iraq and Afghanistan pursuant to an agreement with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in which Defendants purchased security from these FTOs by routing protection payments to them.

371. Plaintiffs have analyzed the attack patterns associated with Ericsson's work in Iraq and Afghanistan since from 2002 through 2022.

372. Attack data from both countries reveals a substantial disparity between the frequency with which Ericsson and non-Ericsson convoys were attacked while traveling on transportation routes known to be targeted by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq from 2004 through 2021.

373. The attack disparity between Ericsson's convoys and other similarly situated convoys that traveled in Iraq and Afghanistan during this period is substantial, obvious, and measurable.

374. From 2004 through 2014, the substantial disparity between the volume of attacks targeting Ericsson convoys in Iraq cannot be explained by any factor other than the existence of a protection agreement between Ericsson and al-Qaeda-in-Iraq, pursuant to which AQI redirected its violence away from Ericsson and towards other targets in Iraq and Syria.

375. From 2014 through at least 2017, the substantial disparity between the volume of attacks targeting Ericsson convoys in Iraq cannot be explained by any factor other than the existence of a protection agreement between Ericsson and Islamic State, pursuant to which ISIS redirected its violence away from Ericsson and towards other targets in Iraq and Syria, including Plaintiffs.

376. Several Confidential Witnesses confirm that if a substantial disparity in the rate of attacks targeting two Western target sets in Iraq or Afghanistan exists after the counterterrorism practitioner normalizes the data between the two target sets to enable an apples-to-apples comparison – *e.g.*, the rate of attacks targeting U.S. military convoys and Ericsson convoys traveling in the same area – the only plausible explanation is that the target set for which there was a substantially reduced likelihood of attack was likely operating in-country pursuant to an agreement to purchase security from the al-Qaeda-affiliated terrorists in the area by making protection payments to them.

377. One Confidential Witness, for example, corroborated that a substantial attack disparity as described above could, on its own, permit the conclusion of a protection relationship between al-Qaeda and Defendants, based upon his/her experience while serving in Iraq first with

the U.S. military in Iraq in 2003-2004 and later with one of the largest private security contractors that operated in Iraq in 2006-2007. While serving in Iraq, this Confidential Witness had specific responsibilities for, *inter alia*, security, transportation, and force protection. The same Confidential Witness also learned about well-known strategies used by terrorists and Western companies alike to illicitly transfer money and goods into, and out of, Iraq. Based on the Confidential Witness's personal observations in Iraq, familiarity with al-Qaeda-in-Iraq insurgent strategy and tactics, government training, and specific experience in connection with protecting Western officials and contractors from attack in Iraq, the Confidential Witness concluded, in sum and substance, that a substantial disparity in the attack patterns could offer strong support that the company in question likely had an arrangement with the terrorists.

378. On information and belief, insurance records in the custody and control of Ericsson would further confirm the substantial attack disparity between Ericsson and other similarly situated persons in Iraq.

### C. Each Defendant Facilitated Ericsson's Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

379. Each Defendant – LM Ericsson, Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm – was an indispensable participant in Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; the first three for the entirety of the period alleged herein, Ibrahim from at least 2014 through 2019, and Ekholm from 2017 through present.

380. In addition to the allegations set forth in the rest of this Complaint, Plaintiffs set forth additional allegations below as to why each Defendant's conduct act facilitated Ericsson's

protection payments alleged herein, and such payments would not have been possible without each Defendant's specific wrongful choices.[61]

381. The synchronicity required for the scheme's success was consistent with Defendants' broader adherence to their "One Ericsson" business mantra. Had any Defendant chosen to resist, Ericsson's protection payments scheme would have collapsed, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would not have received vast sums of money Defendants funneled to them, and the acts of international terrorism that injured Plaintiffs may not have occurred. For that, each Defendant is liable.

**1. LM Ericsson**

382. LM Ericsson was an indispensable participant in Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. LM Ericsson's conduct actively facilitated Defendants' protection payments alleged herein, and such payments would not have been possible without LM Ericsson's specific wrongful choices.

383. From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to ISIS by administering Ericsson's enterprise-wide corruption scheme, in which Defendants' willingness to pay FTOs played a key role.

384. From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to flow to ISIS by deliberately constructing Ericsson's global compliance program to aid, rather than stop, illicit payments, including those to terrorists.

[61] For the avoidance of all doubt, Plaintiffs are not limiting their Defendant-specific allegations to this subsection. This subsection provides representative examples of the roles each Defendant played in the various key details attendant to Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

**a. LM Ericsson Created And Led Ericsson's Enterprise-Wide Illicit Payments Scheme From The Late 1990s Through 2022**

385. In the late 1990s, LM Ericsson devised and perfected Ericsson's enterprise-wide corruption scheme, which LM Ericsson, Ericsson AB, and Ericsson Inc. thereafter jointly pursued from at least the late 1990s through at least 2019. At all times throughout this period, LM Ericsson instructed, or otherwise encouraged, Ericsson's divisions and associated leadership, including Ericsson AB, Ericsson Inc., Defendant Ekholm, and/or Defendant Ibrahim, to participate in various facets of Ericsson's company-wide scheme.

386. LM Ericsson's deliberate refusal to implement meaningful internal controls was the essential ingredient that made Defendants' enterprise-wide corruption scheme possible in the first instance. The SEC found, for example, that "Ericsson knowingly and willfully failed to implement adequate internal accounting controls with respect to retention of consultants and agents, payment of bribes, and making improper payments."[62]

387. "In particular," the SEC found, "Ericsson failed to implement controls to ensure the effective enforcement of its policies and procedures that, among other things, (a) required employees properly to document and account for payments to agents and consultants, including the ultimate recipients of the payments and the reasons for the payments; (b) required adequate due diligence for the retention of third-party agents and consultants; (c) required completed due diligence and a fully executed contract with a third party before the third party could begin providing services; (d) required that agreed-upon payments be commensurate with the services to be performed and that the services paid for were performed; (e) prohibited certain compensation arrangements with third parties, such as advance payments; and (f) established oversight

---

[62] *Id.* ¶ 83.

procedures, by personnel at Ericsson's headquarters and others, to ensure that third parties were retained and paid pursuant to appropriate controls."[63]

388. LM Ericsson encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to make and/or facilitate illicit payments to unlawful recipients in order to drive greater profits for Ericsson as a matter of unofficial Ericsson corporate policy, including to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

389. LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to create purpose-built intermediary relationships designed to obscure Ericsson's illicit payments, including to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

390. LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to design and distribute built-to-fail anti-corruption- and counterterrorism-related policies and procedures that were reverse-engineered to ensure the business unit's desired illicit payment outcomes were always possible, by authorizing Ericsson AB to make them, and also by deliberately failing to prohibit payments to terrorists in the first instance, as a reflection of LM Ericsson's see no evil, hear no evil, speak no evil posture, which enabled Ericsson AB's decision to continue doing business inside Islamic State's caliphate from 2014 through 2017.

391. LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to create and oversee a built-to-fail compliance program that was designed to facilitate illicit payments by concealing their existence rather interdicting illicit payments by exposing them.

---

[63] *Id.* ¶ 84.

392. LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to persistently lie about such conduct thereafter, including about Defendants' facilitation of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

393. LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to coordinate a comprehensive disinformation campaign to further amplify Ericsson's enterprise-wide corruption scheme by open letters, and press releases that were designed to attempt to conceal Ericsson's misconduct through Defendants' comprehensive, whole-of-Ericsson, strategic communications scheme, which was designed to make it easier for Defendants to make illicit payments, including their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by "reputation washing" Ericsson's *bona fides* on anti-corruption, anti-terrorism, and national security issues.

394. LM Ericsson's creation and perfection of Ericsson's enterprise-wide corruption scheme from the late 1990s through the early 2000s was a but-for cause of Defendants' vast, nearly two-decades-long scheme of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

395. From the early 2000s through at least 2019, Ericsson's enterprise-wide corruption scheme consistently grew in volume, legal risk for Ericsson, and the predictably devastating outcomes for the United States in the Middle East, including Plaintiffs. The growth of all three axes – and their intersections with one another, *e.g.*, more bribes meant more DOJ risk – only heightened LM Ericsson's importance to Defendants' ability to sustain Ericsson's company-wide corruption scheme.

396. It would have been impossible for Ericsson AB to route the totality of the protection payments alleged herein to these FTOs without LM Ericsson's creation of the broader

illicit payments scheme upon which Defendants relied to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, *e.g.*, the key Ericsson personnel, intermediaries, tactics and techniques, templates, and so on.

**b. LM Ericsson Secured Ericsson AB's Ability To Win The Iraq Work, And Ericsson Inc's Ability To Profit From The Iraq Work.**

397. LM Ericsson was the but-for cause of Ericsson's decision to seek business in Iraq through the application of Ericsson's enterprise-wide corruption model. This is so because LM Ericsson perfected the model by no later than the late 1990s, administered the application of the model throughout, and protected the model from challenge by, *inter alia*, retaliating against whistleblowers, engaging in reputation-washing on a large-scale for the specific purpose of developing the political capital and media image necessary to deflect criticism though the false narrative that Ericsson was a responsible corporate citizen rather than what it was: a criminal.

398. LM Ericsson played a key role in securing Ericsson AB's Iraq-related contracts, and associated financing, from sources funded or operated by the United States government, Iraqi government, and the World Bank, including each of those identified in this Complaint. LM Ericsson's role was essential, as the underlying contracts upon which Ericsson worked in Iraq would have been impossible without the support of the United States government and the U.S. dollars flowing out of the U.S. government, World Bank, Iraqi government (supplied by the U.S. or the World Bank in Washington, D.C.), or Iraqi customers like Zain Iraq (from the International Finance Corporation ["IFC"] in Washington, D.C.)

**c. LM Ericsson Approved Ericsson AB's Initial Choice To Participate In Al-Qaeda's, Al-Qaeda-in-Iraq's, And Islamic State's Protection Networks.**

399. Whenever the senior leadership of a multinational corporation operates a decades-long, enterprise-wide corruption scheme, one of the first hurdles the scheme must surmount to

get off the ground is the simple gating issue of headquarters-level approval, because enterprise-wide schemes of the nature at issue here are impossible without the participation of at least some key leaders at the headquarters level. Such was the case here: LM Ericsson approved Ericsson AB's decision to continue operating inside of Islamic State's caliphate from 2014 through 2017.

400. On information and belief, LM Ericsson also approved Ericsson AB's earlier decision to enter the al-Qaeda-in-Iraq protection marketplace—which Ericsson AB made, and LM Ericsson approved, on or about late 2003 or early 2004. Plaintiffs' belief is based upon at least three factors that, when considered together, strongly support Plaintiffs' conclusion.

401. *First*, LM Ericsson confronted the **identical illicit relationship question** in 2004 that it faced a decade later in 2014: should LM Ericsson purchase security from violent actors in the Iraqi marketplace by making unlawful protection payments to them? In 2014, LM Ericsson not only chose to do so, but also supported Ericsson AB's, and Defendant Ibrahim's, steamrolling of Ericsson's in-house counsel's legal opposition to Defendants' decision to participate in Islamic State's protection rackets, which cleared the way for Ericsson AB's subsequent payments to flow through to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. The same motivations governed in 2004.

402. *Second*, LM Ericsson faced the **identical positive economic opportunity** in 2004 that it faced in 2014: should LM Ericsson purchase security from terrorists to inflate LM Ericsson's profits from Iraq? In 2014, Islamic State's ascendance throughout much of Iraq motivated LM Ericsson to authorize Ericsson AB's participation in ISIS's growing protection networks and associated protection payments because LM Ericsson and Ericsson AB determined that Defendants could leverage Islamic State's protection networks to substantially increase Ericsson's profits by purchasing security through ISIS, rather than through lawful – and costlier

– means. In late 2003 and early 2004, al-Qaeda-in-Iraq's ascendance throughout much of Iraq presented LM Ericsson with an identical value proposition: make more money by paying bribes to terrorists rather than following the law.

403. *Third*, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State confronted Western corporations, including Defendants, with **substantially similar protection racket-related tactics, techniques, and procedures**, which all three FTOs practiced in the same country (Iraq) and focusing on the same customers (*e.g.*, Asiacell), administrated using the same violent tactics (threats of harm to Western corporations' property and goods to maximize collections), pursued for the same purpose (raising money to fund terrorist attacks), and used to target the same victims (Americans in the Middle East). Moreover, LM Ericsson benefited from substantial continuity in with respect to its key Iraq-facing bad actors, most of all, the ability to use the same proven cutouts whom Ericsson (and others in the Middle East) had long used to pay bribes to terrorists, and whom Ericsson itself concluded likely did so in 2014. As a result, LM Ericsson faced the same incentives and threats in 2014 as it did in late 2003 or early 2004 when deciding whether to authorize Ericsson AB to participate in al-Qaeda-in-Iraq's protection network and make the associated protection payments.

404. When Ericsson AB necessarily chose to participate in al-Qaeda-in-Iraq's nascent protection rackets on or about late 2003 or early 2004, LM Ericsson confronted all the same incentives that persuaded LM Ericsson to approve Ericsson AB's assistance to Islamic State a decade later. On information and belief, LM Ericsson made the same choice in late 2003 or early 2004 concerning al-Qaeda-in-Iraq as it made a decade later regarding Islamic State: pay.

### d. LM Ericsson Supervised Ericsson AB's Subsequent Conduct While Participating in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's Protection Networks.

405. As part of its supervision of Ericsson AB's participation in the FTOs' protection networks in the first instance, LM Ericsson also oversaw Ericsson AB's subsequent decision-making regarding protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

406. LM Ericsson's supervision was important. Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State required Defendants to navigate an unusually risky context to sustain their scheme to pay these FTOS. Among the other challenges they faced, Defendants had to account for: (i) the extreme nature of the transaction, *e.g.*, bribes to terrorists; (ii) the extreme volume of illicit payments, *e.g.*, millions of dollars per year; (iii) the extreme media microscope that was trained on Iraq while Defendants were making their protection payments there; (iv) the extreme terrorism risk presented by Iraq while Defendants were making their protection payments there, which was always – by wide consensus – one of the two greatest counterterrorism threat environments globally for Americans (Afghanistan was the other), and was known as such; and (v) the extreme anti-corruption risk presented by Iraq, which always ranked, alongside Afghanistan, as among the two or three most corrupt countries on earth.

### e. LM Ericsson Authorized Ericsson AB's Associated Protection Payments.

407. LM Ericsson always approved Ericsson AB's protection payments to terrorists, each time doing so in violation of U.S. law and LM Ericsson's obligations to Ericsson's shareholders. Had LM Ericsson made the legal choice, and rejected such payments, Ericsson AB would not have facilitated them, and al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would not have received their money. LM Ericsson's authorization of Ericsson AB's protection payments was thus a but-for cause of the payments being made, and LM Ericsson authorized such

payments with the specific intent that Ericsson AB's money flow through to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because doing so would allow LM Ericsson and its divisions to generate greater profits.

#### f. LM Ericsson Operationalized Ericsson AB's Protection Payment Scheme In Iraq

408. In addition to supervising Ericsson AB's participation in al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection networks, and associated protection payments to such FTOs, LM Ericsson also played a key role in operationalizing key facets of the scheme, which both enabled the scheme in the first instance and, once underway, made the scheme more effective—which results were exactly as LM Ericsson intended, since LM Ericsson intended to facilitate Ericsson AB's protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

409. LM Ericsson also played a key role in Defendants' ability to continue making protection payments by implementing the rewards and punishments wielded by Ericsson as carrots and sticks in defense of Ericsson's continued ability to generate outsized profits from Iraq-related customers by participating in al-Qaeda's, al-Qaeda-in-Iraq, and Islamic State's protection money networks. With respect to rewards, LM Ericsson approved of Ericsson AB's decisions to elevate protection-money-related-wrongdoers, like Ms. Ibrahim, to global C-Suite roles at LM Ericsson. With respect to punishments, LM Ericsson operationalized Defendants' internal punishments (*e.g.*, sacking whistleblowers under absurd pretextual concerns about Ericsson's purported committed to business integrity) and external punishments (*e.g.*, waging a smear campaign in the media against a whistleblower who correctly identified bribes facilitated by LM Ericsson). LM Ericsson's authorization of such incentives and disincentives was key to Defendants' ability to continue making protection payments for as long as they did.

#### g. LM Ericsson's CEO Personally Directed Aspects of Defendants' Protection Money Scheme In Iraq

410. LM Ericsson's CEO, Defendant Ekholm, personally facilitated Defendants' protection payments. *Infra* at II.C.4. LM Ericsson's choice to retain Ekholm in spite of his role in their protection scheme was a ratification by LM Ericsson of Ekholm's conduct.

#### h. LM Ericsson Embraced Defendant Ibrahim, When It Should Have Fired Her, In Order To Enable The Continued Operation Of Defendants' Protection Money Scheme In Iraq

411. From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to ISIS by empowering the openly criminal leadership of Ericsson Middle East, which promoted Ericsson's protection payments in Iraq, and Ericsson's co-participation, alongside MTN, in the Taliban's use of MTN's cellular networks to attack Americans there.

412. In so doing, LM Ericsson was also vital to Defendants' protection payments to Islamic State from 2014 through at least 2019 because of how LM Ericsson responded to Ms. Ibrahim's conduct and decision-making. By no later than 2014, LM Ericsson had actual knowledge – through its directors, employees, and agents, including Simpson Thacher – that Defendant Ibrahim: (i) was involved in prior corruption at Ericsson in Malaysia; (ii) supported Ericsson's participation in Islamic State's protection money networks and Ericsson's associated protection payments to ISIS; and (iii) rejected the emphatic counsel of Ericsson AB's top in-house counsel for the Middle East, Tom Nygren, who urged as strongly as possible that Ericsson refrain from doing business with Islamic State and exit ISIS-controlled geographies in light of the certain terrorist finance implications that would follow from Ericsson's decision to remain inside of Islamic State's caliphate even while every other Western corporation on the ground in Iraq and Syria, other than Lafarge SA, did the opposite.

413. In response, LM Ericsson protected, promoted, and paid Defendant Ibrahim for eight (8) years – and counting – when LM Ericsson should have fired Defendant Ibrahim, at the latest, by the summer of 2014, when LM Ericsson should have also disclosed the details of her (and Defendants') conduct to, *inter alia*, DOJ, FBI, and the SEC.

414. Defendant Ibrahim committed shocking crimes in plain view. Regardless of her obvious criminal exposure at the time, and ever since (which is vast), Ibrahim also demonstrated, in as clear a manner as a senior executive ever could, her shocking willingness to, *inter alia*: (i) cooperate with Islamic State; (ii) defy basic counterterrorism demands by the United States and the civilized world, *e.g.*, "Western corporations, please exit Islamic State's caliphate"; (iii) violate core and universally adopted anti-corruption principles and practices; and (iv) facilitate extreme human rights violations, including human trafficking, by ISIS.

415. On all four of the preceding points, LM Ericsson knew that Defendant Ibrahim's leadership and conduct – if allowed to continue at Ericsson – effectively guaranteed that Defendants' protection payments would continue flowing to Islamic State on and after 2014.

416. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014 and again in 2017, and to continue paying and protecting Ibrahim ever since, ensured that Ericsson AB would remain substantially influenced by Ibrahim and would continue participating in Islamic State's protection networks and paying ISIS for to secure Defendants' ability to do so.

417. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014 and again 2017, and continue paying and protecting Ibrahim ever since, ensured that LM Ericsson would also remain substantially influenced by Ibrahim (through Ibrahim's role as a member of LM Ericsson's executive team), and LM Ericsson (including through Defendant

Ekholm) would continue sponsoring Ericsson AB's and Defendant Ibrahim's participation in Islamic State's protection networks and associated payments to ISIS for the right to do so.

418. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Defendant Ekholm would continue to be personally influenced by Defendant Ibrahim in her capacity as a member of LM Ericsson's Executive Leadership Team as well as, starting in 2019, her role as personal advisor to Defendant Ekholm.

419. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Ericsson Inc. would continue to serve as both the object of the sales to Iraqi customers (owing to Ericsson Inc.'s centrality on the services side), and would necessarily continue to facilitate the flow of protection payments to Islamic State as a result because Ericsson Inc.'s refusal to provide services to Iraqi customers would have destroyed Ericsson's ability to make the payments since Ericsson Inc. was key to the entire "turnkey" approach offered by Ericsson AB in the Middle East, including Iraq.

420. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Simpson Thacher, as agent for LM Ericsson – and, on information and belief, Ericsson AB and Ericsson Inc. – would continue to serve in a compromised posture, as Simpson Thacher's reporting chain was hopelessly compromised by Defendant Ibrahim's presence in, or ability to influence, any meaningful compliance counsel that Simpson Thacher could have provided to LM Ericsson, Ericsson AB, or Ericsson Inc. in a hypothetical world where Simpson Thacher chose to honor its legal and ethical commitments, as well as its fiduciary obligations to LM Ericsson, to interdict the ongoing crime spree perpetrated by Defendants, including Defendant Ibrahim.

421. LM Ericsson also always knew that Defendant Ibrahim's conduct from at least 2014 through at least 2019, if revealed to the world, would vividly expose the fraudulent nature of the Ericsson Group's, including Ericsson AB's constant public and private representations regarding its opposition to terrorist groups, support for U.S. counterterrorism operations, adherence to anti-corruption laws, and promotion of human rights causes from at least 2001 through at least 2022. These four issues were not just aspirational goals – they were concrete expressions of Defendants' purported business values, which Defendants devoted enormous time and resources to amplifying for the simple reason that Defendants believed (correctly) that such branding helped Ericsson make more money. Examples of LM Ericsson's knowledge that Defendant Ibrahim's conduct, if exposed, would reveal Defendants' serial frauds concerning these four points included, but were not limited to:

**a.** **Ericsson's Purported Opposition to Terrorist Groups.** LM Ericsson publicly claimed that it staunchly opposed terrorists like Islamic State. LM Ericsson knew, however, that Ericsson actually paid ISIS, coordinated with ISIS, and even said "please" and "thank you" to ISIS, all which Defendant Ibrahim sponsored and operationalized with LM Ericsson's full knowledge and approval (in real-time, or after-the-fact).

**b.** **Ericsson's Purported Support for U.S. Counterterrorism Operations**. LM Ericsson publicly claimed that the Ericsson Group was a trustworthy counterterrorism and national security partner for the United States, and that it would support America's counterterrorism efforts. LM Ericsson knew, however, that Defendant Ibrahim, among others, had directly and shockingly sponsored Defendants' direct violation of two of the most fundamental counterterrorism demands that the United States ever asks of any multinational corporation: don't pay terrorists, and don't do business in geographies controlled by terrorists.

**c.** **Ericsson's Purported Adherence to Universal Anti-Corruption Rules**. LM Ericsson publicly claimed that the Ericsson Group adhered to widely practiced anti-corruption laws and rules, and more generally, that Ericsson was committed to anti-corruption principles as part of its commitment to social good. LM Ericsson knew, however, that Defendant Ibrahim, among others, had sponsored a wide range of anti-corruption violations of almost every imaginable stripe: bribery and protection payments, built-to-fail internal controls, the business unit overriding in-house lawyers' extreme compliance concerns, (and the list goes on).

d. **Ericsson's Purported Promotion of Human Rights, Including Education for Women and Girls**. LM Ericsson publicly claimed that the Ericsson Group was a strong supporter of human rights generally, with a strong focus on supporting education for women and girls. LM Ericsson knew, however, that Defendant Ibrahim, among others, had sponsored millions in U.S. dollar payments to a terrorist group, Islamic State, that was universally recognized in the United States, Europe, and the Middle East, as the worst human rights violator and enemy of education for women and girls on earth. Remarkably, LM Ericsson (and Ericsson AB) chose to *highlight* Defendant Ibrahim's purported support for human rights and education for women and girls. LM Ericsson did so because Defendants spent years – and, on information and belief, millions of U.S. dollars – cultivating the Ericsson Group's public image on these issues, which LM Ericsson (and Ericsson AB) believed (correctly) played a material role in helping Ericsson win more business around the world.

422. Even simpler, though, LM Ericsson knew that Defendant Ibrahim demonstrated not just a lack of business ethics but an affirmative willingness to engage in conduct that was obviously shocking and appalling to all who were aware of it—as demonstrated by, *inter alia*, the universal scorn Ericsson received from the media and knowledgeable commentators after its secrets leaked in February 2022.

423. In 2014, LM Ericsson knew or was willfully blind to the fact that any responsible multinational corporation in its position would promptly fire (or cause the firing of) Defendant Ibrahim. Instead, LM Ericsson *promoted* Ms. Ibrahim, and in 2017 elevated her to a new title at both Ericsson AB and LM Ericsson by virtue of her roles on the Executive Leadership Team for the Ericsson Group and then later her elevation to personal advisor to LM Ericsson's CEO.

424. As a result of LM Ericsson's conscious decision – starting in 2014 and continuing ever since, including through the date of this Complaint – to keep Defendant Ibrahim inside the Ericsson tent even after she did all that she did, Defendant Ibrahim continued to facilitate Defendants' participation in Islamic State's protection networks and associated protection payments to ISIS while wearing two hats: a senior executive of Ericsson AB, and a member of LM Ericsson's Executive Leadership Team.

### 2. Ericsson AB

425. Ericsson AB was an indispensable participant in Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Ericsson AB's conduct actively facilitated Defendants' protection payments alleged herein, and such payments would not have been possible without Ericsson AB's specific wrongful choices.

426. Ericsson AB operationalized the global corruption scheme devised by LM Ericsson, including through Ericsson AB's: (a) illicit payments to unlawful recipients in order to drive greater profits for Defendants as a matter of unofficial Ericsson corporate policy; (b) operation of purpose-built intermediary relationships designed to obscure Ericsson's illicit payments; (c) adherence to LM Ericsson's decades-long deception about such conduct thereafter; and (d) deliberately sustaining a built-to-fail compliance culture where Ericsson AB consciously avoided doing having any credible compliance function relating to Iraq so that Defendants' ability to pay bribes to Iraqi recipients, including al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, would remain unfettered.

427. Ericsson AB was necessary to operationalize LM Ericsson's decision to seek business in Iraq through the application of Ericsson's enterprise-wide corruption model. This is so because Ericsson AB served as LM Ericsson's face, on the ground, around the world, and was responsible for conducting day-to-day operations while LM Ericsson focused on strategic matters such as communications, lobbying, legal, compliance, and crisis management.

428. Ericsson AB, inclusive of its Iraqi branch, were the counterparties to most, if not all, the contracts in Iraq for which Defendants paid protection money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Such payments would have been impossible had Ericsson AB not agreed to make such payments in order to maximize Defendants' profits associated with Ericsson AB's contracts in Iraq.

429. Ericsson AB was a link in the decision-making chain that authorized Ericsson's protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Ericsson AB's management always approved such payments, each time doing so in violation of, *inter alia*, United States law. Had Ericsson AB made the legal choice, and rejected such payments, LM Ericsson could have not otherwise forced the issue because Ericsson AB could have just refused to do the work, as such work was procured with bribery in violation of U.S. law. Instead, Ericsson AB chose to facilitate illicit payments with the specific intent that Ericsson AB's money flow through Ericsson AB's intermediaries to reach al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because Ericsson AB consciously sought a competitive advantage in the Iraqi marketplace by obtaining below-cost security through their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, rather than investing in real security or pulling out of the terrorist-controlled geographies as nearly every other responsible company did at the time.

430. Aside from directly causing Defendants' protection payments to be routed to the terrorists through Defendants' purpose-built cutouts, Ericsson AB also played an essential role in Defendants' ability to continue making protection payments by operationalizing the rewards and punishments wielded by Ericsson as carrots and sticks in defense of Ericsson's continued ability to generate outsized profits by participating in the terrorists' protection money networks. For example, Ericsson AB elevated protection-money-related-wrongdoers, like Ms. Ibrahim, to global C-Suite roles at LM Ericsson. Ericsson AB's participation in LM Ericsson's broader carrot/stick scheme against whistleblowers was essential to Defendants' ability to continue making protection payments for as long as they did.

431. On information and belief, Ericsson AB also directly retained Simpson Thacher and/or Ericsson AB assented to the retention of Simpson Thacher on Ericsson AB's behalf by

LM Ericsson. When Ericsson AB did so, Ericsson AB had the specific intent that Simpson Thacher deflect any United States government scrutiny concerning Ericsson's illicit payments in Iraq, including those relating to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. *Infra* at Part IV. Ericsson AB and Simpson Thacher agreed as to that course of conduct, and thereafter successfully obstructed the United States government's counterterrorism operations. This conduct was a but-for cause of Defendants' protection payments in Iraq by no later than 2014, when Ericsson AB, on information and belief, retained Simpson Thacher alongside LM Ericsson or, alternatively, assented to LM Ericsson's retention of Simpson Thacher on behalf of Ericsson AB. Ericsson AB and Simpson Thacher were aware of Defendants' payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and Ericsson AB and Simpson Thacher both knew such payments were illegal and foreseeably aided acts of terrorism against Americans, and both Ericsson AB and Simpson Thacher both affirmatively chose to conceal such information from the United States government even though Ericsson AB and Simpson Thacher both had an affirmative duty of disclosure given Ericsson AB's assertion that Ericsson was fully cooperating with the then-existing U.S. government investigation of Ericsson.

432. Ericsson AB coordinated with LM Ericsson and Defendant Ibrahim to continue Ericsson operations in Islamic State-controlled territory during its "caliphate" era from at least 2014 through at least late 2017, and Ericsson AB similarly coordinated (alongside LM Ericsson and Defendant Ibrahim) with Defendant Ekholm to continue Ericsson operations in ISIS-controlled territory throughout at least 2017, when Defendant Ekholm served as CEO of LM Ericsson, which service began on January 16, 2017. Ericsson AB did so even though Ericsson AB knew that such continued Ericsson AB operations in ISIS-governed geographies would inevitably cause millions of dollars in additional "tax" payments by Ericsson AB, including

Defendants' intermediaries, to flow through to Islamic State. Had LM Ericsson made the lawful choice, and instructed Ericsson AB to cease operations from inside of Islamic State's caliphate, most of Defendants' protection payments to Islamic State would not have occurred.[64]

433. As a result of the foregoing, Ericsson AB's conduct caused millions of U.S. dollars in protection payments to flow to al-Qaeda and al-Qaeda-in-Iraq from at least 2004 through at least 2014, and Ericsson AB's conduct caused millions of U.S. dollars in protection payments to flow to Islamic State each year from at least 2014 through at least 2019.

434. On information and belief, from 2014 through at least 2019, Ericsson AB caused more than $15 million in financial transactions related to the protection payments that Ericsson AB was routing to Islamic State on behalf of itself, as well as LM Ericsson, and Ericsson Inc.

### 3. Ericsson Inc.

435. Ericsson Inc. also actively participated in the protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through numerous channels of support that included, but were not limited to, the examples offered below.

436. *First*, Ericsson Inc. directly transferred sophisticated, U.S.-origin, military grade communications technologies to al-Qaeda in Afghanistan from at least 2008 through, on information and belief, at least 2017.

---

[64] True, Ericsson AB would have paid the terrorists some money even had LM Ericsson told Ericsson AB to avoid ISIS's caliphate from 2014-2017 since Islamic State also extracted protection payments from businesses operating near their territory. While Islamic State extracted substantial revenue from companies that conducted operations near to its caliphate (but not inside of it), ISIS extracted far more revenue from the companies that ***both*** remained inside their caliphate **and also** continued operating outside of it. Had LM Ericsson made the responsible choice, Ericsson AB likely would have still made some payments to ISIS, but the volume of such payments would have been lower.

437. *Second*, Ericsson Inc. manufactured and/or procured devices for LM Ericsson and Ericsson AB – for which Ericsson Inc. served as the U.S. division, rather than a traditional subsidiary – that Ericsson Inc. knew were being used by LM Ericsson and Ericsson AB as currency for protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State or, alternatively, to compensate the Ericsson intermediaries that made such payments. Had Ericsson Inc. declined to perform this role, Defendants' ability to participate in, and financially benefit from, al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets would have been substantially degraded.

438. *Third*, under Defendants' "One Ericsson" organizational framework, Ericsson Inc.'s involvement in Ericsson AB's Iraq work was necessary to sustain Defendant' flow of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Under Defendants' "One Ericsson" model, Ericsson organized itself as a single entity with a headquarters in Sweden and divisions, rather than subsidiaries, in key geographies. Consistent with its "One Ericsson" approach, LM Ericsson structured Defendants' operations to minimize redundancies between "divisions" of Ericsson, e.g., Ericsson Inc., and foster interdependence amongst Ericsson's corporate family to foster seamless collaboration between geographies, divisions, and personnel.

439. Under the resulting organizational chart, Ericsson Inc. was therefore a necessary participant in essentially all Ericsson AB work worldwide. This outcome obtained regardless of whether Ericsson Inc. was a party to the contract between Ericsson and the customer in question. As a result, Ericsson Inc.'s participation in the Iraq work was a but-for cause of such work continuing: had Ericsson Inc. refused to continue servicing Iraq-related customers, Ericsson AB's ability to sustain the protection racket would have collapsed because Ericsson AB would

not have been able to offer the "turnkey" engineering, network, and technical services that served as Ericsson's calling card with customers worldwide, including those in Iraq.

440. Indeed, according to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's, Ericsson AB's, and Ericsson Inc.'s operations in North America, Europe, and the Middle East, because of Ericsson Inc.'s support to Ericsson AB, Ericsson's customers in the Middle East experienced seamless "turnkey" services support, which was one of the key value propositions Ericsson offered to its Middle Eastern customers.

441. *Fourth*, Ericsson Inc. affirmatively chose to continue supporting LM Ericsson's and Ericsson AB's work in Iraq well after Ericsson Inc. knew that LM Ericsson operated an enterprise-wide corruption program that, at a minimum, alerted Ericsson Inc. to the foreseeable risk that LM Ericsson, which Ericsson Inc. understood to effectively be on a decades-long global white collar illicit payments crime spree lasting from at least the late 1990s through at least 2022, would extend that corruption program to Iraq. Ericsson Inc.'s knowledge of this fact alone, coupled with Ericsson Inc.'s continued facilitation of Defendants' work in Iraq thereafter, represented an affirmative choice by Ericsson Inc. to look the other way while its corporate affiliate applied the Ericsson playbook to Iraq, with the predictably foreseeable result that bribes would be paid to terrorists and anti-American violence would follow.

442. From 2004 through 2022, Ericsson Inc provided its unfettered support for Defendants' business operations in Iraq while knowing that LM Ericsson and Ericsson AB operated an enterprise-wide corruption scheme. In so doing, Ericsson Inc. consciously avoided reaching the foreseeable – if not inescapable – conclusion: a company with a commitment to corruption that starts in its C-Suite (like LM Ericsson) with billions in potential profits on the line in one of the most violent places in the world (given Iraq's distinction of being one of the

few "virgin" telecoms markets in the world), in which bribing terrorists is the more economically profitable choice (also Iraq) is likely to decide that it could bribe its way to security and greater profit, and therefore bribe terrorists while doing business in what was widely perceived to be the most corrupt and most violent country on earth.

443. *Fifth*, Ericsson Inc. provided essential support to the cross-functional Ericsson Group teams that were indispensable to Defendants' ability to regularly, and reliably, leverage Ericsson's U.S. contacts to support LM Ericsson's and Ericsson AB's Iraq-related business development efforts. Defendants' cross-functional teams were a vital cog in their Iraq machinery because of the central role played by the United States in post-Saddam Iraq and, most of all, the leadership role played by Washington, D.C.-based political, diplomatic, national security, media, and finance stakeholders. Ericsson Inc. maintained an office in Washington, D.C. to enable the activities of Ericsson's cross-functional teams so that they could seamlessly collaborate in the most important city in the world to their business: the District of Columbia.

444. Moreover, between the U.S. government and the World Bank, Washington, D.C. provided outsized support for Iraq's telecommunications sector, including money and technical support, related to supporting Iraq's telecoms-related procurement budgets throughout the post-Saddam era. As a result, Ericsson Inc.'s support for Defendants' Washington, D.C.-based cross-functional team operations was a but-for cause of such teams' ability to help Ericsson land the Iraq work for which Defendants paid protection money. Had Ericsson Inc. declined to share its personnel and office in Washington, D.C., Defendants' ability to effectively compete for Iraq-related work would have evaporated because the U.S. government generally refused to provide robust financial support to companies involved in Iraqi reconstruction that did not have a meaningful presence in the United States. Ericsson Inc.'s status as a U.S. company therefore

helped Defendants seize Iraq-related opportunities because Defendants could invoke their U.S. presence to bolster their credibility as a potentially trustworthy partner for the U.S. government in a conflict zone like Iraq.

445. *Sixth*, on information and belief, Ericsson Inc. directly supported all or nearly all of Ericsson AB's contracts with its Iraqi and Afghanistan customers related to networks and managed services. Ericsson Inc. accomplished such support through Ericson Inc.'s direct participation in Ericsson AB's performance of all or nearly all of Ericsson's contracts with customers in Iraq and Afghanistan alleged in this Complaint.

446. From 2001 through 2022, multinational corporations operating in the United States, Europe, and the Middle East almost universally relied upon transaction structures known as "inter-company transfers" or "inter-company transactions" to maximize corporate efficiencies while simultaneously integrating all the corporation's subsidiaries or divisions into a single "One Company" operational structure.[65] On information and belief, when Ericsson AB employed Ericsson Inc. to help Ericsson AB provide Ericsson's contracted-for technologies and services to Ericsson AB customers in Iraq and Afghanistan—including all such customers and contracts alleged in this Complaint, —Ericsson AB compensated Ericsson Inc. through such inter-company transactions between Ericsson AB and Ericsson Inc. On information and belief, Ericsson AB transmitted instructions to Ericsson Inc. detailing how Ericsson Inc. was to account for the various services, goods, and personnel that Ericsson Inc. provided to Ericsson AB while

---

[65] Given Ericsson's unique "divisions, not subsidiaries" corporate structure, Plaintiffs' use of this nomenclature does not mean to suggest that Plaintiffs concede the separateness between LM Ericsson, Ericsson AB, and Ericsson Inc. For the avoidance of all doubt, Plaintiffs allege—consistent with Ericsson's admission in its guilty plea in 2019—that LM Ericsson, Ericsson AB, and Ericsson Inc. collaborated seamlessly as "One Ericsson" under a corporate model that eschewed boundaries between entities in recognition of their division relationships.

participating in Ericsson AB's provision of services to Ericsson AB's customers and contracts in Iraq and Afghanistan, including every such customer and contract alleged in this Complaint. Plaintiffs' allegation is plausible based upon Ericsson's prior statements, corporate structure, and the practices of other companies like Ericsson.

447. Ericsson Inc. knew that it and the other Defendants aided and abetted al-Qaeda, al-Qaeda-in-Iraq, and Islamic State as alleged in this Complaint because, on information and belief, Ericsson Inc. earned substantial compensation through its provision of goods, services, personnel, and technologies to Ericsson AB related to Ericsson AB's contracts with Ericsson customers in Iraq and Afghanistan. Simply put, Ericsson Inc. always knew that Ericsson AB's unethical and criminal overseas sales practices were an integral part of Ericsson's operations globally, and it is not plausible – nor would it have been credible at the time, or now – for Ericsson Inc. to have concluded that Ericsson Inc. could lawfully earn money through its participation in Ericsson AB's provision of goods and services to Ericsson's customers in Iraq and Afghanistan once Ericsson Inc. knew – as it did all along – that Ericsson AB was committed to an enterprise-wide corruption scheme.

448. Accordingly, when Ericsson Inc. facilitated Ericsson's protection payments, or Ericsson's other unlawful conduct in Iraq or Afghanistan alleged in this Complaint, Ericsson Inc. did so while sharing the same bases as every other Defendant for knowing that Ericsson's conduct (including Ericsson Inc.'s own conduct), aided and abetted the acts of terror committed by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State against Americans in the Middle East, including Plaintiffs.

449. As a result of the foregoing, Ericsson Inc.'s conduct caused millions of U.S. dollars in protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq as protection payments from

at least 2004 through at least 2014, and Ericsson Inc.'s conduct caused millions of U.S. dollars in protection payments to flow to Islamic State from at least 2014 through at least 2019.

**4. Börje Ekholm**

450. Ekholm facilitated the payments alleged herein through his conduct as described in this Complaint, including, but not limited to, Ekholm's approval of such payments in 2017.

**5. Rafiah Ibrahim**

451. Ibrahim knew about and, on information and belief, personally approved of Ericsson's protection payments to al-Qaeda-in-Iraq and Islamic State beginning no later than June 2014. From the moment her 2014 promotion to Head of the Middle East and North Africa Market Area was announced in June, Islamic State terrorists' emergence in Iraq, including Islamic State's taking of Mosul, was top-of-mind for Ibrahim and other Ericsson employees in Iraq. Ericsson's regional leadership, including—and beginning in July, led by—Ibrahim, rejected suggestions of suspending work on Asiacell's network and instead opted to formally ask Islamic State for permission to continue that work via hand-delivered letter. Ericsson's leadership, including Ibrahim, and Ericsson's strategic partner Asiacell were undoubtedly aware that "permission" for Western corporations to conduct business in its territory was not freely given by Islamic State (or its predecessor al-Qaeda-in-Iraq) but would come at a price. Given that Ericsson's work continued mostly unabated, it is reasonable to infer that Ericsson met Islamic State's price.

452. Ibrahim's long and varied tenure with Ericsson suggests her familiarity with its long-documented history of surreptitiously making corrupt (and illegal) payments to third parties. For example, between 2008 and 2010, Ibrahim was Ericsson's head of the North Africa region, which spanned 11 countries, including Egypt (where she was based at the time). In 2019, when LM Ericsson entered into the DPA with DOJ and Ericsson's Egyptian subsidiary, Ericsson

Egypt Ltd., pled guilty to criminal FCPA charges, both entities admitted that from 2000 to 2016, they "through various executives, employees, and affiliated entities, used third-party agents and consultants to bribe foreign government officials and/or manage off-the-books slush funds in countries where it pursued contracts to conduct telecommunications business [and that] [t]he agents were often engaged through sham contracts and paid pursuant to false invoices."

### D. Defendants' Protection Payments To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Had A Substantial Nexus To The United States

#### a. Defendants' Conduct Relied On American Contacts

453. Ericsson's protection payments were closely tied to the United States. Ericsson Inc. made payments through Ericsson AB or another LM Ericsson subsidiary acting as its sales agent in Iraq. Ericsson AB obtained—for the immediate benefit of Ericsson Inc. and the ultimate benefit of LM Ericsson—contracts with the U.S. government, Iraqi government, Korek, and Asiacell, or subcontracts with other prime contractors for those same entities.

454. As an initial matter, the claims asserted in this Complaint arise from Ericsson's illegal conduct in conducting business in post-Saddam Iraq beginning no later than 2004. That business—building telecommunications infrastructure in post-Saddam Iraq—might never have happened without U.S. Government funding and a U.S.-based company with whom Ericsson could partner. In May 2003, shortly after the end of major combat operations in Iraq, the U.S. Department of Defense awarded a $35 million contract to U.S.-based WorldCom, Inc. (aka MCI) to build a small wireless phone network in Baghdad for U.S. civilian and military personnel in Iraq, for which Ericsson agreed to provide 2,000 mobile phones. WorldCom and Ericsson also contracted to have LM Ericsson (likely through Ericsson AB) supply the equipment that WorldCom needed to build a network based on the Global System for Mobile Communication (GSM) standard, including 17 cell towers. After the U.S. Government decided to bar

WorldCom/MCI from being awarded new government contracts in August 2003, Ericsson was quickly able to capitalize on its prior work to win new contracts from Iraqi network operators Korek (on or about November 2003) and ITPC (on or about November 2004)—both of whom invariably relied upon at least some U.S. Government funds to pay Ericsson for its work.

455. Moreover, Ericsson's protection payments in Iraq required extensive involvement of U.S. personnel and facilities in the global Ericsson mobile business unit, Ericsson Inc., which operated in practice as a division of LM Ericsson's integrated structure rather than an independent subsidiary.

456. From 2003 through 2022, LM Ericsson – the parent of both Ericsson AB and Ericsson Inc., the latter of which was its crown jewel and a wholly owned subsidiary – maintained a substantial Iraq-focused presence in the United States, including in Washington, D.C. (*i.e.*, inside this District) and the broader Washington, D.C. metropolitan area, through the Iraq-related activities, travels, transactions, and communications of LM Ericsson's officers, employees, and agents in the United States, including in this District. For example, LM Ericsson and Ericsson Inc. always deployed cross-functional Ericsson teams who worked in Ericsson Inc.'s Washington, D.C. office on behalf of Ericsson Inc. and LM Ericsson, in order to advance Ericsson's critical global requirements, which often hinged upon access relationships with key Washington, D.C. stakeholders, government and non-government alike. According to one former leader of such LM Ericsson and Ericsson Inc. office in Washington D.C., as she/he published online, Ericsson's D.C. office aided LM Ericsson's and Ericsson Inc.'s "influencing plan[s]" in North American as well as Ericsson's "global" "plans", and coordinated directly with LM Ericsson's executives.

457. As LM Ericsson's wholly owned subsidiary in the United States, and the entity responsible for technical innovation, mobile telephony, customer billing, and enterprise management, Ericsson Inc. was the indispensable ingredient to, and partner in, LM Ericsson's next generation network offering worldwide from 2000 through 2022, as sold by its many divisions throughout the world. Through Ericsson Inc. and other U.S. subsidiaries, LM Ericsson also acquired U.S.-technology from, and collaborated with, other U.S.-based technology companies to design, develop, and support Ericsson products and services that were sold or provided for Ericsson's Iraqi projects and contracts during that period. Simply put, Ericsson Inc. provided the U.S. technology (including software and intellectual property), provided the U.S. services, and facilitated other key U.S. commercial relationships that were indispensable to the integrated networks that LM Ericsson sold to customers worldwide through Ericsson AB or other subsidiaries, including Iraq. As such, like many other multinational companies (*e.g.*, medical supply firms) that leveraged U.S. economic prowess, technical expertise, manufacturing strength, and favorable legal regime for their sales in Iraq, LM Ericsson structured its sales in Iraq to operate (through Ericsson AB or another subsidiary) as Ericsson Inc.'s exclusive representative in Iraq, consistent with decades-long Iraqi practice.

458. Ericsson purposely availed itself of the United States, including its patent system, to position itself as the technological and service leader in several important sectors of the global telecommunications industry. Ericsson used that position, as well as a variety of products and services benefitting from Ericsson's U.S. patents, to win the lucrative contracts in Iraq and Afghanistan that gave rise to the illegal protection payments at the very heart of this action. Ericsson also acquired U.S.-based companies to fuel its growth in key business segments for which global demand, particularly in the Middle East, was expected to increase.

459. Ericsson could not have obtained or implemented telecommunications contracts in Iraq without maintaining a substantial U.S. presence through its regular deployment of LM Ericsson and Ericsson AB officers, employees, and agents into the United States in order to, *inter alia*, coordinate with Ericsson Inc. for purposes of designing the bid strategy, executing the bid, performing the subsequent work, and managing finances, for the Iraqi contracts alleged herein, and also to fraudulently conceal Ericsson's facilitation of protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through false statements to LM Ericsson shareholders that LM Ericsson reached into the United States to issue, often jointly with Ericsson Inc., and sometimes through Ericsson Inc. (*i.e.*, Ericsson Inc. is the primary author of a media statement formally on behalf of LM Ericsson). Such close cooperation was consistent with LM Ericsson's admission that its subsidiaries operate as divisions of LM Ericsson, rather than independent entities, and a hallmark of their "One Ericsson" model, which was a popular business model for trans-Atlantic multinational corporate collaboration within one family, as demonstrated by its widespread deployment by other Western industries, *e.g.*, medical supply, during Oil-for-Food and reconstruction-era Iraq.

460. Indeed, LM Ericsson's leadership regularly acted in furtherance of Ericsson's illicit protection money scheme while physically present in the United States. Such contacts were not fortuitous: LM Ericsson promoted the cross-pollination of its European and American workforces. Such practices started at the very top: LM Ericsson's CEO, Börje Ekholm, has lived and worked in the United States while leading LM Ericsson since 2017, including, on information and belief, during the period when Mr. Ekholm approved protection payments from 2017 through at least 2019. LM Ericsson authorized Mr. Ekholm to lead them from the United States so that LM Ericsson, through Mr. Ekholm's presence in America, could leverage the

unique economic, cultural, technological, and financial networks of the United States. While he led LM Ericsson as its CEO from 2017 through 2022 – including while he helped obstruct U.S. counterterror efforts – Mr. Ekholm was a Connecticut resident often working out of New York City. In February 2022, near in time to when Ericsson's Iraq scandal broke, Mr. Ekholm sold his Connecticut home and, on information and belief, relocated to Colorado, where he now resides and has a P.O. Box.

461. Ericsson Inc. personnel in the United States routinely supported Ericsson AB's implementation of Defendants' contracts in Iraq, just as Ericsson Inc. personnel in the U.S. did with respect to the rest of Defendants' North Middle East region, which was comprised of Iraq, Afghanistan, Jordan, Lebanon, and Syria. Ericsson Inc.'s provision of such services to Ericsson AB's ability to perform under its Iraqi contracts and thereby enable Defendants' Iraq-derived profits, which Defendants' protection payments were designed to inflate.

462. Ericsson's protection payments in Iraq (alleged above) involved sales of telecommunications technologies and services sourced from and/or provided largely in the United States, and Ericsson's protection payments were intended to maximize the profits that Ericsson Inc., and, by extension, LM Ericsson, derived from contracts in Iraq for the sale of Ericsson Inc.'s specialized goods and services (like, for example, the Charging and Billing in One, or CBiO system). Moreover, on information and belief, Ericsson procured many of the core radio network components for the systems they installed all over the globe, including in Iraq, from U.S.-based companies. At a minimum, Ericsson used those U.S. companies' technology in the mobile network and broadband systems Ericsson built and installed for its global customer base. For example, Ericsson bundled Ericsson Inc. services with Cisco ASR 9000 routers for its Iraqi client Korek.

463. The object of Ericsson's network and radio contracts in Iraq, including on information and belief every contract with Asiacell and Korek, was to provide U.S.-origin technology and services, including but not limited to the RBS 6000, the Cisco ASR 9000, and the CBiO system, that were sourced in whole or in part by Ericsson Inc. or another LM Ericsson subsidiary in the United States. Each such contract was negotiated, executed, and/or serviced in whole or in part in the United States; each required extensive communications with Ericsson Inc. personnel located in the United States; and each required Ericsson to pay protection money to terrorists as a cost of doing business in terrorist-contested areas, such that all revenue and profit flowing to Ericsson Inc. from Ericsson's Iraq business was a result in part of payments to terrorists. Those revenues and profits were then used in turn to fund future payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and to secure work on new projects in Iraq.

464. Many of the projects to which Ericsson contributed protection payments were managed by and for the benefit of counterparties who were funded by one or more U.S. government components based in Washington, D.C., including, but not limited to, through USAID and the Department of Commerce. For example, in 2003, USAID began awarding contracts for the reconstruction of Iraq's telecommunications networks. By making protection payments in connection with such projects, Ericsson breached U.S. government-based, Washington, D.C.-negotiated contractual requirements prohibiting material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

465. Many of the projects to which Ericsson contributed protection payments were also managed by and for the benefit of counterparties who were funded by the World Bank, through its members the IFC and the Multilateral Investment Guarantee Agency ("MIGA"), both of which were based in Washington, D.C. For example, Zain Iraq entered into a $650 million

managed services contract with Ericsson in November 2011 after securing a $400 million debt facility from IFC earlier that year. By making protection payments in connection with such projects, Ericsson breached MIGA- and IFC-based, Washington, D.C.-negotiated contractual requirements prohibiting material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

466. Many—and on information and belief all—Ericsson contracts in Iraq alleged herein relied on Ericsson's contacts with the United States, and were for the purpose (in whole or in part) of generating business for Ericsson Inc. Given the managerial role played by LM Ericsson and Ericsson AB overseeing Ericsson's Iraq business, including on behalf of Ericsson Inc., LM Ericsson and Ericsson AB personnel often worked with and relied on Ericsson Inc.'s U.S. assets to implement Ericsson's Iraqi projects.

467. LM Ericsson's and Ericsson AB's U.S.-based contacts were important. The United States led Coalition forces in Iraq and spearheaded the civilian reconstruction effort. When other entities like the World Bank funded telecommunications projects in Iraq, they did so in close consultation with the U.S. government and in service of U.S. objectives.[66] LM Ericsson's and Ericsson AB's cooperation with their U.S. affiliates, including Ericsson Inc., was thus material in Ericsson obtaining work from its Iraqi customers, including Korek and Asiacell. Ericsson would not have obtained the Korek and Asiacell contracts alleged herein without promising close coordination with Ericsson Inc. and LM Ericsson's other subsidiaries in the United States. That was particularly true because the subject matters of the Iraqi contracts under

---

[66] Many, and on information and belief most, of Defendants' contracts were awarded by Iraqi customers who received World Bank funding, and as such, Defendants' Iraq-related contracts were often governed by the World Bank's standard contractual provisions, which typically required both the funding recipient (*e.g.*, Asiacell) and the prime contractor who would receive the money downstream (*e.g.*, LM Ericsson) to adhere to strict counterterrorism standards that usually included certifications and reporting requirements applicable to both funding recipient and prime contractor who deploys the World Bank's money.

which Ericsson was paid from 2004 through 2022 focused heavily on the development of Iraq's mobile network and associated business services solutions – the two signature roles played by Ericsson Inc. in LM Ericsson's globally integrated corporate network. LM Ericsson's work in Iraq depended on its relationship with Ericsson Inc.

468. From 2004 until 2022, LM Ericsson – for which Ericsson Inc. served as a U.S. division – and Ericsson AB maintained a substantial presence in the United States, including Washington, D.C., through the travel, communications, transactions, and services that LM Ericsson's officers, employees, and agents obtained in, or routed via, Washington, D.C. LM Ericsson's Washington, D.C.-based agents' conduct. As *Reuters* observed a few days after LM Ericsson's Iraq scandal broke, through "[Mr.] Ekholm," LM Ericsson strategized to, and did, financially "benefit[] from Washington's diplomatic pressure against Huawei [concerning, in part, anti-terrorism issues], which drove [Huawei] out of the U.S. and most of Europe" causing Ericsson's "sales" to "soar[]."[67]

469. LM Ericsson's presence in Washington, D.C. from 2004 until 2022 was accomplished, in part, by LM Ericsson's Washington, D.C.-based compliance and legal agents, public relations agents, lobbyists, and consulting and/or accounting firms. Some of those agents may have been retained by Ericsson Inc. via its office in Washington, D.C., acting as a division of and agent for LM Ericsson. LM Ericsson's Washington, D.C. actions furthered both LM Ericsson's receipt of U.S. dollars from U.S.-based customers or lenders, which LM Ericsson

[67] Reuters, *The Effect of ISIS Case for Ericsson May Go Far Beyond The Fine*, *republished by* NoticiasFinancieras – English (Feb. 18, 2022), 2022 WLNR 5092252. Among the U.S. government's stated Huawei-related national security concerns, Huawei was, and remains, subject to significant U.S. terrorism-related allegations concerning Huawei's alleged sanctions evasion and money laundering relating to Huawei's provision of services to notorious IRGC fronts in Iran.

diverted to terrorists in Iraq in the first instance, and LM Ericsson's successful concealment of its aid to terrorists and obstruction of U.S. policy thereafter. Examples of LM Ericsson's routine and direct presence in Washington, D.C. to further its Iraq-related protection payments and obstruct U.S. counterterrorism efforts include, but are not limited to:

**a.** LM Ericsson's DOJ and SEC-Facing Presence in Washington, D.C.: LM Ericsson routinely interacted with, and facilitated ongoing protection payments by making fraudulent Iraq-related representations, while present in Washington, D.C., to DOJ's and SEC's FCPA Units (which both received the information, and are based in, Washington, D.C.), while LM Ericsson knew of the key role played by DOJ and SEC in protecting Americans from terrorist threats as recognized by longstanding, widely publicized, official joint DOJ/SEC pronouncements, and also knew that LM Ericsson's nearly decade-long concealment of vital al-Qaeda and Islamic State-related information from the U.S. government foreseeably aided such terrorists attacks targeting America and its citizens.

**b.** LM Ericsson's Customer- and Lender-Facing Presence in Washington, D.C.: LM Ericsson routinely deployed its officers, directors, and agents to meet with key Washington, D.C.-based customers and lenders, including U.S. government military, aid, and commercial agencies in Washington, D.C., and World Bank stakeholders who facilitated billions in Iraq-related revenue for LM Ericsson and Ericsson Inc. which LM Ericsson secured through the artificial commercial benefits it derived from its protection payments, which themselves violated LM Ericsson's counterterrorism obligations under standard U.S. government and World Bank contracts that were ordinarily negotiated in Washington, D.C. and governed by Washington, D.C. law.

**c.** LM Ericsson's Media-Facing Presence in Washington, D.C.: Through LM Ericsson's Washington, D.C.-oriented press releases, and Washington, D.C. located officers, employees, and agents—with whom LM Ericsson and Ericsson Inc. routinely cross-pollinated under LM Ericsson's unusual "division"-based integrated corporate approach (in which Ericsson Inc. and other LM Ericsson subsidiaries serve as divisions of LM Ericsson rather than in traditional parent/subsidiary roles)—LM Ericsson routinely published joint statements with its division, Ericsson Inc (which has an agent and office in this District) statements inside Washington, D.C. that LM Ericsson specifically intended to use to influence key Iraq-, terrorism-, and corruption-focused Washington, D.C. media outlets, Washington, D.C.-based journalists, Washington, D.C.-based opinion-makers, and Washington, D.C.-based think tanks, in order to protect LM Ericsson's associated branding, which was vital to keep LM Ericsson's Iraq-related U.S. dollar pipeline—and Defendants' attendant protection payments to terrorists—flowing undetected until 2022. Simply put, LM Ericsson knew that its heavily U.S.-centric business would come under severe pressure in Washington, D.C. if the U.S. government learned it had been bribing anti-American terrorists responsible for beheading and blowing up Americans on camera for more than a decade.

470. Ericsson consummated its transactions through the United States banking system, by relying upon U.S.-based accounts to obtain the cash necessary to make Ericsson's slush fund-based protection payments, and wiring the funds necessary to make Ericsson's intermediary-based protection payments. On information and belief, Ericsson relied upon the U.S. dollar (or "USD") as its currency of choice for illicit Iraq-related payments in the Middle East. Plaintiffs' belief is based upon, among other things:

**a.** the universal preference by terrorists in the Middle East for USD-denominated payments, which usually required a U.S.-based correspondent bank when the original transaction occurred in Iraq;

**b.** LM Ericsson's and Ericsson AB's historical reliance (as documented in LM Ericsson's Deferred Prosecution Agreement) on U.S. dollars routed via U.S. banks when making other corrupt payments to Middle Eastern intermediaries, including consultants and vendors, in violation of U.S. law, as reported in the press and admitted by LM Ericsson in its Deferred Prosecution Agreement;

**c.** LM Ericsson's use of USD as the controlling currency in many (if not most) of its commercial agreements, including with European counterparties;

**d.** Ericsson's profile as a multinational enterprise that worked continuously in Iraq since the fall of Saddam, which ordinarily entailed heavy reliance upon U.S. dollars routed through the U.S. financial system given the interlocking nature of the U.S. and Iraqi systems (by design) after Saddam; and

**e.** Ericsson's recognition that the U.S. dollar was a better currency both for tactical reasons (the currency of choice for illicit cash transactions worldwide) and financial reasons (as the world's reserve currency).

471. Confidential Witnesses confirm the centrality of U.S. banks and the U.S. financial system to transactions in Iraq during the post-Saddam era. According to one Confidential Witness, for example, after the U.S. invasion of Iraq, "U.S. banks were the primary operators in Iraq . . . and the U.S. dollar was the currency that was used for everything." Based on his/her experience, the same Confidential Witness concluded that, "the U.S. financial system was the only way any Western [multinational] company could move [significant] funds into Iraq without

paying an exorbitant transaction fee like 30 percent" or using all cash, which would have been "very risky" because the company could easily get robbed.

472. On information and belief, payments made by Ericsson AB to various Middle Eastern intermediaries, including consultants and vendors, were wired through correspondent bank accounts in America—likely in New York, New York. For example, between 2011 and 2013, Ericsson AB made several payments from one of its Middle Eastern branch offices in Dubai to consultants with bank accounts located in the Middle East and Africa region (including in Djibouti and Qatar) for which the funds were wired through correspondent bank accounts in New York. *See* Information, *U.S. v. Telefonaktiebolaget LM Ericsson,* No. 19-CRIM-884 (S.D.N.Y. Dec. 6, 2019), at ¶¶ 42, 59, 61, 63, 105. On information and belief, some of Ericsson AB's work in Iraq was carried out from that same Dubai branch office.

473. Ericsson's ability to leverage U.S. markets, relationships, legal protections, technologies, and intellectual property enhanced the potency of the resulting terrorist finance and logistical aid that Defendants provided to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

474. With respect to Ericsson's cash-based protection money payments, Ericsson's ability to reliably and regularly access U.S. dollar-related bank accounts in the United States was essential to Defendants' ability to consistently make the high-dollar, U.S. dollar-denominated bulk cash protection payments demanded by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Such ability, in turn, amplified the lethality of the resulting terrorist finance that flowed through to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because the U.S. dollar was the currency of choice for all such FTOs at all times in Iraq, Afghanistan, and Syria because their ability to transact in U.S. dollars allowed them to, on net, purchase more weapons, pay more fighters, and conduct more operations, owing to the economic advantages presented by the USD over every other currency

in Iraq, Afghanistan, Pakistan, Syria, Jordan, Iran, and the Persian Gulf – the jurisdictions that mattered most to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's ability to commit attacks against Americans in Iraq, Afghanistan, and Syria from 2005 through 2022.

475. With respect to Ericsson's free goods-based protection payments, Ericsson's ability to reliably and regularly purchase brand-name American communications devices, including Apple iPads, iPhones, and similarly iconic American consumer technologies, provided a potent stream of hard-to-trace off-books cash equivalents that Ericsson—on its own, or through its intermediary partners, consultants, and subcontractors—passed along to terrorists as an alternative to cash payoffs on behalf of Ericsson in order to "protect" their business interests in high-risk markets like Iraq. For example, ever since the late 2000s, iPhones and iPads purchased from the United States have been the gold standard mobile phone of choice for illicit "free goods" donations by corporations to a recipient who can harm or hurt their business outlook. The reason is simple: iPhones and iPads were (and remain) imbued with powerful, iconic brand (and cash) value because of their association with the United States.[68] As one commentator explained in 2019, "[a] civil servant friend of mine was still offered a brand-new iPhone as a "gift" in 2016; I've yet to hear of anyone who was bribed with a Huawei."[69]

---

[68] The foregoing is not a criticism of Apple, the U.S. consumer, or telecoms companies that sell Apple products. Ordinarily, criminals who use free iPhones and iPads obtained in the United States as a cash equivalent alternative to facilitate corrupt payoffs in the Middle East, like Ericsson, do not openly disclose to their seller their intentions to use the devices purchased in the U.S. for illicit reasons overseas. (Instead, they often cheat the sellers in the U.S. by doing things like breaking the cell phone contracts that the sellers need to earn a profit.) Ericsson, however, harbored an illicit intent, distinguishing Ericsson from manufacturers (like Apple) or consumer brands (like Best Buy) that did not double as a decades-long global corruption factory, terrorist financier, and obstructor of U.S. counterterror efforts (like Ericsson).

[69] Yuan Ren, *Opinion: Why My Chinese Dad Switched From an iPhone to a Huawei*, N.Y. Times (Jan. 5, 2019).

476. LM Ericsson also depended upon access to the United States to maximize its ability to conceal its decades-long protection payment scheme from U.S. counterterrorist practitioners, because LM Ericsson depended upon U.S. relationships and service providers to operate Ericsson's entire virtual private network (or "VPN") system at Ericsson's offices in the Middle East, including Iraq, Qatar, Lebanon, and the United Arab Emirates. The communications security afforded by the state-of-the-art, U.S.-sourced VPN enhanced Ericsson's ability to avoid detection of its unlawful payment schemes by the authorities, including the U.S. government.

477. LM Ericsson also depended upon access to America to enable it to continue making protection payments after Ericsson started doing so. LM Ericsson also purposefully availed itself of the United States by reaching into the U.S. in or about 2013 or 2014 for the specific purpose of retaining a captive American law firm that LM Ericsson could, in turn, wield as a sword and shield, through the imprimatur of United States legal compliance afforded to LM Ericsson by its retention of American lawyers operating out of the nation's capital in Washington, D.C. LM Ericsson retained Simpson Thacher for this purpose.

478. LM Ericsson retained Simpson Thacher on or about 2013 or 2014 in order to leverage Simpson Thacher's presence in America as its agent in order to obtain numerous U.S.-only benefits, which enabled LM Ericsson to continue to sponsor Ericsson AB's assistance to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2014 through 2022. For example, from 2013 or 2014 through 2022, LM Ericsson leveraged its relationship with, and benefits resulting from brand association with, Simpson Thacher, and it instrumentalized Simpson Thacher's services as a form of cover and concealment for Defendants' continuing corruption scheme, including

Defendants' associated protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2013 or 2014 through 2022.

479. LM Ericsson converted its U.S. contacts with Simpson Thacher into continued cover for Defendants' scheme to route protection payments to FTOs. LM Ericsson's ability to launder Ericson's compliance-related reputation by leveraging Simpson Thacher's involvement as a "reputation launderer" was important to Defendants' continued ability to route assistance to al-Qaeda and Islamic State in Iraq and Afghanistan from 2013 or 2014 through 2022. For example, LM Ericsson was able to conceal its protection payments for at least eight (8) years while benefiting from the imprimatur of Simpson Thacher's captive-by-design representation of Ericsson. Thus, LM Ericsson's Simpson Thacher-related contacts with the United States, including Washington, D.C., helped Defendants continue to flow valuable assistance to the FTOs that killed and injured Plaintiffs from 2013/2014 through 2021.

480. LM Ericsson extracted its desired-for cover-and-concealment value from its deployment of Simpson Thacher from 2013 or 2014 through 2022 entirely because of LM Ericsson's ability to reach into America—including inside this District—to extract substantial value for LM Ericsson—and for Ericsson AB and, on information and belief, Ericsson Inc., Ekholm, and Ibrahim—by leveraging the firm's American contacts, including those of its individual partners. LM Ericsson's ability to extract value through its Simpson Thacher-related American contacts benefited from numerous channels of U.S.-located value flowing from the firm to LM Ericsson that included, but were not limited to:

**a.** Simpson Thacher's attorneys located and licensed in the U.S., including one or more of the firm's attorneys in this District;

**b.** Simpson Thacher's offices in the U.S., including the firm's office in this District;

**c.** Simpson Thacher's brand in the U.S., including its reputation with important government, media, and non-profit stakeholders in this District; and

**d.** Simpson Thacher's networks in the U.S., including those in this District.

481. LM Ericsson could not have leveraged Simpson Thacher's eight-year-long reputation washing exercise on Ericsson's behalf into the potent, terrorist-enabling assistance such conduct enabled without the cover provided to LM Ericsson by its ability to represent to its business partners and investors, among others, that Ericsson was represented by a United States law firm with offices in Washington, D.C., from and through which LM Ericsson could—on its own behalf, and on behalf of Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm—continue to manage any of the predictably foreseeable Washington, D.C.-related fallout from LM Ericsson's long-standing, enterprise-wide, corruption scheme, including Ericsson's associated protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

482. LM Ericsson's conduct caused millions of U.S. dollars in protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq as protection payments from at least 2004 through at least 2014, and LM Ericsson's conduct caused millions of U.S. dollars in protection payments to flow to Islamic State from at least 2014 through at least 2019.

**b. Defendants' Conduct Targeted The United States**

483. Ericsson also made direct payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State knowing that each FTO would use Ericsson's payments to target U.S. citizens in terrorist attacks. Those payments were no accident. Ericsson intentionally directed its money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and intentionally aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist campaigns, in exchange for each FTO's agreement to route its attacks away from Ericsson's business interests and toward U.S. forces instead.

484. Ericsson's decision to pay protection money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State was also expressly aimed at the United States, because when making those payments, LM Ericsson, Ericsson AB, and Ericsson Inc. knew they were aiding al-Qaeda, al-

Qaeda-in-Iraq, and Islamic State attacks that were designed specifically to influence U.S. policy by killing and injuring American personnel.

### E. Defendants' Protection Payments To Al-Qaeda And Al-Qaeda-In-Iraq Aided And Abetted Al-Qaeda And Al-Qaeda-In-Iraq Acts of International Terrorism Against Americans In Iraq, Syria, And Afghanistan

#### Funds Raised In Iraq And Syria By Al-Qaeda And Al-Qaeda-In-Iraq Funded Al-Qaeda And Al-Qaeda-In-Iraq Attacks In Iraq, Syria, And Afghanistan

485. Al-Qaeda directly and substantially participated in al-Qaeda-in-Iraq's protection rackets through al-Qaeda's personnel and practice. Al-Qaeda installed al-Qaeda "core" lieutenants into the al-Qaeda-in-Iraq's protection money bureaucracy inside Iraq to ensure that al-Qaeda core received its proper share. Al-Qaeda core also ensured that al-Qaeda-in-Iraq also operated purpose-built bureaucracies designed to route a percentage of all al-Qaeda-in-Iraq back to al-Qaeda "core" in Afghanistan and Pakistan to facilitate al-Qaeda's global jihad against Americans. Among other things, al-Qaeda-in-Iraq maintained an internal account known as the "General Treasury," which al-Qaeda-in-Iraq used to flow a percentage of all its Iraq-based income back to al-Qaeda "core" in Afghanistan and Pakistan.

486. While al-Qaeda and its branches' names evolved over time, this core relationship between protection money and two-way positive cash flow for al-Qaeda and its allies in Iraq, Syria, Afghanistan, and Pakistan remained constant at all relevant times.[70]

487. Al-Qaeda-in-Iraq directly funded al-Qaeda "core" from 2004 through 2014 through at least four channels, usually through U.S. dollar-denominated payments. *First*, al-Qaeda-in-Iraq made large U.S. dollar-denominated cash payments to al-Qaeda core upon the latter's request, which were smuggled by al-Qaeda and/or al-Qaeda-in-Iraq operatives from Iraq,

[70] Even after al-Qaeda and ISIS split in 2014, the same protection rackets continued to fund the global operations of both FTOs and their respective regional affiliates worldwide.

Syria, and the Persian Gulf (where they raised money) to al-Qaeda core in Afghanistan and Pakistan. *Second*, al-Qaeda-in-Iraq paid al-Qaeda core a percentage of its net income (or "excess funding") befitting its status as a branch of al-Qaeda. *Third*, al-Qaeda-in-Iraq provided vital logistical aid that enabled al-Qaeda core's other money-making rackets to generate more cash flow. For example, al-Qaeda-in-Iraq helped al-Qaeda core move narcotics through Iraq and into the Middle East for distribution, which generated cash flow for al-Qaeda core. *Fourth*, al-Qaeda-in-Iraq's successful attacks also directly strengthened al-Qaeda core's ability to raise funds and sign new recruits (who ordinarily contributed to both al-Qaeda and al-Qaeda-in-Iraq) by materially strengthening al-Qaeda's ability to successfully present bin Laden's strategic narrative to the broader pool of global terrorist-curious followers and potential financiers whom were choosing between al-Qaeda and another organization by giving al-Qaeda the ability to present itself as both the senior leader of the global jihadist cause and the terrorist organization with the greatest capabilities and track record of killing Americans after 9/11, which helped it raise more money.

### F. Defendants' Protection Payments To Islamic State Aided And Abetted Islamic State Acts of International Terrorism Against Americans In Iraq, Syria, Turkey, Afghanistan, Central Asia, and Africa

#### 1. Islamic State Relied Upon Protection Money Payments And Donations To Fund Its Terrorist Attacks Against Americans In Iraq, Syria, Turkey, Afghanistan, Central Asia, and Africa

488. Islamic State also modeled al-Qaeda's and al-Qaeda-in-Iraq's doctrinal emphasis on the use of protection rackets and donations as two cornerstones of its terrorist finance strategy. In so doing, Islamic State adopted the same tactics, techniques and procedures as practiced by al-Qaeda and al-Qaeda-in-Iraq.

489. From 2014 through 2021, Islamic State relied upon sophisticated protection rackets in Iraq and Syria to finance Islamic State's operations in Iraq and Syria, as well as Islamic State's operations through key Islamic State branches.

### 2. Defendants' Value Flow To Islamic State Financed The Islamic State Attacks That Killed And Injured Plaintiffs In Iraq, Syria, Turkey, Belgium, And Niger From 2014 Through 2017

490. Islamic State viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign whose purpose was to expel the United States from the entire region to facilitate Islamic State's caliphate there.

491. Abu Bakr al-Baghdadi, the leader of Islamic State until his death in 2019, repeatedly called for Islamic State supporters worldwide to facilitate Islamic State's attacks against Americans in Iraq, Afghanistan, Syria, Turkey, Europe, Central Asia, and Africa through his public statements from 2014 through 2019.

492. Having himself taken refuge with Zarqawi's former allies in the Datta Khel region of North Waziristan, Pakistan between 2012 and 2013, Baghdadi's history confirms the interconnections between Islamic State's activities in Iraq/Syria and Afghanistan/Pakistan.

493. Under Islamic State's organizational structure, copycatted from al-Qaeda, a substantial portion of the value that flowed to Islamic State in Iraq and Syria from 2014 through at least 2022 flowed through Islamic State's "core" there.

494. Defendants' protection payments went to the organization that killed and injured Plaintiffs, in the years and in the places it killed and injured them. The money Defendants caused to flow to Islamic State went to Islamic State's core in Iraq and Syria; it flowed during the same years in which Islamic State committed the attacks that killed and injured Plaintiffs; and Islamic State's own financial apparatus converted that money into the fighters, weapons, and operational capacity with which Islamic State attacked Americans in Iraq, Syria, and Turkey.

495. From 2014 through at least 2019, Defendants caused at least several million U.S. dollars per year in protection payments to flow to Islamic State. *See supra* ¶¶ 287, 433, 449, 482; *infra* ¶ 837. Across that period, Defendants likely routed more than fifteen million U.S. dollars to Islamic State and Jabhat al-Nusra. *See supra* ¶¶ 288, 383–384, 434. Leaked Ericsson documents also record specific payments. Defendants facilitated the payment of millions of U.S. dollars to Islamic State as a "business tax" in order to secure the release of a hostage and resume Defendants' work in Mosul, *see supra* ¶ 337, and facilitated at least several million U.S. dollars' worth of "customs tax" payments to Islamic State in order to move Defendants' equipment along the "Speedway" through Islamic State's territory — including at least $16,500 paid to Islamic State on a single route on a single day in March 2017. *See supra* ¶¶ 341–342.

496. Defendants' payments to Islamic State and the attacks that killed and injured Plaintiffs occupied the same years. Islamic State committed each of the attacks at issue in this Complaint between July 1, 2014 and October 4, 2017. *See infra* Part IX. Defendants were paying Islamic State throughout that entire period, and continued paying Islamic State into 2019, after the last of those attacks. *See supra* ¶ 287. Defendants' assistance and Islamic State's attacks were therefore contemporaneous. Defendants' money was reaching Islamic State while Islamic State was killing and wounding Plaintiffs; it was reaching the same Islamic State organization that committed those attacks; and it was reaching that organization in the same two countries — Iraq and Syria — from which Islamic State planned, resourced, and directed them.

497. Islamic State's financial apparatus received Defendants' payments and put them to work. Islamic State's Finance Council was a cabinet-level entity with a chief financial officer, annual budgets, taxation offices and financial auditors, which governed every Islamic State revenue and expenditure stream and managed Islamic State's cash through "finance distribution

and tax collection centers" in Mosul and "finance storage centers" at Al Qaim, on the Iraqi-Syrian border. *See infra* ¶ 938. Islamic State formalized the protection rackets it inherited from al-Qaeda-in-Iraq into a system of universal taxation of the goods and cash that transited its territory, overseen by that same Finance Council. *See supra* ¶ 210. The protection money Defendants paid entered that system, and Islamic State administered it as institutional revenue.

498. Once inside that system, Defendants' money was redistributed on Islamic State's terms. Protection money flowed from local commanders up to Islamic State's financial commission for the use of its central leadership, and back down from that leadership to commanders in the field. *See infra* ¶ 824. Payments made to local commanders or directly to Islamic State institutions flowed to Islamic State's leadership "for use wherever the terrorists decided to focus their resources." *See infra* ¶ 831. Payments from large, well-financed corporations like the Corporate Defendants were distinctive in exactly this respect: unlike funding from smaller businesses, which tended to be spent locally, Defendants' payments travelled up Islamic State's organizational chain and supplied U.S. dollars that Islamic State's leadership could deploy at will. *See infra* ¶ 834. Defendants' payments accordingly did not merely fund attacks near Defendants' own project sites; Islamic State's process for redistributing them ensured that they financed Islamic State's violence across Iraq, Syria, and Turkey. *See infra* ¶ 835.

499. That redistribution reached Turkey. Islamic State's terrorist campaign in Iraq, Syria, and Turkey was powered by its protection rackets in Iraq and Syria. *See supra* ¶ 209. Islamic State's core in Iraq and Syria financed, directed, and resourced Islamic State's operations against Americans beyond the territory it held, and the protection money collected from businesses operating in Iraq and Syria — Defendants' money among it — financed Islamic

State's terrorist machine in Turkey as it did in Iraq and Syria. *See infra* ¶¶ 824, 835. Islamic State operated as a globally integrated network, led by a core but operationalized by terrorists in dozens of countries; every Islamic State terrorist, in every branch, pledged allegiance to Islamic State's emir. *See infra* ¶¶ 929, 931–932.

500. Defendants' payments also grew in importance to Islamic State precisely as the United States succeeded against Islamic State's other revenue. As the Coalition expanded its airstrikes against Islamic State's oil and gas fields, Islamic State's protection rackets assumed even greater importance to its ability to launch attacks against Americans, and in September 2016 Islamic State intensified its protection-money collections specifically to offset funding losses elsewhere. *See supra* ¶ 214. Protection money from larger, well-financed corporations, including the Corporate Defendants, supplied Islamic State with reliable funding and with insurance against the risk that its other funding sources would be interdicted. *See infra* ¶ 833. Protection money was, for most of Islamic State's existence, its single largest fundraising tactic, and the systematic payments made by large international companies swamped the smaller-scale rackets around them. *See supra* ¶ 16; *infra* ¶ 832. Every dollar Defendants paid in those years was therefore worth more to Islamic State's campaign than the dollars Defendants had paid before.

501. Islamic State converted that money into violence on terms the record makes concrete. Islamic State paid its rank-and-file fighters roughly $100 per month during the 2010s and its mid-level commanders between $200 and $400 per month, and the signature improvised explosive devices used by Islamic State and its predecessors cost roughly $100 apiece to make. *See infra* ¶¶ 828, 839. Islamic State's protection-money surpluses let it outbid every rival for fighters, paying up to $1,000 per month per fighter when the next-closest Sunni terrorist group

could not afford $250. *See infra* ¶ 828. Those surpluses also funded bounties that paid for attacks on Americans directly. *See infra* ¶ 829. At those rates, a single protection payment of $2,000 could put ten Islamic State terrorists and a commander in the field for a month and supply them with five improvised explosive devices. *See infra* ¶ 840. Defendants' payments to Islamic State were many orders of magnitude larger than that, year after year from 2014 through at least 2019. *See supra* ¶ 287; *infra* ¶ 840.

502. The United States government has quantified the relationship Defendants' payments exploited. A 2010 Department of Defense study found a statistically significant relationship between the terrorist finance available to Islamic State's predecessor and the number of successful attacks it carried out in Iraq, concluding that each successful attack required an expenditure of approximately $2,700 — and that even marginal reductions in those funds corresponded with statistically significant reductions in successful attacks. *See infra* ¶ 841. The corollary is the premise of this Complaint: on the same relationship the Department of Defense measured, marginal additions to those funds corresponded with additional successful attacks. Defendants' contributions ran to several million U.S. dollars a year, against that measured cost of approximately $2,700 per successful attack. *See supra* ¶ 287.

503. Islamic State's protection rackets, and the money Defendants had given it, outlasted the territorial caliphate Islamic State lost in late 2017. Islamic State's rackets continued largely unabated, and it retained control of key chokepoints throughout Iraq and Syria from which it continued to extract payments from companies doing business there. *See supra* ¶ 216. The surpluses Islamic State accumulated from protection money — Defendants' among it — served as "rainy day" money that funded Islamic State attacks well after the payments were

made, and Islamic State was still likely benefitting from Defendants' payments years later. *See supra* ¶ 353; *infra* ¶ 827.

504. Defendants also knew what they were buying. Defendants did not reduce the quantum of Islamic State violence by paying Islamic State; they purchased the redirection of that violence away from Defendants' own personnel, projects, and shipments and toward other targets — including Plaintiffs and their family members. *See supra* ¶ 16; *infra* ¶ 822. Islamic State's attacks on Americans in Iraq, Syria, and Turkey were the foreseeable, if not the necessary, consequence of Defendants' decision to keep paying. *See supra* ¶ 16; *infra* ¶ 822.

505. For these reasons, Defendants' protection payments to Islamic State aided and abetted, and were a substantial factor in and a foreseeable cause of, the acts of international terrorism that killed and injured Plaintiffs and their family members in Iraq, Syria, and Turkey. Defendants supplied Islamic State with U.S. dollars, in substantial amounts, year after year, in the same period and in the same theatres in which Islamic State was attacking Americans, through an organization whose financial apparatus Defendants knew would route that money to the commanders and fighters who carried those attacks out.

### 3. Defendants' Value Flow To Islamic State Also Financed Islamic State's External-Operations Branch, Which Directed The March 22, 2016 Attacks In Brussels That Killed And Injured Plaintiffs

506. Islamic State deployed Defendants' money wherever Islamic State's leadership chose to direct violence. Islamic State maintained a dedicated external-operations branch whose assigned function was to plan, resource, and direct terrorist attacks outside the territory Islamic State controlled; that branch answered to Islamic State's most senior leadership in Iraq and Syria; it drew on the same central treasury into which Defendants' protection payments flowed; and it directed the attacks at Brussels Zaventem Airport and the Maalbeek (also rendered Maelbeek)

metro station on March 22, 2016 that killed and injured Plaintiffs and their family members. *See infra* Part IX.

507. That branch was Islamic State's intelligence directorate, known in Arabic as the Amn al-Kharji and commonly as the "Emni." On the basis of thousands of pages of French, Belgian, German, and Austrian intelligence and interrogation documents, the Emni has been described as "a combination of an internal police force and an external operations branch, dedicated to exporting terror abroad," and as the "crucial cog" in Islamic State's "machinery for projecting violence beyond its borders." The European Union Agency for Law Enforcement Cooperation has likewise identified the Emni as "the external operations service within IS to carry out attacks abroad," and has reported that "[a]t least 10 deadly attacks against Westerners have been directed or coordinated by this special unit dedicated to exporting terror abroad, according to a former jihadist interviewed by the New York Times."[71]

508. The Emni was under the overall command of Abu Muhammad al-Adnani, Islamic State's most senior Syrian operative and its official spokesman — one of the terrorists whose conduct of Islamic State's affairs constitutes the Islamic State Campaign. *See infra* ¶ 1025. Beneath Adnani sat "a tier of lieutenants empowered to plan attacks in different regions of the world," including a "secret service for European affairs." Islamic State fighters who completed external-operations training were brought before Adnani and pledged allegiance to him personally — a second oath, owed to the officer who commanded the external-operations branch,

[71] Rukmini Callimachi, *How a Secretive Branch of ISIS Built a Global Network of Killers*, N.Y. Times (Aug. 3, 2016). See also Europol, *Changes in Modus Operandi of Islamic State (IS) Revisited* (The Hague, Nov. 2016). Europol's description of the Emni derives from the same account.

over and above the allegiance every Islamic State terrorist owed to Islamic State's emir.[72] *See infra* ¶ 932. Adnani's command of the Emni placed Islamic State's attacks in Western Europe within the same enterprise, and under the same leadership, as Islamic State's attacks in Iraq and Syria.

509. The Emni was resourced from the same treasury that received Defendants' payments. Islamic State's Finance Council governed every Islamic State revenue and expenditure stream and administered protection money as institutional revenue. *See infra* ¶ 938. That money moved: it flowed from local commanders up to Islamic State's financial commission for the use of its central leadership, and back down for use wherever Islamic State's leadership chose to focus its resources. *See infra* ¶¶ 824, 831, 834, 835. Payments from large, well-financed corporations like the Corporate Defendants travelled that route, putting U.S. dollars in the hands of Islamic State's leadership to be spent where that leadership chose. Adnani's senior lieutenants in the Emni correspondingly controlled operational money, organizing logistics for the operatives Islamic State sent abroad and paying the smugglers who moved them into Europe.[73]

510. Islamic State's leadership in Iraq and Syria directed the Brussels attacks. In a report to the Security Council issued ten weeks after the attacks, the Secretary-General of the United Nations concluded that "[t]he attacks in Paris in November 2015 and in Brussels in March 2016 demonstrate the ability of ISIL to mount complex, multi-wave attacks," that "it is already clear that they were coordinated by foreign terrorist fighters who had returned to Europe

---

[72] Rukmini Callimachi, *How a Secretive Branch of ISIS Built a Global Network of Killers*, N.Y. Times (Aug. 3, 2016).

[73] Rukmini Callimachi, *How a Secretive Branch of ISIS Built a Global Network of Killers*, N.Y. Times (Aug. 3, 2016).

from ISIL-held territory in the Syrian Arab Republic," and that "[t]o some extent, these cells received direction from the ISIL leadership."[74]

511. The United States has identified by name the Islamic State officer who coordinated the Brussels attacks. On June 1, 2017, the Secretary of State determined that Oussama Ahmad Atar had committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States, and designated him a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. Announcing that designation, the Department of State stated that Atar "is a senior leader of ISIS's external operations efforts and has established a network to carry out attacks in Europe"; that he "was a leading coordinator of the November 2015 Paris attacks and March 2016 attacks in Brussels"; and that he "also recruited and mentored two of the bombers involved in the March 2016 Brussels attacks that killed 32 and left many more wounded." Atar, a Belgian-Moroccan national, oversaw the Brussels operation from Islamic State's territory in Syria.[75]

512. Islamic State's external-operations branch supplied the men and the means. The Emni's trainees "led the Paris attacks and built the suitcase bombs used in a Brussels airport terminal and subway station." The explosives used in both the Paris and the Brussels attacks

[74] Report of the Secretary-General on the Threat Posed by ISIL (Da'esh) to International Peace and Security and the Range of United Nations Efforts in Support of Member States in Countering the Threat ¶ 6, U.N. Doc. S/2016/501 (May 31, 2016).

[75] E.O. 13224 Designation of Oussama Ahmad Atar, aka Oussama Atar, aka Usama Attar, aka Usama Atar, aka Abu Ahmad, aka Abou Ahmad, aka Abou Amahad, as a Specially Designated Global Terrorist, Public Notice 10037, 82 Fed. Reg. 27,754 (June 16, 2017); U.S. Dep't of State, Office of the Spokesperson, Media Note, *State Department Terrorist Designations of Mohammad Shafi Armar, Oussama Ahmad Atar, and Mohammed Isa Yousif Saqar Al Binali* (June 15, 2017). See also *The Islamic State's External Operations and the French-Belgian Nexus*, CTC Sentinel, Vol. 9, No. 11 (2016).

were triacetone triperoxide, a home-made explosive that European law enforcement describes as "relatively simple to make from commonly available ingredients and difficult to detect." Islamic State's protection-money surpluses had long financed weapons of exactly this kind. *See infra* ¶¶ 839, 840.[76]

513. Defendants were paying Islamic State when the Brussels attacks occurred, and by then their payments mattered more than ever. Defendants caused at least several million U.S. dollars per year to flow to Islamic State from 2014 through at least 2019, so that March 22, 2016 falls squarely inside the period of Defendants' payments. *See supra* ¶ 287; *infra* ¶ 837. By early 2016 Islamic State was under financial pressure: it had announced a fifty percent reduction in the salaries of its fighters in Raqqa, international airstrikes had diminished its oil production and revenues, and it was compensating by intensifying its "taxation" and extortion — creating new levies and increasing the rates of existing ones. The United Nations reported at the same time that continuing pressure on Islamic State in Iraq and Syria increased the likelihood that it would "try to move funds to affiliates outside the immediate current conflict zone," and that initial reports from Member States indicated this was already occurring.[77] Protection money of the kind Defendants supplied therefore accounted for a larger share of Islamic State's revenue in March 2016 than it had earlier, at the very time Islamic State was directing and financing its operations in Europe.

---

[76] Rukmini Callimachi, *How a Secretive Branch of ISIS Built a Global Network of Killers*, N.Y. Times (Aug. 3, 2016). Europol, *Changes in Modus Operandi of Islamic State (IS) Revisited* (The Hague, Nov. 2016); see also Graeme Smith, *Satan's Recipe: An Hour or Two and $135*, Globe & Mail (Toronto), Aug. 1, 2005, at A1 (reporting that the newspaper purchased the acetone, peroxide, sulphuric acid and hardware sufficient for a backpack bomb over the counter from ordinary London shops for C$134.30, tax included).

[77] Report of the Secretary-General on the Threat Posed by ISIL (Da'esh) to International Peace and Security and the Range of United Nations Efforts in Support of Member States in Countering the Threat ¶¶ 7, 10, U.N. Doc. S/2016/501 (May 31, 2016).

514. For these reasons, Defendants' protection payments to Islamic State aided and abetted, and were a substantial factor in and a foreseeable cause of, the acts of international terrorism that killed and injured Plaintiffs and their family members in Brussels on March 22, 2016. Defendants supplied U.S. dollars, in substantial amounts and year after year, to an organization Defendants knew was attacking Americans beyond Iraq and Syria, including in Europe. *See supra* ¶ 491; *infra* ¶ 690. And they did so through the very treasury that resourced Islamic State's external-operations branch. *See supra* ¶ 509.

## III. DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING OPERATIONAL ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE THROUGH DEFENDANTS' OBSTRUCTION OF UNITED STATES COUNTERTERRORISM OPERATIONS TARGETING AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE

515. Independently, and in addition to Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq and Islamic State, *supra* part II, LM Ericsson, Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm also aided and abetted acts of international terrorism by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State against Americans in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan by obstructing United States counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in the Middle East.

516. LM Ericsson, Ericsson AB, and Ericsson Inc. obstructed U.S. government counterterrorism operations targeting al-Qaeda and al-Qaeda-in-Iraq from at least 2003 through at least 2022, Ibrahim did so from at least 2014 through at least 2022 while acting in her capacity as an Ericsson AB employee and while acting in her capacity as an LM Ericsson employee and

personal counselor to Ekholm, and Ekholm did so from at least 2017 until at least 2022 while serving as CEO.[78]

517. Defendants obstructed U.S. government counterterrorism operations targeting Islamic State from 2014 through at least 2022, and Ekholm did so from 2017 until at least 2022 while serving as CEO.

### A. The U.S. Government Prevented Acts Of International Terrorism Against Americans In Iraq, Syria, Turkey, Europe, Africa, And Afghanistan By Conducting Counterterrorism Operations In The United States And The Middle East That Targeted Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

#### 1. U.S. Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Relied Upon A Whole-Of-Government Approach In Which The Department Of Justice And Other Agencies Shared Information In Order To Prevent Terrorist Attacks

518. From at least 2004 through at least 2022, the United States counterterrorism operations that targeted the transnational terrorist finance, logistics, and personnel networks upon which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State relied depended upon a whole-of-U.S.-government effort in which the Department of Justice played a key role in developing, vetting, and sharing actionable information concerning al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorist finance, logistics, and networks worldwide, which helped protect Americans from attack in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan.

519. This approach reflected America's broad post-9/11 counterterrorism emphasis on cross-pollination of data, intelligence, and investigative leads between various departments of the

---

[78] Ekholm served on LM Ericsson's Board of Directors prior to when Ericsson installed him as CEO in 2017. Plaintiffs believe discovery is likely to show that Ekholm knew of Defendants' protection money payments prior to when he became CEO in 2017, and likely enabled such scheme to continue by violating his own fiduciary obligations to as the Board member of a publicly traded company with actual knowledge of Ericsson's payments to FTOs, and nothing in this Complaint should be interpreted to suggest otherwise.

U.S. government in order to prevent future attacks by al-Qaeda and its progeny, including al-Qaeda-in-Iraq and Islamic State, against Americans.

520. United States counterterrorism strategy from 9/11 through 2022 always depended upon the key role that the National Security Division, USAO-DC, DOJ FCPA Unit, FBI Washington Field Office, SEC FCPA Unit, Treasury Office of Terrorism and Financial Intelligence, and State Department Bureau of Counterterrorism each played – individually, and as part of the post-9/11 "whole-of-government" counterterrorism strategy in response to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – with respect to developing actionable intelligence that enabled whole-of-U.S.-government efforts to more effectively interdict terrorist finance, disrupt terrorist networks, and impair terrorist logistics and thus prevent acts of international terrorism.

521. From 2003 through 2022, the U.S. government published other reports and made multiple public statements that similarly alerted Defendants that their provision of cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs' ability to attack Americans in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan.

522. In November 2004, Assistant Treasury Secretary Juan Zarate testified before Congress that focusing on the sources and movement of monies used to fund terrorist groups in Iraq was absolutely critical to effective counter-terrorism policy in Iraq. Zarate further testified that the U.S. government has taken a coordinated interagency approach to that very issue, which employs robust information sharing across various components of the Treasury Department, DOJ (from whom Defendants were concealing material information that they were duty-bound to

share), the State Department, the Department of Defense, the Department of Homeland Security, the Intelligence Community, and the National Security Council.[79]

523. In February 2005, Assistant Secretary Zarate gave a keynote address at an anti-counterfeiting summit in which he emphasized the importance of collaboration and information sharing between major players from the international private sector (*e.g.*, Ericsson, among others) and the U.S. government in gathering the information required to "triumph over a wide array of terrorist financing" in Iraq and other countries. Mr. Zarate further stated that "Every day it becomes more apparent that following dirty money and attacking its illicit sources is an essential part of winning the financial war on terrorism."[80]

524. In April 2006, Henry Crumpton, the Ambassador-at-Large for Counterterrorism at the U.S. Department of State, further emphasized the importance of "unified statecraft" – built upon cooperation between non-state actors from the private sector and the U.S. government (and other nations) – to "counter th[e] multi-layered threat" posed by "al-Qaida and its affiliates." At one point, he bluntly stated, "The government needs the private sector" in the counterterrorism

---

[79] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* Dep't of the Treasury, Testimony of Juan Carlos Zarate, Assistant Secretary, *Terrorist Financing and Financial Crimes, U.S. Dep't of the Treasury, Before the Senate Permanent Subcomm. On Investigations of the Comm. on Governmental Affairs* (Nov. 15, 2004), https://tinyurl.com/bdd6ykzw. The Treasury Department and State Department both amplified Assistant Secretary Zarate's comments in the national media. *See*, *e.g.*, CQ Congressional Testimony, *Hussein's Abuse of the U.N. Oil Free Food Program* (Nov. 15, 2004) (quoting Zarate testimony).

[80] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit--* (Feb. 1, 2005), https://tinyurl.com/4b78zs5e. The Treasury Department and State Department both amplified Assistant Secretary Zarate's comments in the national media. *See*, *e.g.*, U.S. Dep't of State, Release, *Zarate Cites Need For Public-Private Cooperation, Flexibility*, States News Serv. (Feb. 1, 2005) ("Continued success against terrorist financing will require 'strong and flexible plans' and better ways of collecting and sharing financial data without overburdening the financial sector, he said. 'Effective mechanisms depend on greater collaboration and information sharing within the government and with the private sector,' Zarate said.").

effort. He further explained that he was hopeful that private sector actors would buy into the concept of public-private partnerships in this area because of the private sector's exposure as a terrorist target "for exploitation or destruction."[81]

525. In April 2008, the Treasury's Under Secretary for Terrorism and Financial Intelligence observed how terrorists "rely on financial support networks," which "are not only a rich source of intelligence [for U.S. counterterrorism efforts] but also . . . a vulnerability we can exploit . . . against al-Qaeda" and "the Iraqi insurgency" (*i.e.*, al-Qaeda-in-Iraq). He explained how receiving real-time information, particularly from private sector actors, about terrorists' fast-evolving financial networks is critical to "better understand the relationship among [terrorists' financing nodes] and identify potential vulnerabilities . . . [and] sources and conduits of illicit finance."[82]

526. In March 2009, Lieutenant General David P. Fridovich, commander of Special Operations Command, reiterated the importance of taking "a whole-of-government, or interagency, approach to this challenge [of eliminating the networks of terrorist facilitators]." LTG Fridovich explained the importance of the government's existing and planned collaboration

[81] Ambassador Henry A. Crumpton, Coordinator for Counterterrorism, U.S. Dep't of State, *The Role of Public and Private Partnerships in the Global War on Terrorism; Remarks to the 5th Annual International Counterterrorism Conference: Public and Private Partnerships; Washington, D.C.* (Apr. 20, 2006), https://2001-2009.state.gov/s/ct/rls/rm/2006/64977.htm. The State Department amplified Ambassador Crumpton's comments in the national media. *See*, *e.g.*, State Dep't Documents and Publications, *Government-Private Partnership Key to Defeating Terrorism; Careful Investment Can Replace Ideology Of Hatred With Hope, Says Official* (Apr. 20, 2006) (quoting Ambassador Crumpton's speech).

[82] Under Secretary for Terrorism and Financial Intelligence Stuart Levey, U.S. Dep't of the Treasury, Press Release, *Under Secretary for Terrorism and Financial Intelligence Stuart Levey Testimony* (Apr. 1, 2008), https://home.treasury.gov/news/press-releases/hp898. Treasury amplified Under Secretary Levey's comments in the national media. *See*, *e.g.*, Stuart Levey, *Anti-Terrorism Financing*, CQ Congressional Testimony (Apr. 1, 2008) (quoting Under Secretary Levey's speech).

with partner nations and the private sector, noting that DOD's exchange with "the private sector has been especially informative as we learn how better to deal with the rapidly developing cutting edge financial technologies like internet and cellphone money transfers." He further elaborated on the focus of recent collaborative efforts and exchanges as al-Qaeda's facilitation networks, noting that "[a]ny tracking of money flows in support of the insurgents and terrorists operating in Iraq and Afghanistan links almost immediately to transregional and global facilitation networks that pose very real threats to the United States and our interests." Finally, in highlighting the success to date and future promise of the government's Iraq Threat Finance Cell, he expressed how DOD was "eagerly participating in the establishment of" a similar program focused on Afghanistan-based terrorism threats.[83]

527. In September 2011, Assistant Treasury Secretary of Counter-Terrorist Finance Daniel Glaser testified before a House Subcommittee about how substantial sums of money are critical to terrorist groups—not just to carry out attacks, but to also recruit and train operatives, procure weapons, make 'martyr' payments to terrorists' families, and to gain support from local populations. According to Glaser, terrorists' constant need for funding underscored the importance to counterterrorism efforts of receiving information and intelligence "to identify sources of illicit finance [for terrorists] and those individuals and entities that comprise [their] illicit finance networks." This financial intelligence allows counterterrorist efforts to identify vulnerable points in terrorist finance networks that are susceptible to disruption, including those related to terrorist groups' increasing use of criminal activity to raise money. Secretary Glaser

[83] LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), *quoted in* U.S. House of Representatives, *Tracking And Disrupting Terrorist Financial Networks: A Potential Model For Interagency Success?*, Hearing, House Committee on Armed Services, Terrorism, Unconventional Threats and Capabilities Subcommittee (Mar. 11, 2009).

also explained how "[f]ollowing the money can often yield valuable insights into a terrorist organization and help discover previously unidentified leadership and support nodes." He then touted the Treasury's Office of Financial Intelligence's successful efforts against core al-Qaeda achieved by being able to "undermine[] terrorist financial networks across the globe."[84]

528. In a November 2013 statement before a Senate Committee, FBI Director James Comey described how the FBI works with its law enforcement and intelligence community partners to advance the Bureau's top priority of counterterrorism, particularly as to "Al-Qaeda and its affiliates." Notably, Director Comey emphasized that "there must be cooperation with the private sector" for the government's counterterrorism efforts to succeed, drawing on his assessment of the effectiveness of another public-private partnership in the cybersecurity space where "[t]he private sector is the key player" and provides to its federal and international partners "real-time threat intelligence, every day."[85]

529. Following the emergence of the Islamic State as a prime terrorist threat, Samantha Power, U.S. Permanent Representative to the United Nations, wrote that all countries must rely on and support private sector actors to help them "identify and block financial transactions benefiting ISIL and other terrorist groups" and identify terrorist financiers and other facilitators. As an example of some of those key transactions, Ms. Power specifically highlighted the "crude

---

[84] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Written Testimony Of Treasury Assistant Secretary Daniel L. Glaser Before The House Financial Services Subcommittee On Oversight And Investigations* (Sept. 6, 2011), https://home.treasury.gov/news/press-releases/tg1287. Treasury amplified Assistant Secretary Glaser's comments in the national media. *See*, *e.g.*, States News Service, *Written Testimony Of Treasury Assistant Secretary Daniel L. Glaser Before The House Financial Services Subcommittee On Oversight And Investigations* (Sept. 6, 2011).

[85] FBI Director James B. Comey, *quoted in* FBI, *Homeland Threats And The FBI's Response; Statement For The Record Before The Senate Committee On Homeland Security And Governmental Affairs* (Nov. 14, 2013), https://tinyurl.com/2s4z78t8.

tax and protection rackets" that ISIL employs to raise "hundreds of millions of dollars . . . [and] pay its followers and fund attacks around the world." [86]

530. And in May 2017, Marshall Billingslea, as the nominee for Assistant Treasury Secretary for Terrorist Financing, did not mince words in his opening statement before the Senate Committee considering his nomination when saying that "disrupting terrorist finance and illicit trade requires working closely with the private sector."[87]

531. Moreover, Ericsson personnel have attended in-person U.S. government presentations emphasizing the U.S. government's reliance on actionable information from private sector actors to protect America from asymmetrical threats like terrorism.

532. On July 31, 2019, for example, at least one senior executive acting on behalf of Ericsson attended a presentation at the Washington, D.C. office of the Center for Strategic and International Studies ("CSIS"), a think tank that focuses on, *inter alia*, counterterrorism (the "CSIS Meeting"). During this presentation at the CSIS Meeting, Christopher Krebs, a senior U.S. cybersecurity official, while addressing the importance of "private public partnership," told those in the room, including Defendants:

> We have to continue working together between government and industry to understand what the challenges are and employee mitigations that are collaborative, coordinated and effective. … So, it's going to take all of us working together. … You will hear the perspectives later today from the government players, but it also requires very close coordination with government and industry. … it requires trusted and confidential working relationship. … So again, the call to action here, is government, industry continuing to work together.

[86] Ambassador Samantha Power (U.S. Permanent Representative to the U.N.), *Samantha Power: Putting ISIS Out Of Business*, CNN Wire (Dec. 17, 2015), https://tinyurl.com/46tswhph.

[87] Marshall Billingslea, *Opening Statement Of The Nominee For Assistant Secretary Of The Treasury For Terrorist Financing*, U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 16, 2017), https://tinyurl.com/4brujnkv.

533. As the DOJ FCPA Unit and the SEC FCPA Unit publicly observed in 2012, for example, "DOJ's and SEC's FCPA enforcement actions" regularly successfully interdicted illicit schemes by "third parties, including agents, consultants, and distributors," who were "commonly used to conceal [] [corrupt] payment[s]" "in [] business transactions,"[88] and therefore supported America's post-9/11 counterterrorism efforts because "corruption" "impede[d] U.S. efforts to" "combat … terrorism."[89]

534. With respect to interdicting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State transnational terrorist networks, financiers, logisticians, and tactics operationalizing protection money, "taxation," and the use of cash equivalents like "free goods," the effectiveness of the U.S. government's whole-of-government counterterrorism strategy substantially depended upon DOJ's and SEC's illicit payments-related law enforcement efforts, including those of the National Security Division, USAO-DC, FBI-WFO, DOJ FCPA Unit, and SEC FCPA Unit. This was because such above-described al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists often depended upon modes of value transfer that sounded in corruption, money laundering, and other illicit transnational activity for which DOJ and SEC had substantial expertise.

535. The DOJ's National Security Division, USAO-DC, DOJ FCPA Unit, FBI Washington Field Office, SEC FCPA Unit, Treasury Office of Terrorism and Financial Intelligence, and State Department Bureau of Counterterrorism's contributions to the U.S. government's whole-of-government counterterrorism operations regularly protected Americans from terrorist attacks by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in, *inter alia*, Iraq, Syria, Turkey, Europe, Africa, and Afghanistan from 2002 through 2022 in at least four ways.

---

[88] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 60.
[89] *Id*. at 2-3.

536. *First*, whole-of-U.S.-government efforts routinely secured U.S. federal criminal indictments and convictions of key transnational al-Qaeda, al-Qaeda-in-Iraq, and Islamic terrorist operatives, financiers, and logisticians who directly funded, armed, and staffed such FTOs' terrorist attacks against Americans in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan.

537. *Second*, whole-of-U.S.-government efforts regularly developed actionable information for on-the-ground U.S. government counterterrorism operations in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan designed to protect Americans from terrorist attack (and rescue American hostages) by targeting key al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorist operatives, financiers, logisticians, supply cashes, funding sites, safe houses, and other key targets that directly funded, armed, and staffed such FTOs' terrorist attacks against Americans in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan.

538. *Third*, whole-of-U.S.-government efforts routinely reduced the overall funds, weapons, and equipment available to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for use against Americans in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan by interdicting the corruption, money laundering, narcotics, sanctions evasion, and fraud schemes upon which the terrorists relied, even short of an indictment or conviction.

539. *Fourth*, whole-of-U.S.-government efforts regularly facilitated intelligence sharing between the U.S. government and key counterterrorism allies (e.g., many European or Middle Eastern governments) or participants in the terrorist finance scheme in question (e.g., the universe of companies that chose to pay Islamic State) by developing vetted information that American officials could deploy in the Middle East in order to protect Americans from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan.

540. United States counterterrorism operations always targeted al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection networks – literally every day at issue in this case. In fact, given the central role that such networks played in financing and arming these FTOs in Iraq and Afghanistan, there were usually multiple, large-scale, U.S. counterterrorism operations targeting the protection networks, often dozens of separate ones at the same time.

541. In 2010, for example, U.S. Army Brigadier General Jeffrey Buchanan publicly stated explained how the U.S. government and its Coalition partners were continuing to prioritize counterterrorism operations targeting al-Qaeda-in-Iraq's extortion networks because the United States recognized that, with respect to "al Qaeda," "al Qaeda in Iraq" "remain a threat," "remain dangerous[,]" "[a]nd [al-Qaeda-in-Iraq is a] part of the [al-Qaeda] network" and thus "includes al Qaeda's ability to recruit Iraqi fighters, al Qaeda's ability to bring foreign fighters across the border into Iraq, their ability to plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money."[90] In that context, BG Buchanan observed that "al Qaeda continues to change its tactics and how it adapts" and "[b]ecause [al-Qaeda's and al-Qaeda-in-Iraq's] financial networks have been so degraded, they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of the country."[91]

542. From 2004 through 2014 (in the case of al-Qaeda and al-Qaeda-in-Iraq), and from 2014 through at least 2019 (in the case of Islamic State), the operative FTOs' protection rackets generally shared the same features described by BG Buchanan above: they were multi-faceted,

---

[90] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces-Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.
[91] *Id.*

dynamic, and constantly evolving in response to non-stop 24/7 pressure from the United States, directly through U.S. forces or through Coalition partners like the Iraqi government. In addition to BG Buchanan's public statement in 2010, a constant stream of additional U.S. government announcements and associated media reports regularly highlighted how the U.S. government believed that the effectiveness of American counterterrorism operations in Iraq that specifically targeted al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks were inextricably connected to reducing such FTOs' ability to kill Americans in the Middle East. Examples of such reports included, but were not limited to:

**a.** *Defense Department Documents*, January 2007: "[S]uspected terrorists were captured [] during a raid conducted north of Baghdad that targeted an individual with ties to a senior al Qaeda leader who has … conducted extortion operations …"[92]

**b.** *Associated Press*, July 2007: "On July 9, [2007] Iraqi security forces detained four suspects allegedly responsible for running an extortion network and two individuals suspected of planning attacks against coalition forces. … Iraqi police detained four suspects allegedly engaged in extorting protection money from local contractors and using the funds to finance al Qaeda in Iraq activities."[93]

**c.** *Washington Post*, November 2007: "A good way to prepare for operations in Iraq is to watch … '*The Sopranos*,'' said Maj. Gen. Rick Lynch, commander of U.S. forces in central Iraq, referring to the hit HBO series about the mob. 'You're seeing a lot of Mafioso kind of activity.'… [Detained AQI operative] Abu Nawall admitted … that the group 'gets a lot of money through extortion….' … The racketeering operations extended to nearly every type of business in [Mosul], including … a cellphone company, which paid the insurgents $200,000 a month."[94]

**d.** *American Forces Press Service*, April 2010: "In … Mosul, Iraqi soldiers and U.S. advisors searched … for a suspected AQI member believed to extort money from [] transporters and contractors to fund the terrorist group. … [U.S.] operations resulted in the deaths or arrests of at least six suspected senior AQI leaders believed to greatly contribute to funding the terrorist group by their involvement in a highly-organized extortion … ring based in Mosul. … The six … include the overall AQI commander of

[92] Def. Dep't Documents, *American Forces Information Service News Articles, Combined Operation Nets Insurgents, Weapons in Baghdad* (Jan. 24, 2007), 2007 WLNR 1420339.
[93] Associated Press, *Two Terrorists Killed, 21 Detained In Iraq Raids Today*, AP Alert – Business (July 12, 2007).
[94] Amit R. Paley, *Iraqis Joining Insurgency Less for Cause Than Cash*, Wash. Post (Nov. 20, 2007).

northern Iraq, four men who head the group's funding, and a regional commander for Mosul. 'The capture of all six AQI extortion … network leaders … will likely greatly disrupt AQI operations and prevent future attacks throughout Iraq,' U.S. military officials said … 'The money collected from extortion … comprises the bulk of AQI's income, which is subsequently used to fund the terrorist group's deadly attacks.'"[95]

**e.** *Associated Press*, October 2009: "[A]n extortion network known as the Islamic State of Iraq and related to al-Qaida in Iraq based in … Mosul. … targeted … those who own or work at construction sites and local businesses … Extortionists then use the [] money to fund terrorist attacks …"[96]

**f.** *Associated Press*, September 2010: "Iraqi forces … searched … for a suspected al-Qaida in Iraq leader allegedly responsible for extorting money from … contractors and … transportation workers in order to fund terrorist operations …"[97]

**g.** *New York Times*, December 2013: "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Using extortion … the Qaeda affiliate is largely self-financing. … In Mosul, most of the security force members who are not from the area have left the city, and Al Qaeda controls whole sections of territory."[98]

**2. U.S. Counterterrorism Operations Designed To Protect Americans From Attack By Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State In Iraq, Syria, Turkey, Europe, Africa, And Afghanistan Relied Upon The Effectiveness Of The U.S. Government's Anti-Corruption And Anti-Money Laundering Efforts**

543. From at least 2004 through at least 2022, the United States' counterterrorism operations that targeted the transnational terrorist finance, logistics, and personnel networks upon which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State relied depended upon a whole-of-U.S.-government effort in which the Department of Justice played a key role in developing, vetting, and sharing actionable information concerning al-Qaeda, al-Qaeda-in-Iraq, and Islamic State

[95] American Forces Press Service, *Forces Dismantle Terrorist Group in Northern Iraq*, Defense Department Documents (Apr. 2, 2010), 2010 WLNR 6913562.
[96] AP Alert - Business, *Iraqis Arrest Numerous Terrorism Suspects* (Oct. 14, 2009).
[97] Assoc. Press, *Iraqi Forces Arrest 2 Al-Qaida Suspects*, AP Alert – Terrorism (Sept. 2, 2010).
[98] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).

terrorist finance, logistics, and networks worldwide, which helped protect Americans from attack in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan.

544. The United States government did not approve, publicly or privately, of Defendants' protection payments. The U.S. government relied on its chosen Western contractors – including Defendants – to take responsibility for ensuring the financial integrity of their contracting practices in Iraq. At all times, the U.S. government conveyed the message that protection payments violated U.S. law and undermined U.S. foreign-policy objectives in Iraq.

545. The U.S. government has long been on record that protection payments to terrorists are unlawful – no matter their motivation. In 2007, for example, an Assistant Attorney General emphasized at a public press conference that "corporations are on notice that they cannot make protection payments to terrorists."[99] In 2022, similarly, the Deputy Attorney General emphasized that "business with terrorists cannot be business as usual."[100]

546. The U.S. government viewed protection payments to terrorists in Iraq and Afghanistan the same way. Government officials stated that, as with Chiquita's payments to terrorists in Colombia, protection payments to al-Qaeda-affiliated terrorists undermined U.S. reconstruction objectives in Iraq and Afghanistan. For example, at a House Subcommittee hearing, an Assistant Deputy Undersecretary of Defense for Program Support was asked whether "facilitation payments . . . to ensure that trucks aren't bothered [are] legal under United States law?"[101] He responded: "Clearly, it's not . . . and it's counterproductive to what we're trying to

---

[99] U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty*.
[100] Deputy Attorney General Lisa O. Monaco, *quoted in* U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing A Guilty Plea By Lafarge On Terrorism Charges* (Oct. 18, 2022), https://tinyurl.com/yzb9sb8m ("DAG Statement").
[101] *Hearing on Corruption in Afghanistan Defense Contracting* (statement by Rep. John F. Tierney (D. Mass.)).

do."[102] The U.S. Special Inspector General for Afghanistan Reconstruction ("SIGAR") similarly opined that "I don't think that there should ever be or ever condone paying off a [terrorist] entity for anything . . . Obviously that's wrong; it's against the law and counter to any counterinsurgency or reconstruction initiative that we would like to see put in place."[103]

547. The Congressional Commission on Wartime Contracting found it "particularly alarming" that "subcontractors on U.S.-funded convoys, road construction, and development projects pay insurgent groups for protection."[104] Based on such statements, Defendants knew that the U.S. government was institutionally opposed to protection-money payments.

548. The United States' recent charges against Lafarge S.A. highlights Defendants' deliberate choice to contradict U.S. counterterrorism policy to suit their own selfish interests. According to Deputy Attorney General Monaco, speaking for the United States, "[m]any companies made the right choice — the ***only lawful choice: to leave the region rather than join hands*** with [al-Qaeda- and Islamic State-linked] terrorists" in Iraq and Syria.[105] "Lafarge" – like Ericsson – "made a different decision: to go into business with ISIS and al-Nusrah — two of the world's most notorious and brutal terrorist organizations."[106]

549. Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State directly undermined the United States desire to combat extortion-related terrorist finance—a cornerstone of United States policy specifically designed to protect Americans overseas. U.S. government reports and statements alerted Defendants that resisting terrorists' demands for

---

[102] *Id.* (Statement of Assistant Deputy Undersecretary Gary Motsek).
[103] *Funding The Enemy* at 196.
[104] *CWC Report* at 73.
[105] DAG Statement (emphasis added).
[106] *Id.*

protection payments was a cornerstone of American counterterrorism policy in Iraq, Syria, and Afghanistan.[107]

---

[107] *E.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 6, 2 (Jan. 30, 2006) ("During the past quarter, [SIGIR] continued to advance aggressive oversight of the use of U.S. funds in Iraq's reconstruction. … SIGIR's role in Iraq's reconstruction aims to help secure the overall success of the U.S. effort and thereby honor the sacrifices of the soldiers and contractors killed or wounded. SIGIR's most notable achievements during the past quarter were the arrests of four U.S. citizens for bribery, fraud, and theft involving Iraq reconstruction funds on contracts valued at more than $13 million. These arrests signal that the United States is unequivocally committed to fighting corruption and promoting accountability on all fronts in Iraq. SIGIR's Audit and Inspections divisions continued to focus oversight on [inter alia] ... the effort to fight corruption in Iraq … SIGIR remains committed to intensifying U.S. efforts to promote an effective anticorruption system … [and] to support anticorruption institutions in Iraq."); U.S. Dep't of Defense, Measuring Stability and Security in Iraq, May 2006 Report to Congress in Accordance with Department of Defense Appropriations Act 2006 (Section 9010), at 3 (May 26, 2006) ("The United States remains committed to … helping Iraqis … establishing … rule of law …, and fighting corruption."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 119 (July 31, 2006) ("[In] the Corruption Perception Index, compiled by Transparency International[,] Iraq ranks 21st in countries perceived as most corrupt in the world. The U.S. Embassy-Iraq has identified assisting the Iraqi government in its efforts to reduce corruption as one of its highest priorities."); The White House, *Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL)* (Sept. 10, 2014) ("Our goal is … to degrade and ultimately destroy ISIL through a comprehensive and sustained counterterrorism strategy so that it's no longer a threat to Iraq, the region, the United States, and our partners. … [T]he United States will carry out a comprehensive strategy to defeat ISIL … [for which] the [] core elements [included] … Disrupting ISIL's Finances … The U.N. Security Council resolution that passed unanimously … demonstrated the broad international consensus to disrupt ISIL's finances. We are [] working aggressively … on a coordinated approach that includes: … limiting ISIL's ability to extort local populations;… and disrupting the flow of external donations to the group. Our domestic laws also provide additional tools in this effort, enabling us to sanction or prosecute those who fund ISIL's activities."), http://tinyurl.com/6yce8e3z; Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, December 17, 2014−March 31, 2015*, at 31-32 (Apr. 30, 2015) ("Several U.S. agencies play a role in disrupting ISIL's ability to fund operations. A broad U.S. government team is arrayed against this problem, including DoS, Treasury, DoD, and the intelligence community … work to accomplish the following strategic goals: … [*inter alia*] • Limit ISIL's ability to extort local populations. • … disrupt[] the flow of external donations to the group. • Prevent ISIL from accessing the financial system. … Some of the ongoing activities to disrupt ISIL's financing include: … Limiting ISIL's ability to extort local populations. ... ISIL [] extorts money in connection with daily transactions ranging from fuel and vehicle movement in ISIL-held territories to school fees for children. The U.S. government is working to limit

550. Given the centrality of anti-corruption to U.S. counterterrorism policy in Iraq and Afghanistan after 9/11, protection payments also violated express U.S. government contracting requirements and regulations. Under the terms of their contracts, prime contractors bore responsibility for ensuring the integrity of U.S. spending in Iraq. The government imposed requirements designed to ensure that private contractors lived up to that responsibility. For example, USAID's contracts contained a "standard clause" reminding its contractors that "U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism. It is the legal responsibility of the contractor/recipient to ensure compliance with these Executive Orders and laws."[108] CENTCOM contracts followed DOD guidelines that similarly mandated that defense contracts—and DOD's Contracting Officers who negotiated and enforced them—must include a standard clause in every contract requiring government contractors to comply with all U.S. and Iraqi laws, including laws prohibiting the provision of material support to terrorists.[109]

---

ISIL's ability to transact extorted monies …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, September 30, 2015*, at 59 (Nov. 25, 2015) ("[T]he U.S. government is pursuing a four-part strategy to disrupt ISIL's ability to finance operations: 1. Disrupt ISIL's sources of revenue. Cut off ISIL's ability to generate revenue from … extortion in ISIL-controlled territories … and external donations. 2. Cut off ISIL's access to the regional and international financial systems. Restrict ISIL's ability to move and use its funds by accessing financial systems … and [] limit ISIL's ability to … move funds. 3. Target ISIL's financial leadership and facilitators. Identify and target key financiers within the ISIL structure. 4. Disrupt ISIL's external networks. Deny ISIL access to the international financial network that could support it in resupplying its war effort.").

[108] Memo. from Bruce N. Bower, USAID Regional Inspector General to Earl W. Gast, USAID Afghanistan Director, *Review Of Security Costs Charged To USAID's Projects In Afghanistan* (Review Report No. 5-306-10-002-S) at 11 (Sept. 29, 2010), https://tinyurl.com/2p82chxz.

[109] *See* Office of Under Secretary of Defense, *Class Deviation – Implementation Of The Synchronized Predeployment & Operational Tracker (SPOT) To Account For Contractor Personnel Performing In The United States Central Command Area Of Responsibility*, Memorandum for Directors Of Defense Agencies (Oct. 17, 2007).

551. Prime contractors were required to include those same clauses in their contracts with their subcontractors and to ensure that their subcontractors complied with them.[110] The "vetting" requirements were especially strict for any subcontractors that were to be armed under the contracts. Most Defendants' protection payments – whether made directly, or through subcontractors – violated those requirements and reflected a failure to live up to their responsibility to ensure the legality of their contract spending in Iraq.

552. Contractors typically concealed their protection payments from the U.S. government (and the Iraqi government) by funneling the money through networks of subcontractors and mischaracterizing the payments in their books and records as "security," "transportation," "logistics" or other similar costs. For that reason, the U.S. government (and the Iraqi government) was unaware of the specific illegal payments that Defendants made.

553. As the U.S. government became aware of broader patterns of corruption in Iraq, it implemented a number of programs to curtail illicit payments. For example, Congress created SIGIR, which scrutinized and audited government contracting as part of a broader anti-corruption mandate. The U.S. Embassy in Baghdad also aggressively pushed anti-corruption efforts. The net effect of these various efforts was to elevate anti-corruption to a distinct line of effort in the U.S. strategy in Iraq, and to convey unmistakably to industry participants that protection payments were unacceptable.

554. The U.S. government also implemented a wider array of programs designed to combat corruption in Iraq more broadly. Defendants' protection payments also stymied those programs by fueling the type of corruption that U.S. agencies were attempting to eradicate.

---

[110] *See*, *e.g.*, USAID Contract No. DFD-I-00-05-00250, § H.15 (Sept. 27, 2005) ("[t]his provision must be included in all subcontracts/subawards"); USAID Contract No. 306-C-00-11-00506, § H.17 (Oct. 29, 2010) (same).

555. The U.S. government on occasion encouraged companies to hire local Iraqis or employ local Iraqi businesses in connection with some projects. However, this was not a license for Western companies, including Defendants, to allow (much less instruct) their partners, consultants, and contractors to pay terrorists. On the contrary, the U.S. government at all times communicated its expectation that Defendants should vet their local partners and take affirmative steps to ensure that the money they paid to those partners did not flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. And the U.S. government repeatedly made clear that the payment of protection money – or the payment of terrorist "taxes" – in exchange for permission to proceed with U.S.-funded projects was illegal and counterproductive. Neither USAID nor Multinational Forces-Iraq ever suggested that such payments were either an inevitable consequence or an acceptable cost of implementing U.S.-funded projects in areas controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, or Islamic State.

556. In September 2010, General Petraeus issued formal contracting guidance designed to further discourage protection payments to terrorists. In the guidance document, General Petraeus emphasized that "[w]here our money goes is as important as the service provided or the product delivered."[111] He thus instructed contracting officers to "[h]old prime contractors responsible for the behavior and performance of their sub-contractors," with an understanding that "[e]xcessive sub-contracting tiers provide opportunities for criminal networks and insurgents to divert contract money from its intended purpose."[112] At bottom, the U.S. government's goal was to improve its systems and ensure that its "vendors and contractors" did not "empower the wrong people or allow the diversion of funds" to insurgents.[113] The government took a number

[111] *COMISAF's Contracting Guidance* at 1.
[112] *Id.*
[113] *Id.*

of steps to implement that guidance, including by ramping up its own vetting efforts and affirmatively suspending or debarring certain contractors with suspected links to insurgents.

557. For several reasons, Defendants nonetheless remained able to execute their payments to insurgents despite the U.S. government's efforts to discourage and stop them. *First*, in Iraq and Afghanistan, the government often lacked visibility into the subcontracting networks through which the payments flowed and thus had to "rely exclusively on prime contractors" to vet and supervise the subcontractors.[114] When Defendants knowingly funneled protection money through those subcontractors, the structure of the transactions made it difficult for the government to trace the money with sufficient precision to take corrective action. Such payments frustrated the U.S. military's policy of identifying and terminating "contracts with supporters of the insurgency."[115]

558. *Second*, the U.S. government faced staffing shortages that impeded its efforts to fully monitor the large number of contractors and subcontractors operating in Iraq and Afghanistan. With a limited number of qualified contracting officers available – and a vast network of contracts to supervise – the government lacked the resources to investigate every payment made by Defendants or their subcontractors. Defendants were able to exploit those resource constraints to conceal their protection payments from U.S. government personnel. Defendants did so even though they were duty bound to affirmatively flag such issues for the U.S. agencies funding their projects with U.S. taxpayer money.

559. *Third*, because the U.S. government's contractors often had better access to on-the-ground information than it had, the U.S. government relied on the good faith of its

[114] U.S. Special Inspector General for Afghanistan Reconstruction, *Contracting With The Enemy,* at 8, Audit No. 13-6 (Apr. 2013).
[115] *Id*.

contractors to prevent payments to terrorists. Due to Defendants' business ties – and the long in-country tenures of many of their personnel, as compared to the typically short rotations of U.S. government deployments – Defendants had unique real-time visibility into where their money was going. The government's need to rely on Defendants to use that unique visibility to do the right thing made it even easier for Defendants to conceal their payments from U.S. regulators.

560. Given those constraints, it was Defendants (not the U.S. or Iraqi governments) that had the resources, expertise, and obligation to ensure that their practices did not materially support al-Qaeda, al-Qaeda-in-Iraq, or Islamic State. As the U.S. Senate Finance Committee's Oversight and Investigations Unit reported in 2020, when a Western company's "work [in] some of the most" "dangerous," "active hotspots for terrorist activity" "generates more than $1 billion in revenue" directly or indirectly through U.S. federal government "grants," "both USAID's and OFAC's processes clearly state that it was the responsibility of the [company] to vet all sub-grantees" and the Western company plainly "has a duty to ensure that funds acquired from the U.S. government … do not end up supporting terrorist activity."[116]

561. In such circumstances, if a Western company had "access to the appropriate public information and should have known how, but failed to, properly vet [a contractor] as a sub-grantee, resulting in the transfer of U.S. taxpayer dollars to an organization with an extensive history of supporting … terrorists," it is the company that "bears the sole responsibility for their failure to properly vet [the contractor]" because "[h]ad [the company] employed [reasonable] due diligence … methods …, taxpayer dollars would not have exchanged hands with an organization

[116] U.S. Senate Finance Committee Oversight and Investigations Unit, *World Vision Financial Transactions, Memorandum to Senator Charles E. Grassley*, at 5-8, 10-11 (Dec. 22, 2020), https://tinyurl.com/5ax34th7.

that is known to fund terrorist organizations."[117] "Particularly concerning," according to the U.S. Senate Finance Committee's Oversight and Investigations Unit, "is [when a Western company] attempt[s] to shift the blame to the federal government for [its] own inability to properly vet a subcontractor" for terrorist finance.[118]

562. In sum, the U.S. government clearly stated its opposition to protection payments and attempted to curtail them. But those efforts were imperfect, and, at all times, Western contractors, including Defendants, functioned as the U.S. government's principal tool against terrorist financing. But Defendants abused that trust to pay off al-Qaeda, al-Qaeda-in-Iraq, and Islamic State and thereby increase their profit margins. Ericsson's conduct forms the basis of this lawsuit; Plaintiffs expressly disclaim any challenge to the U.S. government's policy decisions.

### B. Defendants Provided Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State By Obstructing United States Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

563. Ericsson's participation in the FTOs' protection-money rackets gave it firsthand access to important information about how terrorists were raising money in Iraq. No later than 2013 (when it was under investigation by the U.S. government for foreign bribery), Ericsson was required to disclose this information to the U.S. government and others, but it chose instead to conceal it to prevent Ericsson's own complicity with terrorists from coming to light. Thus, at various points thereafter, Ericsson hid information about the protection-money rackets, including the identities of terrorist actors (*e.g.*, Haji Saleh), corrupt contractors and subcontractors (*e.g.*, al Awsat), and details regarding how money was solicited and collected that allowed the FTOs'

---

[117] *Id.* at 10-11.
[118] *Id.*

finance mechanism to flourish. This concealment independently aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's violence.

564. From at least 2013 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. routinely and substantially obstructed United States counterterrorism operations designed to protect Americans from terrorist attacks by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by lying to multiple key members of the U.S. government's whole-of-government counterterrorism team, including, but not limited to, the DOJ National Security Division, DOJ FCPA Unit, and SEC FCPA Unit.

565. Eventually, Defendants' global bribery scheme – but not the terrorist finance aspects of such scheme – was detected, in part. In 2013, the SEC launched an FCPA investigation of LM Ericsson's and its subsidiaries' corrupt practices worldwide, and DOJ launched its own investigation in 2015 (but neither learned that Ericsson obstructed U.S. counterterrorism efforts until at least 2022).

566. Even then, however, Defendants' obstruction of U.S. counterterrorism efforts endured: from 2013 through 2022, LM Ericsson, Ericsson AB, Ericsson Inc., and Ekholm represented to DOJ, as well as LM Ericsson's shareholders, that Defendants were fully cooperating with the United States' then-ongoing criminal and civil anti-corruption investigations.

567. Ericsson brazenly obstructed U.S. counterterrorism efforts by concealing Defendants' payoffs to terrorists throughout the course of DOJ's and SEC's respective investigations. During the early phase (from 2013 through 2015), while Defendants were promising cooperation and good corporate citizenship to DOJ and SEC, they plotted to pay off terrorists. During the middle phase (from 2016 through 2018), Defendants continued their

payoffs to Islamic State – while still lying to everyone else. Amazingly, while LM Ericsson was finalizing its parallel resolutions with DOJ and SEC in 2019, it was simultaneously making the deliberate – and obviously wrongful – choice to conceal its protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State under the pretense that corrupt payments to the world's most notorious anti-American terrorist group were not "material."

568. To obstruct U.S. government counterterrorism operations designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Defendants routinely structured illicit transactions to conceal their protection payments on books-and-records, including, but not limited to, through Defendants': (i) illicit transactions with and through intermediaries, including their Iraqi partners, consultants, and contractors; (ii) use of slush funds and cash payoffs; and (iii) creation and maintenance of deliberately deficient internal controls.

569. To obstruct U.S. government counterterrorism operations designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Defendants routinely made materially false representations to, *inter alia*, the DOJ National Security Division, DOJ FCPA Unit, SEC FCPA Unit, and FBI, that obstructed such U.S. counterterrorism authorities' investigations and intelligence concerning al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq and Syria. LM Ericsson, Ericsson AB, and Ericsson Inc. routinely caused such obstructive communications to be made to U.S. government officials from at least 2013 through at least 2022, and Ekholm did so from at least 2017 through at least 2022.

570. On December 6, 2019, LM Ericsson and its subsidiaries—which LM Ericsson admitted "operated as divisions of the parent, rather than separate and independent entities"—(1) admitted to a years-long campaign of corruption undertaken to solidify its grip on telecommunications business in six countries; and (2) entered into a Deferred Prosecution

Agreement with DOJ, under which LM Ericsson agreed to pay total criminal and regulatory penalties to the United States government in the amount of $1,060,570,432, one of the largest corruption fines ever imposed.

571. As *Reuters* observed, Ericsson's subsequent "excuse for not fessing up earlier" – i.e., "that the [Iraq] transactions … didn't meet Ericsson's 'materiality' threshold" – was "unlikely to sit well with the Department of Justice, which takes a dim view of anything less than full disclosure in anti-corruption probes."[119] According to *Reuters*, Ericsson's "[k]eeping [Ericsson's] Iraqi skullduggery under wraps while in negotiations with the Feds is a distinctly bad look" considering "[LM Ericsson]'s 2019 [FCPA] settlement over graft in China, Vietnam, Indonesia, Kuwait and Djibouti made clear that the hefty size of the fine was partly due to Ericsson's foot-dragging."[120]

572. DOJ agreed. On March 2, 2022, LM Ericsson publicly admitted: "On March 1, 2022, the DOJ informed Ericsson that the disclosure made by the company prior to the DPA about its internal investigation into conduct in Iraq in the period 2011 until 2019 was insufficient. Furthermore, it determined that the company breached the DPA by failing to make subsequent disclosure related to the investigation post-DPA." As the *Washington Post* reported, DOJ "accused … Ericsson of violating a billion-dollar legal settlement by failing to fully disclose evidence of alleged corruption and possible payments to terrorists in Iraq."[121]

[119] Ed Cropley, *Ericsson's ISIS Fallout Could Go Beyond Big Fines*, Reuters (Feb. 16, 2022).
[120] *Id.*
[121] Greg Miller and Louisa Loveluck, *Justice Department Accuses Ericsson of Failing to Fully Disclose Alleged Fraud and Possible Payments to ISIS*, Washington Post (Mar. 2, 2022).

573. The SEC concurred. On June 9, 2022, LM Ericsson reported that the SEC "has notified the Company that it has opened an investigation concerning the matters described in the Company's 2019 Iraq investigation report."[122]

574. According to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments to increase Ericsson profits in high-risk jurisdictions, the following conclusions are "obviously" correct:

**a.** LM Ericsson's and Ericsson AB's "top management" both "approved" Ericsson's decision to "bribe[]such terrorist organizations" – i.e., al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – "but also wanted to hide it from DOJ+SEC+IRS during their penalty negotiations up to the signing of the DPA in December 6, 2019."

**b.** When LM Ericsson's and Ericsson AB's "top management" concealed information concerning Ericsson's decision to "bribe[] such terrorist organizations," Defendants' "top management" did so "in spite of the existence" – by no later than "2018" – of Defendants' "revealing Internal Compliance Report" "concerning their payments in Iraq."

**c.** "[LM Ericsson's] CEO [i.e., Börje Ekholm] should have presented [Defendants' "Internal Compliance Report" regarding Iraq] to those US Authorities," including "DOJ," "without delay, before the signing of the DPA."

575. The suspicious timing of Simpson Thacher's final report (and the fact that Simpson Thacher was simultaneously advising LM Ericsson on the DOJ investigation) also suggests that the report was intentionally delayed until just after the ink on LM Ericsson's DPA had dried so that Ericsson could get away with not disclosing it to the DOJ—and, if necessary, to give Ericsson the ability to say it could not have disclosed Simpson Thacher's findings to the DOJ before finalizing their settlement. LM Ericsson and the DOJ executed the DPA on November 26, 2019. The DOJ filed the related criminal charges and put out a press release

---

[122] LM Ericsson, *Press Release: Update on Ericsson Engagement with U.S. Authorities* (June 9, 2022).

announcing the DPA on December 6, 2019. And Simpson Thacher "finished" its report on December 11, 2019.

### C. Each Defendant Facilitated Ericsson's Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

#### 1. LM Ericsson

576. Defendants' corporate culture of obstruction, like their corporate culture of corruption, started at the top: LM Ericsson directed Defendants' obstruction of U.S. counterterrorism operations.

577. From the start of the DOJ's and SEC's respective investigations, LM Ericsson specifically intended to impede the U.S. government's ability to uncover LM Ericsson's bribes to al-Qaeda and Islamic State in Iraq and Afghanistan. LM Ericsson's agent, Simpson Thacher, has boasted in marketing materials how "the Firm convinced the SEC to drop certain issues from its ongoing investigation" of a "global telecommunications company . . . regarding alleged payments to government officials in various countries in violation of the FCPA."

578. LM Ericsson hired Simpson Thacher with the specific intent that Simpson Thacher deflect any United States government scrutiny concerning Ericsson's illicit payments in Iraq, including those relating to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. *See infra* Part IV. LM Ericsson and Simpson Thacher agreed as to that course of conduct, and thereafter successfully obstructed the United States government's counterterrorism operations. *Id.* This conduct was a but-for cause of Defendants' protection payments in Iraq by no later than 2014; when LM Ericsson had already retained Simpson Thacher; both LM Ericsson and Simpson Thacher were aware of Defendants' payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; both LM Ericsson and Simpson Thacher knew such payments were illegal and foreseeably aided

acts of terrorism against Americans; and LM Ericsson and Simpson Thacher both affirmatively chose to conceal such information from the United States government even though both had an affirmative duty of disclosure given LM Ericsson's assertion that it was fully cooperating with the then-existing U.S. government investigation of Ericsson.

579. On information and belief, LM Ericsson represented to DOJ – directly, or through its agent, Simpson Thacher – that LM Ericsson was fully cooperating with DOJ's investigation.

**2. Ericsson AB**

580. Consistent with the "One Ericsson" model, Ericsson AB had control of most Ericsson employees and other personnel (from Ericsson's customers, strategic partners, consultants, and other vendors, suppliers, and subcontractors with whom Ericsson AB contracted) relevant to the Corporate Defendants' obstructive conduct. By exercising direct control over those individuals, Ericsson AB helped LM Ericsson operationalize its obstruction.

581. Moreover, on information and belief, Simpson Thacher also represented Ericsson AB (in addition to LM Ericsson) in connection with the SEC and DOJ probes of Ericsson's corrupt payments and other potential FCPA violations.[123] Because Ericsson AB was jointly represented by Simpson Thacher, it was jointly aware of LM Ericsson's obstructive conduct and facilitated it through its ongoing concealment

[123] Ordinarily, in a government investigation, a firm in Simpson Thacher's position that represents the parent corporation would represent its various divisions and encompassed subsidiaries. In particular, the Statement of Facts attached to and incorporated by reference in, LM Ericsson's DPA stipulated that "LM Ericsson was a holding company operating worldwide through its subsidiaries and affiliated entities," and that its "subsidiaries acted as divisions of the parent, rather than separate and independent entities."

### 3. Ericsson Inc.

582. On information and belief, Ericsson Inc. was aware of Ericsson's transfers of U.S.-origin communications technologies to al-Qaeda in Afghanistan and thus obstructed U.S. counterterrorism operations—thereby providing operational assistance to al-Qaeda—by concealing information regarding those transfers (just as it concealed information regarding Defendants' illicit payments to Islamic State).

583. Moreover, Ericsson Inc. concealed its own likely direct payments to terrorists in Iraq and Afghanistan. Given that, according to one Confidential Witness, "[t]he Ericsson people in Iraq between [March 2003 and February 2004] were generally Americans"—combined with his/her observations about stark attack disparities in military-led convoys that included (versus those that did not include) Ericsson personnel—it is reasonable to infer that the Ericsson personnel on the ground either made or were directly involved in the making of protection payments to al-Qaeda-in-Iraq and al-Qaeda "core" in Afghanistan.

584. Ericsson Inc. also participated in the Corporate Defendants' obstruction scheme by operationalizing Ericsson's whistleblower intimidation machinery, particularly by leveraging the U.S. legal system to maximize Ericsson's ability to threaten former Ericsson Inc. employees. This was designed to intimidate those employees from communicating with the U.S. government about Defendants' conduct, including (on information and belief), the conduct alleged herein.

585. According to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's, Ericsson AB's, and Ericsson Inc.'s operations in North America, Europe, and the Middle East, Ericsson caused a draft letter agreement to be transmitted to one or more former employees of Ericsson Inc. in the United States that contained, inter alia, the following:

| ERICSSON | | Ericsson Internal<br>POLICY | | |
|---|---|---|---|---|
| Prepared (also subject responsible if other)<br>[redacted] | | No.<br>EUS-08:008075 Uen | | |
| Approved<br>[redacted] | Checked | Date<br>2020-04-06 | Rev<br>AM | Reference |

## 11 Proprietary Information

Please read, sign and return to your HR Generalist

FROM: Legal Department

RE: PROPRIETARY INFORMATION

This letter is to remind you of your continuing obligations regarding proprietary information of Ericsson Inc., Ericsson Canada Inc. and their parent companies, subsidiaries and affiliates (collectively, the "Company"). Company proprietary information includes (but is not limited to) proprietary information concerning Company products, technology and all non-public aspects of Company business.

Under the terms of agreement(s) signed pursuant to your employment with the Company, it is a violation to disclose or use for your own benefit or the benefit of any other individual or entity the confidential or proprietary information of the Company. Federal, provincial, and state laws establish similar post-employment obligations under the law, including a duty not to disclose or use information that may be classified as a trade secret or proprietary information of your prior employer.

While we understand your loyalties will be with your future employers, we expect you to observe and comply with your responsibilities to the Company, just as your future employers will expect with regard to their proprietary information.

We wish you the best of luck in the future.

Sincerely,

Ericsson Legal Department

______________________________ Employee's Name

______________________________ Employee's Signature

______________________________ Date

586. Plaintiffs refer to this letter, and substantially similar communications demanding confidentiality from former employees of Ericsson Inc., as the "Ericsson Legal Threat Letter."

587. Although phrased as a "reminder," the Ericsson Legal Threat Letter is clearly a threat, as it threatens legal consequences under both contracts as well as federal, state, and local laws for any person who discloses Ericsson's confidential or proprietary information. The demand for secrecy is sweeping: the letter refers to confidential or proprietary information without specifying what that is, and makes it clear that it applies to information relating not only to Ericsson Inc., but also to the company's parent, subsidiaries, and affiliates. It is also unqualified: it does not exclude, for example, reports of information to law enforcement authorities. And it purports to be binding, as it requires the employee's signature.

588. It is well-known across industries that such broad and unqualified demands for secrecy chill whistleblowing activity by intimidating putative whistleblowers. Employees will err on the side of self-preservation by staying silent if they are concerned that disclosing information about their employer's illegal activities will result in adverse consequences—and doubly so if they have recently signed a document promising not to disclose that information.

589. Precisely for this reason, such demands are illegal. For example, Securities and Exchange Commission Rule 21F-17 prohibits any person from taking action to impede an individual from communicating information to the Commission, including by "enforcing, or threatening to enforce, a confidentiality agreement" with respect to that communication. Pursuant to this rule, the Commission has repeatedly brought enforcement actions against companies that adopt broad confidentiality policies or agreements that do not inform employees of their right to disclose information to law enforcement authorities.

590. Suppressing potential whistleblowers was important to Ericsson because, for years, LM Ericsson was systematically breaking the law around the world. Indeed, for engaging in widespread bribery, record-keeping violations, and internal controls violations, Ericsson

admitted to one of the largest Foreign Corrupt Practices Act sanctions in U.S. history in 2019. The government explained that Ericsson did not receive full credit for cooperation in connection with that investigation because Ericsson failed to voluntarily disclose all of its serious misconduct, produced materials in an untimely manner, and did not fully remediate the violations. Indeed, years after Ericsson's 2019 settlement, it emerged that Ericsson had withheld information about payments to Islamic State.

591. Consistent with Ericsson's policy of covering up its wrongdoing, LM Ericsson and Ericsson AB depended upon Ericsson Inc. to ensure that Ericsson's whistleblower intimidation machinery functioned as Defendants corruptly intended—to intimidate any whistleblowers who challenged any aspect of Ericsson's criminal schemes.

592. Thus, LM Ericsson and Ericsson AB relied upon Ericsson Inc. to transmit the Ericsson Legal Threat Letter to one or more former Ericsson Inc. employees who directly serviced Ericsson AB's customers in the North Middle East Group – which covers Afghanistan, Iraq, Jordan, Lebanon, and Syria – from an Ericsson Inc. office in America. This letter was transmitted even after Ericsson's December 2019 resolution with the U.S. government, indicating specific intent to cover up wrongdoing.

593. The Ericsson Legal Threat Letter appears to be a form letter that was sent not only to one Ericsson Inc. employee, but on information and belief to every exiting Ericsson Inc. employee. Each time, the letter was transmitted not only for the benefit of Ericsson Inc., but also for all of that company's parents, subsidiaries, and affiliates, including LM Ericsson and Ericsson AB. Each time, the letter was transmitted from an Ericsson Inc. office in the United States, to an employee in the United States, referencing U.S. laws, and requesting a signature in the United States.

594. LM Ericsson and Ericsson AB caused Ericsson Inc. to transmit the Ericsson Legal Threat Letter with the shared specific intent for LM Ericsson and Ericsson AB to each reach into the United States to use Ericsson Inc. to intimidate every former Ericsson Inc. employee who could potentially expose LM Ericsson's and Ericsson's enterprise-wide corruption scheme from 2001 through at least February 15, 2022, of which Defendants' terrorist finance was an inextricable part, including the foreseeable risk that evidence of LM Ericsson's and/or Ericsson AB's payments to terrorists throughout the Middle East, including al-Qaeda, al-Qaeda-in-Iraq, the Taliban, and Islamic State.

595. When LM Ericsson and Ericsson AB reached into America through Ericsson Inc. to transmit Ericsson's Legal Threat Letter to former Ericsson Inc. employees in the U.S. who could expose Ericsson AB's unlawful conduct while working for high-risk Middle Eastern customers, LM Ericsson and Ericsson AB sought to secure significant business benefits derived from LM Ericsson's and Ericsson AB's desired consequential actions inside America:

**a.** Ericsson Inc. acted on behalf of LM Ericsson and Ericsson AB, and attempted to procure a signed admission from each newly fired Ericsson Inc. employee residing in America, which LM Ericsson and Ericsson AB valued specifically because of their need to deter whistleblowing given Ericsson's admitted, extensively documented, criminal conduct.

**b.** Acting through Ericsson Inc. in the U.S., LM Ericsson and Ericsson AB asked each Ericsson Inc. employee in America to "[p]lease read, sign and return to your HR Generalist" in Ericsson Inc.'s office in the United States. When LM Ericsson and Ericsson AB used Ericsson Inc. to send this request to the U.S.-based newly fired employees of the latter, LM Ericsson and Ericsson AB intended to secure a strong piece of evidence against former Ericsson Inc. employee, which LM Ericsson and Ericsson Inc. specifically intended to use in an American court.

**c.** Each time Ericsson Inc. secured a signature on behalf of LM Ericsson and Ericsson AB from a newly fired Ericsson Inc. employee in the United States, LM Ericsson and Ericsson AB obtained a valuable business asset – *i.e.*, the signed document – that LM Ericsson and Ericsson AB could (and, on information and belief, often did) later use to extract further advantages from Ericsson Inc. and the American legal system.

**d.** Acting through Ericsson Inc. in the U.S., LM Ericsson and Ericsson AB reached into America to threaten potential whistleblowers and witnesses.

596. At all times, LM Ericsson and Ericsson AB knew that Ericsson faced substantial criminal risk under United States law, given LM Ericsson's and Ericsson AB's operation of an enterprise-wide corruption scheme in which LM Ericsson and Ericsson AB violated numerous laws of the United States prohibiting, *inter alia*, the provision of material support to terrorists.

597. LM Ericsson and Ericsson AB reached into the United States to wield Ericsson Inc. as both sword and shield. LM Ericsson and Ericsson AB leveraged unique advantages offered by America's legal system, including the rule of law, reliable courts, discovery, and so on, to attempt, through Ericsson Inc., to proactively compel former Ericsson Inc. employees to remain silent about whatever they knew given the explicit legal threat for which LM Ericsson and Ericsson AB relied upon Ericsson Inc.'s presence in America.

598. LM Ericsson and Ericsson AB also knew that Ericsson AB's most profitable network development and managed services contracts outside of America and Europe tended to be in the so-called "virgin" telecoms markets that offered the potential for Ericsson to build an entire network from scratch—with the attendant chance for LM Ericsson and Ericsson AB to realize outsized profits. In every "virgin" telecom market that existed from 2001 through 2022, however, the reason for the market opportunity was simple: the country in question posed the most severe terrorist finance and anti-corruption risk possible. From 2001 through 2022, Iraq and Afghanistan exemplified this trend.

599. Given LM Ericsson's status as a publicly traded company whose shares trade in America, LM Ericsson and Ericsson knew that LM Ericsson's and Ericsson AB's ability to keep profiting from Ericsson's enterprise-wide corruption scheme, including their protection payments to FTOs arising thereunder, depended upon LM Ericsson's and Ericsson AB's ability to manage the vast U.S.-linked Dodd-Frank-whistleblower risk arrayed against LM Ericsson given its

criminal conduct in Iraq, Afghanistan, and elsewhere from 2001 through 2022. As a result, ever since the SEC's Dodd-Frank whistleblower rules took effect on August 12, 2011, LM Ericsson's and Ericsson AB's ability to protect their ability to profit from illicit payment strategies, like Ericsson AB's choice to purchase protection from FTOs by making protection payments to them, has depended on suppressing whistleblowers in the United States and avoiding U.S. law enforcement.

600. LM Ericsson and Ericsson AB also actively managed their U.S.-related whistleblower risk arising from Ericsson's top-down corruption model and associated payments to FTOs like al-Qaeda as Ericsson AB's cost of doing business in "virgin" telecom markets like Iraq and Afghanistan.

601. From 2011 through 2022, LM Ericsson and Ericsson AB also knew that Ericsson Inc.'s former employees in America could utilize the U.S. legal system's robust legal protections for whistleblowers, for which America stood alone amongst the Western legal world, as the only jurisdiction in which the government offers potential 8- and 9-figure "bounty" awards to incentivize disclosures.

602. LM Ericsson and Ericsson Inc. attempted to manage the risks described above by routinely deploying Ericsson Inc. to threaten former Ericsson Inc. employees inside the United States to minimize the chance that LM Ericsson and Ericsson Inc. would get caught.

#### 4. Börje Ekholm

603. Ekholm in particular played a critical role in Defendants' obstruction of U.S. counterterrorism operations designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Among other things, Ekholm approved Ericsson's overall strategy, which facilitated protection payments to Islamic State in Iraq, and the related obstruction of U.S. counterterrorism operations thereafter.

604. Rafiah Ibrahim, Ericsson's head of the Middle East and Africa regions and member of LM Ericsson's Executive Leadership Team since 2017, had personal knowledge of Ericsson's illicit activities in Iraq and played an active role in key aspects of them. In March 2019, while Ericsson's outside counsel from Simpson Thacher was conducting an internal investigation of Ericsson's corruption and the DOJ/SEC investigation was nearing its end, Ericsson announced that Ibrahim would be leaving her position as regional head for Middle East and Africa (and her post on LM Ericsson's Executive Leadership Team) to become a strategic "advisor" to Ekholm beginning on August 31, 2019—even though no replacement for her had yet been identified. Although dressed up as a mere personnel change and perhaps even a promotion for Ibrahim, Ekholm's move to make Ibrahim one of his "advisors" was recognized by some industry insiders as an obvious "euphemism for 'gardening leave'". It is clear in hindsight that Ekholm made that decision with knowledge of at least some of Ericsson's illegal conduct in Iraq (as well as Ibrahim's culpability for that conduct).

605. On information and belief, Ibrahim is still employed by LM Ericsson as an "advisor" to Ekholm. Ekholm most likely decided not to fire Ibrahim to conceal from the U.S. Government Ericsson's illegal activities in Iraq. Ekholm was laser-focused on finalizing Ericsson's dealings with DOJ and SEC so Ericsson could "close this legacy chapter" and "move forward." Had Ericsson cut Ibrahim loose rather than paying her to assume a fake role as Ekholm's personal strategic advisor (without being on the same continent as the person she was advising), she undoubtedly would have told the U.S. Government where all of Ericsson's bodies were buried. This would have jeopardized Ericsson's ongoing settlement negotiations with the DOJ and SEC and potentially exposed Ericsson to fines and penalties even larger than those under discussion at the time.

606. Although plaintiffs allege that Ekholm and other Ericsson executives knew about their payments to terrorists in Iraq much earlier, and that Ekholm knew while he was on LM Ericsson's Board prior to his appointment as CEO in 2017, Ekholm admitted publicly that he knew of the illegal payments in Iraq as early as 2018, which prompted Simpson Thacher's internal investigation in 2019.

607. In the wake of Simpson Thacher's final report leaking to ICIJ, Ekholm has conveniently claimed in public that in 2019 he had instructed certain Ericsson officials to "disclose fully [the report's findings] to the DOJ" but that others at Ericsson decided against this following an "internal process." Ekholm had many incentives to portray himself in a favorable light at that time; it was just one week until Ericsson's annual shareholder meeting where shareholders would vote on, among other things, whether to maintain the existing board members (including Ekholm) and whether to approve Ekholm's proposed compensation for the year ahead, and whether to discharge Ekholm from personal liability related to the Iraqi scandal. And proxy firms were recommending to shareholders that they vote to remove Ekholm as CEO. However, if Ekholm's claim to have given instruction is true, it is an admission that Ekholm recognized the imperative to share this information about Ericsson's terrorist payoffs in Iraq with the U.S. Government, but that Ericsson deliberately withheld that information in the hopes that it would stay under wraps and that Ekholm was on board with that decision.

**5. Rafiah Ibrahim**

608. As alleged *supra*, Simpson Thacher uncovered evidence during the course of its internal investigation that Ibrahim was directly involved with many of Ericsson's corrupt payments in Iraq, including to FTOs. Simpson Thacher conducted this investigation around the same time that the DOJ and SEC were beginning to wrap up their investigations of Ericsson concerning similar types of corrupt payments in other countries. Upon learning of STB's

discovery of a limited subset of Ibrahim's conduct as Head of Middle East and Africa, CEO Börje Ekholm sought to remove Ibrahim from her role while disincentivizing her from cooperating with law enforcement authorities, including the U.S. Government, and possibly spilling the tea on Ericsson's dirty deeds in Iraq (and elsewhere). Thus, rather than abruptly firing this long-tenured Ericsson executive outright—which would have raised red flags (and potentially jeopardized Ericsson's ability to renew lucrative business with key customers in her region)—Ekholm and Ibrahim reached their own "sham" agreement in early 2019: On August 31, 2019, Ibrahim would "voluntarily" step down as Head of Ericsson's Middle East and Africa Region and become an "advisor" to Ekholm—essentially a "no-show" job for which she would be handsomely compensated—and Ibrahim would remain within the Ericsson tent and not tell the U.S. where the bodies were buried.

609. Ericsson and Ekholm engineered this arrangement so that Ibrahim's departure would be announced in mid-March 2019 as a mere redeployment that would not take effect until nearly six months later—on August 31, 2019. Rolling out the announcement this way was strategic on several fronts. First, because Ibrahim's departure as Middle East/Africa Market Head was not effective immediately, Ericsson avoided raising suspicions that the move was driven by Ibrahim's potential involvement in criminal activity or other misconduct severe enough to necessitate an abrupt change. Second, by announcing that Ibrahim would move into the role of an advisor to Ekholm, Ericsson created a narrative that could be publicly spun as a "promotion" and that would, at the very least, counteract any implication that Ibrahim was engaging in criminal behavior. (After all, why would a CEO publicly emphasizing his company's newfound commitment to compliance publicly announce appointing a corrupt executive as a personal advisor?) Third, by removing Ibrahim from LM Ericsson's Executive

Team, her name would no longer be featured in Ericsson's Annual Reports (or other SEC filings), and her compensation would no longer need to be disclosed publicly.[124] More important, however, was the fact that by making Ibrahim an "advisor", the mere fact of her continued employment by Ericsson (and any change in that status) would no longer be readily verifiable by the public. And lastly, consistent with Ericsson's foundational commitment to putting profits above all else, allowing Ibrahim to remain as Ericsson's Head of Middle East and Africa region empowered her to use her relationships with the region's largest telecom companies one last time to finalize a handful of new and lucrative long-term deals for Ericsson—including a massive contract with Asiacell for network expansion and optimization in Iraq that Ericsson announced on July 11, 2019.

610. By agreeing to this deal, Ibrahim also became an indispensable participant in Ericsson's strategy of obstructing the U.S. Government's investigation of Ericsson and concealment of material information regarding FTO activities in Iraq from the U.S. Government.

### D. Defendants' Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Had A Substantial Nexus To The United States

611. LM Ericsson's and Ericsson AB's ability to reach into the United States was both the initial but for cause, and turbocharger thereafter, of Defendants' operational assistance to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State though Ericsson's obstruction of U.S. counterterrorism operations from at least 2015 through at least 2022. LM Ericsson's routine

[124] Ericsson's Annual Reports disclosed individual compensation for members of LM Ericsson's Board of Directors and for the CEO. The compensation for the other 14 members of LM Ericsson's Executive Team was not broken out individually but was reported in aggregate form. Nevertheless, certain shareholders and certainly LM Ericsson's Board of Directors likely had more visibility into the Executive Team's compensation than provided in the Annual Reports alone.

communications inside the United States, mostly, on information and belief in Washington, D.C., enabled additional terrorist violence by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by concealing Ericsson's payments to the terrorists and thus depriving the U.S. government of the intelligence, investigative leads, and network understanding it needed to attack the protection rackets Ericsson financed. If LM Ericsson had not reached into the United States as it did, it would not have been able to obstruct U.S. counterterror efforts as it did.

612. Ericsson's ability to conceal its illegal protection payments to FTOs was, in part, based on the credibility and favor that Ericsson Inc. had built up, on behalf of Defendants, by interfacing and working with the U.S. Government on national security issues over the course of several years. Specifically, following LM Ericsson's January 2012 acquisition of New Jersey-based Telcordia Technologies, Ericsson had effectively acquired a seat on the U.S. National Security Telecommunications Advisory Committee ("NTSAC") that had been occupied by Telcordia's CEO, Mark Greenquist, since January 2011.

613. The NSTAC is comprised of up to 30 senior executives from the U.S. telecommunications industry and was established to provide the President, through the Secretary of Homeland Security, with information and advice regarding national security and cybersecurity issues arising from domestic and global communications infrastructure, new communications technologies, and the ever-changing threat environment, among other things.

614. After gaining that toehold on the NTSAC through its Telcordia acquisition, Ericsson achieved full and direct access when President Obama appointed the chairman of Ericsson Inc., Angel Ruiz, to the NTSAC in 2013, where he remained through at least 2018. Angel Ruiz was not merely the top brass at Ericsson Inc.; he was also a member of LM Ericsson's 15-person Executive Leadership Team. Accordingly, LM Ericsson was able to have

one of the key members of its leadership team regularly interfacing with the highest levels of the U.S. Government on some of the nation's most sensitive national security issues.

615. LM Ericsson's ability to earn the U.S. Government's trust and the attendant credibility it afforded Ericsson as a trusted advisor/partner to the U.S. not only enabled Ericsson's concealment of its corrupt conduct in Iraq (and the related counterterrorism implications) but proved quite lucrative. As just one example, in 2014, the Department of Defense purchased a "miliary communications system" from Ericsson AB for $35.1 million in connection with Operation Inherent Resolve in Iraq. Ironically, this allowed Ericsson to profit from the U.S. military's effort to defeat the al-Qaeda-in-Iraq and Islamic State terrorists--which effort was necessitated, in large part, by the very protection payments Ericsson made over the course of many years that allowed those FTOs to grow and thrive.

616. United States counterterrorism operations concerning Iraq, Afghanistan, Syria, Turkey, Europe, and Africa often featured a transnational component with a heavy Washington, D.C. element. This reflected the heavy centralization of stakeholders relevant to Iraq, Afghanistan, Syria, Turkey, Europe, and Africa in Washington, D.C., including, but not limited to:

**a.** **Washington, D.C.-Based U.S. Government Agencies**, including the U.S. Department of Justice, U.S. Department of State, U.S. Agency for International Development, U.S. Department of the Treasury, and U.S. Department of Commerce;

**b.** **Washington, D.C.-Based International Organizations**, including the World Bank and IFC;

**c.** **Washington, D.C.-Based Iraq- and Afghanistan-Focused Think Tanks**, including, but not limited to, the Foundation for Defense of Democracies and CSIS; and

**d.** **Washington, D.C.-Based Media**, including, but not limited to: (i) Washington, D.C.-headquartered media including, but not limited to, the *Washington Post* and *Washington Times*; (ii) Washington, D.C.-located news bureaus or reporters for mainstream media outlets, including, but not limited to, ABC News, the Associated Press, Bloomberg, CBS

News, Fox News, the *New York Times*, *Politico*, and the *Wall Street Journal*; and (iii) Washington, D.C.-located strategic communications professionals.

617. Given Washington, D.C.'s central status to the U.S. government's whole-of-effort counterterrorism policy, the U.S. government's counterterrorism operations that targeted the al-Qaeda, al-Qaeda-in-Iraq, and Islamic State transnational terrorist networks, financiers, and logisticians, and operatives that directly funded, armed, and staffed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks against Americans in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan from 2004 through 2022 typically depended upon the close cooperation – including robust information sharing – between an array of Washington, D.C.-located U.S. government components. These included, but were not limited to, the:

**a.** **U.S. Department of Justice National Security Division**, which was at all times part of Main Justice and located at 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530 ("National Security Division");

**b.** **U.S. Attorney's Office for the District of Columbia**, which was at all times located at 555 Fourth Street, NW Washington, D.C. 20001 ("USAO-DC");

**c.** **U.S. Department of Justice FCPA Unit**, which was at all times part of the Fraud Section of DOJ's Criminal Division and located at: (i) 950 Constitution Ave., NW, Washington, D.C. 20530; and (ii) 1400 New York Ave., NW, Bond Building--4th Floor, Washington, D.C. 20005 ("DOJ FCPA Unit");

**d.** **U.S. Federal Bureau of Investigation Washington Metropolitan Field Office**, which was at all times located at 601 4th St NW, Washington, D.C. 20535 ("FBI Washington Field Office" or "WFO");

**e.** **U.S. Securities and Exchange Commission FCPA Unit**, which was at all times located at 100 F Street, NE, Washington, D.C. 20549 ("SEC FCPA Unit");

**f.** **U.S. Department of the Treasury Office of Terrorism and Financial Intelligence**, which was at all times located at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220 ("Treasury Office of Terrorism and Financial Intelligence"); and

**g.** **U.S. Department of State Bureau of Counterterrorism**, which was at all times located at 2201 C Street NW, Washington, DC 20520 ("State Bureau of Counterterrorism").

618. Mr. Ekholm, who resided (and still resides) in the United States at all relevant times while serving as LM Ericsson's CEO, was physically present in the United States while personally participating in Ericsson's obstructive conduct.

619. Ms. Ibrahim purposefully availed herself of contacts in the United States when she entered into the arrangement with Ericsson and Ekholm to nominally serve as the latter's "advisor" because he resided in the United States at all relevant times between 2019 and the present.

### E. Defendants' Operational Assistance To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Aided And Abetted The Terrorists' Acts Of International Terrorism Against Americans In Iraq, Syria, Turkey, Europe, Africa, And Afghanistan

620. Each of Defendants' obstructive acts set forth in this section impaired then-ongoing American counterterrorism operations specifically designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by affirmatively lying to the U.S. government about core facts relevant to American counterterrorism in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan. Among other reasons, Defendants impaired the U.S. government's counterterrorism efforts regarding:

**a.** the existence and extent of al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's telecom-facing protection money rackets;

**b.** the identities of key intermediaries who operationalized such rackets on behalf of Western companies, including Ericsson;

**c.** such intermediaries' corresponding al-Qaeda, al-Qaeda-in-Iraq, and Islamic State points of contact;

**d.** the protection-money related tactics, techniques, and procedures followed by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; and

**e.** al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's preferred methods of value transfer and communication in such FTOs' telecoms-facing protection rackets.

621. American counterterrorism operations against Islamic State worked by finding and cutting off the money that financed it. *See supra* ¶¶ 518, 520, 522. Ericsson's concealment denied the United States precisely that information about the protection rackets Ericsson was financing — their extent, the intermediaries who ran them, those intermediaries' Islamic State counterparts, and the methods by which Islamic State moved the value. *See supra* ¶¶ 611, 620. The United States had task forces working to interrupt exactly this flow of protection money to terrorists in Iraq, *see supra* ¶ 18; what those efforts lacked, as to the money Ericsson was paying, was the information Ericsson was withholding. And on the relationship the Department of Defense itself measured, even marginal reductions in the terrorist finance available to Islamic State's predecessor produced statistically significant reductions in its successful attacks. *See infra* ¶ 841. When Ericsson obstructed U.S. counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq (inclusive of its alias, Jabhat al-Nusra), and Islamic State, Ericsson provided critical operational assistance to these FTOs' terrorist attacks against Americans in Iraq, Syria, Turkey, and Europe, including Islamic State's attacks on Plaintiffs.

## IV. DEFENDANTS FRAUDULENTLY CONCEALED THEIR ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, THE TALIBAN, AND ISLAMIC STATE

622. From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. provided vital cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, including the Islamic State terrorists who facilitated the attacks against Plaintiffs in Iraq, Syria, Turkey, Belgium, and Niger, by breaching Defendants' legal obligations to, *inter alia*, the United States, LM Ericsson's shareholders, and Plaintiffs, to speak truthfully concerning its relationships with counterparties, including al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; Ekholm did so from 2017 until at least 2022 while serving as LM Ericsson's CEO.

623. From 2003 through at least February 15, 2022, Ericsson actively and fraudulently concealed its illicit transactions with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State alleged herein to cloak its illegal activities.

624. While facets of Defendants' scheme were eventually detected – in part – by the United States government, *see supra* Part III, such detection did not reveal Defendants' decision to purchase security from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for at least fifteen (15) years from at least 2004 through at least 2019.

625. From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. routinely structured illicit transactions to conceal their protection payments in books-and-records, including, but not limited to, through Defendants': (i) illicit transactions with and through intermediaries, including their strategic partners, consultants, and contractors; (ii) use of slush funds and cash payoffs; and (iii) creation and maintenance of deliberately deficient internal controls.

626. From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. regularly provided cover and concealment to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection money rackets in Iraq and Syria by issuing public statements that fraudulently assured, *inter alia*, U.S., European, and Middle Eastern governments, LM Ericsson's shareholders, and Plaintiffs, that LM Ericsson, Ericsson AB, and Ericsson Inc. (i) followed a rigorous compliance policy; (ii) were subject to terrorism-related risks, while concealing Ericsson's protection payments; and (iii) were cooperating fully with the U.S. government's investigation of Ericsson's illicit payments. LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, and Ekholm's routine provision of such unlawful cover and concealment aid to

al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq and Syria through Defendants' false public statements from 2003 through 2022 included, but were not limited to:

**a.** On June 22, 2004, Ericsson Inc. represented to LM Ericsson's shareholders: "Integrity and ethics has always been a significant part in the way Ericsson conducts business. Ericsson continues to further strengthen this through its Code of Business Ethics and Conduct, which is aimed toward all its employees."[125]

**b.** On April 11, 2014, LM Ericsson represented to its shareholders that: (i) LM Ericsson adhered to "a solidified approach to responsible business including rigorous compliance processes"; (ii) LM Ericsson "emphasi[zed]" that "conducting business responsibly takes a full value chain perspective," "begins with supply chain[,] and extends through Ericsson's own operations including the sales process"; and (iii) "we are focused on building a strong foundation for corporate responsibility within the company."[126]

**c.** On May 13, 2014, LM Ericsson—acting through its Group Vice President of Sustainability and Corporate Responsibility, Elaine Weidman-Grunewald—represented to its shareholders that: "Globally, [corruption] is a huge impediment to doing business in many parts of the world. When you have corrupt societies you also, in general, would have, for example, greater human rights abuses and many other problems … We have a zero tolerance to corruption of the [C]ompany, and so we just put a huge focus on this. We don't want to be involved in the wrong kind of business. It doesn't mean that we're perfect or any company is perfect, but it means we're putting a focus on this, and all of our employees know that this is not the way we're going to do business. So, we have a code of business ethics, and every one of our 114,000 employees is required to acknowledge that they have read and understand this code and the requirements and the principles that we set forth in the code. … Why is it important globally? Because this is really dragging and holding societies down, holding people back, holding back development. … So, we decided to do the human rights impact assessment, and we worked together with Shift to do that. We're just completing that now. It was a quite a huge learning experience. … [T]he main learning with the U.N. guiding principles is really when companies traditionally would look at human rights impacts, [they] would traditionally look at the risks to themselves or to their brand about being present in the market. The new U.N. guiding principles are about the impact on people, the local stakeholders, the local communities. It's not so much like what is Ericsson's risk. Of course, we look at that as well, but we also look at potential negative human rights impact on people, basically. … One huge accomplishment was to get the top-level executive

---

[125] Ericsson Inc., *Press Release, Ericsson's Leading Technology Contributes Significantly to Global Sustainable Development*, *published in* Business Wire (June 22, 2004).
[126] LM Ericsson, *Press Release: Ericsson Emphasizes Responsible Business, Energy and Technology for Good in 2013* (Apr. 11, 2014).

team and the CEO to really see the value and the need to be active in this area and see the benefits of it."[127]

**d.** In June 2016, LM Ericsson—via its CEO, Hans Vestberg—fraudulently represented that: at LM Ericsson, "[r]educing corruption," "fighting crime and terrorism," and "strengthening and improving the equity of fiscal policy," were "core" to achieving the "[Sustainable Development Goals]" to which LM Ericsson professed to adhere.[128]

**e.** On March 19, 2017, LM Ericsson and Ericsson Inc. jointly published a statement from LM Ericsson's Group Vice President of Sustainability and Corporate Responsibility, Ms. Weidman-Grunewald, which fraudulently represented that, with respect to corporate social responsibility, Ericsson was "Turning intentions into impact," and that: "Ericsson's deep-rooted commitment to the [Sustainable Development Goals] is well documented. Technology for Good is the concept we work with every day to address sustainable development challenges like … humanitarian issues, [and] human rights … We recently launched our 23rd Sustainability & Corporate Responsibility Report and are turning our intentions into impact in a number of ways."[129]

**f.** On September 18, 2018, Ericsson AB (including through Rafiah Ibrahim, Head of Ericsson Middle East and Africa) represented to LM Ericsson's shareholders that Ericsson engaged "[i]n an effort to make quality secondary education more accessible in Iraq" purportedly reflected Ericsson's ongoing "work[]" in "Iraq to leverage" "our employees to make a positive impact" in recognition, as Ms. Ibrahim stated, of Ericsson's purported efforts to ensure that "girl[s]" in Iraq could "receive [a] quality education."[130]

**g.** On July 11, 2019, LM Ericsson represented to its shareholders that: "Under [LM Ericsson's] agreement [with Asiacell], Ericsson will provide network design and

---

[127] Heather Clancy, *How She Leads: Elaine Weidman-Grunewald, Ericsson*, Greenbiz, (May 13, 2014), https://tinyurl.com/eh3jr2xj.
[128] Hans Vestberg, *quoted in* LM Ericsson, *ICT and SDGs*, at 7, 18-19, 29.
[129] LM Ericsson and Ericsson Inc., *Taking Action On The Sustainable Development Goals* (May 12, 2016) (quoting Ms. Weidman-Grunewald), https://www.ericsson.com/en/blog/2016/5/taking-action-on-the-sustainable-development-goals.
[130] LM Ericsson, *Press Release: Ericsson and Zain Bring 'Connect to Learn' Education Initiative to Iraq* (Sept. 18, 2018). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because this statement was accurate only because LM Ericsson concealed Defendants' gigantic, regular protection payments to Islamic State—which Defendants had been making to ISIS specifically for the more than four years since its February 2014 inception by the time this statement—which LM Ericsson knew, through its own personnel and agents on the ground as well as U.S. government and media reports, directly funded ISIS's rampage against schools for women and girls throughout Iraq, which was the signature issue that Islamic State opposed above nearly all else. LM Ericsson could not accurately describe its true relationship to schools for women and girls in Iraq – i.e., that LM Ericsson was responsible for funding the people blowing them up, burning them down, and murdering everyone inside – so LM Ericsson concealed such fact from its disclosures, including this statement.

optimization as well as expansion services … Ericsson will also offer round-the-clock network monitoring, problem restoration and performance enhancement services."[131]

**h.** On December 6, 2019, LM Ericsson represented to its shareholders that: (i) "The resolution relates to historical FCPA breaches ending Q1 2017"; (ii) "In parallel to the investigations, [LM Ericsson] has since 2016, together with external expert advisors, conducted a comprehensive review of the Company's anti-corruption program …[and] has been taking significant steps to improve its Ethics and Compliance program"; (iii) "Pursuant to the resolutions, Ericsson has agreed to continue enhancing its internal controls and its compliance program"; and (iv) "Reaching a resolution with the US authorities allows us to close this legacy chapter" and "now move forward …"[132]

**i.** On March 3, 2020, LM Ericsson represented to its shareholders that "[w]e have … a significant proportion of our sales to emerging markets in the … Middle East" and "[o]ur extensive operations are subject to additional risks, including … acts of terrorism."[133]

627. Each of the statements in the previous paragraph fraudulently concealed Ericsson's protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by addressing LM Ericsson's purported operational risks from terrorism in the Middle East while concealing Ericsson's payoffs to terrorists in Iraq, the implications of those payoffs, and/or the true nature of the services Ericsson provided to its Iraqi customers like Korek and Asiacell.

---

[131] LM Ericsson, *Press Release: Asiacell Selects Ericsson Services for Superior User Experiences in Iraq* (July 11, 2019). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because this statement omitted Ericsson's key service to Asiacell as the leader and orchestrator of protection money payments made on both Ericsson's and Asiacell's behalf. LM Ericsson's service as Asiacell's protection money partner was a core service (albeit an illegal one) that LM Ericsson provided to Asiacell. This statement fraudulently concealed such fact.

[132] LM Ericsson, *Press Release: Ericsson Reaches Resolution on U.S. FCPA Investigations* (Dec. 6, 2019).

[133] LM Ericsson, *2019 Annual Report*, at 127 (Mar. 3, 2020). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because LM Ericsson described risks from terrorism without revealing that LM Ericsson's behavior had worsened such risk, by providing a dependable, large-scale, stream of income to terrorists in LM Ericsson's key Middle Eastern markets. This statement fraudulently concealed such fact.

628. LM Ericsson, Ericsson AB, and Ericsson Inc. also combined as One Ericsson, or the "Ericsson Group" to participate in events, and coordinate shared statements, that were designed to conceal, and did conceal, Defendants' nearly two-decade-long-campaign of protection payments and logistical aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

629. Defendants pursued a "One Ericsson"-inspired strategy of issuing combined open statements published at high-profile international events in the United States – in which Defendants participated as the "Ericsson Group" – that concealed Ericsson's protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

630. Defendants' use of events in the United States that promoted adherence to the U.N.'s Sustainable Development Goals – which the signers, including Defendants, touted as a group of "17 Goals to Transform Our World" (the "Sustainable Development Goals" or "SDGs") – illustrates how Defendants operationalized the cover and concealment they afforded to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. U.N. Sustainable Development Goal 16 (or "SDG 16") specifically committed its backers to "target[ing]" conduct intended to, inter alia, protect Americans (and others) against terrorist attacks by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – the three FTOs that dominated the attention of the U.N. at all times:

[Sustainable Development] Goal 16 [T]argets

> **16.1** Significantly reduce all forms of violence and related death rates everywhere
>
> ***
>
> **16.3** Promote the rule of law at the national and international levels and ensure equal access to justice for all
> **16.4** By 2030, significantly reduce illicit financial and arms flows, strengthen the recovery and return of stolen assets and combat all forms of organized crime
> **16.5** Substantially reduce corruption and bribery in all their forms
> **16.6** Develop effective, accountable and transparent institutions at all levels
>
> ***

> **16.A** Strengthen relevant national institutions, including through international cooperation, for building capacity at all levels, in particular in developing countries, to prevent violence and combat terrorism and crime[134]

631. Defendants were aware, through their statements regarding Sustainable Development Goal 16's anti-corruption and counterterrorism goals, that Ericsson's protection payments and obstruction of U.S. counterterrorism operations facilitated attacks against Americans by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.[135]

632. On September 24, 2014, Defendants were the only corporate sponsor of an coordinated an open letter published in New York in which the participants professed their commitment to all of the Sustainable Development Goals, including SDG 16's anti-corruption and counterterrorism goals (the "Ericsson Group Open Letter").[136] The Ericsson Group Open Letter provided, in part, as follows:

> We, the under-signed, believe transparent, accountable and inclusive institutions are vital. … [and that] [w]e should also join forces to implement anti-corruption measures … Corruption thrives in every corner of the world and in countries of every income level. … Now more than ever we must act to enshrine good governance within the sustainable development goals. Please join us. …
> **SIGNATORIES … Ericsson Group**[137]

---

[134] United Nations, *Sustainable Development Goal 16: Promote Just, Peaceful and Inclusive Societies* (2014), https://tinyurl.com/ycx9mahf.

[135] For example, according to LM Ericsson: (i) "the 2030 Agenda for Sustainable Development includes 17 Sustainable Development Goals (SDGs) and 169 associated targets," ICTs and SDGs, at 18; (ii) "In addition to ongoing development priorities …, [the new SDGs] set out a broad range of interconnected economic, social and environmental objectives including more peaceful and inclusive societies," *id.*; (iii) LM Ericsson supported "achieving at least 10 of the SDGs in the following areas: … Reducing corruption, fighting crime and terrorism and strengthening and improving the equity of fiscal policy." *Id.* at 29.

[136] Ericsson Group, et al., *Opening Statement From The Event: "Ending Poverty: Why Strong, Accountable Institutions Matter," 24 September 2014, New York* (Sept. 24, 2014), https://tinyurl.com/mu9ybz3y ("Ericsson Group Open Letter").

[137] Ericsson Group Open Letter, (emphasis in original).

633. The Ericsson Group Open Letter was the result of a high-profile event in the United States, which one or more senior Ericsson executives, including Vice President for Sustainability and Corporate Responsibility Elaine Weidman-Grunewald, attended. Notably, of the 25 signatories on the original Open Letter published in the United States on September 24, 2014, Ericsson was the ***only*** major multinational corporate signatory: all the others were nonprofits.[138] In so doing, Defendants cynically transformed their purported support for the Sustainable Development Goals into a highly effective smokescreen that covered and concealed Ericsson's company-wide embrace of payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – the three FTOs that were always the U.N.'s greatest counterterrorism focus.

634. Notably, Defendants published the Ericsson Group Open Letter at the same time – Fall 2014 – when Defendants were simultaneously serving as one of Islamic State's largest multinational corporate financial partners and financiers. This timing was a feature, not a bug, of Ericsson's efforts to conceal ISIS's protection rackets, and Defendants' participation therein.

635. After 2014, Defendants repeatedly returned to Ericsson's purported adherence to the Sustainable Development Goals even while they flagrantly defiled them. On May 12, 2016, for example, LM Ericsson publicly reiterated Defendants' purported adherence to all the Sustainable Development Goals, which included anti-corruption and counterterrorism. After LM Ericsson observed that "[j]oint research between Ericsson and the Earth Institute at Columbia

[138] Aside from "Ericsson Group," the other signatories to the Open Letter as originally published in the United States on September 24, 2014 were: (1) Article 19; (2) CAFOD; (3) Civicus; (4) FUNDAR; (5) Gemawan; (6) Global Organization of Parliamentarians Against Corruption; (7) Human Rights First Rwanda Association; (8) Interaction; (9) Institute for State Effectiveness; (10) Kemitraan; (11) Namati; (12) Partnership for Governance Reform; (13) Pattiro; (15) Plan UK; (16) Ploughshare Group; (17) Publish What You Fund; (18) Publish What You Pay Indonesia; (19) Restless Development; (20) Rights Rwanda; (21) Safer World; (22) Save the Children; (23) Transparency International Indonesia; (24) Transparencia Mexicana; (25) Transparency International; and (26) United Nations Association of the USA.

University highlights ICT's role in accelerating achievement of the United Nations Sustainable Development Goals by 2030," LM Ericsson represented that, with respect to the U.N.'s "Sustainable Development Goals," Ericsson was "[t]urning intentions ***into impact***" because "Ericsson's ***deep-rooted commitment to the SDGs***" – necessarily including SDG 16's anti-corruption and counterterrorism goals "is ***well documented***."[139]

636. In June 2016, LM Ericsson again repeated its public assurances that it was committed to adhering to all the Sustainable Development Goals, which included SDG 16's Goals relating to anti-corruption and counterterrorism, doing so in a public report, titled *ICTs and SDGs*, which LM Ericsson jointly published in the United States alongside its co-author, The Earth Institute, of Columbia University.[140]

637. After LM Ericsson published ICTs and SDGs, LM Ericsson appears to have scrubbed *ICTs and SDGs* from Ericsson's websites.[141] On information and belief, LM Ericsson did so as a reflection of Defendants' consciousness of guilt regarding Defendants' aid to al-

[139] Elaine Weidman-Grunewald, LM Ericsson, *Taking Action On The Sustainable Development Goals* (May 12, 2016), https://www.ericsson.com/en/blog/2016/5/taking-action-on-the-sustainable-development-goals.

[140] Hans Vestberg, LM Ericsson, *quoted in* LM Ericsson and The Earth Institute, Columbia University, *ICTs and SDGs, How Information and Communications Technology Can Accelerate Action on the Sustainable Development Goals, Final Report*, at 7 (June 2016) ("[C]ompanies like Ericsson are working with others to achieve shared societal goals and collectively tackle global challenges. … In the late 1890s our founding father, Lars Magnus Ericsson coined the phrase that "access to communication is a basic human need." Today, this underpins our vision of being a relevant and responsible driver of positive change by using Technology for Good. As an industry leader, our ideas, technology and people have had real impact, helping to transform lives, industries and society as a whole. As the world embarks on the ambitious journey of achieving the 17 Sustainable Development Goals (SDGs), it is our responsibility to work with other stakeholders to extend the benefits of communication by ensuring they are affordable and accessible to all. … The report builds on the work of the Broadband Commission for Sustainable Development, a forum Ericsson has been deeply engaged in since its launch in 2010."), https://tinyurl.com/3p92wr64.

[141] Plaintiffs have not located any Ericsson-related website in which *ICTs and SDGs* can be located.

Qaeda, al-Qaeda-in-Iraq, and Islamic State and associated knowledge that *ICTs and SDGs* comprised relevant evidence concerning Ericsson's aid to such FTOs. Among other reasons, Ericsson's understanding of its terrorism-related criminal and civil exposure is the most plausible explanation for why LM Ericsson would put so much effort into ICTs and SDGs in the summer of 2016 only to essentially discard it a few years later.[142]

638. Until at least February 15, 2022, when Ericsson publicly admitted to much of the corrupt conduct alleged herein, none of the Plaintiffs had any knowledge of Defendants' violations alleged herein. Further, until recently, Plaintiffs could not have discovered, by the exercise of reasonable diligence, that Defendants engaged in the violations alleged herein because Defendants actively and fraudulently concealed these violations to cloak their illegal activities. Defendants fraudulently concealed their illegal activities, as alleged herein, by, *inter alia*, making false and misleading entries in their books and records, filing false and/or misleading documents with the U.S. government, and issuing false press releases, reports, and other statements concerning, *inter alia*, their compliance program.

639. Ericsson also deployed its counsel at Simpson Thacher to conceal its conduct. On information and belief, a Simpson Thacher team lead by DC-based partner Cheryl Scarboro began representing LM Ericsson beginning in 2013 (or early 2014 at the latest). Ms. Scarboro joined Simpson Thacher in June 2011 after spending 19 years at the SEC, where she "had a hand in every major FCPA investigation" conducted by the SEC and also "worked closely with the Justice Department's FCPA team." That extensive experience caused the Wall Street Journal to refer to her as ***the*** "SEC's FCPA guru." During her later years at the SEC, she spent a great deal

[142] About two months after LM Ericsson published *ICTs and SDGs*, on September 28, 2016, Congress enacted JASTA over President Obama's veto. There was no comparable legislative enactment during this period concerning the FCPA.

of time leading FCPA investigations into illicit payments made by many companies to the Iraqi government to win contracts under the U.N.'s Oil-For-Food Program.

640. Given the sheer volume of countries listed in prior media reports concerning allegations of bribery by Ericsson and the number of countries in which the SEC appeared to be investigating, the real possibility of enterprise-wide corruption at Ericsson could not be ignored. Simpson Thacher should have neither advised LM Ericsson nor acquiesced in LM Ericsson's instruction to exclude those jurisdictions from any internal investigations into corrupt payments and related possible FCPA violations once Simpson Thacher became aware of Ericsson's own "list" of 15 *additional countries* not being investigated by the SEC or DOJ where there was evidence of possible corrupt Ericsson activity (which was no later than 2018), and given Ericsson's business activity in war-torn Middle Eastern countries—particularly Iraq and Afghanistan, both of which were widely known to have endemic corruption problems.

641. The publicized and well-known connections between endemic corruption in Iraq and Afghanistan and connections between that corruption and terrorist financing presented extreme risks for Ericsson's business in those countries, requiring investigation—if not from the outset of the probe then at any number of times before LM Ericsson and the DOJ finalized and executed their DPA.[143] Given Ms. Scarboro's specific experience concerning bribery and

---

[143] *See*, *e.g.*, Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit--* (Feb. 1, 2005), https://tinyurl.com/4b78zs5e ("[W]e know that financial subterfuge was at the heart of how Saddam and his cronies skirted international financial restrictions and the United Nations Oil for Food Program (OFF). … This abuse of the international financial system and of the OFF program . . . may also now be part of the financial backing that now fuels the Iraqi insurgency and terrorism inside Iraq."). *See also* Section V.C.1 *infra* (describing, respectively, allegations in ATA lawsuit captioned *Abecassis v. Oscar S. Wyatt, Jr.*, No. 09-cv-00001 (S.D. Tex. Jan. 2, 2009), and allegations in JASTA lawsuit captioned *Atchley v. AstraZeneca UK Ltd.*, No. 17-cv-02136 (D.D.C. Oct. 17, 2017).

corruption in Iraq under the Oil-For-Food Program, the failure to seriously investigate Iraq is even more stunning.

642. Simpson Thacher's representation of LM Ericsson in connection with the SEC and DOJ FCPA probes, including the internal investigation(s), was not truly independent but instead appears to have been beholden to the interests of LM Ericsson's Executive Leadership Team and shareholders—producing a "captive" investigation that was controlled at all times by LM Ericsson while it was, literally, on a transnational white collar crime spree. Moreover, the internal investigation itself appears to have been conducted in large part by Ericsson's in-house compliance team with the report being prepared "with the help of Simpson Thacher." And on information and belief, Simpson Thacher did not implement any type of independent reporting structure designed to encourage Ericsson employees (including possible whistleblowers) to voluntarily report to Simpson Thacher serious corporate misconduct without fear of reprisal.

643. Moreover, over the course of the probes, Simpson Thacher had preexisting and ongoing representations of LM Ericsson and/or Ericsson Inc. in several litigations.[144]

644. Nor was the internal investigation comprehensive. As the ICIJ reporters themselves observed:

> The internal review, while damning, often fails to reach specific conclusions and suggests an incomplete investigation into some of the most explosive allegations, including that payments were made to terrorists. Internal investigators didn't interview officials of either the main transport firm moving Ericsson equipment through ISIS territory or the subcontractors the company relied on to work in ISIS-held Mosul, for example.

---

[144] *See*, *e.g.*, *Siti-Sites.com, Inc. v. Verizon Communications, Inc.*, No. 1:10-cv-03751 (S.D.N.Y.); *True Position, Inc. v. LM Ericsson Tel. Co.*, No. 2:11-cv-04574 (E.D. Pa.).

ICIJ, *Ericsson List*. This lack of comprehensiveness was likely a byproduct of Simpson Thacher not conducting the investigation itself but instead purporting to merely oversee Ericsson's investigation of its own potentially illegal payments.

645. Lastly, the conclusions reached in Simpson Thacher's report based on Ericsson's internal investigation lacked credibility. Many of the "findings" were written in the passive voice to obfuscate the culpability of particular Ericsson personnel. Other findings were obvious examples of Simpson Thacher pulling punches. For example, the report appeared to treat Ericsson's use of intermediaries as a basis to "conclude" that no Ericsson employees were "directly involved" even though Ericsson conducted its illegal business using intermediaries for exactly that reason. Similarly, Simpson Thacher's reporting ignored the notorious protection money relationships between Iraqi Kurds and Islamic State, which then permitted Simpson Thacher to downplay the seriousness of Defendants' payments to their Kurdish agents.

646. All of these problems with the internal investigation and related concealment of corrupt payments (including to terrorists) from the SEC and DOJ were deliberate, part of the plan all along. Indeed, Simpson Thacher touted as early as 2015 (on information and belief) the great job it was doing for Ericsson in its marketing materials:

> [T]the Firm convinced the SEC to drop certain issues from its ongoing investigation" of a "global telecommunications company . . . regarding alleged payments to government officials in various countries in violation of the FCPA.

Simpson Thacher's and LM Ericsson's active concealment continued through 2019, as further suggested by the suspect timing of Simpson Thacher's final report, which was dated December 11, 2019—just days after LM Ericsson and the DOJ executed and publicly released their DPA. This sequencing was likely aimed at providing LM Ericsson and its executives some measure of protection for not having shared it with the United States before its probes were concluded.

647. Defendants' conduct as alleged herein was wrongfully concealed and carried out in a manner that was intended to, and did, preclude detection.

## V. DEFENDANTS KNEW THEY WERE AIDING AND ABETTING ATTACKS ON AMERICANS BY AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE

### A. Defendants' Conduct Suggests That They Were Aware Their Protection Payments And Obstruction Of United States Counterterrorism Operations Aided And Abetted Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Attacks Against Americans

648. The manner in which all Defendants acted to avoid discovery of their protection payments and other aid to FTOs strongly supports the inference that they were aware at all relevant times that their conduct was unlawful and that it aided and abetted terrorists.

649. *First*, the Corporate Defendants and Mr. Ekholm retaliated against whistleblowers while promoting (or at a minimum, retaining) those who were instrumental to Ericsson's corrupt payments and other value transfers to terrorists. As alleged, in mid-2014, Roger Antoun, an Ericsson manager for one of Asiacell's Iraq projects had suggested invoking force majeure in its Iraq customer contracts in mid-2014 due to recent surges in Islamic State violence and control of certain territory. He was fired in January 2019 for certain conduct related to an "uncontrolled slush fund" set up through Ericsson subcontractors that Ericsson determined may have been used to make payments to terrorists, while others who were more directly responsible for illegal payments to third parties—like Tarek Saadi and Rafiah Ibrahim—were kept on. What is more, when asked directly about Ericsson's failure to terminate some of the most culpable individuals responsible for what was leaked in the ICIJ press reports, LM Ericsson deflected. All of this shows that the Corporate Defendants and Mr. Ekholm wished to deter people from speaking out about serious misconduct while keeping the most culpable persons whose loyalty was not in question on side.

650. *Second*, as alleged, the 2019 agreement between Mr. Ekholm and Ms. Ibrahim to prevent her from spilling the beans to the U.S. government (and possibly other law enforcement authorities) about the illegal conduct that she oversaw as Ericsson's Head of the Middle East and Africa market area (and possibly in other regions before 2014) suggests that the Individual Defendants (as well as the Corporate Defendants) were all aware of how their illegal conduct may have aided and abetted notorious Middle East terrorist groups. As alleged, even Ericsson's announcement of Ms. Ibrahim's "transition" was deliberately structured in a manner to avoid raising public suspicion that she was responsible for staggering misconduct.

651. *Third*, over the entire course of DOJ's and SEC's investigations into Ericsson's illegal third party payments from 2013 through December 2019, LM Ericsson actively concealed from DOJ and SEC information about its internal investigation into Ericsson's illegal payments in Iraq (and 14 other countries), including "possible" payments to al-Qaeda-in-Iraq and Islamic State, before entering a guilty plea (for Ericsson's Egypt subsidiary), settling with the SEC, and entering into a DPA with DOJ—all while purporting to be fully cooperative and transparent with U.S. law enforcement.

652. *Fourth*, all Defendants continued to conceal any whisper of their illegal Iraq payments after the conclusion of the SEC and DOJ probes into Ericsson's corrupt payment schemes through February 2022, until they had to address them when parts of Simpson Thacher's final investigative "report" leaked to reporters. DOJ has publicly taken the position that LM Ericsson breached its ongoing obligations to the U.S. government under the DPA by having concealed the existence of that investigation and the findings set forth therein (representing the second time in roughly two years DOJ has accused LM Ericsson of breaching the DPA). Having apparently recognized just how problematic its conduct has been, LM

Ericsson voluntarily agreed on December 14, 2022, to remain under the supervision of an independent monitor for a full fourth year (even though the monitorship required by Ericsson's agreements with DOJ and SEC would have concluded by the end of 2022).

653. *Fifth*, even as late as 2022, the Corporate Defendants were requiring departing employees to sign confidentiality agreements that failed to clearly inform their employees that nothing in those agreements would preclude them from (or punish them for) sharing relevant information with law enforcement or other governmental authorities.

654. *Sixth*, as alleged, almost everything about LM Ericsson's retention of Simpson Thacher with respect to the SEC and DOJ FCPA probe, including the way in which Ericsson's/Simpson Thacher's internal investigation was conducted, the "conclusions" reached in the final report, and the circumstances surrounding the preparation of that report, all suggest that Defendants wanted to bury, conceal, and/or minimize any evidence of Ericsson's illegal conduct in Iraq.

### B. Defendants Knew They Operated In A Hyper-Corrupt Environment In Which Corporations Commonly Made Protection Payments To Terrorists

655. Defendants knew they operated in a business environment in Iraq that posed extreme terrorist finance risks because Iraq was hyper-corrupt, and Western companies there – and their regional and local partners, consultants, and contractors – routinely made protection payments as the cost of doing business. These conditions were always obvious to Defendants.

656. Defendants knew that the facts throughout this section applied with equal force to business transactions made throughout Iraq, including in northern Iraq (including Mosul and Erbil), central Iraq (including Baghdad), and western Iraq (including Anbar).

657. LM Ericsson, Ericsson AB, and Ericsson Inc. are sophisticated companies that specialize in performing work in high-risk countries like Iraq. Given Ericsson's integrated

business model in which Ericsson AB and Ericsson Inc. serve as divisions of LM Ericsson, and the contractual role they undertook to monitor the local security environment, Defendants each monitored open-source reporting on the risks of operating in Iraq, Syria, and other similarly risky places they did business. As part of those efforts, Defendants' standard practice necessarily included conducting basic research on the local market and the mechanics of local subcontracting. Even cursory research of that nature would have uncovered the reports and statements alleged in this Part V, or other similar reports.

658. On information and belief, Defendants were aware of the reports, statements, studies, events, and litigations below, or similar ones, and their substance, which alerted Defendants that their conduct foreseeably aided anti-American terrorists through Defendants' officers, employees, and agents in the United States, Sweden, and Iraq, Defendants' corporate security departments in all three countries, and Defendants' in-house sales, legal, and compliance teams, all of whom would have regularly received the reports, or similar ones, referenced herein.

659. Defendants' management, and their compliance, legal, and corporate security departments, also subscribed to intelligence reporting services that further alerted them to the link between their corrupt contracting practices and terrorist finance. For example, Strategic Forecasting Inc., popularly known as Stratfor, is a global strategic intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world. Stratfor regularly reported on protection payments in Iraq, including by directly emailing Defendants copies of media reports.

660. On information and belief, based on purported Stratfor subscription lists (as published online), one or more executives, employees, or agents of Defendant LM Ericsson, and one or more executives, employees, or agents of Defendants Ericsson AB and Ericsson Inc. had

access to Stratfor's intelligence services when those messages were transmitted. The recipient list included at least five (5) employees of Defendants who regularly received the type of updates alleged above.

### 1. Defendants Knew The Iraqi Business Climate Was Hyper-Corrupt

661. From 2000 through 2022, Defendants' senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that Iraq was a hyper-corrupt business environment in which payoffs were routine and where it was unusual for a major transaction to move forward *without* an illicit payment.

662. **United States government reports**, including those by the Department of Defense ("DOD"), Special Inspector General for Iraq Reconstruction (or "SIGIR"), and Lead Inspector General for Operation Inherent Resolve (or "LIGOIR"), alerted Defendants that they operated in a hyper-corrupt environment in which the risk of financial crime was extreme.[145]

---

[145] *E.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 8 (Oct. 30, 2005) ("Corruption was endemic in the prior regime, and its legacy of corruption still burdens the country."); The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 21 (Dec. 2006) ("[C]orruption is rampant."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 4, 129 (Jan. 30, 2007) ("Corruption continues to plague Iraq. … Corruption continues to limit the ability … to manage reconstruction efforts and key areas of economic policy. … Transparency International ranks Iraq 161st of 163 countries measured."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 5, 99 (Apr. 30, 2007) ("SIGIR has repeatedly observed that corruption is a significant impediment … funds have been subject to improper diversion. … Because of the deteriorating security …, sectarian political climate, and outdated laws, anticorruption experts believe that opportunities for corruption have increased."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 147 (Apr. 30, 2008) ("[T]he World Bank listed Iraq as … lacking corruption controls."); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2008 Report to Congress*, at 5 (Jan. 9, 2009) ("Corruption in Iraq remains a significant problem."); Stuart W. Bowen, Jr., *Quarterly Report and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 8 (Jan. 30, 2009) ("[General Raymond Odierno:]

663. **Terrorism scholars** also routinely reported that corruption in Iraq was endemic and impacted the specific areas in which Ericsson conducted business. On July 1, 2009, for example, the U.S. Army War College published *Criminals, Militias, and Insurgents: Organized Crime in Iraq*, an extensive analysis of the nexus between corruption and terrorist finance in Iraq that was authored by terrorist finance scholar Dr. Phil Williams,[146] which reported that:

**a.** "The legacy of Saddam Hussein, the debilitating consequences of sanctions, … and the rise of anomic conditions after [2003], perpetuated a culture of corruption."[147]

**b.** "[T]he U.S. presence brought with it a massive injection of cash for reconstruction, much of which was handled … ad hoc … with little oversight. The reconstruction program provided enormous opportunities for corporate malfeasance on the U.S. side. … The result was that Iraq rapidly metamorphosed into one of the most corrupt countries in the world. According to Transparency International's Corruption Perceptions Index for 2007, Iraq was ranked number 178, below Haiti, and above only Somalia and Myanmar."[148]

**c.** "[C]orruption in Iraq is both pervasive and endemic [and] … corruption is both top down and bottom up, coming from within government and from outside. It is both a political and economic condition on the one side, and an instrument of criminal organizations, militias, insurgents, and terrorists and their sympathizers and associates on the other."[149]

**d.** "The various forms of corruption in Iraq … [includes] criminal corruption. Critically, corruption is not only a condition characterizing governments and bureaucracies but also an instrument used by criminal organizations to advance their illicit business interests and

---

Corruption is still a huge problem across the board … [that] will take quite a long time to solve it. … [C]orruption is worse now in Iraq than it has been since the 2003 invasion.") (quoting, inter alia, General Ray Odierno, Commander of U.S. Forces – Iraq); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress*, at 11 (Jan. 29, 2010) ("One of Iraq's primary economic challenges going forward is … endemic corruption … [that] increased risk to both the investment capital and the business model.").

[146] Dr. Phil Williams, *Criminals, Militias, and Insurgents: Organized Crime in Iraq* (U.S. Army War College July 1, 2009), https://tinyurl.com/5yab72a8. In the Forward, Douglas C. Lovelace, Jr., explained that, given "the vulnerability of conflict and post-conflict situations to organized crime" and the inextricable linkage between such crime and terrorism in Iraq, Afghanistan, and other conflict areas, protecting Americans in such places "require[d]" "a holistic … strategy in which security, development, and the rule of law complement[ed] one another." *Id.* at vii.

[147] *Id.* at 199.

[148] *Id.* at 199-200. Of course, Iraq was near the top of the corruption index even before the 2003 invasion. For example, the Oil-for-Food scandal was the largest collective FCPA scandal of all time. But after 2003, Iraq regularly occupied one of the top three slots.

[149] *Id.* at 207.

protect the illicit markets in which they operate. The use of corruption as an instrument, of course, is much easier where direct and factional corruption is endemic."[150]

664. In 2010, the National Defense University publication *Prism* published another analysis by Dr. Williams concerning the nexus between organized crime and terrorism in Iraq.[151] Dr. Williams reported, among other things, that:

**a.** "The development of a 'political-criminal nexus' [in Iraq] mirrored that in many other parts of the world … [and] undermined U.S. interests [in Iraq.]"[152]

**b.** "[T]he injection of large amounts of money for economic reconstruction without adequate control or oversight and no plan for effective disbursement exacerbated both crime and corruption [in Iraq]."[153]

**c.** "Reconstruction moneys tempted … U.S. corporations and contractors [to engage in corruption]—many of which performed abysmally in terms of task completion. Reconstruction was vital but its implementation, in spite of all the efforts of the [SIGIR], facilitated and encouraged the growth of corruption and organized crime."[154]

665. **Media reports** regularly alerted Defendants that Iraq was endemically corrupt and large deals there usually involved big payoffs.[155] Indeed, reports routinely alerted

---

[150] *Id*. at 208-09.
[151] Dr. Phil Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, Prism, Vol. 1, No. 2, Published by Institute for National Strategic Security, National Defense University (2010), https://tinyurl.com/4f6x8nra.
[152] *Id*. at 61.
[153] *Id*.
[154] *Id*.
[155] *E.g.*, Rod Nordland and Michael Hirsh, *The $87 Billion Money Pit; It's The Boldest Reconstruction Project Since The Marshall Plan. And We Cannot Afford To Fail. But Where Are The Billions Really Going?*, Newsweek (Nov. 3, 2003) (cover story) ("American companies are barred by law from paying bribes … abroad. But Iraq is still largely a lawless place. And one company director for a British firm … in Baghdad says that makes all the difference. 'I've never seen corruption like this by expatriate businessmen. It's like a feeding frenzy,' he says. … One prominent Iraqi businessman said he was told he'd have to raise his bid by $750,000 to get a major contract, so long as he kicked back that amount to the contractor's rep. … *Newsweek* witnessed such behavior directly: An Iraqi-Anglo joint venture did a relatively small job in the magazine's Baghdad bureau. When a final price had been agreed, the company's Iraqi manager said, 'Shall we add a commission of 10 percent?' Commission? 'Well, you would keep that of course,' he said. In other words, a kickback. When *Newsweek* declined, he said, 'You're the first one who didn't want a commission.'"), 2003 WLNR 3489142; John Heilprin, *Army Probes*

Defendants that Iraq's telecommunications sector in particular was endemically corrupt throughout both the Saddam and post-Saddam eras. In 2004, for example, a *Washington Times* article concerning telecoms companies in Iraq reported, among other things, that:

**a.** The Iraqi government "is investigating whether illegal payoffs were made to secure cell phone contracts …, said [L. Paul] Bremer [former head of the CPA]."

**b.** "Mr. Bremer ordered the cell phone contract investigation after receiving a memorandum [] from John A. Shaw, the [D]eputy [U]ndersecretary of [D]efense for [I]nternational [T]echnology [S]ecurity, who said the contracts should be revoked because of fraud."

**c.** "Mr. Shaw states in a June 14 memorandum to [Mr. Bremer] that an investigation by his office had uncovered 'fraud on the Ministry of Communications by Orascom, Atheer and AsiaCell,' three companies that … won cell phone licenses for three regions of Iraq."

**d.** "A [U.S. government] report … states that … bribes [were used] to secure cell phone contracts worth $500 million. … [A U.S. government] report states that payments were made to two Iraqi officials, two British contractors and two American officials as part of the fix. Pentagon investigators have said bribes of up to $11.5 million were paid to Iraqis and other foreign nationals to win the contracts for the three companies …"

**e.** "Mr. Bremer said corruption remains a major problem in Iraq[:] … '[C]orruption in the Iraqi system … [is] a serious problem… [a]nd institutionalized.'"

**f.** "Mr. Bremer … also said the U.N. [O]il-for-[F]ood program was corrupt 'throughout.' Contracts for that program, which was designed to provide humanitarian goods to Saddam's regime, included 10 percent to 19 percent 'kickers' that were payoffs."[156]

---

*Wide-Ranging Contractor Fraud*, Associated Press, *republished in* Intelligencer (Jan. 28, 2007) ("From high-dollar fraud to conspiracy to bribery and bid rigging, Army investigators have opened up to 50 criminal probes involving battlefield contractors in the war in Iraq and the U.S. fight against terrorism…"), 2007 WLNR 2014425; Dave Zweifel (Editor Emeritus of *The Capital Times*), Editorial, *War Profiteers Work Their Schemes In Iraq*, Capital Times (Mar. 10, 2008) ("American corporations have long taken advantage of the nation's taxpayers in a time of war, and the war that our country is fighting in Iraq is no exception. … [The] *Chicago Tribune* outlined just how pervasive war profiteering is … [today] in [Iraq] …To put it mildly, []contractors don't give the U.S. and its taxpayers discounts … War is a good time to make money and that's exactly what military contractors do. … There's gold in them thar battlefields."), 2008 WLNR 4748217.

[156] Bill Gertz, *Iraq Probing Cell Phone Deals Reported Payoffs By Saddam Ally Under Scrutiny*, Washington Times (July 8, 2004), 2004 WLNR 812238.

666. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants as to the hyper-corrupt nature of the Iraqi business environment in which they did business.

### 2. Defendants Knew Corruption In Iraq Was Inextricably Connected To Terrorism

667. Defendants knew that their corrupt payments in Iraq foreseeably aided terrorists. From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) knew that corruption in Iraq, like that which Defendants practiced as a matter of strategy, was always inextricably linked to terrorist violence given the unique features of the Iraqi business, political, and terrorist context.

668. **United States government reports** alerted Defendants that corrupt practices in Iraq foreseeably aided terrorists there. On August 10, 2006, for example, President George W. Bush publicly observed that "corruption" "impedes our efforts to" "combat" anti-American "terrorism."[157] Also in 2006, the Department of Defense warned that "[i]t is increasingly difficult to distinguish [criminals'] activities from those committed by insurgent and terrorist groups who are also engaged in kidnappings, extortion, murder, and other illegal behavior," and that "criminal activity … is an increasingly important source of funding for insurgent and terrorist groups."[158] Other reports repeatedly alerted Defendants to similar effect.[159]

---

[157] President's Statement on Kleptocracy, 2 Pub. Papers 1504 (Aug. 10, 2006).
[158] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, November 2006 Report to Congress*, at 5 (Nov. 30, 2006).
[159] *E.g.*, President George W. Bush, Proclamation No. 7750, 69 Fed. Reg. 2287 (Jan. 14, 2004) ("I have determined that … persons who have committed, participated in, or are beneficiaries of corruption… [foreseeably risked] serious adverse effects on … the security of the United States against … terrorism."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 7 (Apr. 30, 2006) ("Corruption is another form of

669. **Media reports** and **terrorism scholars** also routinely reported that corruption in Iraq was inextricably linked to terrorist violence. In 2009, for example, Dr. Williams' study published by the U.S. Army War College reported that "[c]orruption in Iraq also often leads to or entails violence, which is not always characteristic of corruption elsewhere."[160] Indeed, "[c]orruption in Iraq is [] closely related to violence: both are instruments of criminal organizations and are typically used by these organizations as part of their risk management

---

insurgency in Iraq."); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, November 2006 Report to Congress*, at 5 (Nov. 30, 2006) ("Iraq … must effectively deal with militias … However, a range of … factions that pursue their own interests through the use of … extortion, bribery, and corruption is threatening accomplishment of these actions."); Stuart W. Bowen, Jr., *Quarterly and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at Introduction, 9 (July 30, 2007) ("SIGIR views" "the endemic corruption" "in Iraq" "as a 'second insurgency.'" "According to the U.S. Embassy's Anti-Corruption Strategy, the endemic corruption problem in Iraq … funds illegal actors and activities, including terrorism[.]"); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2008 Report to Congress*, at 6 (Mar. 7, 2008) ("Corruption, in the form of extortion, theft and bribery, is rampant in parts of the [Government of Iraq] and business sector. Corruption in the … transport industries is [] linked to the financing of extremists."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 32 (Apr. 30, 2008); The White House, *National Security Strategy* 38, 49 (May 2010) ("[P]ervasive corruption is a …severe impediment to development and global security. … Transnational criminal threats … cross borders[,]… subverting government institutions through corruption and harming [American] citizens worldwide. … The crime-terror nexus is a serious concern as terrorists use criminal networks for logistical support and funding."); U.S. Dep't of Justice and Securities and Exchange Commission, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 2-3 (Nov. 14, 2012) ("The Costs of Corruption … [C]orruption [] undercuts good governance and impedes U.S. efforts to… combat … terrorism across the globe."); U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 26-27 (Aug. 24, 2015) ("The U.S. government has observed that numerous terrorist organizations worldwide engage in criminal activity to fund their organizations and operations. Globally, [al-Qaeda], [Islamic State], [and] the Haqqani Network …, for example, are known to be financed … by proceeds derived from … extortion. … [B]oth criminal organizations and terrorist groups continue to develop international networks and establish alliances. … [L]ooking forward, … the risk that [terrorist groups] will collaborate with [] criminal organizations increases. Collaboration can serve as a force multiplier for both criminal and terrorist groups, bolstering their capabilities, strengthening their infrastructure, and increasing their wealth.").

[160] Williams, *Criminals, Militias, and Insurgents*, at 208.

strategies."[161] As a result, according to Dr. Williams, "corruption, organized crime, and insurgent and militia violence become difficult to disentangle analytically, let alone physically disrupt. One American official averred that 'corruption funds the insurgency, so there you have a very real threat to the new state.'"[162] In 2010, likewise, Dr. Williams reported that "[c]orruption in Iraq was [] integrally related to violence."[163] In 2014, similarly, *Thomson Reuters* published an analysis by terrorism scholars Jean-Charles Brisard and Damien Martinez regarding the nexus between Iraqi corruption and Islamic State violence and the "convergence between commodities and terrorism":

> [a] common feature in many conflict zones is the weakening of the society's value system. Any kind of person is involved in every kind of business. This generalized break down of values is particularly true for the territory controlled by the Islamic State. For nearly thirty years people in the region have been involved in various forms of black market and smuggling activities, first to get around the dictatorships in the region, then to circumvent the Oil-For-Food program in the 90s, and today to ensure funding of the Islamic State.[164]

670. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants that corruption in Iraq was inextricably tied to terrorist violence.

### 3. Defendants Knew They Did Business In Geographies That Were Insecure And Targeted By Terrorists

671. From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that their Iraq-related business required

---

[161] *Id*. at 210.
[162] *Id*. at 211.
[163] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, at 48-49.
[164] Jean-Charles Brisard and Damien Martinez, *Islamic State: The Economy-Based Terrorist Funding*, at 6 (Thomson Reuters Accelus Oct. 2014), https://tinyurl.com/2d26cvxx (hereinafter, "Brisard and Martinez").

transactions in Iraq and transportation using Iraqi, Turkish, and Syrian routes that were specifically targeted by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

672. Defendants also knew that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State targeted companies and individuals associated with the United States specifically because they wanted to be paid protection money in larger amounts and specifically in U.S. dollars – the currency of choice for every FTO in Iraq and Afghanistan.

673. **United States government reports and statements** alerted Defendants that their Iraqi business was conducted in an insecure environment and that their transportation and logistics networks were specifically at high risk for illicit payments. In 2007, for example, the SIGIR reported that, "Security continues to pose a significant threat to reconstruction in" the "transportation and communications" "sector" "in Iraq," including "telecommunications."[165]

674. **Media reports** and **terrorism scholars** alerted Defendants that their business required transportation through terrorist-controlled or contested areas. In 2007, for example, the *Associated Press* reported that while "[t]he threat from al-Qaida … has been significantly reduced," its allies had "established 'almost mafia-like presence' in some areas" like Baghdad according to "the top U.S. commander in Iraq," "Gen. David Petraeus," who "stressed" that "al-Qaida remains a very dangerous and very lethal enemy of Iraq."[166]

675. In 2009, similarly, Dr. Williams's report published by the U.S. Army War College also identified insecure Iraqi geographies – which overlapped with areas where Defendants conducted business – that were notoriously targeted by Sunni terrorists like al-

[165] Stuart W. Bowen, Jr., *Quarterly and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 103 (July 30, 2007).
[166] Associated Press, *Petraeus: Al-Qaida Presence in Baghdad Has Been 'Significantly Reduced'* (Oct. 28, 2007) (internal quotations omitted), https://tinyurl.com/hr58hszp.

Qaeda-in-Iraq (and later, Islamic State) for protection money payments from Western corporations, and their partners, consultants, and subcontractors:

**a.** "[O]rganized crime did not suddenly arise from the chaos of invasion and occupation but had deep roots in an authoritarian and corrupt state subject to international sanctions."[167]

**b.** "[T]he actions of the international community in the 1990s unintentionally widened and intensified the scope of organized crime and the illicit economy. By 2003 all the conditions for an upsurge of organized crime were present; the toppling of the regime provided the catalyst Iraq and Syria have long shared related economies, traditions, illicit transfer strategies, and notorious intermediaries who make the entire corruption economy work – including those who facilitate protection payments to terrorists."[168]

**c.** "An additional factor" that facilitated al-Qaeda-in-Iraq's criminal terrorist finance strategies "was 'the collapse of road security,' especially in the Sunni triangle."[169]

**d.** "Parasitic taxes on commerce, reconstruction, and the transportation of oil (whether it is part of the licit trade or stolen and diverted) are highly profitable."[170] "Extortionists have few, if any, start-up costs, especially if they already have a reputation for violence; payments tend to be recurring; and, in Iraq, the number of businesses which could be targeted grew as the reconstruction process gradually became more effective."[171]

**e.** "In …2004, as opposition in Iraq developed into a full-blown insurgency, the occupying forces lost control of the highways. This allowed insurgents to extort money from contractors (both American and Iraqi) involved in [] reconstruction [], and from [] truck drivers, whether carrying legal loads such as … reconstruction materials or engaged in theft and smuggling. For Sunni insurgents, the legality or illegality of the load was irrelevant. Indeed, they not only subjected drivers to extortion, but confiscated 'a portion of the … goods transported through the areas they control' as a tax for safe passage. One contractor noted that the insurgents would sometimes 'hijack a truck…' to illustrate their power and establish their credibility. Gradually, however, the process became institutionalized and, as with extortion elsewhere, the threat itself was sufficient."[172]

**f.** "[E]xtortion and skimming are [] pervasive [and] … are real moneymakers in Iraq."[173]

---

[167] Williams, *Criminals, Militias, and Insurgents*.
[168] *Id*. at xi (emphasis added).
[169] *Id*. at 125.
[170] *Id*. at 159.
[171] *Id*.
[172] *Id*. at 158.
[173] *Id*. at 162.

**g.** “Profits were clearly extensive, enduring, and highly lucrative” to “violent actors in Iraq’s post-Hussein conflict milieu.”[174]

**h.** “[M]ilitias—because they provide protection to particular segments of the population—have enormous opportunities for both extortion and black market activities. Markets in Baghdad resemble those in Moscow in the 1990s when even small market stallholders were required to make protection payments—often under the guise of ostensibly legitimate fees—in return for which they were allowed to continue selling.”[175]

676. In 2010, a National Defense University publication, *Prism*, published another analysis by Dr. Williams in which he reported, among other things, that

> U.S. operational units appreciated the organized crime component … As early as July 2004, Marine commanders were acknowledging that it was difficult to overemphasize the importance of organized crime in the insurgency. . . . The perpetrators are motivated by self-interest and greed. They not only plan and carry out violence but pay others to do the same. One commander compared the intransigence of Iraqi organized crime networks to that of the mafia in Sicily before World War II. It has the same stranglehold on whole local economies and populations, and is protected by family and tribal loyalties.[176]

677. Similar reports were published over the next decade. In 2015, for example, Dr. Jonathan Schanzner of the Foundation for Defense of Democracies reported that the Turkish government “allowed extremists of various stripes to go in” to Iraq and Syria and “it’s actually created a security problem on the other side of the Turkish border” in Iraq and Syria where “there is infrastructure there representing Nusra front, ISIS, other Salafi and jihadi groups.”[177]

678. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants that they did business in Middle Eastern geographies in which terrorists extracted protection money.

---

[174] *Id.*
[175] *Id.* at 158.
[176] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, at 55.
[177] Dr. Jonathan Schanzer (Foundation for Defense of Democracies), *quoted in* Federal News Service Transcripts, *House Financial Services Committee hearing on Task Force to Investigate Terrorism Financing* (Apr. 22, 2015), 2015 WLNR 12099026.

### 4. Defendants Knew Multinational Corporations' Illicit Transactions In, Or Relating To, Iraq, Afghanistan, Syria, And Turkey Were Routinely Designed To Route Protection Payments To Al-Qaeda And Islamic State Branches Operating In The Middle East And Beyond

679. From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents), knew that multinational corporations' illicit transactions in, or relating to, Iraq, Afghanistan, Syria, and Turkey were routinely designed to route protection payments to al-Qaeda-affiliated and Islamic State-affiliated terrorists in geographies, like Iraq, Syria, Turkey, Afghanistan, Europe, and Africa where they posed a severe threat.

680. **United States government reports** alerted Defendants that their illicit Iraq-related transactions foreseeably caused protection money to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. In April and August 2010, for example, DOD reported that "[d]espite" its "serious … losses, [al-Qaeda-in-Iraq] is still capable of conducting" attacks and "continues its efforts to gain funds through widespread extortion efforts."[178]

681. **Media reports** alerted Defendants that multinational corporations doing business in or near terrorist-contested geographies routinely facilitated protection payments to terrorists as the cost of doing business using mechanisms like those used by Defendants in Iraq. Such reports included, but were not limited to:

**a.** *St. Louis Post-Dispatch*, October 1999: "Businessmen are still aiding bin Laden … [and] are continuing to transfer tens of millions of dollars … U.S. intelligence officials [said] the payments are 'protection money'…"[179]

---

[178] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2010 Report to Congress*, at 34 (Apr. 29, 2010); *see also* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, June 2010 Report to Congress*, at 35-36 (Aug. 20, 2010).
[179] St. Louis Post-Dispatch, *World* (Oct. 29, 1999), 1999 WLNR 931817.

**b.** Scotsman, September 2001: "al-Qaeda … runs an international network of up to 80 front companies in more than 50 countries … Financial backing for al-Qaeda's terrorist activities [inter alia] comes from 'protection money' …."[180]

**c.** *Newsweek*, May 2008: "Al Qaeda in Iraq is no stranger to racketeering. The group has long raised money through [criminal] activities … The group's spies also … tell Al Qaeda leaders about businesses own[ed] [by high profile persons in Iraq] … The haul from these illegal enterprises runs to the tens of millions of dollars … AQI… demands 'protection' payments from legitimate businesses."[181]

**d.** *American Forces Press Service*, October 2009: "[A] Mosul-based al-Qaida in Iraq cell leader … served as the former extortion ringleader for the region … [and was] suspected of extorting money from companies in Mosul. … the [] team found and apprehended a man suspected of using extortion money to fund attacks … [who was] alleged to be closely associated with extortion network members operating in northern Iraq."[182]

**e.** *Australian*, December 2010: "[T]he Commission on Wartime Contracting said … billion[s] in U.S. funds were lost to waste and fraud in Iraq … over a decade through lax oversight of contractors, poor planning, and payoffs to … insurgents."[183]

**f.** *CBS News*, August 2014: "Much of the funding for [] Islamic State… is coming from extortion … a counterterrorism source told CBS News … primarily from citizens of European countries, including employees of corporations who quietly pay … the source told CBS News…."[184] "A CBS News report … reveals that a Scandinavian corporation recently paid [] $70,000 … and it is this method that ISIS is gathering funds."[185]

**g.** *Telegraph*, September 2016: "Lafarge allegedly paid taxes to ISIL to protect its cement making business in Syria … [and agreed] to pay taxes to [Islamic State] in return for continuing its operations in Syria. … [LaFarge] bought the site in 2007 before beginning operations there in 2011. *Le Monde* reported in June that it had seen letters sent by Lafarge managers in Syria 'revealing arrangements that Lafarge made with the jihadist group to continue production until September 19, 2014.' … [A] 'pass stamped with an

---

[180] Ilona Amos, *Spotlight Put On Bin Laden Links With UK*, Scotsman (Sept. 17, 2001), 2001 WLNR 2379387.
[181] Lennox Samuels, *Al Qaeda In Iraq Ramps Up Its Racketeering*, Newsweek (May 20, 2008), https://tinyurl.com/4ezvphc9.
[182] American Forces Press Service, *Iraqis Arrest Bombing Suspects in Baghdad*, Defense Department Documents (Oct. 26, 2009), 2009 WLNR 21347934.
[183] Hugh Tomlinson and Giles Whittell, *Pentagon Billions Probed; War On Terror Mired In Graft*, Australian (Dec. 29, 2010), 2010 WLNR 25535341.
[184] CBS News, *"Multiple Kidnappings For Ransom" Funding ISIS, Source Says* (Aug. 21, 2014), https://tinyurl.com/ymv4r77v.
[185] CBS News (Washington, D.C.), *CBS News: 'Multiple Kidnappings For Ransom' Bring ISIS Funding* (Aug. 21, 2014), https://tinyurl.com/an8v4r7b.

ISIL stamp and endorsed by ISIL's finance chief in the Aleppo region' proves [LaFarge] had struck a deal with ISIL to allow for free circulation of its goods …"[186]

682. Media reports alerted Defendants that when telecommunications companies that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were present – like Defendants – engaged in illicit transactions as the cost of doing business, such activity routinely was intended to cause protection payments to reach terrorists using mechanisms like that used by Defendants in Iraq. Such reports included, but were not limited to:

**a.** <u>*Washington Post*, November 2007</u>: "A good way to prepare for operations in Iraq is to watch … '*The Sopranos*,'' said Maj. Gen. Rick Lynch, commander of U.S. forces in central Iraq, referring to the hit HBO series about the mob. 'You're seeing a lot of Mafioso kind of activity.'… [Detained AQI operative] Abu Nawall admitted … that the group 'gets a lot of money through extortion….' … The racketeering operations extended to nearly every type of business in [Mosul], including … a cellphone company, which paid the insurgents $200,000 a month."[187]

**b.** <u>*Times Record News*, August 2008</u>: "[T]he Taliban [] expand[ed] 'their extortion campaign, [and] demand[ed] that businesses pay 'protection money' … [T]here were several cell phone companies operating in [] Afghanistan, the Taliban went to the … companies and offered not only 'protection,' but damage to a competitor, for a price.' "[188]

**c.** <u>*Agence France Presse*, September 2012</u>: "'Revenue extorted from nationwide enterprises such as … mobile telephone operators … goes to the Taliban Financial Commission which answers to the Taliban leadership,' said the report. . . . 'Estimates of Taliban income from contracts funded by the United States and other overseas donors range from 10 percent to 20 percent of the total, usually by the Taliban agreeing protection money with the contractor or demanding a cut.' "[189]

**d.** <u>*Canadian Press*, June 2013</u>: "[In] Mosul and the surrounding countryside, … al-Qaida was never really routed … Michael Knights, an analyst … who closely follows regional

---

[186] Henry Samuel, *Paris-Plages May Say Au Revoir To Sand Over Complaints Provider 'Paid Taxes To Isil' And Environmental Concerns*, Telegraph Online (Sept. 28, 2016), 2016 WLNR 29671392.
[187] Amit R. Paley, *Iraqis Joining Insurgency Less for Cause Than Cash*, Wash. Post (Nov. 20, 2007).
[188] Times Record News, *Anatomy Of Terror* (Aug. 21, 2008), 2008 WLNR 31329261.
[189] Agence France Presse, *Taliban Made $400mn In 2011 From Taxes, Extortion: UN* (Sept. 11, 2012), https://www.nation.co.ke/news/world/Taliban-made--400-mn/1068-1504748-w0sl0a/index.html.

security issues, said al-Qaida in Iraq has long generated cash from businesses … through extortion of large firms such as mobile phone companies."[190]

**e.** Independent, October 2013: "Al-Qa'ida is once again making ground attacks on cities like Fallujah … The same is true of … Mosul …, where ISIS is reported to levy protection money on everybody from the local green-grocer to satellite phone … companies – bringing in monthly revenue of $8m."[191]

**f.** Business Insider, December 2015: "ISIS … pulls in hundreds of millions of dollars from 'taxing' … those who live in the territory the group controls in Iraq and Syria. ISIS is thought to make as much as $800 million or $900 million from residents and businessmen in its territory, American and European officials [said] … [T]he militants have created a complex financial system to extract as much money as possible from individuals and businesses. ISIS charges import taxes, rent for businesses, fines for breaking laws, utility bills, and income tax. … ISIS' 'Office of Resources' controls the group's … operations … [relating to] … mobile-phone companies …"[192]

683. **Terrorism scholars** alerted Defendants that their transactions posed a severe risk of routing protection payments to terrorists. Dr. Williams's 2009 study, for example, was published by the U.S. Army War College and documented an extensive analysis of protection rackets operated by terrorists in Iraq – including the key role played by intermediaries in lubricating the entire protection money economy there.[193] Dr. Williams reported, *inter alia*, that:

**a.** "As one observer notes: 'AQI in certain parts of Iraq is basically running protection rackets … and engaging in criminality.'"[194]

**b.** "One businessman involved in construction noted that there were two options: 'one, they give you the contract for a price but then you have to provide your own security; the other deal is that for a certain percentage of the contract they will provide you with gunmen.'"[195] "In his last four contracts, the businessman had paid $500,000 in bribes."[196]

---

[190] Sameer N. Yacoub and Adam Schreck, *Spreading Shakedowns and Distrust of Authorities Embolden Al-Qaida in Iraq's Restive Mosul*, Canadian Press (June 20, 2013).
[191] Patrick Cockburn, *As Syria Disintegrates, So Too Does Iraq*, Independent (Oct. 29, 2013), 2013 WLNR 27123183.
[192] Pamela Engel, *ISIS Has Found A Huge Money-Making Method That Is 'Impervious To Sanctions And Air Raids'*, Business Insider (Dec. 2, 2015).
[193] Williams, *Criminals, Militias, and Insurgents*.
[194] *Id.* at 232-33.
[195] *Id.* at 160.
[196] *Id.*

**c.** "In [Diyala] Province in July 2007, AQI … extorted about $3,000 from a local sheikh almost in passing."[197] "Much more has probably been obtained from white collar criminals in Mosul who reportedly have also been targeted by AQI."[198]

**d.** "Larger businesses are also subject to extortion and generally find it preferable to make payoffs than to incur the risks and costs associated with resistance."[199]

**e.** "As one military spokesman notes, '[t]he racketeering operations extended to nearly every type of business in the city, including a Pepsi plant, cement manufacturers, and a cellphone company, which paid the insurgents $200,000 a month."[200]

**f.** "For contractors and subcontractors, of course, these payments became simply the cost of doing business in an environment where security and law had been lacking and were almost certainly factored into contract bids to U.S. authorities in Iraq."[201]

**g.** "Knowing that extortion payments are required for the movement of supplies and people, contractors inflated their bids accordingly."[202]

**h.** "Extortion from contractors involved in construction projects also had a debilitating impact, increasing the costs of most projects and offering opportunities for diversion of funds to insurgent groups."[203]

684. In 2010, the National Defense University published another analysis by Dr. Williams concerning terrorist protection rackets in Iraq.[204] Among other things, Dr. Williams reported that, with respect to "the range of criminal activities perpetrated by … political groups using crime to fund their cause":

> Extortion (and its less malevolent concomitant, protection) became pervasive. And the reconstruction efforts multiplied the opportunities. Large amounts of money for reconstruction were poured into Iraq with inadequate oversight … Iraqis were awarded contracts with protection money almost invariably built in, some of which went to … the insurgency.[205]

---

[197] *Id.* at 233.
[198] *Id.*
[199] *Id.* at 158.
[200] *Id.*
[201] *Id.* at 159.
[202] *Id.*
[203] *Id.* at 259.
[204] Williams, *Criminals, Militias, and Insurgents*, at 259.
[205] *Id.* at 48-49.

685. Similarly, in 2014, *Thomson Reuters* published its analysis by terrorism scholars Jean-Charles Brisard and Damien Martinez, which detailed Islamic State's continuation of al-Qaeda-in-Iraq's protection money operation and warned the multinational corporations who subscribe to *Thomson Reuters* (owner of, *inter alia*, Westlaw) that illicit transactions in Iraq foreseeably facilitated protection money payments to Islamic State:

**a.** "In its quest to establish administrative and civil control over its conquered territory, the [Islamic State] has implemented taxes on a variety of commercial activities. In Mosul alone, [Islamic State] is believed to raise US$8 million in taxes each month. Such taxes include the following:
— a tax on all goods;
— a tax on telecommunication companies;
— a tax on cash withdrawals from bank accounts;
— a 5% tax collected for social welfare and other public purposes on all salaries;
— a road tax of US$200 in Northern Iraq;
— an US$800 custom tax per truck entering Iraq …;
— a tax on looting archeological sites (20% in Aleppo, 50% in Raqqa); and
— a protection tax for non-Muslim communities (known as jizya)."[206]

**b.** "In total, the extortion/tax system imposed in areas under its control in Iraq and Syria could generate as much as US$30 million per month for [Islamic State], or US$360 million a year."[207]

**c.** "Today these methods of funding by extortion are common to many different terrorist groups across the globe. However, in the case of the Islamic State, there is a relative ingenuity in imposition of these new taxes. In the short term, Western groups already operating in the area could find themselves exposed to this pernicious funding mechanism and thereby constrained by the payment of protection money.

**d.** "It is known that the Islamic State not only gets its funding from [*inter alia*, taxation], but that it has diversified from the known traditional avenues, and is using more unusual methods to generate its funds. This is the risk that the compliance community must face on a daily basis, not only dealing with a large majority of known risks (conventional terrorism financing for some countries, for certain entities)."[208]

**e.** "The compliance community has a clear idea of the inherent risks … Various criminal cases including those linked to bribery has [sic] prompted companies … to take action and put in place measures and processes to both increase control over, and to mitigate

[206] Brisard and Martinez, at 5.
[207] *Id.*
[208] *Id.*

their exposure to these risks. The emergence of the Islamic State…, and the necessity to identify its financing channels is proving to be a stress test for [] compliance teams."[209]

686. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that corporations' illicit transactions in, or relating to, Iraq, Afghanistan, Syria, and Turkey were routinely designed to route protection payments to the branches of terrorist groups operating there.

### 5. Defendants Knew Al-Qaeda's And Islamic State's Terrorist Campaigns In Iraq And Afghanistan Were Inextricably Linked

687. Indeed, the close and intimate relationship between al-Qaeda and Islamic State terrorists in Iraq and Afghanistan has been repeatedly made clear to the public (and Defendants) since the mid-2000s. Both groups, and their branches, in both countries, viewed the Iraq and Afghanistan terrorist campaigns against America as part of the same integrated effort to drive the United States out of the Middle East.

688. United States government reports and statements alerted Defendants as to the inextricable connection between al-Qaeda "core" in Afghanistan and Pakistan and al-Qaeda-in-Iraq, and the similarly inextricable connection between Islamic State "core" in Iraq and Syria and Islamic State's "branch" in Afghanistan and Pakistan. For starters, U.S. military documents confirmed the vital nature of the Iraq/Afghanistan linkage. For example, according to a report prepared by CENTCOM in 2007, al-Qaeda-in-Iraq's "leadership" was already preparing "plans" "by late 2005" in which "AQI leadership" would "use" their Iraqi strongholds "as a base for [al-Qaeda's and al-Qaeda-in-Iraq's] long-term war against the United States and its allies": "[r]eflective of this global jihad worldview was the fact that propaganda distributed by [AQI] began to show fighters in Afghanistan as well as in Iraq in their videos and flyers."

[209] *Id*. at 7.

689. Al-Qaeda's leadership agreed. From 2003 through 2022, al-Qaeda's and al-Qaeda-in-Iraq's respective leaders (and later Islamic State's leadership) viewed Iraq and Afghanistan as a single linked campaign against the American "Crusaders." Such FTOs' approach ignored geographic boundaries with respect to their operations in these two countries – facilitated throughout by Iran's IRGC, which permitted al-Qaeda and its branches to operate a land bridge connecting Iraq and Afghanistan through Iran.

### C. Defendants Knew Their Illicit Transactions Aided Terrorist Attacks By Causing Financial Assistance To Flow To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State Through Defendants' Protection Payments To Them

690. Defendants knew that they were supplying funding to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who were intent on attacking Americans in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan. That Defendants chose to funnel their illicit payments through partners, consultants, and contractors, *infra* V.C.1, slush funds, *infra* V.C.2, and deliberately deficient internal controls, *infra* V.C.3, only heightens their culpability. Defendants intentionally used the contracting process to insulate themselves from the illicit payments on paper, but that process – offloading responsibility to local partners, consultants, and contractors several layers removed – was simply their technique for encouraging the payments while avoiding detection and accountability. The protection payments may often have been physically delivered by an intermediary, but Defendants knew they were occurring and purposefully orchestrated them. That is because Defendants could only obtain their desired business outcome by ensuring that their money actually reached al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Had Defendants' partners, consultants, and contractors spent the money on some other legitimate purpose, rather than directing it to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, Defendants would not have obtained the security benefit they wanted.

691. From 2004 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) knew that Defendants' illicit transactions in Iraq foreseeably caused protection money to flow to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Plaintiffs' allegations exclusively concern Ericsson's understanding of the foreseeable terrorist finance risks posed by Defendants' ***illicit*** Iraq-related transactions. Plaintiffs do not allege that Ericsson knew their Iraq-related conduct foreseeably aided terrorists targeting the United States from 2004 through 2022 merely because Defendants did business in Iraq during this time. Instead, Plaintiffs' allegations in this Part V focus on Ericsson's knowledge that ***illicit*** Iraq-related transactions throughout this period foreseeably aided terrorists.

692. Defendants knew their illicit Iraq-related transactions facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

693. From 2004 through 2022, it was common knowledge among businesses operating in Iraq, including Defendants, that illicit transactions pursued by Western corporate and contracting parties were typically designed to cause U.S. dollars to flow to terrorists in Iraq, including al-Qaeda and al-Qaeda-in-Iraq (from 2004 through 2014) and Islamic State (from 2014 through at least 2022), in the form of protection money routed through transactions that were often plainly illicit on their face. Because al-Qaeda, al-Qaeda-in-Iraq, and Islamic State always openly demanded the money – and because local agents usually paid it through relatively straightforward, albeit highly illegal, means – Western companies on the ground in Iraq were widely aware of the practice. Defendants were sophisticated companies with billions of dollars

in revenues at stake in Iraq. They knew this prevailing understanding that their illicit Iraq-related transactions were foreseeably flowing to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

694. Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's own public statements alerted Defendants that their illicit Iraq-related transactions would be used to facilitate murderous attacks on Americans. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State openly proclaimed that the protection money was for terrorism. The demands for payments, which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State themselves tied to their insurgencies, alerted Defendants to the connection between the payments and terrorist violence.

695. Defendants' illicit transactions were also the fruits of Defendants' negotiation of their payments in circumstances that left no doubt about whom they were financing. With respect to the large-scale payments negotiated directly with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, LM Ericsson, Ericsson AB, and Ericsson Inc. (or their agents) met with high-level representatives acting on behalf of such terrorist groups who openly represented their respective Financial Commissions (each maintained one). The payments to local al-Qaeda, al-Qaeda-in-Iraq, and Islamic State regional cell leaders likewise occurred via negotiations with cell leaders who openly identified as al-Qaeda, al-Qaeda-in-Iraq, and Islamic State members. Given the al-Qaeda- and Islamic State-controlled or contested geographies in which Defendants operated, Defendants assuredly knew that the intermediaries they were paying off through their illicit Iraqi transactions worked for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

696. Al-Qaeda and Islamic State memorialized their respective protection rackets (al-Qaeda, through AQI, from 2004 through 2014, Islamic State from 2014 through at least 2022) in documents that further notified Defendants that they were financing terrorists. Most prominently, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State often conveyed their demands for

protection payments in so-called "Night Letters." Night Letters – whose name comes from their frequent delivery during the night – were documents on official al-Qaeda, al-Qaeda-in-Iraq, or Islamic State letterhead bearing the relevant group's insignia. Although Night Letters could convey a variety of threats, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commonly sent them to companies to demand protection payments. Night Letters were a staple of the terrorist playbook, widespread in Iraq, particularly in areas controlled by al-Qaeda or Islamic State, and were one of the principal means through which al-Qaeda and Islamic State communicated their demands for protection money to companies, including Defendants.

697. Similarly, after effecting the illicit transactions that routed protection payments, companies regularly received so-called "tax receipts" from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, so they would have documentation proving they had paid their dues to the terrorists. For example, Islamic State's Financial Commission, following the al-Qaeda playbook, "has attempted to demonstrate a degree of sophistication and a formalized, structured internal financial management system by providing receipts for levies" paid to their "protection racket."[210] And those tax receipts – like the Night Letters – appeared on Islamic State letterhead and made clear on their face that protection money was intended for Islamic State's benefit. On information and belief, Defendants or their agents received Night Letters and tax receipts from al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in connection with their projects in Iraq.

698. Defendants did not believe – nor was it true – that their protection payments were necessary for them to avoid imminent death or serious bodily injury. After 2004, al-Qaeda and Islamic State typically did not extract protection payments by physically confronting companies

[210] Financial Action Task Force, *FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)*, at 12 (Feb. 2015), https://tinyurl.com/5b98bmbh

and threatening immediate violence; rather, the threats were often vaguer and future-looking. Many times, those threats were directed at Defendants' equipment or projects, rather than their personnel. Given the non-immediate nature of the threats, Defendants could have notified the U.S. government of al-Qaeda's and Islamic State's protection rackets and tried to enlist the military's aid in responding. But rather than avail themselves of such options, Defendants decided that the simplest (and most profitable) option was to pursue the illicit transactions necessary to make or facilitate the payments that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State demanded.

699. Indeed, Defendants knew that their large, regular protection money payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State strengthened such FTOs' racketeering enterprise both through funding its operation and by generally causing dramatic inflation in the prices – and associated terrorist finance extracted by the FTOs – attendant to the illicit economy in Iraq. As a result, Defendants' large-scale protection money payments had a multiplier effect for the terrorists, by raising the price of the economic activity generally. Ericsson's conduct therefore perversely made it so that only large multinational corporations could consistently secure reliable protection money arrangements with these FTOs, because for everyone else, the prices were often too high due to the inflation caused by Defendants (and their multinational peer companies). Thus, Defendants knew that their conduct made kidnapping and murders more likely by (a) facilitating the growth of the entire protection money racket while simultaneously (b) causing dramatic price inflation, pricing out people at the lower end of the new illicit economy Defendants helped birth and sustain.

700. Although Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents provided especially valuable aid for such FTOs' terrorist attacks, the causal

nexus was not limited to such FCPA violations. Whether or not Defendants technically violated the FCPA or their contractual obligations to their U.S. and Iraqi customers, their transactions with an intermediary with the specific intent of routing protection money directly to terrorist groups targeting the United States – which intermediaries flowed Defendants' resources through to their intended terrorist recipients – supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with U.S. dollars, sourced from U.S. transactions processed by U.S. banks in the U.S., and valuable U.S. free goods, including valuable American high-tech communications systems that provided encrypted communication capabilities and doubled as cash-equivalents in Iraq, like the iPads that Ericsson regularly sourced from the United States and used as cash equivalents in its corrupt transactions in the Middle East—all of which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State used to fund attacks against Americans in Iraq, Afghanistan, Syria, Turkey, Europe, and Africa.

701. While each of the above items on its own alerted Defendants, specific aspects of their illicit transactions and corrupt business practices also further alerted them that they were facilitating the flow of protection payments to terrorists, including, but not limited to, Defendants' corrupt payments in Iraq involving: (1) illicit transactions with strategic partners, consultants, and contractors; (2) slush funds; and (3) intentionally deficient internal controls.

### 1. Defendants Knew Their Illicit Transactions With Iraq-Related Intermediaries Caused Protection Payments To Flow To Terrorists

702. Defendants knew, and intended, that their illicit transactions with their partners, consultants, and contractors were designed to, and would, facilitate protection payments through such intermediaries on behalf of Defendants.

703. Defendants knew their practice of routing illicit cash payments and other illicit value through intermediaries, including Defendants' self-described partners (like Asiacell),

consultants (like al-Awsat), and security, transportation, and logistics contractors (like SLS and Cargo Iraq) would conceal their regular protection payments to terrorists.

704. Defendants knew their illicit transactions with intermediaries facilitated protection payments to FTOs because (at a minimum) Defendants' employees and agents in Iraq – who were from Iraq, operated businesses in Iraq, and lived in Iraq for decades – knew it to be true.

705. Defendants knew that the excessive fees they illicitly routed to their intermediary partners, consultants, and contractors were red flags for unlawful payments.[211]

706. Defendants knew that their inability to document the services provided by their intermediary partners, consultants, and contractors was a red flag that such intermediaries were illicitly passing value along to third parties, i.e., the terrorists.[212]

707. Defendants knew that a substantial percentage of corrupt value they helped flow to their intermediaries reached al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For example, as one Iraqi company officer publicly explained in 2007, the "contractor sets his price at up to four times the going rate because he'll be forced to give 50 percent or more to gun-toting insurgents

[211] *See*, *e.g.*, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 22 ("[c]ommon red flags associated with third parties include . . . excessive commissions to third-party agents or consultants"), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf.
[212] *Id*. at 60 ("DOJ's and SEC's FCPA enforcement actions demonstrate that third parties, including agents, consultants, and distributors, are commonly used to conceal the payment of bribes … in international business transactions. Risk-based due diligence is particularly important with third parties … some guiding principles always apply. First, … companies should understand the qualifications and associations of its third-party partners … The degree of scrutiny should increase as red flags surface. Second, companies should have an understanding of the business rationale for including the third party in the transaction … [and] should understand the role of and need for the third party and ensure that the contract terms specifically describe the services to be performed [and] … payment terms … Moreover, companies may want to confirm and document that the third party is actually performing the work for which it is being paid and that its compensation is commensurate with the work being provided. Third, companies should undertake some form of ongoing monitoring of third-party relationships.").

who demand cash payments in exchange for the supply convoys' safe passage" – so that of every $1 million he received, $500,000 was flowed through to the FTOs.[213]

708. **United States federal criminal prosecutions** alerted Defendants that their illicit transactions through intermediaries facilitated protection payments to terrorists. On March 19, 2007, for example, Chiquita Brands International, Inc. ("Chiquita"), a multinational banana supplier, pleaded guilty in this District to having provided material support to the United Self-Defense Forces of Colombia ("AUC") in Colombia.[214] Chiquita had routed protection payments to the AUC – then designated as a Specially Designated Global Terrorist – "through various intermediaries," and had falsely accounted for them as "security payments."[215] Chiquita later argued that it paid AUC protection money "under threat of violence," but DOJ responded that the "payments were illegal and could not continue."[216] It thus charged Chiquita with (and Chiquita pleaded guilty to) the federal crime of transacting with a Specially Designated Global Terrorist.[217] In so doing, Chiquita admitted that "[f]or several years Chiquita paid [an FTO] by check through various intermediaries[,]" it "recorded these payments in its corporate books and records as 'security payments' or payments for 'security' or 'security services" but "never received any actual security services in exchange for the payments."[218]

---

[213] Hannah Allam, *Iraq Aid Helps To Kill U.S. Troops?: Insurgents Extort Payoffs From Contractors In Anbar Province*, Sacramento Bee (Aug. 27, 2007), 2007 WLNR 16739213.
[214] *See* Plea Agreement, *United States v. Chiquita Brands Int'l, Inc.*, No. 07-cr-00055-RCL (D.D.C. filed Mar. 19, 2007), Dkt. 11.
[215] Press Release, U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty To Making Payments To A Designated Terrorist Organization & Agrees To Pay $25 Million Fine* (Mar. 19, 2007) ("*Chiquita Brands International Pleads Guilty*").
[216] *Id.*
[217] *See* 50 U.S.C. §§ 1701, 1705; 31 C.F.R. §§ 594.201(a), 594.701(c); Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001).
[218] *Chiquita Brands International Pleads Guilty*.

709. In DOJ's 2007 press release announcing Chiquita's plea deal, an Assistant Attorney General declared: "Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations… Thanks to … this prosecution, that funding stream is now dry and corporations are on notice that they cannot make protection payments to terrorists."[219] The U.S. Attorney for this District further warned: "Funding a terrorist organization can never be treated as a cost of doing business… American businesses must take note that payments to terrorists are of a whole different category. They are crimes."[220]

710. On information and belief, Defendants were aware of the *Chiquita* settlement and the U.S. government's clear message that it considered protection payments illegal. The settlement received extensive scrutiny among the international business community and was the subject of recurring media coverage. Media outlets describing the settlement included *United Press International* on March 14, 2007, the *Washington Times* on March 19, 2007, the *Associated Press* on March 20, 2007, and the *Washington Post* on August 2, 2007.[221]

711. **United States government reports** alerted Defendants that their illicit transactions through intermediaries foreseeably aided terrorists. In 2011, for example, the Final Report of the U.S. Congress' Commission on Wartime Contracting in Iraq and Afghanistan documented to Congress (and Defendants) that:

> Another significant cost of overseas-contingency contracting is diversion—payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects. … In Iraq and Afghanistan, significant … issues include: … diversion of contract funding to the insurgency … In Iraq and Afghanistan, U.S. funds have been diverted to insurgents … as a

---

[219] *Id.*
[220] *Id.*
[221] *See* United Press Int'l, *Chiquita To Pay $25M For Terrorist Payoffs* (Mar. 14, 2007); Matt Apuzzo, *Chiquita Pleads Guilty To Doing Business With Terrorists*, Assoc. Press (Mar. 20, 2007); *Chiquita Pleads To Protection Payoffs*, Wash. Times (Mar. 19, 2007); Carol D. Leonnig, *In Terrorism-Law Case, Chiquita Points to U.S.*, Wash. Post (Aug. 2, 2007).

> cost of doing business … While there is no official estimate of the amount of U.S. funds diverted to insurgents, it certainly comes to a significant percentage of a project's cost. … Because they directly strengthen the insurgency, diverted funds pose far more danger than other kinds of waste and have a disproportionately adverse impact on the U.S. effort.[222]

712. The Commission on Wartime Contracting's finding was widely reported in the media. As the *Boston Globe* summarized, for example, "[t]he final report by the Commission on Wartime Contracting found at least $31 billion has been lost during the past decade through lax oversight of contractors, poor planning, and payoffs to … insurgents in … Iraq."[223] The Associated Press and others also published similar reports.[224]

713. In 2012, DOJ and SEC jointly warned sophisticated multinational corporations, like Ericsson, that "DOJ's and SEC's FCPA enforcement actions demonstrate that third parties, including agents, consultants, and distributors, are commonly used to conceal [] [corrupt] payment[s]" "in [] business transactions,"[225] and such "corruption" "impedes U.S. efforts to" "combat … terrorism."[226]

714. In 2018, public reports submitted to Congress by the Lead Inspector General for Operation Inherent Resolve highlighted the extreme terrorist finance risks posed by illicit transactions in Iraq and alerted Defendants, among other things, that:

---

[222] Commission on Wartime Contracting in Iraq and Afghanistan, *Transforming Wartime Contracting: Controlling Costs, Reducing Risks*, at 32, 70, 73-74 (Aug. 2011).
[223] Stephanie Ebbert, *Brown Returns From US War Zone; Reservist Trained In Afghanistan*, Boston Globe (Sept. 2, 2011), 2011 WLNR 17388152.
[224] *See*, e.g., Richard Lardner, *AP Exclusive: Up To $60B In War Funds Said Wasted*, AP Online (Aug. 30, 2011) ("As much as $60 billion in U.S. funds has been lost to waste and fraud in Iraq and Afghanistan over the past decade through lax oversight of contractors, poor planning and payoffs to warlords and insurgents, an independent panel investigating U.S. wartime spending estimates.").
[225] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 60.
[226] *Id*. at 2-3.

**a.** "ISIS … generate[d] income from extortion, taxation, and illicit trafficking activities," facilitated by "middlemen who engaged in transactions with the group."[227]

**b.** "The [FBI] reported that while ISIS did not appear to have links to transnational criminal organizations, it was involved with income-generating crimes and as a result had formed connections with preexisting smuggling and black market networks in the region."[228]

**c.** An "unstable security situation" near Syria's border with Iraq "raised the risk that combatants might divert humanitarian assistance," and "the risks of humanitarian assistance being diverted to armed groups … included … imposition of taxes, duties, and fees on USAID implementers and beneficiaries; [and al-Qaeda-affiliated terrorists'] control of local councils and [contractor's] camp management that assist USAID implementers identify eligible beneficiaries."[229]

715. **European government reports** also alerted Defendants that their illicit transactions with, or through, intermediaries were designed to route protection payments to terrorists. The European Parliament's 2017 report concerning Islamic State's terrorist finance strategies, for example, alerted Defendants that, with respect to the protection money operation created by al-Qaeda, refined by al-Qaeda-in-Iraq, and continued by Islamic State, "[t]he case of the Swiss … conglomerate LafargeHolcim" was "typical of" the al-Qaeda-in-Iraq/Islamic State protection money "*modus operandi*" in geographies the terrorists controlled.[230]

716. The history, media, and litigation attendant to multinational corporations' illicit payments to Iraqis revealed by the **United Nations' Oil-for-Food Program scandal** from 1998 to 2003 alerted Defendants that their intermediaries were foreseeably paying protection money to terrorists on Defendants' behalf. The Oil-for-Food scandal alerted Defendants that

---

227 Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, *Report to the United States Congress, January 1, 2018–March 31, 2018*, at 32 (May 5, 2018).
228 *Id.*
229 Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2018–September 30, 2018*, at 55 (Nov. 5, 2018).
230 European Parliament, Directorate-General for External Policies, Policy Department, *The Financing of the 'Islamic State' in Iraq and Syria (ISIS)*, at 11 (Sept. 2017), https://tinyurl.com/yd3dy6rz. While this report was limited to Islamic State, Defendants knew, as did the European Parliament, that Islamic State followed the same protection money-related tactics, techniques, and procedures as did al-Qaeda through its branch, al-Qaeda-in-Iraq.

intermediaries often served as conduits for illicit payments in Iraq by no later than 2005, when the scandal was already a major matter subject to multiple investigations worldwide, including several by U.S. authorities.[231] Through their knowledge of the Oil-for-Food scandal, Defendants knew that the routing of programmatic illicit payments to violent actors in Iraq through notorious intermediaries in Iraq, Lebanon, Syria, and Jordan was a universal feature of Iraqi society during the five years immediately preceding the U.S. invasion in 2003.

717. The Oil-for-Food scandal alerted Defendants that the use of sham consulting deals to route payments was a signature strategy in the Iraqi corruption playbook, and that such notorious use of intermediaries to route illicit payments in Iraq under the Oil-for-Food program birthed a worldwide scandal and was, at all relevant times, the largest collective FCPA scandal in U.S. history.[232] In 2012, for example, a joint report by DOJ and SEC noted in 2012, "SEC charged [a] former CEO … for his role in schemes to bribe Iraqi[s] … in connection with the United Nations Oil-For-Food Programme and to bribe Iraqi[s] … to purchase the company's fuel

[231] *See*, *e.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 111 (Jan. 30, 2006) ("GAO, other congressional investigators, the Defense Intelligence Agency Iraq Survey Group, and others have reported that Iraq gained billions in illicit revenues through smuggling and corruption [under the U.N. Oil-for-Food program]."); Stuart W. Bowen, Jr., Special Inspector General for Iraq Reconstruction, *Hard Lessons: The Iraq Reconstruction Experience*, at 6 (Feb. 2, 2009) ("[B]eneath the sanctions and authorized oil sales, an illicit economy flourished [under Oil-for-Food]. Institutionalized corruption infected both the government and the supporting UN programs, spawning powerful criminal elements within Iraq.").

[232] Compl. ¶ 1, *SEC v. Textron Inc.*, No. 07-cv-01505 (D.D.C. Aug. 23, 2007), ECF No. 1; Compl. ¶ 1, *SEC v. Novo Nordisk A/S*, No. 09-cv-00862 (D.D.C. May 11, 2009), ECF No. 1; Compl. ¶¶ 2-3, *SEC v. Innospec, Inc.*, No. 10-cv-00448 (D.D.C. Mar. 17, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Daimler AG*, No. 10-cv-00473 (D.D.C. Mar. 22, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Gen. Elec. Co.*, No. 10-cv-01258 (D.D.C. July 27, 2010), ECF No. 1; Compl. ¶¶ 33-41, *SEC v. ABB Ltd.*, No. 10-cv-01648 (D.D.C. Sept. 29, 2010), ECF No. 1; Compl. ¶¶ 51-60, *SEC v. Johnson & Johnson*, No. 11-cv-00686 (D.D.C. Apr. 8, 2011), ECF No. 1; Deferred Prosecution Agreement, *United States v. DePuy, Inc.*, No. 11-cr-00099-RBW (D.D.C. Apr. 8, 2011), ECF No. 1-1; Deferred Prosecution Agreement, *United States v. Weatherford Int'l Ltd.*, No. 13-cr-733 (S.D. Tex. Nov. 26, 2013), ECF No. 4.

additives," for which "the company used false invoices and sham consulting contracts to support large bribes that were passed on to foreign officials through an agent, and the bribes were mischaracterized as legitimate commissions and travel fees in the company's books and records."[233]

718. The Oil-for-Food scandal alerted Defendants to the prominent role that universal taxes or kickbacks played in illicit Iraqi dealings because Defendants knew that Saddam's regime imposed a 10% After Sales Service Fee as "a mandatory kickback to be paid by all suppliers" from 2000 through 2003.[234] The Oil-for-Food scandal alerted Defendants that the recipients of illicit payments in Iraq ordinarily collected these payments from multinational corporations – ostensibly to pay for consulting services but in reality functioned as an illicit source of cash flow for Saddam's regime that was free of U.N. oversight. Defendants knew that, according to the Volcker Commission, recipients of illicit payments in Iraq sometimes collected their payoffs without memorializing them in a contract; the "ten percent fee" was often paid "without labeling it an 'after-sales-service' fee or without inserting an after-sales-service provision in the applicable contract."[235] Defendants also knew that multinational corporations typically concealed illicit payments on their books by routing them through third-party intermediaries, like "consultants" or suppliers who acted as their sales agents in Iraq.

719. The Oil-for-Food scandal also alerted Defendants that Western companies routed these corrupt payments to Saddam's regime through notorious intermediaries even though the

[233] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 44 n.5.
[234] Paul A. Volcker et al., *Manipulation of the Oil-for-Food Programme by the Iraqi Regime*, at 276 (Oct. 27, 2005) (the "Volcker Report"). The Volcker Report was a 623-page report by the Volcker Commission, a U.N.-commissioned Independent Inquiry Committee led by former U.S. Federal Reserve Chair Paul Volcker.
[235] *Id*. at 249.

public purpose of the international sanctions program (which such transactions, like Defendants' here, circumvented) was to choke off Saddam's ability to finance terrorist activities.[236] In fact, it was widely reported that Saddam used the illicit revenue obtained from corrupt foreign suppliers through the Oil-for-Food Program to finance international terrorist attacks.[237] Indeed, public reports concerning Iraq's Oil-For-Food scandal from Congress, media outlets, third-party watchdogs, and non-governmental organizations from 2004 through 2007 further alerted Defendants that their suspicious payments to intermediaries in Iraq, Syria, Jordan, and Lebanon relating to "trucking," "shipping," "logistics," "security," and "commissions" – among other classic Iraqi euphemisms – foreseeably enabled anti-American terrorist finance because that was exactly what had recently happened under Saddam.[238]

720. **Anti-Terrorism Act litigation** alerted Defendants that their illicit transactions with fronts or intermediaries in geographies at an elevated risk for terrorist finance, including Iraq, foreseeably facilitated protection payments to terrorists on Defendants' behalf.

721. On March 12, 2008, American victims of FTO-affiliated kidnappers in Colombia sued Chiquita, the iconic American banana company, for making protection payments to the

---

[236] *See* Iran Sanctions Act of 1990, Pub L. No. 101-513, § 586F(c)(1), 104 Stat. 1979, 2051 (Iraq sanctions imposed on "a country which has repeatedly provided support for acts of international terrorism"); Determination Iraq, 55 Fed. Reg. 37,793 (Sept. 13, 1990) (determining that "Iraq is a country which has repeatedly provided support for acts of international terrorism").

[237] *See*, *e.g.*, Cynthia R. Fagen, *Iraq's Oil for Terror; $72 Million to Palestinians*, N.Y. Post (Oct. 17, 2004) ("Saddam Hussein secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program"), https://tinyurl.com/3t9fha7u; Statement of Chairman Henry Hyde, *The Oil-for-Food Program – Tracking the Funds: Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 9 (Nov. 17, 2004) (Saddam funded Palestinian terror through "kickback money Saddam demanded from suppliers"), https://tinyurl.com/59ncafjx; David Marr, *Report Ties Iraq Terrorism To Payoffs*, Sydney Morning Herald (Oct. 6, 2006) (prominent multinational corporation's "kickbacks to Saddam Hussein" during the "oil for food scandal," which the company and its intermediaries "disguised as trucking fees," "may have financed terrorism"), 2006 WLNR 26874182.

[238] *See generally id.*

terrorist group FARC. *See* Compl. ¶¶ 1-2, *Julin et al. v. Chiquita Brands Int'l, Inc.*, No. 08-cv-20641 (S.D. Fla. Mar. 12, 2008), ECF No. 1. Among other things, plaintiffs alleged that:

**a.** "In order to disguise the payments, and ensure their continued and undetected flow to FARC, Chiquita and/or Banadex [Chiquita's wholly owned subsidiary] at times placed false names and non-existent employees on their payroll, providing those funds on local paydays to regional FARC commanders." *Id.* ¶ 192.

**b.** "Chiquita assisted … FARC terrorists on how to create front[s] … Through this deception, Chiquita … continue[d] its secret practice of covertly channeling funds to FARC, [and] was also able to mislead regulators, auditors, or anyone else examining Chiquita and Banadex's books-and-records. [Chiquita] could point to the false front[s] … to (falsely) record its payments to FARC as legitimate [] expenses." *Id.* ¶ 193.

**c.** "Chiquita also drew up fictitious contracts with legitimate, operating organizations, or alternatively overvalued existing contracts it maintained with such organizations, for the express purpose of burying (in its bookkeeping) its secret payments to FARC." *Id.* ¶ 194.

722. On January 2, 2009, American victims of attacks committed by FTOs funded by Saddam during Oil-for-Food sued defendants who allegedly routed illicit payments to Iraqis to secure lucrative Iraqi business. *See* Compl. ¶¶ 1-2, *Abecassis et al. v. Oscar S. Wyatt, Jr., et al.*, No. 09-cv-00001 (S.D. Tex. Jan. 2, 2009), ECF No. 3. Plaintiffs alleged, *inter alia*, that:

**a.** "Defendants provided illegal, financial and material support for known terrorists" funded by Iraqi sponsors of terrorism during the Saddam era by routing value "through third-party intermediaries at inflated prices …, knowing that part of the [] price was being used to pay illegal surcharges and kickbacks" that financed terrorism. *Id.* ¶¶ 1, 4.

**b.** "To conceal these illegal surcharge payments, [Defendant] … deposit[ed] millions of dollars in a bank account controlled by [the Iraqi terrorist sponsor] at the Jordan National Bank in Amman, Jordan." *Id.* ¶ 171.

**c.** "To conceal these illegal surcharge payments, [Defendant] agreed to pay [its business partner] inflated commission[s] … on the original []transactions, with knowledge and expectation that the [business partner] would then make the surcharge payments to the [Iraqi terrorist sponsor]." *Id.* ¶ 175.

**d.** "[Defendant] purchased [goods] from … third parties, knowing that premiums paid to the third parties were used to pay illegal surcharges and kickbacks to [the Iraqi terrorist sponsor]." *Id.* ¶ 177.

723. On October 17, 2017, American victims of attacks committed by Iraqi terrorists funded by illicit payments to the terrorist-controlled Iraqi Ministry of Health ("MOH") sued supply companies who allegedly, *inter alia*, made corrupt payments to the terrorist-controlled Ministry. *See* Compl. ¶¶ 1-2, *Atchley et al. v. AstraZeneca UK Ltd., et al.*, No. 17-cv-02136 (D.D.C. Oct. 17, 2017), ECF No. 1. Among other things, plaintiffs alleged that:

**a.** "The distribution stage presented yet another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers. The standard Kimadia [i.e., the MOH entity responsible for procurement of imported drugs and medical supplies] sales contract imposed harsh penalties for late deliveries and conditioned payment on successful delivery. Meeting these conditions required the sign-off of multiple MOH officials, including the Kimadia Deputy Director General of Imports, individual warehouse managers, and members of the Facilities Protection Service nominally providing 'security' for the shipments. As detailed in the *Contract Management* article, MOH employees historically have leveraged these positions to force companies to make additional corrupt payments throughout the distribution process." *Id.* ¶ 155.

**b.** "Like Saddam had done under Oil-for-Food, the [Iraqi terrorists] also extracted corrupt payments funded through sham or inflated payments by the suppliers relating to such items as post-sales 'services,' 'warranties,' 'equipment donations,' 'contractual facilities,' 'maintenance,' and 'training.' Corrupt payments through sham services agreements was the signature bribe of the Oil-for-Food scandal; while the nomenclature later changed, the practice continued once the Sadrists assumed control of MOH." *Id.* ¶ 156.

**c.** "The inventory stage similarly allowed Jaysh al-Mahdi to collect corrupt payments from medical-goods suppliers. Kimadia's standard sales contract imposed steep penalties on companies whose goods did 'not comply with specifications' (e.g., failed MOH testing) or went 'missing.' That gave the Facilities Protection Service, whose members guarded MOH warehouses, significant leverage over medical-goods suppliers: if they failed to provide security, pilfered medicines from warehouse storage, or failed to properly maintain the goods (e.g., by shutting off the power to a warehouse storing refrigerated goods), Kimadia could accuse the company of default and levy the penalties specified in the contract. That leverage allowed Jaysh al-Mahdi agents to extract additional payments from foreign suppliers." *Id.* ¶ 157.

**d.** "Defendants' … sham 'training' and 'travel' expenses … functioned as a slush fund for cash payments to [] Jaysh al-Mahdi agents." *Id.* ¶ 160.[239]

[239] In *Atchley*, the intermediary question concerned Defendants' allegedly intentional use of buffers, like consultants from Lebanon and Jordan and local Iraqi "scientific bureaus," to route payoffs to terrorists who controlled the Iraqi Ministry of Health; the intermediary question in

724. [240][241]On January 4, 2022, the United States Court of Appeals for the D.C. Circuit rejected the core legal arguments advanced by the defendants in *Atchley*, ruling that corrupt payments to terrorists in Iraq, including protection payments, supported liability under the ATA. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022). Defendants knew about that ruling, which received significant media coverage, and it further incentivized Defendants to continue concealing their corrupt payoffs to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – which Ericsson continued doing until its internal documents leaked about six weeks later. The Supreme Court later granted certiorari, vacated that judgment, and remanded for reconsideration in light of *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). *See* 144 S. Ct. 2675 (2024). On remand, the D.C. Circuit again reversed the dismissal of the plaintiffs' aiding-and-abetting claims, and reinstated its holdings that the plaintiffs had adequately pleaded proximate causation and that a designated Foreign Terrorist Organization had planned and authorized the attacks. *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026).

725. Defendants knew about plaintiffs' corruption- and protection money-related ATA allegations in *Chiquita*, *Abecassis*, and *Atchley*, which alerted Defendants that their own illicit transactions through intermediaries foreseeably caused protection payments to flow to terrorists

---

*Atchley* was not properly whether the Iraqi Ministry of Health was an intermediary because the D.C. Circuit determined the Ministry was no longer an independent intermediary once, as alleged, it had been taken over and instrumentalized by Jaysh al-Mahdi.

[240] *See generally Atchley et al. v. AstraZeneca UK Ltd., et al.*, 22 F.4th 204 (D.C. Cir. 2022).

[241] *See*, *e.g.*, Andrew C. Nichols, Esq. (Charis Lex P.C.), *D.C. Circuit Continues Its War On Acronyms*, DC Circuitry (Jan. 11, 2022) ("Last week, the D.C. Circuit revived the claims of victims of terrorist attacks in Iraq against U.S. [] companies and their foreign suppliers, who allegedly secured [] contracts by paying off the terrorists."); *see also* Mike Scarcella, *Update 1-U.S. Court Revives Lawsuit Against Pfizer, Others On Iraq Terrorism Funding Claims*, Reuters Gulf Financial News (Jan. 4, 2022); Khorri Atkinson, *DC Circ. Revives Terror-Funding Case Against AstraZeneca*, Law360 (Jan. 4, 2022); Ross Todd, *Litigator of the Week: Kellogg Hansen's Josh Branson Revives an Anti-Terrorism Act Suit Against Big Pharma Companies*, AmLaw Litigation Daily (Jan. 7, 2022).

on Defendants' behalf. Defendants knew about these ATA lawsuits because, among other reasons, such cases were widely covered in the media, relevant to Defendants' business, and known to Defendants' employees and agents, including, but not limited to, Defendants' legal, sales, management, and compliance personnel in Iraq, Sweden, and the United States.

726. **Media reports** and **terrorism scholars** alerted Defendants that their illicit transactions through intermediaries were foreseeably routing protection payments to terrorists on Defendants' behalf. In 2007, for example, *McClatchy* published a blockbuster report by Hannah Allam, who led the Cairo desk of its award-winning Middle East bureau, which stated that illicit transactions associated with Western companies operating in Iraq were invariably designed and used to flow protection money through intermediaries to al-Qaeda and al-Qaeda-in-Iraq on behalf of such Western companies, which payments, in turn, financed terrorist attacks against Americans in the Middle East.[242] Ms. Allam and *McClatchy* reported, *inter alia*, that:

**a.** "Iraq's deadly insurgent groups have financed their war against U.S. troops in part with hundreds of thousands of dollars in U.S. rebuilding funds that they've extorted from Iraqi contractors in Anbar province."

**b.** "The payments, in return for the insurgents' allowing supplies to move and construction work to begin, have taken place since the earliest projects in 2003, Iraqi contractors, politicians and interpreters involved in reconstruction efforts said."

**c.** "A fresh round of rebuilding spurred by the U.S. military's recent alliance with some Anbar tribes – 200 new projects are scheduled – provides another opportunity for militant groups such as al-Qaida in Iraq to siphon off more U.S. money, contractors and politicians warn."

**d.** "An [United States] embassy spokesman" in Baghdad "said … that 'in terms of contracting practices, we have checks and balances in our [U.S. government] contract awarding system to prevent any irregularities from occurring. Each contracted company is responsible for providing security for the project.'"

**e.** "Providing that security is the source of the extortion, Iraqi contractors say. A U.S. company with a reconstruction contract hires an Iraqi subcontractor to haul supplies

[242] Hannah Allam, *Iraq Aid Helps To Kill U.S. Troops?: Insurgents Extort Payoffs From Contractors In Anbar Province*, Sacramento Bee (Aug. 27, 2007), 2007 WLNR 16739213.

along insurgent-ridden roads. The Iraqi contractor sets his price at up to four times the going rate because he'll be forced to give 50 percent or more to gun-toting insurgents who demand cash payments in exchange for the supply convoys' safe passage."

**f.** "One Iraqi official said the arrangement makes sense for insurgents. By granting safe passage to a truck loaded with $10,000 in goods, they receive a 'protection fee' that can buy more weapons and vehicles."

**g.** "Sometimes the insurgents take the goods, too."

**h.** "Suleiman … displayed a stack of photos [that] … showed crumbling, half-finished structures overgrown with weeds and surrounded by patchworks of electrical wires. He blamed such failures on …'[t]hose responsible for these projects' … [who gave] money to al-Qaida. Frankly, gunmen control contracting in Anbar,' he said."

**i.** "None of the Iraqi contractors agreed to speak on the record – they risk losing future U.S. contracts and face retaliation from insurgent groups. Some of the Iraqis interviewed remain in Fallujah or Ramadi on the U.S. payroll; others had fled to Arab countries and Europe after they deemed the business too risky. "'I put it right in my contracts as a line item for 'logistics and security,'' said one Iraqi contractor who is still working for a major American company with several long-term projects in Anbar. 'The Americans think you're hiring a security company, but how you execute it is something else entirely. This is how it's been working since Day One.'"

**j.** "One Iraqi contractor who is working on a U.S.-funded rebuilding project in the provincial capital of Ramadi said he faced two choices when he wanted to bring in a crane, heavy machinery and workers from Baghdad: either hire a private security company to escort the supplies for up to $6,000 a truck, or pay off locals with insurgent connections. He chose the latter, and got $120,000 for a contract he estimates to be worth no more than $20,000. 'The insurgents always remind us they're there,' the contractor said. 'Sometimes they hijack a truck or kidnap a driver and then we pay and, if we're lucky, we get our goods returned. It's just to make sure we know how it works.' 'Insurgents control the roads,' he added. 'Americans don't control the roads – and everything from Syria and Jordan goes through there.'"

**k.** "An Iraqi who used to work as an interpreter for Titan Corp., the U.S. company that supplies local interpreters to U.S. forces in Iraq, said he witnessed countless incidents of insurgents shaking down contractors during the two years he spent as a translator on a U.S. military base in Anbar. He said he was stunned when, from early 2004 to his departure in summer 2006, a parade of sheiks with known insurgent connections were awarded contracts worth hundreds of thousands of dollars."

**l.** "Fawzi Hariri, a member of the Iraqi Cabinet and head of the government's Anbar Reconstruction Committee, said some U.S. rebuilding funds certainly have gone into insurgents' pockets …"[243]

---

[243] *Id.*

727. *McClatchy*'s report received widespread coverage and republication.[244] A week later, one newspaper's editorial board – in a piece titled "'Insurgent tax'" – noted Ms. Allam's "telling report" "about the inextricable circumstances burdening the American mission in Iraq," in which "she relayed how Iraqi insurgents have financed their operations, including attacks on American troops, with American money extorted from Iraqi contractors."[245] With respect to the question of "[h]ow" "the extortion work[ed]," the same editorial stated the following:

> American companies hire Iraqi subcontractors to help with reconstruction projects. Those subcontractors supply their own security. They do so by paying off Iraqi insurgents with protection money. … This "insurgent tax" isn't cheap. One Iraqi contractor explained … that he sets his price knowing that 50 percent or more will go to insurgents. The result is doubly damaging. Reconstruction proceeds more slowly, as money gets diverted. … [and] the cash fuels the insurgency … as weapons and soldiers flow into Iraq. … [T]he violence has generated an economy of its own, American money sustaining the insurgents.[246]

728. From 2004 through 2022, similar reports published by the media and terrorism scholars alerted Defendants that their illicit transactions with intermediaries were foreseeably routing protection payments to terrorists. Such reports included, but were not limited to:

**a.** *Courier Mail*, November 2005: "The [] Opposition [] demanded a royal commission into alleged kickbacks paid by the Australian Wheat Board to Saddam … AWB … paid almost $300 million to Jordanian company Alia to truck wheat into Iraq under the UN's [O]il-for-[F]ood program …Alia … channelled the money back to the regime. Despite Alia increasing the cost of transporting wheat into Iraq by 400 per cent in four years, AWB has insisted it was an unwitting pawn of Saddam. … [Future Australian Prime Minister] Kevin Rudd said … [that] under UN sanctions … Australian companies …

---

[244] *See*, *e.g.*, Hannah Allam, *Militants Extort Rebuilding Funds; Iraqi Contractors Pay 'Insurgent Tax' with U.S. Money Earmarked for Infrastructure*, Myrtle Beach Sun News (Aug. 27, 2007), 2007 WLNR 16672127; Hannah Allam, *Militants Siphon Off Rebuilding Funds*, News & Observer (August 27, 2007), 2007 WLNR 16691310; Hannah Allam, *Conflict In Iraq: Insurgents Use Extorted U.S. Money to Fight Troops; Through Extortion, Anti-American Insurgents are Obtaining Some of the Money Intended for the U.S. Rebuilding Effort in Iraq*, Miami Herald (August 27, 2007), 2007 WLNR 16667609; Hannah Allam, *Iraqi Militants Taking a Cut of Contract Funds / Insurgents Extort Money for Safe Passage of Goods, Workers Report*, Houston Chronicle (Aug. 27, 2007), 2007 WLNR 16732391.
[245] Akron Beacon J., *Editorial: 'Insurgent Tax'* (Sept. 3, 2007), 2007 WLNR 17238345.
[246] *Id*.

[caused] '$300 million to be paid illegally to Saddam …' he said. 'This slush fund is still available to the Iraqi insurgency and poses a continuing threat to [] troops in Iraq.'"[247]

**b.** Dr. Phil Williams, July 2009: "By 2003 all the conditions for an upsurge of organized crime were present; the toppling of the regime provided the catalyst Iraq and Syria have long shared related economies, traditions, illicit transfer strategies, and notorious intermediaries who make the entire corruption economy work – including those who facilitate protection payments to terrorists."[248] "For contractors and subcontractors, of course, [protection] payments became simply the cost of doing business in an environment where security and law had been lacking and were almost certainly factored into contract bids to U.S. authorities in Iraq."[249] "While the scale of extortion is impossible to determine, in a culture where baksheesh and 'fixers' have long been necessary and in which the United States has spent enormous amounts on reconstruction, it is almost certainly in the millions of dollars."[250] "[T]he appropriation of organized crime methodologies by key Iraqi power centers increased the resilience of insurgents, terrorists, and militias."[251] Thus, "analysis [must] be broadened to include targets beyond those groups directly attacking U.S. forces. Financiers, facilitators, and criminal groups working with insurgents also need to be on the target list."[252]

**c.** Jean-Charles Brisard and Damien Martinez, October 2014: "[I]t is very likely that, given the amounts involved, … anti-money laundering teams and specialized suppliers are well positioned to identify dubious middlemen. It has emerged that the [Islamic State] is making use of the old networks put in place by the Baath Party to circumvent the Iraq Oil-For-Food program."[253] "[I]f organizations across the globe do not take steps to conduct a thorough assessment of all of the possible [terrorist finance] risks, they could find themselves engaged in the financing structure of one of the most violent terrorist groups in the world. … There is a consensus among compliance officers today that the Islamic State is a clear and present danger … Islamic State is making use of well-established facilitators and money laundering networks, some of which were set up decades ago, to take care of the financial side of the organization … All this information placed end to end should in theory be able to highlight every dubious situation, commercial transaction or operation.[254]

**d.** *Newsweek*, November 2014: "At its heart, the ISIS money machine runs on the fear—and greed—of the millions of people it controls. It also manifests itself in a wide range of financial activities, many of them outsourced via middlemen and driven by hordes of self-interested parties. … ISIS also depends on the steady income it extracts from private

[247] Steven Wardill, *Full Probe Demanded Into Wheat Contracts*, Courier Mail (Australia) (Nov. 2, 2005), 2005 WLNR 17628572.
[248] Williams, *Criminals, Militias, and Insurgents*, at xi.
[249] *Id*. at 159.
[250] *Id*.
[251] *Id*. at 262.
[252] *Id*. at 263.
[253] Brisard and Martinez, at 7.
[254] *Id*. at 9-10.

donors, the heavy taxation and extortion it levies on its captive population … The …extortion that go[es] toward funding ISIS's day-to-day operations provide[s] a steady cash flow, [former governor of Nineveh province Atheel] al-Nujaifi says. … [E]xtortion, … [] help fund[s] ISIS's day-to-day operations …"[255]

**e.** *Telegraph*, September 2016: "Lafarge allegedly paid taxes to ISIL … [and] has been accused of making arrangements with [Islamic State] … In order to keep making cement Lafarge bought licences from and paid taxes to ISIL middle-men …."[256]

**f.** *Construction Europe*, April 2017: "Swiss-listed cement firm LafargeHolcim has been asked to divulge any relationship it has had with militant groups … follow[ing] recent allegations that senior executives … agreed to pay protection money to [] terrorist organisations. … An inquiry into Lafarge[] … has been opened by prosecutors in Paris, and French human rights groups have filed a lawsuit, alleging the firm had 'business relations' with ISIS. While already admitting that 'significant errors of judgement' were made at the plant, which was evacuated in 2014, … LafargeHolcim said, 'The local company provided funds to third parties to work out arrangements with a number of... armed groups, including sanctioned parties, in order to maintain operations."[257]

**g.** *Globe and Mail*, June 2018: "France has put cement giant LafargeHolcim under formal investigation over allegations of terrorist financing … [based on] allegations that Lafarge paid the Islamic State and other terrorist groups in Syria more than US$15-million between 2011 and 2014 for supplies and assurances they wouldn't attack the company's new plant … [E]ight former Lafarge executives, including two former [CEOs], have been put under formal investigation over allegations of terrorist financing. … [T]he FBI has launched an investigation. … 'The activities of Lafarge … are a perfect illustration of how multinationals can fuel conflicts …,' said Miriam Saage-Maass, legal director at ECCHR. … Lafarge executives were determined to keep [] operating as the country's civil war escalated and other western companies pulled out. … Lafarge executives often disguised the payments as 'donations' and relied on a pair of intermediaries, including a [] consultant, to make the payments to rebel groups. The relationship between the company and [Islamic State] became so formalized, [ISIS] issued travel permits to Lafarge workers and the company paid a 10-percent 'tax' to the terrorists."[258]

---

[255] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.
[256] Henry Samuel, *Paris-Plages May Say Au Revoir To Sand Over Complaints Provider 'Paid Taxes To ISIL' And Environmental Concerns*, Telegraph Online (Sept. 28, 2016), 2016 WLNR 29671392.
[257] Construction Europe, *Syria Questions For LafargeHolcim: Possible Terrorist Links Investigated At Swiss-Based Company After "Significant Errors Of Judgement" Were Made* (Apr. 1, 2017), 2017 WLNR 13774661.
[258] Paul Waldie, *Lafarge Under Investigation In France Over Allegations Of Terrorist Financing*, Globe and Mail (June 29, 2018), 2018 WLNR 19862585.

729. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that also alerted Defendants that their illicit transactions involving intermediaries were foreseeably designed and used to route protection payments to terrorists on Defendants' behalf.

730. Indeed, in addition to alerting Defendants that their illicit Iraq-related transactions with intermediaries were routinely used to route illicit payments to terrorists, from 2004 through 2022, sources like those described throughout this section alerted Defendants that each of their specific intermediary "buffer" tactics foreseeably routed protection payments to terrorists, including Ericsson's reliance upon: (a) Iraq-headquartered companies that LM Ericsson touted as a "partner," like Asiacell and Korek; (b) Iraqi, Jordanian, or Lebanese consultants, like al-Awsat; and (c) security, transportation, logistics contractors, like SLS and Cargo Iraq.

### a. Defendants Knew Their Illicit Transactions With Iraqi Partners Caused Protection Payments To Flow To Terrorists

731. Defendants knew their illicit transactions with their Iraqi partners, like Asiacell and Korek, facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true. Several Confidential Witnesses confirm this point. According to Colonel Romeo, for example any major international company operating in Iraq would have known that any transport checkpoint not staffed by Coalition forces was run by "the bad guys" and that any money paid to them for passage "isn't going to pay for holidays . . . but instead they are using the money to further fund the insurgency for things like weapons and IED." Any ethically run company "should turn around."

732. **Media reports** alerted Defendants that illicit transactions involving Iraq-headquartered companies that operated in areas where al-Qaeda or Islamic State-affiliated

terrorists were present – like the Defendants' "partners" Asiacell and Korek – routinely were for purposes of routing protection payments to such terrorists as the cost of doing business using mechanisms like those used by Defendants in Iraq. Such reports included, but were not limited to:

**a.** *Knight Ridder*, November 2005: "Ahmed, a [] resident with long-standing ties to local insurgent groups, … said businesses … had been paying local insurgents protection money, as much as $70,000 a month. Al-Qaida in Iraq demanded the money. 'Al-Qaida said they needed the money to operate….' he said."[259]

**b.** *New York Times*, December 2013: "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Using extortion … the Qaeda affiliate is largely self-financing. … In Mosul, most of the security force members who are not from the area have left the city, and Al Qaeda controls whole sections of territory."[260]

**c.** *Australian Broadcasting Corporation*, January 2014: "In … Mosul ISIS nets upwards of $8 million a month by extorting taxes from local businesses, according to the US-based Council on Foreign Relations (CFR)."[261]

**d.** *NPR*, April 2014: "In Mosul, the extortionists prey on thousands with regular demands and threats. The story of one small business owner shows how it works. Tawfik ran a computer shop in Mosul until last year. … He says he left Mosul after an anonymous caller demanded about $114,000 for jihad, or holy war … Several other people interviewed said the problem of extortion is entrenched and ongoing."[262]

**e.** *Daily Mail*, June 2014: "According to the Council on Foreign Relations, ISIS was already extorting taxes from Mosul businesses before its takeover…"[263]

---

[259] Mohammed Al Dulaimy (Knight Ridder Foreign Service), *Al-Qaida in Iraq, Local Insurgents at Odds*, *republished in* St. Paul Pioneer Press (Nov. 13, 2005), 2005 WLNR 18333033.
[260] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).
[261] Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014), 2014 WLNR 425449.
[262] Alice Fordham, *For Extremists In Syria, Extortion Brings Piles Of Cash From Iraq*, NPR (Apr. 21, 2014), https://tinyurl.com/5ejx25y7.
[263] Michael Seamark, *Jihadi Terror Group PLC*, Daily Mail (June 19, 2014), 2014 WLNR 16625914.

733. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their Iraqi partners were foreseeably making protection payments to terrorists on Defendants' behalf.

#### b. Defendants Knew Their Illicit Transactions In Iraq With Local Consultants Caused Protection Payments To Flow To Terrorists

734. Defendants knew their illicit transactions with their Middle Eastern consultants, like al-Awsat, facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

735. **Media reports** alerted Defendants that their illicit transactions with their Iraqi, Jordanian, and Lebanese consultants, including Kurdish intermediaries affiliated with the then-head of Kurdistan's regional government, Mahsoud Barzani – like those who served as Defendants' agents in Iraq – foreseeably aided terrorists because such consultants notoriously had longstanding protection arrangements with Sunni terrorists, including al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Therefore, Defendants' illicit transactions involving such consultants raised multiple red flags for possible protection payments. On top of the reports above, such media reports also included:

**a.** *UPI*, July 2014: "Prime Minister Nouri al-Maliki …, in a nationally televised broadcast …, blamed Kurds for allegedly protecting insurgents in their capital city of Erbil and for allowing the militant group Islamic State to use Erbil as a base of operations."[264]

**b.** *Newsweek*, November 2014: "Interviews with Iraqi, Kurdish, European, Syrian and American government officials, analysts and intelligence agents sketch a portrait of ISIS's robust, sprawling, and efficient financial operation. … At its heart, the ISIS money machine runs on the fear—and greed—of the millions of people it controls. It also manifests itself in a wide range of financial activities, many of them outsourced via middlemen and driven by hordes of self-interested parties. … ISIS is probably getting

[264] Ed Adamczyk, *Kurds Pull Out of Iraqi Government, Except for Parliament Members*, UPI NewsTrack (July 11, 2014).

help from its oil-rich neighbors … [D]espite their hostility to ISIS, the Kurds in Iraq, Turkey and Syria have all done deals with ISIS, often through middlemen. … The regional Kurdish government in Iraq recently arrested some of its own citizens along with a number of Kurdish politicians and security officials for acting as intermediaries … on behalf of ISIS. … [and] ISIS members [] infiltrated Erbil, Iraqi Kurdistan's capital.…"[265]

**c.** *Foreign Affairs*, December 2014. "ISIS' enemies are getting richer from [Islamic State-related] trade, too: Kurdish part-time smugglers who facilitate ISIS' oil sales can earn up to $300,000 each month. A Kurdish newspaper recently published a list of people involved with ISIS … The list includes individuals with the last names of several Kurdish ruling families ... Kurdish facilitators also provide goods to ISIS, including trucks, gas cylinders (for cooking and heating), gasoline, and other necessary commodities."[266]

**d.** *Carnegie Council*, March 2015: "It seemed … ISIS would be content to own Mosul. There was an understanding [] between [] ISIS … and Masoud Barzani, [] president of the Kurdistan regional government, that [ISIS] would not attack the Kurds."[267]

**e.** *New York Times*, November 2015: "'[T]he United States and its allies have concentrated their efforts on trying 'to stop [ISIS] from getting access to the financial system' … That has also proved to be difficult. The Islamic State trades with individuals and businesses in the countries it is fighting, selling … to Kurds in Iraq …, among others."[268]

736. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their illicit transactions with, or through, their Iraq-related consultants were likely routing protection payments to terrorists on Defendants' behalf.

---

[265] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.
[266] Louise Shelley, *How ISIS Makes Bank*, Nat'l Herald Trib. (Pakistan) (Dec. 3, 2014), 2014 WLNR 34092636 (republication of article published by *Foreign Affairs* (subscription)).
[267] David L. Phillips (*Author of The Kurdish Spring: A New Map of the Middle East*), *quoted in* Carnegie Council Transcripts and Articles (Blog), *The Kurdish Spring: A New Map Of The Middle East* (Mar. 20, 2015), 2015 WLNR 8346795.
[268] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, N.Y. Times (Nov. 29, 2015).

### c. Defendants Knew Their Illicit Transactions with Security, Transportation, and Logistics Contractors in Iraq, Syria, Jordan, Turkey, Qatar, the U.A.E., And Lebanon Caused Protection Money to Flow to Terrorists

737. Defendants knew their illicit transactions with their Iraq, Syria, Jordan, Turkey, Qatar, U.A.E., and Lebanon-based security, transportation, and logistics contractors, like SLS and Cargo Iraq, facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true. Through such persons and media coverage, Defendants knew that, like the *Associated Press* reported in 2006, "[t]he route to Jordan and Syria goes through Anbar province, a stronghold of Sunni insurgents."[269]

738. **Media reports** and **terrorism scholars** alerted Defendants that illicit transactions involving security contractors that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were present – like the ones Defendants used – routinely routed protection payments to such terrorists as the cost of doing business using mechanisms like those used by Defendants in Iraq. Such reports included, but were not limited to:

**a.** *Akron Beacon Journal*, September 2007: "American companies" "suppl[ied] their own security" "[and by] paying off Iraqi insurgents with protection money" "[resulting in] American money sustaining the insurgents."[270]

**b.** *Los Angeles Times*, September 2010: "The report, released [] by the inspector general of the U.S. Agency for International Development, says subcontractors hired to protect a development project near Jalalabad may have paid more than $5 million to the militants through local authorities. . . . The report says local authorities often demand a 20% 'protection tax' in such circumstances. Under those deals – along the lines of extortionist protection rackets in the U.S. – the Taliban … promises that they won't attack … their equipment and won't try to halt the contract work…."[271]

---

[269] Sameer N. Yacoub, *Sectarian Divisions Change Baghdad's Image As A City Of Religious Coexistence,* AP Worldstream (July 3, 2006).
[270] Akron Beacon J., *Editorial: 'Insurgent Tax'* (Sept. 3, 2007), 2007 WLNR 17238345.
[271] Paul Richter, *Audit: U.S. Government Funds May Have Gone To Taliban*, L.A. Times (Sept. 30, 2010).

**c.** Christian Science Monitor, October 2010: "The Senate investigation also turned up mounting evidence to suggest that largely unmonitored Pentagon contracts with private security companies … may also be lining the pockets of Taliban insurgents who agree not to attack convoys in exchange for cash. 'If you want to know the driving force of corruption in Afghanistan, it's not Afghan culture,' warns Anthony Cordesman, a security specialist at the Center for Strategic and International Studies in Washington. 'It's American contracting.'"[272]

739. Media reports and terrorism scholars also alerted Defendants that their illicit transactions with their transportation and logistics service providers – like the ones Defendants used – operating in areas where al-Qaeda or Islamic State-affiliated terrorists were present likely operated to route protection money to terrorists as the cost of doing business using mechanisms like those used by Defendants in Iraq. Such reports included, but were not limited to:

**a.** *Inter Press Service*, September 2008: "Often … logistics companies have to pay protection money … In one route, between the capitals of Kandahar and Urozgan provinces [in Afghanistan], contractors pay millions in protection money …"[273]

**b.** Dr. Phil Williams, July 2009: "Truckers" "pa[id] $500 for protection money [per truck]."[274] "Truckers were willing to cooperate with 'smuggling gangs, pay bribes or use forged papers … [and] the whole process was lubricated by pervasive corruption …"[275] "The going rate for allowing [] trucks to pass was typically $500. The huge volume of truck traffic made the practice highly lucrative. With rail and air service inoperable in most of the country, many areas, especially Baghdad, relied on truck convoys for basic goods and reconstruction materials. The dilemma for transportation services was multiple tolls in different locations exacted by different actors—although for those involved … there was often enough money to cover all these tolls."[276]

**c.** *Washington Post*, March 2010: "The essential question, said an American executive …, is 'whether you'd rather pay $1,000' for Afghans to safely deliver a truck, even if part of the money goes to the insurgents, or pay 10 times that much for security provided by the U.S. military or contractors."[277]

---

[272] Anna Mulrine, *Rogue Security Companies Threaten US Gains In Afghanistan War*, Christian Sci. Monitor (Oct. 21, 2010).
[273] Anand Gopal, *Afghanistan: Subsidised Fuel Trail Winds Back To Pakistan*, Inter Press Service (Sept. 30, 2008).
[274] Williams, *Criminals, Militias, and Insurgent*s, at 84-85.
[275] *Id*. at 85.
[276] *Id*. at 158-59.
[277] Karen DeYoung, *Afghan Corruption: How To Follow The Money?*, Wash. Post (Mar. 29, 2010).

**d.** *Al Jazeera America*, December 2013: "[S]ince the U.S. military withdrawal in 2011 … violent attacks have sharply increased. … The number of dead so far this year now rivals 2006 and 2007 figures, when sectarian fighting was at its most feverish … The majority of the recent attacks have been carried out …, primarily, by a branch of Al-Qaeda that has folded in Al-Qaeda in Iraq with its affiliates in Syria to become known as Al-Qaeda in Iraq and Syria (AQIS). The group continues to absorb fighters filing across the 400-mile border the two countries share. … 'Going back to 2006 is the major fear,' [said] Michael Knights, a research fellow at the Washington Institute for Near East Policy … Also solidifying its financial base are Al-Qaeda and its affiliates, who sought to bolster their local support in cities … where Iraqi security forces have failed to gain a foothold. 'Since 2010 AQIS has been self-funding through organized crime rackets involving … protection payments from large Iraqi companies, plus trucking …' Knights said."[278]

**e.** *Newsweek*, November 2014: "ISIS applies a 'tax' to all goods imported to or exported from the city. ISIS even 'taxes' groups providing genuine humanitarian aid in its own war zone. 'ISIS taxes people transporting nearly anything,' says one Lebanese intelligence officer. …"[279]

**f.** *Washington Post*, December 2014: "Islamic State … provid[ed] … a salary of up to $1,100 per month … for each fighter's family. The largesse is funded with … the extortion of truckers and others who cross Islamic State territory."[280]

**g.** Louise Shelley, September 2015: "Terrorists … exploit supply chains. … [T]errorists in border areas tax the cross-border flow of goods. … Terrorists share a major concern of legitimate businesses supply chains—as they need to ensure the safe and timely delivery of goods without disruption. … Terrorists make substantial money by controlling supply chains … as well as by taxing … others that pass through borders or territory that they control. The ability to tax the transit of commodities is one key to their financing. Organized crime groups' extortion of trade has been known for a significant period, which is why they are so deeply involved in ports and the trucking industry. Yet terrorist groups on many different continents also profit from exploiting supply chains and taxing trade. … Terrorists often generate revenues by taxing the supply chains that move legitimate … products across territory they control. Through corruption … terrorist groups … bolster their own in key border areas, ports, and other transport hubs. Therefore, they have learned from organized crime the importance of controlling territory

---

[278] Jamie Tarabay, *Iraq In 2014: Back To Civil War?*, Al Jazeera America (Dec. 21, 2013), https://tinyurl.com/5k57c4vx.
[279] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.
[280] Kevin Sullivan and Karla Adam, *Hoping To Create A New Society, The Islamic State Recruits Entire Families*, WashingtonPost.com (Dec. 25, 2014), 2014 WLNR 36516895.

and have capitalized on the corporate world's need to move commodities long distances in the increasingly globalized economy."[281]

740. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their illicit transactions with, and through, their security, transportation, and logistics service providers were likely making protection payments to terrorists on Defendants' behalf.

**2. Defendants Knew Their Uncontrolled Iraqi Slush Funds Caused Cash-Based Protection Payments To Flow To Terrorists, And Intended For Their Officers, Employees, Agents, Partners, Consultants, And Contractors To Use Slush Funds To Covertly Route Protection Money To Terrorists**

741. Defendants knew that their strategy to generate hard-to-trace, off-the-books cash sources through uncontrolled slush funds for their illicit Iraq-related transactions caused USD-based protection payments to terrorists.

**a. Defendants Knew, And Intended, That Their Uncontrolled Iraqi Slush Funds Would Facilitate Covert Protection Payments To Terrorists**

742. Defendants knew their use of uncontrolled Iraqi slush funds would help them conceal their regular protection payments to terrorists. Defendants knew their Iraqi slush funds facilitated cash-based protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

743. **United States government reports** alerted Defendants that their uncontrolled slush funds foreseeably enabled money laundering that was vital to terrorist finance because

[281] Louise Shelley, *quoted in* SEC Wire, *George Mason University Founder and Director, Terrorism, Transnational Crime and Corruption Center Louise Shelley, Prepared Testimony Before the House Financial Service Committee Hearing on Could America Do More? An Examination of U.S. Efforts to Stop the Financing of Terror* (Sept. 9, 2015).

slush funds provided the untraceable cash that intermediaries acting for terrorists required to make illicit protection payments. In November 2006, for example, a senior DOJ official publicly observed that "[s]hell corporations and nominees are widely used mechanisms to launder the proceeds from crime, particularly bribery (e.g. to build up slush funds). The ability for competent authorities to obtain and share information regarding the identification of companies and their beneficial owner(s) is therefore essential … for preventing … money laundering."[282]

744. **Media reports** alerted Defendants that terrorists operating in high-risk environments routinely depended upon uncontrolled slush funds maintained by their funders. Such reports included, but were not limited to:

**a.** *United Press International*, April 2002: "Slush funds are not a sovereign prerogative. Multinationals, banks, corporations, religious organizations, political parties, and even non-governmental organizations salt away some of their revenues and profits in undisclosed accounts, usually in offshore havens. … [P]added invoices, sham contracts, fictitious loans, interest accruing on holding accounts, back to back transactions with related entities [were] all [types of transactions] used to funnel money to the slush funds. Such funds are often set up to cover for illicit and illegal self-enrichment, embezzlement, or tax evasion. … BBVA's payments to [terrorist group] ETA may have been a typical payment of protection fees. Both terrorists and organized crime put slush funds to bad use. They get paid from such funds, and maintain their own."[283]

**b.** *Hindustan Times*, February 2003: "Delhi Police will interrogate … Abdul Gani Bhat for his alleged role in funding terrorist organisations with slush funds … from Pakistan."[284]

**c.** *National Post*, February 2004: "Israel's raids may … chok[ed] off the slush funds used to underwrite terrorism, [and] … help stanch the flow of … blood."[285]

---

[282] Stuart G. Nash (U.S. Associate Deputy Attorney General), *Lack of Ownership Information for Suspect Incorporations Companies – Part 2, Testimony Before the Senate Homeland Security and Governmental Affairs Permanent Investigations Committee*, Congressional Testimony via FDCH (Nov. 15, 2006) (cleaned up), 2006 WLNR 19827292.
[283] Sam Vaknin (UPI Senior Business Correspondent), *Analysis: Slush Funds - Part 2*, UPI North American News (Apr. 23, 2002).
[284] Sudhi Ranjan Sen and Vibha Sharma, *Bhat to be Questioned on Terror Funding*, Hindustan Times (Feb. 11, 2003), 2003 WLNR 111300.
[285] Nat'l Post (Canada), Editorial, *Follow the Shekel*s (Feb. 26, 2004), 2004 WLNR 10998196.

**d.** Courier Mail, November 2005: "[Future Australian Prime Minister] Kevin Rudd [said]: '[S]lush fund[s] … available to the Iraqi insurgency [] pose[] a … threat to [] troops.'"[286]

**e.** Australian, July 2006: "Crown prosecutor Mark Dean detailed lurid accounts of jihadi training camps, terror slush funds, secret meetings and bomb-making recipes …"[287]

**f.** Daily Telegraph, August 2006: "[A] Saudi anti-corruption drive … recogni[zed] that the slush funds associated with other Saudi arms contracts have helped finance terrorism."[288]

**g.** Indo-Asian News Service, June 2009: "With slush funds being increasingly used for financing terrorism, Indian financial institutions are planning to increase investment in their anti-money laundering systems, a survey by … KPMG has found."[289]

**h.** Assam Tribune, March 2011: "Much of the slush-money stashed away in foreign banks is linked to illegal transactions in narcotics and hawala money-laundering, not to mention obvious terror links … [reflected by] the proliferation of slush-funds abroad …."[290]

**i.** Telegraph, December 2012: "[M]ilitant groups … are getting involved in [] lucrative … trade and the slush funds earned is a major source of 'sustaining insurgency'."[291]

**j.** AllAfrica.com English, October 2015: "[Nigerian] President Muhammadu Buhari's charge to the international community … to strengthen mechanisms for dismantling havens for proceeds of corruption … appropriately advertises the receiving countries of illicit fund flows as equally promoters of corruption. … [M]any of the receiver-countries, mostly in the western world, are coming to terms with the fact that uncontrolled movement of slush funds is at the heart of heightening global … terrorism …"[292]

745. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their Iraqi slush funds foreseeably caused protection payments to flow to terrorists on Defendants' behalf.

---

[286] Steven Wardill, *Full Probe Demanded Into Wheat Contracts*, Courier Mail (Australia) (Nov. 2, 2005), 2005 WLNR 17628572.
[287] Cameron Stewart, *Laughs Turn Cold as Prosecution Puts Case*, Australian (July 25, 2006), 2006 WLNR 12749446.
[288] Roland Gribben, *Defence BAE Lands Arms Deal For A New Generation*, Daily Telegraph (Aug. 19, 2006), 2006 WLNR 14368620.
[289] Indo-Asian News Service, *Financial Sector to Strengthen Anti-Money Laundering Systems* (June 18, 2009).
[290] Assam Tribune, Editorial, *Shameful Negligence* (Mar. 14, 2011), 2011 WLNR 5028725.
[291] Wasim Rahman, *Plea to Check Illegal Mining*, Telegraph (India) (Dec. 5, 2012), 2012 WLNR 25931403.
[292] AllAfrica.com English, *On Havens for Slush Funds* (Oct. 15, 2015).

### b. Defendants Knew, And Intended, That Their Cash-Related Practices In Illicit Iraqi Transactions Would Facilitate Covert Protection Payments To Terrorists

746. Defendants knew that terrorists craved access to cash – particularly U.S. dollars, the currency of choice for terrorists worldwide. Indeed, the riskier the operation, the more important for it to be paid fully in cash.

747. **United States government reports** alerted Defendants that bulk U.S. dollar cash payments and associated cash smuggling was a key strategy to route payments to terrorists. The following are just a few examples of such reports:

**a.** Treasury Department, 2005: "[O]nce funds are raised for insurgent groups, they must be transported … and disbursed within Iraq. … [T]he physical transportation of cash into Iraq [and] … [r]eliance on currency for transactions … carries significant risks with respect to insurgency financing."[293]

**b.** The White House, 2006: "Funds … provide the fungible, easily transportable means to secure all other forms of material support necessary to the survival and operation of terrorist organizations. Our enemies raise funds through a variety of means, including soliciting contributions from supporters; operating businesses, NGOs, and charitable fronts; and engaging in criminal activity such as … extortion … They transfer funds through several mechanisms, including … cash couriers … Effective disruption of funding sources and interdiction of transfer mechanisms can help our partners and us to starve terrorist networks of the material support they require."[294]

**c.** Treasury Department, 2015: "Combined with the widespread demand for U.S. currency globally, multiple terrorist groups, including AQ and its affiliates, ISIL, Al-Shabaab, Hizballah, and FARC, will continue to use cash smuggling as a less efficient alternative for moving funds globally."[295] "The use of cash is attractive to criminals mainly because of its anonymity, portability, liquidity and lack of audit trail. According to the surveyed cases, since 2007, 18 [terrorist finance]-related prosecutions in the United States have in some way involved the use of cash to transfer funds to terrorist organizations. These

---

[293] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005), https://home.treasury.gov/news/press-releases/js2658. The U.S. government addressed this program on or about 2005 through its facilitation of electronic banking throughout Iraq, which obviated Defendants' need to rely upon cash. *Id.*
[294] The White House, *National Strategy for Combating Terrorism*, at 12 (Feb. 2006).
[295] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 56 (Aug. 24, 2015).

cases have involved various FTOs, including core AQ, AQ in Iraq (the predecessor organization to ISIL), AQAP, Al-Shabaab, Hizballah, and FARC."[296]

**d.** Treasury Department, 2015: "People use cash for a variety of reasons, including because it has no fee per transaction, it is readily available and accepted worldwide for consumers, is confidential, cannot be hacked, and does not run out of battery power. Unlike electronic transfers of funds, cash does not leave a digital trace. … The same characteristics that make cash dependable and portable to everyday consumers are also attractive to criminals. … Recognizing that using cash for unexplained large consumer or commercial purchases can be an indicator of illicit activity, and the initial U.S. AML/CFT statute imposed a cash reporting requirement to mitigate against this risk."[297]

**e.** LIGOIR, May 2020: "Treasury and the [U.N.] both reported that ISIS primarily uses cash … funds within and out of Syria and Iraq and through neighboring countries."[298]

748. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their use of cash in Iraq foreseeably caused protection payments to flow to terrorists on Defendants' behalf.

### 3. Defendants Knew Their Deliberately Deficient Internal Controls Were An Intentional Tactic To Help Conceal Their Protection Payments To Terrorists

749. Defendants also knew their intentionally deficient internal controls were a feature, not a bug, and were purpose-built to facilitate and conceal Ericsson's corrupt payments, including its protection payments to terrorists.

750. Defendants knew their intentionally deficient internal controls facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business there, and lived there for decades – knew such fact to be true.

---

[296] *Id*. at 54-55.
[297] U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing, Report to Congress*, at 23 (2020).
[298] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020*, at 20 (May 13, 2020).

751. Defendants also knew their practice of facilitating payments without clear beneficiaries facilitated protection payments to terrorists because Defendants' employees and agents in Iraq knew such fact to be true.

752. **United States government reports** alerted Defendants that their practice of facilitating illicit payments without clear beneficiaries was a tactic used to conceal terrorist finance. Such reports and statements included, but were not limited to:

**a.** Treasury Department, September 2006: "[D]onors are encouraged to … consider[] protective measures to prevent … abuse by terrorists. … [E]ffective internal controls … can prevent … terrorist financing …".[299] "When supplying [] resources …, fiscal responsibility on the part of a [payor] should include: ... determining that the potential grantee of … contributions has the ability to … protect the resources from … exploitation by terrorist organizations and/or their support networks …"[300]

**b.** DOJ and SEC, November 2012: "Effective policies and procedures require an in-depth understanding of the company's business model, including its products and services, third-party agents, customers, government interactions, and industry and geographic risks. Among the risks that a company may need to address include the … use of third parties; gifts, travel, and entertainment expenses; … donations; and facilitating and expediting payments. … [Routine corporate internal controls] systems can be a good way to …, if properly implemented, prevent[] and detect[] potential FCPA violations."[301]

**c.** LIGOIR, May 2018: "An ongoing USAID OIG investigation found that employees of a U.S.-based nongovernmental organization knowingly diverted USAID-funded food kits to a militant organization operating in northern Syria … employees of the non-governmental organization … submitted falsified beneficiary lists to USAID to conceal the [terrorists]' participation in the … program."[302]

**d.** Senate Finance Committee, December 2020: "A [] robust and fundamentally sound system of screening and vetting is needed to [ensure] that contributions made to [an entity in a high risk terrorist environment] are not funding illicit organizations."[303]

---

[299] U.S. Dep't of the Treasury, *U.S Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S.-Based Charities*, at 2-3 (Sept. 2006).
[300] *Id*. at 8.
[301] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 48.
[302] Lead Inspector Gen. for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2018–March 31, 2018*, at 69 (May 5, 2018).
[303] U.S. Senate Finance Committee Oversight & Investigations Unit, *World Vision Financial Transactions, Memorandum to Senator Charles E. Grassley*, 10-11 (Dec. 22, 2020), https://tinyurl.com/5ax34th7.

753. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their intentionally deficient internal controls were a tactic to conceal their protection payments.

### D. Defendants Knew Their Obstruction Of United States Counterterrorism Operations Provided Operational Assistance To Al-Qaeda And The Taliban

754. From 2013 through 2022, LM Ericsson's and Ericsson AB's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) and cross-functional compliance and legal personnel in the United States knew that Defendants' lies to counterterrorism-facing components of the United States government, including DOJ and the FBI, foreseeably obstructed U.S. government counterterrorism operations targeting the same protection networks about which Defendants lied to the United States.

#### 1. Defendants Knew Their Conduct Obstructed U.S. Government Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

755. Defendants knew their false communications to the United States government, including DOJ and FBI, obstructed U.S. counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

756. From 2004 through 2022, it was common knowledge among businesses operating in Iraq, including Defendants, that the United States pursued a whole-of-government approach to post-9/11 counterterrorism in the Middle East, that DOJ and FBI keyed such efforts by sharing actionable evidence and intelligence with on-the-ground U.S. counterterrorism personnel in Iraq, Syria, and Afghanistan, and that companies that lie to DOJ about their payments to al-Qaeda, al-

Qaeda-in-Iraq, and Islamic State impede U.S. counterterrorism operations by depriving U.S. counterterrorism personnel in the Middle East – both DOJ and FBI, as well as others using information shared by DOJ and FBI – of vital information concerning al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection networks, including, but not limited to:

**a.** identities of the associated terrorist operatives, intermediaries, and financiers associated with the protection network;

**b.** demands made by the terrorists operating the protection network;

**c.** location of the terrorists operating the protection network;

**d.** modality of value transfer, including the currency, used by the protection network;

**e.** means of communication, including phone numbers, emails, and in-person cutouts, used by the protection network;

**f.** bank account details associated with the terrorist or their intermediary cutout for the protection network; and

**g.** pattern-of-life information about the above-described persons associated with protection networks, upon which U.S. counterterrorism operators depended for successful raids of suspected terrorists.

757. Western companies on the ground in Iraq were widely aware of the reality that the more information the United States government had concerning terrorism threats, the more effectively the U.S. could protect its citizens from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan. Defendants were sophisticated companies with billions of dollars in revenues at stake in Iraq, which was the paradigmatic example of this point. They knew this prevailing understanding that lies to DOJ and FBI concerning their involvement with al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks in Iraq were foreseeably obstructing U.S. government counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

758. Defendants' obstruction of U.S. counterterrorism operations was also the fruit of Defendants' lies to DOJ and FBI in circumstances that left no doubt about whom they were aiding. LM Ericsson, Ericsson AB, Ericsson Inc., and Ekholm (or their agents) met with U.S. counterterrorism-facing U.S. law enforcement, including, but not limited to, the DOJ FCPA Unit and the FBI, who openly acted on behalf of the United States and as part of an integrated response to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through DOJ's and FBI's participation in Iraq-facing counterterrorism efforts, fusion cells, threat finance cells, and similar cross-departmental counterterrorism operations.

759. Defendants knew, and intended, that their lies to DOJ and FBI concerning their involvement in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks would obstruct U.S. counterterrorism investigations into the very terrorist networks with which Defendants were profitably collaborating and Defendants intended to accomplish such obstruction in order to allow Defendants' participation in the terrorists' protection money racket – and associated outsized profits for Defendants – to continue.

760. Defendants also consciously avoided investigating Ericsson's conduct in the geographies that posed the greatest risk specifically for terrorist finance in order to conceal the truth about Ericsson's knowing participation in al-Qaeda, al Qaeda-in-Iraq, and Islamic State protection rackets. Instead, Ericsson later boasted that it persuaded the United States against investigating Ericsson's conduct in such geographies. This sequence of events confirms that Ericsson ***intended*** to conceal its conduct in the geographies that Ericsson's outside counsel later boasted at having successfully shielded from government scrutiny.

761. Defendants knew that Ericsson was one of the largest multinational corporations operating in all of Iraq, Iran, Syria, Afghanistan, Pakistan, Turkey, and Lebanon, and Defendants

also knew that Ericsson was the only major multinational corporations (other than Lafarge S.A.) to continue to maintain an on-the-ground-presence inside of Islamic State's caliphate from 2014 through 2017. Armed with such knowledge, Defendants knew that their information concerning al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq offered significant value to U.S. counterterrorism operations against those terrorists in the Middle East. Defendants therefore knew that their decision to lie to DOJ would degrade the quality of the information DOJ shares with its associated U.S. government fusion cell partners, and increase the effectiveness, resiliency, and profitability of the FTOs' protection networks and associated financial, logistics, and personnel aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State acts of terrorism against Americans in the Middle East. 1

762. Although Defendants' obstruction-based assistance to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State agents provided especially valuable aid for such FTOs' terrorist attacks, the causal nexus was not limited to conduct that violated investigative disclosure-related statutes, *e.g.*, 18 U.S.C. § 1001 (false statements). Whether or not Defendants technically violated U.S.C. § 1001 or a similar obstruction-related criminal prohibition, their lies to DOJ and FBI with the specific intent of concealing information about al-Qaeda, al-Qaeda-in-Iraq, and Islamic State's protection networks, and Defendants' participation therein, supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with vital communications, operations, logistics, and intelligence assistance, sourced from U.S. communications received by U.S. law enforcement in Washington, D.C., all of which al-Qaeda, al-Qaeda-in-Iraq, and Islamic State used to fund attacks against Americans in Iraq, Afghanistan, Syria, Turkey, Europe, and Africa.

### 2. Defendants Knew Their Obstruction Of U.S. Government Counterterrorism Operations Targeting Al-Qaeda, Al-Qaeda-in-Iraq, And Islamic State Aided Attacks Against Americans

763. Defendants knew their provision of operational aid, cover, and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State regarding such FTOs' protection rackets aided al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks against Americans because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

764. **United States government reports and statements** alerted Defendants that their cover and concealment of al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks undermined U.S. government counterterrorism efforts in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan. For example, DOJ and SEC repeatedly communicated to Ericsson that their cover and concealment of illicit payments could harm U.S. national security by facilitating terrorism when DOJ and SEC published the FCPA Resource Guide in 2012, which documented DOJ's and SEC's views that companies that concealed corrupt payments foreseeably aided terrorists.

765. From 2003 through 2022, the U.S. government published other reports and statements that similarly alerted Defendants that their provision of cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs' ability to attack Americans in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan.[304]

---

[304] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* Dep't of the Treasury, Testimony of Juan Carlos Zarate, Assistant Secretary, *Terrorist Financing and Financial Crimes, U.S. Dep't of the Treasury, Before the Senate Permanent Subcomm. On Investigations of the Comm. on Governmental Affairs* (Nov. 15, 2004), https://tinyurl.com/bdd6ykzw; Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit--* (Feb. 1, 2005), https://tinyurl.com/4b78zs5e; Ambassador Henry A. Crumpton, Coordinator for Counterterrorism, U.S. Dep't of State, *The Role of Public and Private Partnerships in the Global War on Terrorism; Remarks to the 5th Annual*

766. U.S. government reports also specifically emphasized the importance of obtaining accurate information from the private sector to the U.S. government's ability to mitigate the terrorist finance and logistics risks that specifically arise when foreign telecom companies do business in ultra-high-risk geographies, like Iraq. For example, according to a White House statement of U.S. counterterrorism strategy in 2018:

> Terrorists cannot sustain their operations without [information technology]. The United States and our partners … in the private sector must, therefore, prevent terrorists from using [information technologies sourced from the United States] while safeguarding these resources for legitimate use. To accomplish this, we will increase information-sharing with the private sector …[305]

767. **International organizations** and **terrorism scholars** also alerted Defendants to these risks. For example, according to the 2016 Global Terrorism Index (published in 2016):

> Since the publication of the 2015 Global Terrorism Index (GTI), the … emphasis on engaging the private sector in [Preventing Violent Extremism] is a welcome one, and there are obvious reasons to do so. … DO NO HARM … [M]ost

---

*International Counterterrorism Conference: Public and Private Partnerships; Washington, D.C.* (Apr. 20, 2006), https://2001-2009.state.gov/s/ct/rls/rm/2006/64977.htm; Under Secretary for Terrorism and Financial Intelligence Stuart Levey, U.S. Dep't of the Treasury, Press Release, *Under Secretary for Terrorism and Financial Intelligence Stuart Levey Testimony* (Apr. 1, 2008), https://home.treasury.gov/news/press-releases/hp898; LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), *quoted in* U.S. House of Representatives, *Tracking And Disrupting Terrorist Financial Networks: A Potential Model For Interagency Success?*, Hearing, House Committee on Armed Services, Terrorism, Unconventional Threats and Capabilities Subcommittee (Mar. 11, 2009); Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Dep't of the Treasury), quoted in U.S. Dep't of the Treasury, Written Testimony Of Treasury Assistant Secretary Daniel L. Glaser Before The House Financial Services Subcommittee On Oversight And Investigations (Sept. 6, 2011), https://home.treasury.gov/news/press-releases/tg1287; FBI Director James B. Comey, *quoted in* FBI, *Homeland Threats And The FBI's Response; Statement For The Record Before The Senate Committee On Homeland Security And Governmental Affairs* (Nov. 14, 2013), https://tinyurl.com/2s4z78t8; Ambassador Samantha Power (U.S. Permanent Representative to the U.N.), *Samantha Power: Putting ISIS Out Of Business*, CNN Wire (Dec. 17, 2015), https://tinyurl.com/46tswhph; Marshall Billingslea, *Opening Statement Of The Nominee For Assistant Secretary Of The Treasury For Terrorist Financing*, U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 16, 2017), https://tinyurl.com/4brujnkv.

[305] The White House, *National Strategy for Counterterrorism of the United States of America*, at 15 (Oct. 2018).

important[ly], the private sector must make every effort to Do No Harm. Companies, as well as those institutions and structures engaging them (civil society and governments) must be held accountable and must engage responsibly. This means not only engaging with reputable businesses and business sectors to abstain from corrupt practices, but also focusing on the outcomes of that engagement. … Vetting: … we had better be sure of who we are working with. Equally as important as knowing who our partners are, is knowing who their partners are. … There is a real concern that if the wrong company or an unethical company is engaged, the risk is to do more harm to a community than good.[306]

768. **Terrorism scholars** alerted Defendants that their concealment of their payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs by undermining United States counterterrorism policy, which relied upon complete, and truthful information from multinational corporations conducting business in areas at severe risk for terrorist finance, like Defendants. In 2014, for example, terrorism scholar Louise Shelley observed that:

The effort to counter ISIS should also involve Western businesses. The cigarette industry follows the ebb and flow of the illicit cigarette trade. Energy and pharmaceutical companies monitor the movement of their commodities in the region. Transport companies have insights into the dynamics of illicit trade, and insurance companies have insights into kidnapping. That is why public-private partnerships are key. Corporations can share the information they already collect on illicit trade routes, smuggling shipments, and key facilitators. They can also warn consumers not to purchase the counterfeit and smuggled commodities that fund terrorism. For now, the government response to ISIS has not taken the business community enough into account. But without such cooperation, Washington cannot hope to successfully counter the nimble ISIS.[307]

769. In 2016, similarly, terrorism scholar Celina Realuyo, Professor of Practice at National Defense University, publicly testified before Congress that:

In the post-9/11 world, we have witnessed how "following the money trail" has enhanced our efforts to counter the threats around the world. Since international financial flows are not controlled or managed by governments, public-private partnerships with the many facets of the financial services industry are essential in combating threats … terrorist financing … Governments no longer enjoy a

[306] Amy E. Cunningham and Khalid Koser, *Why Preventing Violent Extremism Is The Private Sector's Business*, 2016 Global Terrorism Index Report (2016), https://tinyurl.com/4e5c7ybe.

[307] Shelley, *How ISIS Makes Bank*.

> monopoly on national security or the use of force as they did in the past; therefore, they need to adopt a "whole of society" approach … ISIL relies heavily on extortion and the levying of "taxes" on local populations under its control … The contemporary threat posed by ISIL to global security has been empowered by a dangerous convergence of terrorism and crime that generates significant income for the group. The systematic practice of "taxation," … provide vital resources for the group's military, financial, recruitment, and propaganda campaigns. … Unilateral, individual country efforts are not enough to counter terrorist financing and money laundering. Our international financial system is far more interconnected and interdependent than ever before. International cooperation between the public and private sectors is therefore paramount.[308]

770. In 2019, terrorism scholar Stephen Tankel, Assistant Professor in the School of International Service at American University, published an analysis that also observed the central role of accurate private sector information to the effectiveness of American counterterrorism efforts against al-Qaeda- and Islamic State-affiliated terrorists worldwide:

> [T]here are almost four times as many Sunni Islamist militants operating in 2018 as there were on 9/11. … [T]he movement's ongoing strength stems in large part from the fragile nature of the states in which the majority of its adherents operate … across parts of South and Central Asia … where … [m]any of these governments are poorly run and corrupt … [W]hen it comes to terrorists' use of technology … the need for public- private partnerships and international collaboration is even greater. Governments, multinational organisations and alliances, and the private sector must come together … to combat[] jihadists locally and globally.[309]

771. **International organizations** also alerted Defendants that concealment and cover are essential to the effectiveness of terrorists' ability to maximize their cash flows from illicit sources. For example, Transparency International confirmed in a 2014 report that "transparency, accountability, and countercorruption …initiatives also depend heavily on the active involvement of other actors, such as government, business, and civil society, to ensure that

---

[308] Celina Realuyo, *Stopping Terrorist Financiers*, Written Statement Before the House Fin. Servs. Comm. Terrorism Financing Task Force, CQ Congressional Testimony (June 23, 2016).
[309] Stephen Tankel, *How Jihadists Went 'Glocal' And What To Do About It – Analysis*, Eurasia Review (Nov. 6, 2019), https://tinyurl.com/mwv7xa67.

checks and balances are in place and adhered to."[310] Similarly, a report published by the FATF in 2015 also alerted Defendants that Islamic State's ability to maximize ISIS cash flow from its protection rackets in Iraq and Syria – and attendant ability to fund attacks that killed Americans – substantially depended upon the cover and concealment afforded to the key nodes of ISIS's protection networks in Iraq and Syria.[311]

772. **Media reports** alerted Defendants that their cover and concealment of al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks undermined U.S. government counterterrorism efforts in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan. Such reports included, but were not limited to:

**a.** *Congressional Quarterly Today*, March 2009: "[S]elf-supporting terrorist groups have been increasingly drawn to crime, from petty credit card fraud to global drug cartels to finance training and activities. [U.S. Army Lieutenant General] David P. Fridovich, director of special operations for Special Operations Command, emphasized how Defense Departments efforts to cooperate with other government entities and the private sector have been integral to terrorism finance prevention strategy in Iraq and Afghanistan. 'To us, it means very simply that DoD, no matter how we may adjust and organize, by ourselves, will fail to eliminate these networks,' Fridovich said. 'We must

---

[310] Transparency International UK, Defense and Security Programme, *Corruption Threats & International Missions*, at 11-13 (2014), https://tinyurl.com/2m54yzxj.

[311] FATF Report, *Financing Of The Terrorist Organisation Islamic State In Iraq And The Levant (ISIL)* (Feb. 2015) ("ISIL earns revenue primarily from five sources, listed in order of magnitude: (1) illicit proceeds from occupation of territory, such as bank looting, extortion, control of oil fields and refineries, and robbery of economic assets and illicit taxation of goods and cash that transit territory where ISIL operates … ISIL manages a sophisticated extortion racket by robbing, looting, and demanding a portion of the economic resources in areas where it operates, which is similar to how some organized crime groups generate funds. This vast range of extortion, including everything from fuel and vehicle taxes to school fees for children, is done under the auspices of providing notional services or 'protection.' … The need for greater international co-operation between countries to combat the ISIL threat is without question. … For example, law enforcement agencies should continue to leverage their international working relationships [with public sector and private sector partners] to proactively identify and develop investigative leads involving illicit money flows related to terrorism and/or terrorist groups such as ISIL. … Discussions should include the sharing of best practices for detecting and investigating individuals who are illicitly financing ISIL."), https://tinyurl.com/3hnjz2wm.

work not only within our own interagency but with the coalition, other partner nations and the private sector.'"[312]

**b.** *Inside the Pentagon*, March 2009: "One of the key ways that SOCOM fulfills its 'synchronization' responsibilities is to host gatherings -- twice a year -- of roughly 100 counterthreat finance analysts, investigators and case agents from the combatant commands, as well as the Treasury, State, and Homeland Security departments, the FBI, the Drug Enforcement Agency and officials from Britain, Australia and Canada. Representatives from the private sector are also invited, [LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM)] said. 'This has become the premier forum for U.S. government threat finance [information] exchange,' according to [LTG Fridovich's] testimony. 'Exchange with the coalition, and the private sector has been especially informative as we learn better how to deal with the rapidly developing cutting edge financial technologies like Internet and cell phone money transfers.'"[313]

773. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that their fraudulent concealment of their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs by obstructing American counterterrorism efforts.

## E. Defendants Knew Al-Qaeda's Role

### 1. Defendants Knew Al-Qaeda Waged A Terrorist Campaign Against The United States

774. Defendants knew that al-Qaeda waged a global terrorist campaign against the United States in which al-Qaeda and its branches and allies in Iraq, Afghanistan, Syria, and elsewhere attacked Americans to drive the United States out of the Middle East.

[312] LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), *quoted in* Daniel Fowler, Caitlin Webber and Rob Margetta, *Several Hearings Highlight Persistent Threat of Worldwide Terrorism*, Congressional Quarterly Today (Mar. 11, 2009).
[313] Inside the Pentagon, *New DOD, Treasury Team To Disrupt Taliban*, Al Qaeda Funding (Mar. 19, 2009).

775. Defendants knew about al-Qaeda's global terrorist campaign against the United States, including its key focus on attacking Americans in Iraq, because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

776. **United States government reports** alerted Defendants to the globally interconnected nature of al-Qaeda's campaign against the United States. The U.S. government long recognized the inextricable connection between al-Qaeda "core" in Afghanistan and Pakistan and al-Qaeda-in-Iraq. For starters, U.S. military documents confirmed the vital nature of the relationship. For example, according to a declassified report prepared by CENTCOM in 2007, al-Qaeda-in-Iraq's "leadership" was already preparing "plans" "by late 2005" in which "AQI leadership" would "use" their Iraqi strongholds "as a base for [al-Qaeda's and al-Qaeda-in-Iraq's] long-term war against the United States and its allies." "Reflective of this global jihad worldview was the fact that propaganda distributed by [AQI] began to show fighters in Afghanistan as well as in Iraq in their videos and flyers."

777. United States counterterrorism policy also recognized, as cornerstones of the U.S. strategy against al-Qaeda and al-Qaeda-in-Iraq, that (i) "[a]l-Qaida's worldwide networks are augmented by ties to local Sunni extremists"; and (ii) "[w]hile the largest concentration of senior al-Qaida members now resides in Pakistan, the network incorporates members of al-Qaida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, and Europe who

continue working to carry out future attacks against U.S. interests."[314] Other U.S. government reports confirmed the inextricable ties between al-Qaeda's operations in Iraq and Afghanistan.[315]

778. **Media reports** alerted Defendants to the globally interconnected nature of al-Qaeda's campaign against the United States.[316]

---

[314] U.S. Dep't of State, *Country Reports on Terrorism 2005* at 218 (Apr. 2006); *see also* U.S. Dep't of State, *Country Reports on Terrorism 2006* at 270 (Apr. 2007); *U.S. Dep't of State, Country Reports on Terrorism 2007* at 299 (Apr. 2008); U.S. Dep't of State, *Country Reports on Terrorism 2008* at 318 (Apr. 2009); U.S. Dep't of State, *Country Reports on Terrorism 2009* at 275 (Aug. 2010).

[315] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2005* at 217 ("al-Qaida's top leaders continue to plot and direct terror attacks worldwide … Over the past four years, al-Qaida, its affiliates and those inspired by the group were also involved in many anti-U.S. or anti-Coalition attacks in Africa, Europe, the Middle East, Afghanistan, Pakistan, and Iraq, including suicide bombings and vehicle-borne improvised explosive devices."); The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 1-2, 4, 34 (Dec. 2006) ("Iraq is vital to regional and even global stability, and is critical to U.S. interests. … It is now a base of operations for international terrorism, including al Qaeda. … Al Qaeda is responsible for … some of the more spectacular acts: suicide attacks, large truck bombs, and attacks on significant religious or political targets. Al Qaeda in Iraq is now largely Iraqi-run and composed of Sunni Arabs. Foreign fighters—numbering an estimated 1,300—play a supporting role or carry out suicide operations. Al Qaeda's goals include … driving the United States out of Iraq. … As one Iraqi official told us, 'Al Qaeda is now a franchise in Iraq, like McDonald's.' Left unchecked, al Qaeda in Iraq could continue to incite violence … A chaotic Iraq could provide a still stronger base of operations for terrorists who seek to act regionally or even globally. Al Qaeda will portray any failure by the United States in Iraq as a significant victory that will be featured prominently as they recruit for their cause in the region and around the world. Ayman al-Zawahiri, deputy to Osama bin Laden, has declared Iraq a focus for al Qaeda: they will seek to expel the Americans and then spread 'the jihad wave to the secular countries neighboring Iraq.'"); David S. Cohen (Under Secretary for Terrorism and Financial Intelligence, Treasury Dep't), *quoted in* U.S. Dep't of the Treasury, *Remarks of Under Secretary for Terrorism and Financial Intelligence David Cohen before the Center for a New American Security on "Confronting New Threats in Terrorist Financing"*, (Mar. 4, 2014) ("al-Qa'ida 'core' [] spawned numerous affiliates that recruit[ed] their own jihadists, organize[d] their own operations, and raise[d] their own funds"), https://home.treasury.gov/news/press-releases/jl2308.

[316] *E.g.*, Newsweek, *Terror Goes Global*, *republished by* PR Newswire, *International And Asia Highlights And Exclusives - February 19, 2001 Issue* (Feb. 11, 2001) ("[Newsweek] COVER: 'Terror Goes Global' … Intelligence officials tell Newsweek that they believe … Al Qaeda [] is trying to forge ties with Hizbullah, Hamas and Palestinian Islamic Jihad. … Increasingly linked by the Internet, Islamic extremists are on the move and in contact with each other … Bin Laden's movement has gone as transnational as any global corporation."); Kathy Gill, *OBL Death Is*

779. **Terrorism scholars** also alerted Defendants to the globally interconnected nature of al-Qaeda's campaign against the United States, including, but not limited to:

**a.** Dr. Matthew Levitt, 2003: "Al-Qaeda successfully built an entrenched and sophisticated international logistical and financial support network of the kind that eventually facilitated the attacks of September 11."[317]

**b.** Professor Jimmy Gurulé 2008: "Since the September 11, 2001 terrorist attacks, al Qaeda emerged as the head of a global Islamist terror movement, comprised of dozens of deadly jihadist groups" and "[s]everal members of the al Qaeda terror movement [were] designated as FTOs."[318] "[Al-Qaeda] used its substantial financial resources to establish links, leverage support and maintain the loyalty of more than 20 militant jihadist groups globally" and "provided financial assistance to these terrorist surrogates to underwrite specific jihadi operations, purchase weapons, and train thousands of their members at al Qaeda-run camps in Afghanistan, Pakistan, … and elsewhere."[319]

**c.** Dr. Leah Farrall, 2011: "When the pressure on al Qaeda eased between 2003 and 2006, because the United States was focusing less on Afghanistan, the group was able to regenerate its capacity and intensify its planning for global operations. But the U.S. drone campaign against al Qaeda in Pakistan's tribal areas has again put pressure on it, and the group has [] tapped … its franchises, particularly AQI. In 2008, for example, it asked AQI to carry out attacks against Danish interests in retaliation for a Danish newspaper's publication of cartoons … When subsidiaries do carry out attacks outside their territories, al Qaeda requires that they be conducted within set parameters. For example, al Qaeda heavily encourages suicide attacks and repeated strikes on preapproved classes of targets, such as public transportation, government buildings, and vital infrastructure. Once a location has been authorized, the branch and the franchises are free to pursue plots

---

*Symbolic*, Moderate Voice (May 2, 2011) ("*Foreign Affairs* noted … Al Qaeda is stronger today than when it carried out the 9/11 attacks. Accounts that contend that it is on the decline treat the central al Qaeda organization separately from its subsidiaries and overlook its success in expanding its power and influence through them."), 2011 WLNR 8478998; Alan Clendenning, *Terror 'Franchises' A Huge Risk*, Associated Press, *republished by* Herald News (May 19, 2011) ("They … send bombs to the United States from Yemen and mount bloody attacks in Iraq and Pakistan. These homegrown terror groups worldwide are informally dubbed al-Qaida franchises. … Rohan Gunaratna, who heads the Center for Political Violence and Terrorism Research …, predicted that al-Qaida and the franchises are 'likely to pose an enduring threat in the foreseeable future.' Al-Qaida now has about 10 major franchises, although the Afghanistan-Pakistan group has splintered into smaller and more dangerous ones. Al-Qaida provides ideological inspiration and sometimes direct training and funding. The franchises have goals within their own regions but also international aspirations, which include U.S. … targets."), 2011 WLNR 9988400.

[317] Dr. Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on Post-Modern Terrorism (Sept. 8, 2003), https://tinyurl.com/5pdjpkza.

[318] Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 89 (Edward Elgar 2008) (hereinafter, "Gurulé, *Unfunding Terror*" or "Gurulé").

[319] *Id*. at 73.

against it. But al Qaeda still emphasizes the need to consult the central leadership before undertaking large-scale plots, plots directed against a new location or a new class of targets, and plots utilizing a tactic that has not been previously sanctioned …"[320]

**d.** Professor Daniel Byman, 2012: "From the start, … al-Qa'ida was unusual: it was both a group with its own agenda and operations, as well as a facilitator for other terrorist groups. So al-Qa'ida in the 1990s carried out attacks on U.S. targets in Kenya, Tanzania, and Yemen and, at the same time, acted as 'quartermaster for jihad,' … Thus, from its inception, al-Qa'ida was immensely concerned with its relationship with outside groups. While, traditionally, groups with a similar mindset who operate in the same theater as one another compete fiercely for money and recruits, for al-Qa'ida, the attitude was different. Al-Qa'ida did still compete with other Salafi-jihadist groups, but at the same time, it believed that its own mission entailed furthering their aims. In order to fulfill this mission, it trained fighters from these other groups and undertook propaganda efforts on behalf of their causes."[321] "Al-Qa'ida has always been both a group with its own agenda and a facilitator of other terrorist groups. This meant that it not only carried out attacks on U.S. targets in Kenya, Tanzania, and Yemen throughout the 1990s, but it helped other jihadist groups with funding, training, and additional logistical essentials. … After September 11, 2001, this process of deepening its relationship with outside groups took off, and today a number of regional groups bear the label 'al-Qa'ida' in their name, along with a more local designation. Some of the most prominent affiliates include al-Qa'ida of Iraq (AQI) …"[322] "While there are clear benefits for an affiliate in linking with al-Qa'ida, there are also rewards for the al-Qa'ida core: • Mission Fulfillment and Reach. Having a diverse array of affiliates helps al-Qa'ida extend its reach … • Relevance. Especially since 9/11, … [s]ome of the most notorious "al-Qa'ida" attacks attempted since 9/11 have in fact been carried out by affiliate groups. • Logistics. Beyond the ability to carry out attacks, affiliates offers al-Qa'ida access to their media resources, recruiters, and other core parts of their organizations. • Hardened Fighters. Since its inception, al-Qa'ida has sought members who are experienced and dedicated. Many of the affiliates who come to al-Qa'ida do so with just such a cadre."[323]

**e.** Juan Zarate, 2013: "Treasury's [counterterrorism] strategy … aimed at targeting networks of key financial actors and nodes in the terrorist support system. The point was … to make it harder for individuals who were financing terrorists … Our analyses therefore focused on the networks of actors and institutions providing the financial

---

[320] Leah Farrall (Former Senior Counterterrorism Intelligence Analyst with the Australian Federal Police), *How Al Qaeda Works: What the Organization's Subsidiaries Say About Its Strength*, Foreign Affairs (Mar. 1, 2011), 2011 WLNR 29001382.
[321] Daniel Byman (Saban Ctr. for Mid. E. Policy at the Brookings), *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at 3 (Aug. 2012), https://tinyurl.com/m4nuskbs.
[322] *Id*. at iv.
[323] *Id*. at v.

backbone to terrorist enterprises. Interestingly, we found that there were all-purpose financiers who would give to multiple causes—'polyterror' supporters."[324]

**f.** Thomas Joscelyn, 2013: "The 9/11 commission … pointed [out that] very early on, [] more than two decades ago, … bin Laden [] employed a strategy of … planting seeds in a variety of countries to try and hopefully cultivate … affiliates or branches. … in some spectacular ways, these efforts have actually worked. … al-Qaida's core is not confined … to Afghanistan and Pakistan. … [b]ased on al-Qaida's literature, including a … published letter from [] al-Zawahiri is that [Afghanistan and Pakistan are] basically where [al-Qaeda's] general command is actually headquartered, and they have a series of committees and advisers surrounding [] al-Zawahiri. But the general command dispatches operatives around the globe to oversee their interests,… [with] specific operatives who … are in touch with the general command, who have been dispatched by the general command, and they're operating in places such as Egypt, Libya, Syria, Yemen, Sinai …, across the globe, basically. … [R]ecent evidence [suggests] that al-Qaida in Iraq … considered dispatching operatives to launch [an] attack in … the U.S."[325]

780. The same information sources described throughout this section alerted Defendants that al-Qaeda and al-Qaeda-in-Iraq's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi geographies in which Defendants conducted business. Examples of such reports include, but are not limited to:

**a.** Iraq Study Group, December 2006: "Four of Iraq's eighteen provinces are highly insecure—Baghdad, Anbar, Diyala, and Salah ad Din. … In Anbar, the violence is attributable to the Sunni insurgency and to al Qaeda …"[326]

**b.** DOD, March 2007: "Violence in Baghdad, Diyala, and Balad is characterized by sectarian competition for power and influence between AQI and JAM, principally through murders, executions, and high-profile bombings."[327] "Violence in Anbar is characterized by Sunni insurgents and AQI attacks against Coalition forces."[328]

---

[324] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41 (Public Affairs 2013) ("Zarate, *Treasury's War*").
[325] Thomas Joscelyn (Foundation for Defense of Democracies), *quoted in* Federal News Service Transcripts, *Hearing of the Terrorism, Nonproliferation and Trade Subcommittee of the House Foreign Affairs Committee Subject: "Global al-Qaida: Affiliates, Objectives and Future Challenges"* (July 18, 2013), 2013 WLNR 17723295.
[326] The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 6 (Dec. 2006).
[327] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2007 Report to Congress*, at 14 (Mar. 2, 2007).
[328] *Id.*

c. DOD, September 2007: "Although Irbil, Dahuk and Sulaymaniyah are generally stable, AQI maintains a presence in those areas and there is some evidence that AQI is increasingly targeting the region. Attacks on infrastructure, such as roads and bridges, have increased …, likely in an effort to hinder … Coalition forces' mobility and undermine local confidence in … Coalition forces' ability to protect them. For example, the Sarahah Highway Bridge (south of Kirkuk), which was destroyed on June 2, [2007,] was a key conduit for transportation between the southern and northern provinces."[329]

d. DOD, September 2008: "AQI and affiliated Sunni insurgent groups … remain active in the North, particularly in Ninewa and Tamim Provinces, where the possibility of Kurdish annexation of Ninewa districts and Kirkuk is a polarizing issue."[330]

e. DOD, January 2010: "AQI remains the most active and violent group in Iraq and initiates the vast majority of [high profile attacks] in areas such as Anbar Province, Mosul, Kirkuk, Diyala, and Baghdad."[331]

f. SIGIR, January 2010: "DoD reports that the al-Qaeda in Iraq (AQI) terrorist network … appear[s] to be targeting mixed urban areas—including those in Ninewa, Tameem, Diyala, and Baghdad provinces …"[332]

a. On June 30, 2005, the *Boston Globe* quoted General David Barno, former head of the US military in Afghanistan, who predicted "that most of the [Taliban] would collapse in the coming 'year or so,' leaving behind a 'small hard-core remnant . . . which is essentially a wholly owned subsidiary of Al Qaeda.'"[333]

b. On May 30, 2007, the *Washington Times* reported that "[t]he Taliban has merged its propaganda and field operations with those of the global al Qaeda network led by Osama bin Laden" and "[t]he Taliban have changed immensely in the last year due to the mentoring they are getting from leading Arab jihadists in Pakistan with al Qaeda, both in the realm of battlefield tactics and media operations, … [and] are doing what works in Iraq and often succeeding… Before his [] death …, the Taliban's military commander, Mullah Dadullah, claimed that the Taliban's planning and operations were one and the same with those of al Qaeda. Afghan officials also said the Taliban's suicide bombing attacks in Kabul and other large cities were approved in advance by senior al Qaeda operatives in Pakistan. 'The Taliban is now an integral part of an internationalized jihad,'

[329] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, September 2007 Report to Congress*, at 23 (Sept. 14, 2007).
[330] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, September 2008 Report to Congress*, at 27 (Sept. 26, 2008).
[331] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress*, at vii (Jan. 29, 2010).
[332] Stuart W. Bowen, Jr., *Quarterly Report and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 41 (Jan. 30, 2010).
[333] Victoria Burnett, *17 Aboard Downed Copter Feared Dead*, Boston Globe (June 30, 2005), 2005 WLNR 10289401.

said Waheed Mujda, an Afghan writer who served as a deputy minister in the Taliban's government between 1997 and 2001."[334]

**c.** On November 29, 2009, the *Associated Press* reported that a Pakistani official believed that al-Qaeda was likely providing the Taliban with "[t]he training to make, place and detonate" IEDs used to kill U.S. troops.[335]

**d.** On December 3, 2009, Secretary of State Hillary Clinton testified publicly that the U.S. government viewed al-Qaeda and the Taliban "not as separate independent operators" but "as part of a syndicate of terrorism."[336]

**e.** On December 15, 2009, the *Wall Street Journal* quoted Admiral Mullen as saying that U.S. officials were "deeply concerned about the growing level of collusion between the Taliban and al Qaeda."[337]

**f.** On January 5, 2010, the *Wall Street Journal* reported in a front-page article that the December 30, 2009, attack on Camp Chapman was carried out by a bomber working with al-Qaeda, and that the Taliban had claimed responsibility for it.[338]

**g.** On January 21, 2010, Secretary of Defense Robert Gates stated publicly that al-Qaeda and the Taliban "had formed a 'syndicate' of terrorist groups," and that the Taliban was one of the "factions" that was "working under the umbrella of Al Qaeda."[339]

**h.** On January 18, 2011, the *Long War Journal* reported that "the Taliban and al Qaeda are known to have conducted a joint operation against [] Bagram Airfield" that consisted of a "complex assault [] launched late at night" against a U.S. airbase involving "[h]eavily armed fighters, including at least four fighters wearing suicide vests."[340]

**i.** On May 28, 2011, the *Washington Post* reported that Secretary Clinton said the goal of United States talks with the Taliban was "to split the Taliban from al-Qaeda."[341]

**j.** On April 30, 2012, the *Guardian* reported: "Anyone who follows the wars in Afghanistan and Pakistan closely knows that, despite the talk of diminished al-Qaida numbers on the ground, its activists and affiliates are heavily involved in the Taliban military campaign. In particular, it contributes military expertise to the spectacular

---

[334] Philip Smucker, *Taliban Learns Tactics, Propaganda From Al Qaeda*, Washington Times (May 30, 2007), 2007 WLNR 10111354.
[335] Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).
[336] S. Hr'g 111-479, at 24.
[337] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).
[338] Siobhan Gorman et al., *CIA Blast Blamed on Double Agent*, Wall St. J. (Jan. 6, 2010).
[339] Wash. Post, *Gates Casts Qaeda As Terror Syndicate* (Jan. 21, 2010).
[340] Bill Roggio, *Senior German Al Qaeda Leader Killed In Afghanistan*, Long War J. (Jan. 19, 2011), https://tinyurl.com/k9cd3tpe.
[341] Karen DeYoung, *Clinton Sees 'Turning Point' After Brief Visit to Pakistan*, Wash. Post (May 28, 2011).

attacks organised out of Waziristan, it sends groups of fighters from there to the front lines and it inspires."[342]

**k.** On October 21, 2015, an opinion piece in the *New York Times* described Zawahiri's "oath of fealty" to Mullah Mansour, who was the Taliban's Supreme Leader from July 2015 until his death in May 2016.[343]

781. Defendants also knew that al-Qaeda and its progeny prized their safe haven in Afghanistan and would likely deploy their terrorist resources there. As terrorism scholar Colin P. Clarke observed, "[w]ithin the broader jihadi universe, al-Qaeda existed as a central node and maintained connections, linkages, and alliances with a diverse array of groups, including the Afghan Taliban."[344] According to Dr. Clarke, "[i]n many ways, Afghanistan, despite its geographic location outside of the Middle East and North Africa, has served as one of the, if not the, most critical hubs in the global jihad over the past four decades. It is a place that militants have continually returned to, even after other conflicts have drawn them away."[345]

782. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that al-Qaeda waged a globally integrated terrorist campaign against the United States.

---

[342] Michael Semple, *The Taliban Need Help to Break Their Al-Qaida Ties*, The Guardian (Apr. 30, 2012).
[343] Thomas Joscelyn & Bill Roggio, *Are We Losing Afghanistan Again?*, N.Y. Times (Oct. 21, 2015).
[344] Dr. Colin P. Clarke, *After the Caliphate: The Islamic State & the Future Terrorist Diaspora* 24 (Polity 2019).
[345] *Id.*

### 2. Defendants Knew Protection Payments Aided Al-Qaeda

#### a. Defendants Knew Their Cash-Based Protection Payments Aided Al-Qaeda

783. Defendants knew protection payments aided al-Qaeda's operations worldwide because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

784. **United States government reports and statements** alerted Defendants that their protection payments in Iraq aided al-Qaeda's worldwide campaign, including, but not limited to:

**a.** Treasury Department, 2005: "[T]he Zarqawi Network … use[s] a variety of classic al Qaida-type terrorist financing mechanisms, including: * Funds provided by charities, Iraqi expatriates, and other deep pocket donors, primarily in the Gulf, but also in Syria, Lebanon, Jordan, Iran, and Europe; * Criminal activities, such as … extortion …."[346]

**b.** U.S. Army, November 2010: "al Qaeda in Iraq … remain a threat, and they remain dangerous … [and remain] part of the [al-Qaeda] network …[,] [which] includes al Qaeda's ability to … plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money. … al Qaeda continues to change its tactics and how it adapts. … they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of [Iraq]."[347]

**c.** Treasury Department, 2015: "GLOBAL SOURCES OF TERRORIST FINANCING[.] In order to operate, [al-Qaeda] requires significant funding. While the cost of an individual terrorist attack can be quite low, maintaining a terrorist organization requires large sums. Organizations require significant funds to create and maintain an infrastructure of organizational support, to sustain an ideology of terrorism through propaganda, and to finance the ostensibly legitimate activities needed to provide a veil of legitimacy for terrorist organizations. As deceased AQ financial chief Sa'id Al-Masri put it: 'without money, jihad stops.' Although financial activities can vary significantly among different terrorist groups, several areas of commonality exist. … 1. *CRIMINAL ACTIVITY*[.] Terrorist groups engage in a range of criminal activity to raise needed funds. Extensive revenue from … criminal activities such as extortion have permitted AQ affiliates and other terrorist groups to generate significant revenue. … [E]xploitation of

[346] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. *Dep't of the Treasury, Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005), https://home.treasury.gov/news/press-releases/js2658.

[347] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces-Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.

> local populations … has become a key revenue source for numerous terrorist groups worldwide. … this form of pseudo-sovereignty-based fundraising has spread to other un- or under-governed territories around the world, most recently Iraq and Syria."[348]

785. U.S. government reports also alerted Defendants that their protection payments in the form of "free goods," comprised of high-tech communications technologies donated to terrorists through Ericsson's uncontrolled Iraqi slush funds and intermediary partners, consultants, and contractors—which Defendants sometimes facilitated as an in-kind alternative to cash-based protection payments—also aided al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For example, according to a White House statement of U.S. counterterrorism strategy in 2018:

> The technological advances of the past century have created an interconnected world in which it is easier than ever to quickly move people, funding, material, and information across the globe. The backbone of this interconnected system is information technology—largely created and facilitated by the United States Government and private industry—that is increasingly enabling faster transactions of all kinds across the world. Terrorists use these same publicly available technologies to command and control their organizations and to plot attacks, travel, and abuse the global financial system to raise funds and procure weapons, materiel, and basic necessities. Terrorists cannot sustain their operations without these resources. The United States[,] … [a]round the globe, [] will promote effective enforcement of legislation and policies aimed at protecting … communication industries.[349]

786. **Media reports** alerted Defendants that protection money payments in Iraq aided al-Qaeda's operations worldwide. The media routinely reported that al-Qaeda doctrine emphasized the extraction of protection money as a core fundraising tactic from the late 1990s through 2004. Such reports included, but were not limited to:

---

[348] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 14-15 (Aug. 24, 2015).
[349] The White House, *National Strategy for Counterterrorism of the United States of America*, at 15 (Oct. 2018).

**a.** Agence France Press, October 1998: "[B]in Laden has … exhausted his own [] fortune, … and now depends on donations [and] … protection money to finance his operations."[350]

**b.** Washington Post, September 2001: "The legend of … bin Laden is that of … a business-savvy nomad who has used … a constellation of companies to finance a global network … Ever since his days as a student of economics and finance …, bin Laden has shown a special affinity for raising and managing money. … Bin Laden has built upon those sources and methods to finance his terrorism. … Bin Laden's organization draws large amounts of money from … 'protection money' …, a former senior U.S. official said."[351]

**c.** Sunday Mail, September 2001: "Severing the financial arteries that feed [] bin Laden's war machine has become a priority… Intelligence sources believe … [b]usinessmen throughout the Middle East … [were] paying millions of dollars in protection money."[352]

**d.** Mirror (UK), October 2001: "[B]in Laden has bought off the Taliban by giving them [] 70 million and is said to own and operate the vicious regime. The terrorist leader has been secretly funding Mullah Omar Muhammad and his leaders … The money bin Laden gives the Taliban comes from businesses … and protection money from … firms to ensure he keeps his activities in their area to a minimum."[353]

**e.** Herald (Glasgow, Scotland), October 2001: "US government sources told the Washington Post that the CIA has concluded that bin Laden 'owns and operates' the Taliban. … The [Post] was told the money [bin Laden provides to the Taliban] comes from three primary sources: legal and illegal businesses or front companies bin Laden operates; protection payments he receives from … companies…; and entities that are masked as charities."[354]

---

[350] Agence France Presse English Wire, *Osama Bin Laden Gets Money From Saudi Royalty: US Intelligence* (Oct. 10, 1998).

[351] Robert O'Harrow Jr., David S. Hilzenrath, and Karen DeYoung, *Bin Laden's Money Takes Hidden Paths To Agents of Terror; Records Hint at Complex Financial Web*, Washington Post (Sept. 21, 2001), 2001 WLNR 13158661.

[352] Sunday Mail (Australia), *War On Terror; The World Waits; The Money Trail* (Sept. 23, 2001), 2001 WLNR 5323188.

[353] Andy Lines, *War On Terror: Battlefront: Pounds 70 M It's Honey Money To Aid Taliban, Mirror (UK)* (Oct. 12, 2001), 2001 WLNR 9358733. On information and belief, most of the referenced payments in this source were primarily denominated in U.S. dollars and/or facilitated by U.S. dollar-denominated transactions, and the Mirror's reference to pounds was merely a conversion by the journalist for its intended U.K. audience.

[354] Kay Jardine, *West Is 'Thirsty for Bloodshed'*, Herald (Glasgow, Scotland) (Oct. 12, 2001), 2001 WLNR 3862913.

**f.** APA (English News Service), October 2001: "An Austrian economics professor …, Prof. Friedrich Schneider said … between ten and 20 per cent of Al Qaida's income came from 'classical' criminal activities such as …'protection money'."[355]

**g.** *Cleveland Plain Dealer*, November 2001: "[B]in Laden" "co-opted" "other terror groups … [and] … [h]is … protection rackets … have been exceedingly lucrative."[356]

**h.** *Associated Press*, February 2002: "[A]n al-Qaida training manual aimed at teaching Osama bin Laden's followers the best ways to kill thousands of people and spread fear in the United States … [known as the] 11-volume 'Manual of Afghan Jihad' … offers advice on how to raise funds for covert operations through extortion."[357]

**i.** *PA News*, December 2003: "[A]l Qaida operatives levy a 'tax' on shipments as they pass borders or areas under the terror network's influence, in Iran, Pakistan, Turkmenistan and other countries."[358]

**j.** *BBC International Reports (Europe)*, October 2004: "[T]he merging of organized crime and terrorism is a new phenomenon. BND President Hanning assumes 'that terrorist structures, such as … Al-Qa'idah, finance their fight through the extortion of protection money as well as direct involvement in drug-trafficking.'"[359]

787. From 2004 through 2014, media reports regularly alerted Defendants that their protection payments in Iraq directly benefited al-Qaeda's worldwide operations. The following are just a few examples of such media reports:

**a.** *Cleveland Plain Dealer*, October 2006: "There simply are not enough coalition forces in Iraq to be everywhere to impose security. Al-Qaida operatives … seem to be running their own protection rackets …"[360]

**b.** *New York Times*, November 2006: "The insurgency in Iraq is now self-sustaining financially, raising tens of millions of dollars a year from … [inter alia] … crimes …, a classified United States government report has concluded. [I]ts most surprising

[355] APA (English News Service), *Economics Professor Says Al Qaida Backed By 4.85 Billion Dollars* (Oct. 25, 2001), 2001 WLNR 130475.
[356] Elizabeth Sullivan, *How To Turn A Terrorist Into A Has-Been*, Cleveland Plain Dealer (Nov. 19, 2001), 2001 WLNR 11203968.
[357] Hamza Hendawi, *Al-Qaida Manual Pushes Mass Fatalities Visibility*, Associated Press, *republished in* Wichita Eagle (Feb. 2, 2002), 2002 WLNR 1319548.
[358] Mark Sage, *Bin Laden 'Funding Terror Through Drugs'*, PA News (Dec. 29, 2003).
[359] BBC International Reports (Europe), *German Intelligence Chief Says Bin-Ladin Still Alive* (Oct. 10, 2004).
[360] Cleveland Plain Dealer, Opinion, *No Honey Coating Only Hard Choices Lie Ahead In Violence-Torn Iraq; It's Time To Explain Them Honestly To The American People* (Oct. 25, 2006), 2006 WLNR 18536168.

conclusion: '… terrorist and insurgent groups in Iraq may have surplus funds with which to support other terrorist organizations outside of Iraq.'"[361]

**c.** Los Angeles Times, June 2007: "By January [2007], the Islamic State's proclamations appeared on walls and were circulated in leaflets [in Iraq]. … 'They issued laws and decrees like a real state,' said [an Iraqi victim] …. Papers demanding protection money were sent to homes [and] Al Qaeda backers flexed their muscle …"[362]

**d.** National Public Radio, July 2007: "[Peter Bergen stated:] '… al-Qaida in Iraq is beginning to finance al-Qaida central in the Afghan-Pakistan border, because al-Qaida in Iraq is making a lot of money from … from protection money … and is now, financially, a quite viable organization.'"[363]

**e.** Reuters News, September 2007: "[V]igorous fund-raising from protection rackets … helped keep al Qaeda active."[364]

**f.** Reuters News, December 2007: "Iraq has pulled back from the brink of civil war, but recent security gains are fragile and still reversible, the top U.S. commander in Iraq, General David Petraeus, said … Petraeus said he viewed Sunni Arab al Qaeda as the main enemy in Iraq… MAFIA RACKETS[.] Petraeus said most attacks were carried out by al Qaeda in northern Iraq, … He said al Qaeda had turned to 'mafia-style' rackets to finance its operations …. Shi'ite militias were involved in similar rackets."[365]

**g.** Associated Press, March 2008: "The suicide bombers who have killed 10,000 people in Iraq, including hundreds of American troops, usually … come from outside Iraq. … 'Al-Qaida recruits these people from the Middle East and North Africa, hitting them at the most vulnerable time of the life,' said [a] senior [U.S.] analyst[] … The demand for many foreign fighters begins in places such as the dingy back streets of teeming Iraqi cities such as of northern Mosul – where al-Qaida still holds sway. An al-Qaida cell decides it needs two suicide bombers. They put in an order which is funded by money made through racketeering, extortion and kidnapping. That request travels to Damascus and to the facilitators and recruiters training young men in North Africa and Saudi Arabia. Three months later, the bomber is delivered, military investigators and officials say."[366]

---

[361] John F. Burns and Kirk Semple, *U.S. Finds Iraq Insurgency Has Funds to Sustain Itself*, N.Y. Times (Nov. 26, 2006).
[362] Ned Parker, *The Conflict In Iraq: Baghdad Neighborhood Purged*, Los Angeles Times (June 27, 2007), 2007 WLNR 12080034.
[363] Peter Bergen, *quoted in* NPR Talk of the Nation, *A Closer Look at al-Qaida in Iraq* (July 23, 2007), 2007 WLNR 14086129.
[364] William Maclean, *Refile-Analysis-Algeria Rebel Attacks Test Govt Security Policy*, Reuters News (Sept. 23, 2007).
[365] Ross Colvin, *Petraeus: Iraq Security Fragile, Gains Reversible*, Reuters News (Dec. 29, 2007).
[366] Patrick Quinn (Associated Press), *US Military Study Of Iraq Detainees Provides Insights Into The Motivations Of Foreign Fighters*, AP Worldstream (Mar. 15, 2008) (emphasis added).

**h.** Reuters Gulf Financial News, August 2011: "Al Qaeda has resurfaced in former Iraqi strongholds … [and has] been carrying out bolder attacks… Mosul, is seen as one of the last urban strongholds of al Qaeda in Iraq … [Al Qaeda in Ninewa Province] funds operations through extortion …"[367]

**i.** Economist, November 2013: "al-Qaeda is … making its presence heavily felt, collecting protection money to help pay for its operations. … [Iraqi Prime Minister Maliki's] aides stress that 'al-Qaeda is a common threat to everyone.' Indeed, a group responsible for many of the recent … bombings, [ISIS], gives its allegiance to al-Qaeda."[368]

**j.** New York Times, December 2013: "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Qaeda's regional affiliate, the Islamic State in Iraq and Syria, has become a potent force in northern and western Iraq. … [S]aid Michael Knights, an expert on Iraqi security …[:] … 'There is one place in the world where Al Qaeda can run a major affiliate without fear of a U.S. drone or air attack, and that is in Iraq and Syria.' … Using extortion … the Qaeda affiliate is largely self-financing."[369]

788. **Terrorism scholars** alerted Defendants that their protection payments aided al-Qaeda. For example, in 2009, Dr. Williams reported that "the proceeds from protection fees … strengthened nonstate groups and provided resources for their continued challenge to the Baghdad government."[370] According to Dr. Williams, "al-Qaeda" "need funding and are unlikely to remain aloof when others are making money, either legally or through illicit activities" and thus "even if they are not directly involved they are almost certainly imposing some kind of tax or demanding a slice of the profits in return for allowing the trade to operate."[371]

789. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that protection payments aided al-Qaeda's terrorist campaign against the United States.

---

[367] Rania El Gamal, Suadad al-Salhy, Jim Loney, and Ruth Pitchford, *Analysis–Iraq Al-Qaeda Regroups, Shi'ite Militias Threaten*, Reuters Gulf Financial News (Aug. 28, 2011).
[368] Economist, *Civil Strife In Iraq: Going All Wrong* (Nov. 2, 2013), 2013 WLNR 27433452.
[369] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).
[370] Williams, *Criminals, Militias, and Insurgents*, at 161.
[371] *Id*. at 177.

**b. Defendants Knew "Free Goods"-Based Protection Payments Aided Al-Qaeda**

790. Defendants' above-described knowledge applied equally to Defendants' "free goods" payments of cell phones to al-Qaeda. At all times, Defendants knew that al-Qaeda prioritized obtaining U.S.-origin cell phones for their unique operational benefits to the terrorists.

791. In later years, similar media reports documented al-Qaeda's continuing efforts to source communications technologies, cell phones, and similar dual-use weapons from the United States. For example, on June 7, 2010, it was widely reported that a "federal grand jury" "charged a Texas man with attempting to provide al Qaeda with global positioning instruments, cell phones and a restricted publication on U.S. weapons in Afghanistan."[372]

792. Indeed, media reports specifically alerted Defendants that al-Qaeda's strategy for its joint cells with the Taliban in Afghanistan relied on cell phones as detonators for al-Qaeda's signature calcium ammonium nitrate ("CAN") fertilizer bombs.[373]

793. Such reports also alerted Defendants that al-Qaeda's reliance upon iconic American communications technologies deepened in the late 2000s, not unlike the knowledge, communications security, and communications efficiency benefits, among others, familiar to most smartphone users after the iPhone revolutionized the space in the late 2000s.

**3. Defendants Knew Protection Payments Aided Al-Qaeda-In-Iraq**

794. Defendants knew protection payments aided al-Qaeda-in-Iraq because Defendants' employees and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants – knew such fact to be true.

---

[372] David C. Morrison, *Behind the Lines: Our Take on the Other Media's Homeland Security Coverage*, CQ Homeland Security (June 7, 2010), 2010 WLNR 11991958.

[373] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009).

795. **United States government reports** alerted Defendants that their protection payments aided al-Qaeda-in-Iraq.[374]

796. **Media reports** alerted Defendants that protection payments provided vital funding that aided al-Qaeda-in-Iraq's operations in Iraq, Syria, and Afghanistan.[375]

---

[374] *E.g.*, Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. *Dep't of the Treasury, Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005) ("The financing networks of the Iraqi insurgency are complex and diverse. Insurgents draw on both external financing and on internal Iraqi sources of funds and materiel. For example, … jihadist groups use … Criminal activities, such as … extortion …"), https://home.treasury.gov/news/press-releases/js2658; U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2010 Report to*, at 34 (Apr. 29, 2010) ("AQI … continues its efforts to gain funds through widespread extortion efforts."); *see also* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, June 2010 Report to Congress*, at 35-36 (Aug. 20, 2010) (same); American Forces Press Service, *Forces Dismantle Terrorist Group in Northern Iraq*, Defense Department Documents (Apr. 2, 2010) ("In … Mosul, Iraqi soldiers and U.S. advisors searched … for a suspected AQI member believed to extort money from [] transporters and contractors to fund the terrorist group. … [U.S.] operations resulted in the deaths or arrests of at least six suspected senior AQI leaders believed to greatly contribute to funding the terrorist group by their involvement in a highly-organized extortion … ring based in Mosul. … The six … include the overall AQI commander of northern Iraq, four men who head the group's funding, and a regional commander for Mosul. 'The capture of all six AQI extortion … network leaders … will likely greatly disrupt AQI operations and prevent future attacks throughout Iraq,' U.S. military officials said … 'The money collected from extortion … comprises the bulk of AQI's income, which is subsequently used to fund the terrorist group's deadly attacks.'"), 2010 WLNR 6913562; Julia McQuaid, Jonathan Schroden, Pamela G. Faber, P. Kathleen Hammerberg, Alexander Powell, Zack Gold, David Knoll, and William Rosenau, *Independent Assessment of U.S. Government Efforts against Al-Qaeda, CNA Report Pursuant to Section 1228 of the 2015 National Defense Authorization Act*, at 175 (Oct. 2017) ("AQI/ISI relied on a variety funding streams. In the runup to the founding of AQI … As of 2009, AQI was essentially self-financing, supporting itself through crimes such as extortion …").

[375] *E.g.*, Pamela Hess (UPI Pentagon Correspondent), *Analysis: Zen and The Art of Counterinsurgency*, UPI News (July 29, 2004) ("It is tough to overemphasize the importance of organized crime in the insurgency, Marine commanders say. Millions of dollars flow through the country daily in an unofficial economy and have for the past decade. The perpetrators are motivated by self-interest and greed. They not only plan and carry out violence but pay others to do the same. One commander compared the intransigence of Iraqi organized crime networks to that of the mafia in Sicily before World War II. It has the same stranglehold on whole local economies and populations, and is protected by family and tribal loyalties."); Bilal A. Hibab, *Iraq's Disappearing Oil*, Wilson Quarterly (Sept. 2006) ("A web of corruption and criminality [] is helping to destabilize Iraq, … and financing the country's slide toward chaos … [Al-Qaeda-in-

797. **Terrorism scholars** alerted Defendants that their protection payments aided al-Qaeda-in-Iraq worldwide. Examples of such reports include, but are not limited to:

**a.** Professor Robert Looney, 2005: "[T]he convergence of large segments of the Iraqi insurgency with elements of organized crime … [and] the insurgency's subtle shift

---

Iraq] [i]nsurgents [in Mosul] attack Iraqi [transportation targets] … in part to force the government to rely on trucks … who usually pay protection money to the insurgents."); Associated Press, *Two Terrorists Killed, 21 Detained In Iraq Raids Today*, AP Alert – Business (July 12, 2007) ("On July 9, [2007] Iraqi security forces detained four suspects allegedly responsible for running an extortion network … [who allegedly extracted] protection money from local contractors and us[ed] the funds to finance al Qaeda in Iraq activities."); Lennox Samuels, *Al Qaeda In Iraq Ramps Up Its Racketeering*, Newsweek (May 20, 2008) ("AQI is … increasingly turning to crime to help finance its deadly operations. … Al Qaeda in Iraq is no stranger to racketeering … [and] long raised money through [crime] … The haul from these illegal enterprises runs to the tens of millions of dollars … AQI… demands 'protection' payments from legitimate businesses. … That money helped AQI purchase arms, pay salaries and bribes and stage attacks."), https://tinyurl.com/4ezvphc9; Andrew E. Kramer, *Iraqi Christians' Secret: Protection Money To Insurgents*, International Herald Tribune (June 26, 2008) ("[P]rotection money … grew into a source of financing for [al-Qaeda-in-Iraq]. [Protection payments] thus became a secret, shameful and extraordinary complication … 'People deny it, people say it's too complex, and nobody in the international community does anything about it,' said Andrew White, the Anglican vicar of Baghdad. … [M]any … in Iraq paid … knowing full well the money would be used for bombs and weapons to take the lives of others."), 2008 WLNR 11985310; Pamela Hess (Associated Press), *US: Iraqi Fighters Extort, Kidnap to Raise Funds*, AP DataStream (July 29, 2008) ("Al-Qaida in Iraq is increasingly embracing extortion … to finance its operations ... [by] demanding protection money of local businesses."); AP Alert - Business, *Iraqis Arrest Numerous Terrorism Suspects* (Oct. 14, 2009) ("[A]n extortion network known as the Islamic State of Iraq and related to al-Qaida in Iraq based in … Mosul. … targeted … those who own or work at construction sites and local businesses … Extortionists then use the [] money to fund terrorist attacks …"); Associated Press, *Iraqi Forces Arrest 2 Al-Qaida Suspects*, AP Alert – Terrorism (Sept. 2, 2010) ("Iraqi forces … searched … for a suspected al-Qaida in Iraq leader allegedly responsible for extorting money from … contractors and … transportation workers in order to fund terrorist operations …"); Kerry Murphy (Australian Immigration Lawyer and Arabic Scholar), *What's Eating Syria And Iraq*, Eureka Street (June 17, 2014) ("The capture of … Mosul by [AQI] is a major concern not just for Iraq but for the whole Middle East. … Although Zarqawi was killed…, AQI continued. In towns where it had control or influence, it demanded mafia-style protection payments which helped fund its operations in Iraq and more recently in Syria."), https://tinyurl.com/y98ah99f; Jamie Tarabay, *Iraq In 2014: Back To Civil War?*, Al Jazeera America (Dec. 21, 2013) ("[S]olidifying its financial base are Al-Qaeda and its affiliates, who sought to bolster their local support in cities … where Iraqi security forces have failed to gain a foothold. 'Since 2010 AQIS has been self-funding through organized crime rackets involving … protection payments from large Iraqi companies, plus trucking, smuggling and real estate portfolios,' [Michael] Knights said."), https://tinyurl.com/5k57c4vx.

toward increased reliance on criminal activity has implications that are … important for the Iraqi economy. Increased criminal activity is effectively stifling attempts to expand the formal sector. … [A] successful attack on criminal activity in Iraq is as important in determining the country's future as the outcome of the current anti-insurgency campaign. One might even venture to say they are largely one and the same. … Insidious criminal activity is not new to Iraq. In fact, as recent revelations coming out of the United Nations Oil for Food scandal show, criminal activity has long been pervasive in all areas of Iraqi society, from the highest levels of official power to the lowly smuggler trying to eke out an existence during the period of sanctions in the 1990s. … With segments of the insurgency's financial needs matching or in some cases overriding its political motivations, an increasing amount of time and effort of these groups is devoted to creating 'in house' criminal capabilities. …. Complicating matters is the near impossibility of establishing effective anti-crime programs in an environment of rampant corruption. … Transparency International [] ranks Iraq as the most corrupt country in the Middle East …, with the country's corruption actually worsening between 2003 and 2004. Instability, high unemployment and corruption have created a volatile mix that is ideal for organized crime. … In this environment, Western intelligence agencies are becoming increasingly worried about the systematic strengthening of ties between terrorists and organized crime. … The current wave of crime and insurgent activity creates, and is in turn supported by, an increasingly sophisticated criminal economy."[376]

**b.** <u>Douglas Lovelace, 2009</u>: "[T]he insurgency [in Iraq] was strengthened and sustained by criminal activities," "including" "extortion" aided by "the critical role played by corruption in facilitating and strengthening organized crime," through which "al-Qaeda in Iraq … used criminal activities to fund their campaigns of political violence."[377]

**c.** <u>Dr. Phil Williams, 2009 and 2010</u>: "[A] large volume of such" "protection" "payments" … "became a significant revenue source [for anti-American terrorists in post-Saddam Iraq].[378] "Terrorist organizations … use organized crime activities as a funding mechanism. … in Iraq … criminal activities were used … by insurgents … seeking to enhance their resource bases and prosecute their campaigns of violence more effectively. … [E]xtortion … helped to fund much of the violence in Iraq. Extortion was highly profitable partly because of the scale of reconstruction and partly because of the loss of security on Iraqi roads. … Foreign fighters and jihadis groups, especially al-Qaeda in Iraq (AQI), exploited various criminal activities to augment their financial base. … Extortion … [was one of AQI's] core funding activities. … AQI's criminal activities continue to finance its resistance in and around Mosul. …"[379] "[I]t is important to emphasize that

---

[376] Robert E. Looney (Professor of National Security Affairs at the U.S. Naval Postgraduate School), *The Business of Insurgency: The Expansion of Iraq's Shadow Economy*, National Interest (Oct. 1, 2005), 2005 WLNR 29354864.
[377] Douglas C. Lovelace, Jr., *Foreward* ("Lovelace, Jr., *Foreward*"), *published in* Williams, *Criminals, Militias, and Insurgents*, at vii-viii.
[378] Williams, *Criminals, Militias, and Insurgents*, at 236.
[379] Lovelace, Jr., *Foreward*, at ix-xvi. Shiite terrorists also practiced protection rackets. *See, e.g.*, *id.* at xv ("Shiite militias, especially Jaish-Al-Mahdi (JAM), have been among the most powerful

organized crime in Iraq is not something separate from the insurgency, the sectarian conflicts, or the activities of AQI; rather, it is interwoven with these other organizations and activities, … creating negative but very powerful synergistic effects."[380] "[A] critical component of organized crime in Iraq was the appropriation of criminal methods by … jihadis … In many respects this was a familiar pattern. Groups as diverse as the Irish Republican Army, Liberation Tigers of Tamil Eelam, and Revolutionary Armed Forces of Colombia had long used criminal activities as a funding mechanism. For jihadi groups, especially AQI, criminal activities became a critical source of revenue. … Extortion [was among AQI's] … core funding activities."[381] "Organized crime in Iraq in the months and years after March 2003 … finance[ed] the violent opposition to the occupation forces. … In 2008, the capacity to generate funds through criminal activities enabled al Qaeda in Iraq (AQI) to continue resisting [] the U.S. military."[382]

798. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that protection payments aided al-Qaeda-in-Iraq's terrorist campaign against the United States.

### F. Defendants Knew Islamic State's Role

#### 1. Defendants Knew Islamic State Waged A Terrorist Campaign Against The United States

799. Defendants knew that Islamic State waged a global terrorist campaign against the United States in which Islamic State attacked Americans in Iraq, Syria, Afghanistan, and elsewhere to drive the United States out of the Middle East.

800. Defendants knew about Islamic State's global terrorist campaign against the United States, including its key focus on Iraq, because Defendants' employees and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants – knew such fact to be true.

---

and important groups engaged in organized crime in Iraq—although how much has been carried out under the direct control of the organization and how much by rogue factions is uncertain. [] [C]riminal activities [that] provided Mahdi Army members with important revenue streams[] [included] extortion and protection…").

[380] Williams, *Criminals, Militias, and Insurgents*, at 13.

[381] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, , at 51.

[382] *Id*. at 47.

801. **United States government reports** alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States while Islamic State acted as a caliphate from 2014 through 2017.[383]

802. Throughout Islamic State's "caliphate" era from 2014 through 2017, U.S. government reports and statements alerted Defendants that Islamic State's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi provinces in which Defendants did business.[384]

---

[383] *See*, *e.g.*, The White House, *Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL)* (Sept. 10, 2014) ("Islamic State … poses a clear threat to the people of Iraq and Syria, … the broader Middle East, as well as U.S. persons, allies and interests in the region. Left unchecked, ISIL could pose a growing threat beyond the region …"), http://tinyurl.com/6yce8e3z; Office of the Director of National Intelligence, *Counterterrorism Guide: Islamic State of Iraq and the Levant (ISIL)* (2015) (In June 2014, ISIL unilaterally declared the establishment of an Islamic caliphate and called on all Muslims to pledge allegiance to the group. Since then, ISIL has announced the establishment of eight provinces outside of Iraq and Syria, including in Afghanistan and Pakistan …"), https://tinyurl.com/yckhbv89; U.S. Dep't of State, *Country Reports on Terrorism 2016* at 8 (July 2017) ("ISIS attacks outside its territorial strongholds in Iraq, Syria, and Libya were an increasingly important part of its terrorism campaign in 2016. Most of these attacks took place in countries where ISIS has a declared branch, such as Afghanistan …."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2017–September 30, 2017*, at 26 (Nov. 3, 2017) ("ISIS: Global Reach[.] … Several of the affiliates have acquired funding, weapons, recruitment, and tactics from core ISIS. …ISIS-associated groups were also active in … Afghanistan ...").

[384] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2015* at 178-79 (June. 2016) ("Iraq witnessed a continued surge of terrorist activity in 2015, primarily as a result of the actions of [] Islamic State …, which has occupied large areas of the country since early 2014. … Terrorist groups continued to mount a large number of attacks throughout the country."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2016–December 31, 2016*, at 8 (Feb. 2, 2017) ("[W]hile fighting in Iraq and Syria centered on the battles for Mosul and Raqqah, ISIL militants continued insurgent activity outside of those areas in both countries. For example, ISIL militants reactivated networks in Anbar province and carried out suicide attacks near Karbala in southern Iraq and at checkpoints leading to Fallujah and Amiriyal al-Fallujah."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017*, at 47 (May 6, 2017) ("ISIS's [recent] activity signaled that [it] was transitioning … to an insurgency … In Iraq, ISIS's insurgent activity consisted of harassing

803. Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States.[385]

804. Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants that Islamic State's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi provinces in which Defendants did business. Such reports included, but were not limited to:

---

attacks and suicide bombings in the central and western parts of [Iraq]. … ISIS continued to use IED and VBIED attacks … in Baghdad … [and] suicide and VBIED attacks in Anbar …").

[385] *E.g.*, The White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 2018) ("ISIS remains … the primary transnational terrorist threat to the United States … ISIS retains the financial and material resources and expertise to launch external attacks—including against United States interests—and its senior leaders continue to call for attacks against the United States. The group's global reach remains robust, with eight official branches … regularly conducting terrorist and insurgent operations across Africa, Asia, Europe, and the Middle East."); U.S. Dep't of State, *Country Reports on Terrorism 2018* at 9 (Oct. 2019) ("ISIS's global presence evolved with affiliates and networks conducting attacks in the Middle East, South and East Asia, and Africa. Additionally, battle-hardened terrorists headed home from the war zone in Syria and Iraq or traveled to third countries, posing new dangers."); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 2 (Dec. 2021) ("Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a worldwide terrorism campaign, carrying out deadly attacks globally. Illustrating the evolving threat, ISIS affiliates outside Iraq and Syria caused more fatalities during 2020 than in any previous year. ISIS maintained an active presence and low-level insurgency in Iraq and Syria, with increased attacks in both countries during the first half of 2020. In South … Asia, ISIS radicalized individuals to violence, inspiring them to conduct attacks."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2021–December 31, 2021*, at 23 (Feb. 8, 2022) ("ISIS-Core Leads a Global Organization[.] … ISIS-Core leaders in Iraq and Syria continued to manage the group as a global caliphate, maintaining an element in Iraq and Syria dedicated to overseeing the group's branches around the world. Since 2014, ISIS has incorporated existing jihadist groups or upstart elements into its global organization, expanding into the Arabian Peninsula, South … Asia, Eurasia, Turkey, and Africa. … ISIS leaders provided the group's branches with guidance, media support, and funding.").

**a.** State Department, September 2018: "ISIS remained a terrorist threat … and continued to carry out suicide, hit-and-run, and other asymmetric attacks throughout [Iraq]."[386]

**b.** State Department, October 2019: "Reverting to clandestine tactics following its loss of territory, ISIS … sought to reestablish support among populations in Ninewa, Kirkuk, Diyala, Salah ad Din, and Anbar provinces, in particular. Although ISIS maintained the capability to conduct deadly terrorist attacks in Iraq, these attacks resulted in fewer casualties in 2018 than in 2017."[387]

**c.** State Department, June 2020: "ISIS continued to present a serious threat to Iraqi stability … ISIS sought to reestablish support among populations in Ninewa, Kirkuk, Diyala, Salah ad Din, and Anbar provinces, especially in the areas of disputed control between the Kurdistan Regional Government (KRG) and the federal government …"[388]

**d.** LIGOIR, November 2020: "Kirkuk province consistently ranks as one of the most violent provinces in Iraq … The northern Iraqi province, parts of which are claimed by both the central Iraqi government and the semi-autonomous Kurdistan Regional Government (KRG), remains a focal point of ISIS's rural insurgency in Iraq. Both the territorial dispute and the sectarian divide in Kirkuk aid ISIS's survival in [Kirkuk]'s challenging physical terrain. … ISIS [] survive[s] as a lingering insurgency in Kirkuk. … ISIS remains most prevalent in the rural and mountainous regions of southern Kirkuk, where [ISIS] is organized in small insurgent cells. In particular, ISIS exploits the rugged terrain of the Hamrin, Qarachokh, and Makhmour Mountains for safe haven and to evade counterterrorism forces …. Similarly, ISIS uses valleys in [Kirkuk] … to launch mostly small-scale attacks, including ambushes, IED attacks, and small-arms fire that target local security elements, civilians, and infrastructure. … ISIS frequently intimidates, coerces, and kidnaps local civilian and tribal leaders [in Kirkuk] … to obtain resources."[389]

**e.** LIGOIR, May 2021: "ISIS remained entrenched in rural areas throughout Iraq and retains freedom of movement, particularly in rugged mountain and desert regions … ISIS continued to exploit ethnic, sectarian, and political tensions… ISIS fighters in Iraq continued to operate in small, mobile cells that primarily conduct simple hit-and-run attacks … ISIS regularly targeted infrastructure, security and military positions, and civilians … ISIS focused its activity during the quarter in Anbar, Diyala, Kirkuk, and Salah ad Din provinces, and in areas surrounding Baghdad and Mosul. … ISIS continues to use the permeable border between Iraq and Syria to smuggle members and affiliates to safe havens it has established in rural and permissive areas, where it can conceal its operations and leaders, avoid security patrols, and intimidate the local population."[390]

---

[386] U.S. Dep't of State, *Country Reports on Terrorism 2017* at 229 (Sept. 2018).
[387] U.S. Dep't of State, *Country Reports on Terrorism 2018* at 117 (Oct. 2019).
[388] U.S. Dep't of State, *Country Reports on Terrorism 2019* at 117 (June 2020).
[389] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2020–September 30, 2020*, at 20 (Nov. 3, 2020).
[390] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021*, at 16 (May 4, 2021).

**f.** State Department, December 2021: "Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a worldwide terrorism campaign, carrying out deadly attacks globally. Illustrating the evolving threat, ISIS affiliates outside Iraq and Syria caused more fatalities during 2020 than in any previous year. ISIS maintained an active presence and low-level insurgency in Iraq and Syria, with increased attacks in both countries during the first half of 2020. In South … Asia, ISIS radicalized individuals to violence, inspiring them to conduct attacks."[391] "While ISIS remains unable to control territory and its leadership ranks have been significantly degraded, the group remains a serious threat to U.S. interests, security in the region, and beyond. In Iraq and Syria, ISIS fighters continued to wage a low-level insurgency, seeking to destabilize the region, recruit new members, and regain territory. … Beyond Iraq and Syria, ISIS branches, networks, and supporters across the Middle East and North Africa remained active, including in the Arabian Peninsula, Libya, the Sinai Peninsula, Tunisia, and Yemen."[392] "Despite its territorial defeat, ISIS continued to conduct operations on a smaller scale, particularly in the North and West [of Iraq], including rural areas … ISIS sought to reestablish footholds in Anbar, Diyala, Kirkuk, Ninewa, and Salah al-Din provinces, especially in the areas of disputed control between the Kurdistan Regional Government and the federal government."[393]

805. **Terrorism scholars** alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States. For example, terrorism scholar Katherine Bauer reported in 2018 that Islamic State's "most significant recent attacks have been traced back to groups or 'provinces' operating outside of Syria and Iraq."[394]

806. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that Islamic State waged a globally integrated terrorist campaign against the United States.

---

[391] U.S. Dep't of State, *Country Reports on Terrorism 2020* at 2 (Dec. 2021).
[392] *Id*. at 112.
[393] *Id*. at 120.
[394] Katherine Bauer (Fellow, Washington Institute for Near East Policy), *Survey of Terrorist Groups and Their Means of Financing*, Testimony Submitted to the House Financial Services Subcommittee on Terrorism and Illicit Finance, at 4 (Sept. 7, 2018), http://tinyurl.com/mter35be.

### 2. Defendants Knew Protection Payments Aided Islamic State

807. Defendants knew protection payments aided Islamic State because Defendants' employees and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants – knew such fact to be true.

808. **United States government reports** alerted Defendants that their protection payments aided Islamic State's caliphate from 2014 through 2017.[395]

---

[395] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2014* at 354, 9, 171 (June 2015) ("ISIL receives most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … ISIL … use[d] … criminal activities to raise funds for operational purposes. … ISIL earned up to several million dollars per month through its [] extortion networks … In 2014, ISIL derived income from [*inter alia*] … extortion, illegal 'taxation,' … and foreign donations. … [T]he United States used sanctions to ensure that banks, companies, and citizens across the world did not engage in financial transactions with ISIL."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report to the United States Congress, April 1, 2015–June 30, 2015*, at 46 (Aug. 24, 2015) ("ISIL … use[d] … criminal activities to raise funds for operational purposes. Much of ISIL's funding, … was [] gathered in Iraq and Syria. ISIL earned up to several million dollars per month through its [] extortion networks …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, September 30, 2015*, at 58, 61, 63, 64-5 (Nov. 25, 2015) ("ISIL … derives most of its revenue from its control of territory[,] [including] extortion/taxation … ISIL's funds come from several key sources[,] [including] … taxes and extortion from the occupied territories … Most of these constitute a 'sophisticated extortion racket[] … [R]eceipts that confirm ISIL is collecting a 20% 'khums tax' … and that the tax collections are being enforced across the territory it controls. … ISIL also requires local populations in those territories to pay it a percentage of any salary (largely paid in cash). ISIL further imposes 'taxes' on all types of business activities. … ISIL 'stands to profit from taxing all of the sources of revenue to the tune of hundreds of millions of dollars per year.'"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report to the United States Congress, October 1, 2015−December 31, 2015*, at 70-72 (Feb. 16, 2016) ("ISIL's extortion [] and taxation … have funded its military machine for years. … ISIL's administrative apparatus enables it to generate revenue through taxation … and the collection of fees for everything [including] sales of goods … [O]il is second only to taxation and extortion as a source of income for ISIL."); U.S. Dep't of State, *Country Reports on Terrorism 2015* at 6 (June. 2016) ("ISIL relies heavily on extortion and the levying of 'taxes' on local populations under its control …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017*, at 45-46 (May 6, 2017) ("ISIS continued to be able to finance operations in Iraq and Syria … ISIS generates the majority of its revenue from … taxes [] and extortion …"); U.S. Dep't of State, *Country Reports on Terrorism 2016* at 408

809. Similar U.S. government reports alerted Defendants that their protection payments aided Islamic State's "global insurgency" from 2018 through 2022.[396]

---

(July 2017) ("ISIS receives most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, April 1, 2017–June 30, 2017*, at 23 (Aug. 3, 2017) ("Coalition airstrikes also killed [ISIS] financial facilitators … and destroyed several ISIS cash storage facilities in Iraq and Syria. Fawaz al-Rawi and Samir Idris were accused of moving millions of dollars for the ISIS network. However, … ISIS still generates millions of dollars … from illegal taxation and extortion …").

[396] *E.g.*, U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing*, at 25 (2018) ("ISIS derives most of its revenue from … the extortion and taxation of civilian populations and economies in Iraq and Syria … However, ISIS also receives limited financial support from within the United States. … U.S.-based individuals have raised or solicited funds specifically for the group itself. These funds are often derived from legitimate sources as well as from small-scale criminal activity. ISIS financiers and supporters abroad also send funds to other ISIS supporters or regional affiliates in foreign jurisdictions that may be routed through the U.S. financial system and may seek to procure sensitive or controlled goods from U.S.-based companies."); U.S. Dep't of State, *Country Reports on Terrorism 2017* at 304, 132 (Sept. 2018) ("ISIS received most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … In 2017, the Government of Iraq … continued to dismantle ISIS's financial activity and safeguard its financial institutions from exploitation by ISIS. Iraq enforced a national directive to prohibit financial transactions with banks and financial companies located in ISIS-controlled areas. It … prohibited … companies located in ISIS-held areas and those suspected of illicit activity from accessing U.S. banknotes … Iraq also barred ISIS financial facilitators … from Iraq's financial system and froze all of their assets."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2018–December 31, 2018*, at 21-22, 31 (Feb. 4, 2019) ("[T]he bulk of ISIS financial and military resources is generated in Iraq and Syria, … ISIS branches worldwide contribute varying degrees of support to the ISIS leadership … ISIS continued to extort money from both individuals and construction companies seeking to rebuild destroyed infrastructure. … ISIS could insert operatives into the reconstruction effort to siphon off money. … Extortion remains a major source of income for [ISIS] … Independent analysts also suggested that ISIS would likely seek to extort companies engaged in reconstruction in Iraq, and would also insert operatives into reconstruction entities to divert funds to terrorist activities. … [A]part from these efforts, ISIS in Iraq gains revenue from [inter alia] … taxation …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2019–December 31, 2019*, at 41 (Feb. 4, 2020) ("ISIS Generates Revenue Even After Loss of Territory … ISIS continues to generate revenue by [*inter alia*]… extortion, and … front companies."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020*, at 20, 51 (May 13, 2020) ("[E]ven with its territorial defeat, ISIS continues to generate funds in Syria through extortion … and the use of

810. **Financial Action Task Force ("FATF") reports** alerted Defendants that protection money payments played a key role in financing Islamic State's operations around the world, including in Iraq, Syria, Turkey, Europe, Africa, and Afghanistan. For example, the FATF published guidance concerning Islamic State terrorist finance in February 2015, which concluded, among other things, that:

**a.** "[F]unding is central and critical to [Islamic State's] activities. … ISIL's primary sources of revenue … include … extortion … Cutting off these vast revenue streams is … [an] opportunity … to defeat this terrorist organisation."[397]

**b.** "ISIL is operating in vast swathes of land across Syria and northern Iraq, allowing ISIL to exploit the local population and material resources through extortion … ISIL takes advantage of the resources in this domain, … taxing local economies. … ISIL obtains the vast majority of its revenues through local criminal and extortion activities …"[398]

**c.** "ISIL earns revenue primarily from five sources, listed in order of magnitude: (1) illicit proceeds from occupation of territory, such as … extortion, … illicit taxation of goods and cash that transit territory where ISIL operates; … (3) donations …"[399]

**d.** "ISIL manages a sophisticated extortion racket by … demanding a portion of the economic resources … [like] how … organized crime groups generate funds. This vast range of extortion, including everything from … vehicle taxes to school fees …, is done under the auspices of providing notional services or 'protection.'"[400]

---

front companies. … ISIS is increasingly brazen in its revenue-producing activities in Iraq and Syria. … ISIS members [] openly extort[] …. ISIS [is] able to move more freely [and] extort protection money …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021*, at 15 (May 4, 2021) ("ISIS generated revenue from extortion, … and moves resources to its safe havens and to operatives throughout Iraq. … ISIS used similar fundraising tactics in Syria, targeting civilian businesses … for possible utilization as front companies."); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches …").

[397] Financial Action Task Force, *FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)*, at 5 (Feb. 2015), https://tinyurl.com/5b98bmbh.

[398] *Id*. at 10.

[399] *Id*. at 12.

[400] *Id*.

**e.** "ISIL has attempted to demonstrate a degree of sophistication and a formalized, structured internal financial management system by providing receipts for levies paid."[401]

**f.** "Trade of goods and transfers of cash into and out of ISIL-held territory has been significantly disrupted due to the weak security environment. However, according to industry contacts and press reporting, some trade of goods has persisted, as have cash transfers necessary for financing this trade. ISIL is able to impose levies on all goods transiting territory where it operates. ISIL has reportedly imposed specific taxes on the movement of goods in parts of Iraq where it operates, including a road tax of 200 USD in northern Iraq and an 800 USD 'customs' tax on trucks entering Iraq …"[402]

**g.** "Some delegations identified terrorist financing risks regarding wire transfers from charitable foundations to conflict zones or areas where ISIL operates. Other risks identified include … raising funds for recipients in a third country which are or are suspected to be part of an organisation [] that engages in violent … activities. These risks are enhanced when the source of the funds and purpose of the transaction is not known or cannot be verified. These instances include transactions not listing any reference or using generic terms such as 'other', 'services' and 'goods'. In some cases, public appeals for donations have not correlated with the organisations' stated purpose (e.g. educational, health care or humanitarian relief)."[403]

**h.** "ISIL[] will always require funds for operational support and to meet broad organisational requirements. … This report … identif[ied] the most important sources of ISIL funding, particularly … extortion …"[404]

811. **Media reports** alerted Defendants that protection payments aided Islamic State. In 2014, for example, *Forbes* analyzed Islamic State's tax rules, which alerted Defendants that their protection payments directly financed anti-American terrorism:

**a.** "Initially, [ISIS] depended on outright violence to raise cash. But as ISIS made the transition to [Islamic State], its revenue extraction became more sophisticated. … ISIL enforced taxes on a variety of commercial activities, including telecommunications companies that had relay towers in ISIL-controlled zones."

**b.** "The *New York Times* [] noted the extent to which ISIS is regularizing its … tax process. … 'Many … received official receipts stamped with the ISIS logo … These forms of taxation … increasingly carry the trappings of regularized tax collection."[405]

---

[401] *Id.*
[402] *Id.* at 17.
[403] *Id.* at 19.
[404] *Id.* at 32.
[405] Joseph Thorndike, *How ISIS Is Using Taxes To Build A Terrorist State*, Forbes (Aug. 18, 2014), https://tinyurl.com/5c3wa2ap.

812. In 2015, the *New York Times* reported the typical experience of any businesses operating inside Islamic State-controlled territory:

**a.** "Three times a month, Mohammad al-Kirayfawai hands $300 to fighters from the Islamic State for the privilege of driving his refrigerated truck full of ice cream and other perishables from Jordan to a part of Iraq where the militants are firmly in charge. The fighters who man the border post treat the payment as an import duty, not a bribe. They even provide a stamped receipt, with the logo and seal of the Islamic State, that Mr. Kirayfawai, 38, needs for passing through other checkpoints on his delivery route."

**b.** "Across wide expanses of Syria and Iraq, [] Islamic State … has set up a predatory and violent bureaucracy that wrings every last American dollar … it can from those who live under its control or pass through its territory."

**c.** "Islamic State[] … exact[ed] tolls and traffic tickets; rent for government buildings; utility bills for water and electricity; taxes on income, crops and cattle; and fines for smoking or wearing the wrong clothes."

**d.** "'They fight in the morning and they tax in the afternoon,' said Louise Shelley, … of the Terrorism, Transnational Crime and Corruption Center at George Mason University."

**e.** "[A]s Western and Middle Eastern officials have gained a better understanding of the Islamic State's finances over the past year, a broad consensus has emerged that its biggest source of cash appears to be the people it rules, and the businesses it controls."

**f.** "Inside that territory, [] Islamic State … has taken over the legitimate revenue collection operations of the governments it has usurped. And it has … extract[ed] as much as it can from the people, businesses and property it now controls."

**g.** "Another Islamic State department, the Diwan al-Rikaz, or the Office of Resources, oversees … a long list of other businesses now controlled by the militants. It operates … mobile phone companies … skimming revenues from all of them."

**h.** "The Islamic State also demands a cut of the revenues earned by small businesses. 'We either pay in [goods] or cash, it depends on the production,' said Tarek, a Syrian …"

**i.** "Officials of the so-called caliphate dislike the term 'tax,' preferring the Islamic term '*zakat*,' which refers to the alms Muslims are required to pay. Although the norm would be 2.5 percent of a person's wealth under typical interpretations of Islamic law, the militants are taking 10 percent, justifying the high rate by saying they are a 'nation in a time of war,' according to a citizen journalist in Raqqa …"

**j.** "Islamic State is extracting as much as $800 or $900 million, possibly more, from residents or businessmen inside the territory it controls."

**k.** "[U.S. government] [o]fficials assume that the Islamic State must be circulating the money it collects back out into the regional and global financial system since there have

not been signs of the kind of rampant inflation that could result from a large influx of currency into a relatively small economy closed off from the surrounding markets."[406]

813. From 2014 through 2017, similar media reports alerted Defendants that protection payments aided Islamic State during its caliphate era.[407]

---

[406] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, New York Times (Nov. 29, 2015).

[407] *E.g.*, Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014) ("In … Mosul ISIS nets upwards of $8 million a month by extorting taxes from local businesses …"), 2014 WLNR 425449; APS Diplomat Operations in Oil Diplomacy, *Ninewah Autonomy Efforts & Petroleum Projects* (Mar. 3, 2014) ("Said to have an IRGC-run base in Iran near Iraq's north-eastern province of Diyala, the ISIS extorts money from business owners in Mosul, helping to fund its activities in Iraq and Syria. … The tactical alliance between the IRGC and the ISIS is one of the strange things despite the fact that the Neo-Salafi group is killing many Iraqi Shi'ite Arabs …"), 2014 WLNR 5861825; Guy Taylor, *Al-Baghdadi, A Brutal Contender For Bin Laden's Mantle, Emerges In Iraq*, Washington Times (June 13, 2014) ("Under al-Baghdadi's leadership, ISIL's strategy has involved … running 'protection rackets' … in northern Iraq. [] [T]he mafia-style tactics may bring in piles of local cash …"), 2014 WLNR 15982987; Der Spiegel Staff, *The New Face of Terror ISIS; Rise Pushes Iraq to Brink*, *reprinted in* Yerepouni Daily News (Lebanon) (June 26, 2014) ("[F]unding comes from … protection money extorted in Mosul and other Sunni cities in Iraq."), 2014 WLNR 17314098; Lee Smith and Hussain Abdul-Hussain, *On The Origin Of ISIS*, Weekly Standard (Sept. 8, 2014) ("Nor are ISIS's money-raising schemes especially novel in the Middle East. … [one of ISIS's … main source[s] … is taxation …"), 2014 WLNR 38032996; Steven Mufson, *Islamic State Fighters Drawing On Oil Assets For Funding And Fuel*, WashingtonPost.com (Sept. 16, 2014) ("Islamic State has obtained revenue by imposing tariffs, [and] exacting protection money …"), 2014 WLNR 25578145; Economist Intelligence Unit, *MENA Politics: The Pushback*, EIU ViewsWire (March 23, 2015) ("[Islamic State] is left with … extortion and taxes levied in the name of *zakat*, Islamic alms."), 2015 WLNR 8488485; Worcester Telegram & Gazette (MA), Editorial, *Our View: Time to Lead* (Dec. 6, 2015) ("ISIS has grown into the world's most dangerous terrorist organization, financed - some say $50 million per month - by [inter alia] … taxes, tolls and extortion from the people living within or entering its borders."), 2015 WLNR 36138427; Senate Armed Services Committee, Advance Questions for General Joseph L. Votel, U.S. Army Nominee for Commander, U. S. Central Command, Targeted News Service, *Gen. Votel Testifies at Hearing on Nomination to be Commander, U.S. Central Command* (Mar. 9, 2016) ("General Joseph L. Votel" "testi[fied] [that]" "Mosul will remain [Islamic State's] finance hub as [Islamic State] likely will increasingly rely on extortion and tax revenue streams ..."); CNN: Early Start, *Trump Escalates War on News Media; Clinton Returns to California to Fight Sanders; Fierce Fighting in Falluja. Aired 4:30-5a* (June 1, 2016) ("ISIS still has a $2 billion empire thanks in part to new taxes. That's according to a new report from the Center for the Analysis of Terrorism, which … says ISIS made $2.4 billion in 2015. … the main reason why is taxes."), 2016 WLNR 16677887; Pioneer, *ISIS Down, Not Out: Ways To Kill It* (July 9, 2016) ("ISIS first occupied significant

814. From 2018 through 2022, similar media reports alerted Defendants that protection payments aided Islamic State during its post-caliphate global insurgency era.[408]

815. **Terrorism scholars** further alerted Defendants that their protection payments aided Islamic State.[409]

---

stretches of territory in Iraq and Syria … It has raised its finances quite skilfully by … engaging in … extortion, [and] levying of taxes, in territories held by it."), 2016 WLNR 20848601; Patrick Wintour, *Saudi Arabia Must Do More To Prevent Secret Funding Of ISIS, MPs Say*, Guardian (July 12, 2016) ("In a report on … ISIS finances, the [U.K. Parliament] claims [ISIS] in Iraq and Syria is increasingly desperate for more money, … resorting to 'gangsterism and protection rackets' disguised as taxation."), 2016 WLNR 21120198; Vivian Salama, Associated Press, *reprinted in* Canadian Press, *As Territory Shrinks, IS Group Looks For New Money Sources* (Oct. 19, 2016) ("[Former Treasury official Daniel] Glaser said … Islamic State … generated some $30 million per month … from taxation and extortion in 2015. Hisham al-Hashimi, an expert on IS…, said [Islamic State] currently makes about $4 million per month from taxes in Mosul alone. Al-Hashimi said the group charges a 4 per cent income tax on salaries less than $600 per month, and 5 per cent on monthly salaries between $600 and $1,000."); Karen DeYoung and Philip Rucker, *Trump Summons Muslim Nations To Confront 'Islamic Terror Of All Kinds'*, WashingtonPost.com (May 21, 2017) ("Islamic State … has largely funded itself through [inter alia] extortion and taxes … in Syria and Iraq …"), 2017 WLNR 15782138.

[408] *E.g.*, Jonathan Walker, *Source Of Terror Group's Millions Uncovered In New Report By North MP; Oil, Tax, And Trade Key To Daesh*, Sunday Sun (Apr. 29, 2018) ("ISIS raised billions of pounds from [inter alia] … taxing millions of residents … ISIS used a number of lucrative revenue streams to finance its operations across the globe … In recent years [Islamic State] has attempted to make up for the loss of oil revenue by extracting money from the people living in the remaining territory it controls. Almost everything was taxed, including cash withdrawals, salaries, and roads. It also charged a 'protection' tax for non-Islamic residents."), 2018 WLNR 13011934; Ellen Ioanes, *Here's What's Left Of ISIS — And Why They Still Pose A Major Threat*, Business Insider (Aug. 27, 2019) ("[J]ust because ISIS no longer has a caliphate, that doesn't mean it doesn't have influence or power in the places it once controlled — and that it's not still incredibly dangerous. … In both Iraq and Syria, ISIS is making money by … [*inter alia*] extorting civilians, and skimming funds off rebuilding contracts …").

[409] Jean-Charles Brisard and Damien Martinez (Al-Qaeda Scholars), *Islamic State: The Economy-Based Terrorist Funding*, at 5 (Thomson Reuters Accelus Oct. 2014) ("Since its inception, the [Islamic State] has relied on" "criminal activity to fund its activities, targeting businessmen, local politicians and clerics, in addition to foreign nationals."), https://tinyurl.com/2d26cvxx; Professor Jimmy Gurulé, *quoted in House Financial Services Committee Hearing on "Terrorist Financing and the Islamic State"; Testimony by Jimmy Gurule, Law Professor, Notre Dame Law School*, *republished in* U.S. Congressional News (Nov. 13, 2014) ("ISIS is primarily self-funded. … illicit taxation systems are also a significant source of income for ISIS. …The … ATA could be used against … [persons] that knowingly transfer

816. From 2014 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements similarly that alerted Defendants that their protection payments aided Islamic State's terrorist campaign.

## VI. DEFENDANTS' ASSISTANCE WAS SUBSTANTIAL

### A. Defendants Provided Support Tailored To The Violence At Issue Here

817. Defendants' assistance was tailored to the violence at issue in this case. That violence was Islamic State's campaign against Americans in Iraq, Syria, Turkey, Belgium, and Niger between July 1, 2014 and October 4, 2017: Islamic State fighters who overran civilian towns and villages; who kidnapped, held, tortured and executed civilians, including Americans; who ambushed American service members with small arms, heavy machine guns, rocket-propelled grenades, and mortars; and who detonated themselves in places of public use. *See infra* Part IX. What that campaign required, above all, was money — and money of a particular kind.

---

funds … to … ISIS."), 2014 WLNR 32049937; *Foundation for Defense of Democracies Vice President, Research Jonathan Schanzer, Prepared Testimony Before the House Financial Services Committee Hearing On Task Force To Investigate Terrorism Financing: A Survey Of Global Terrorism And Terrorist Financing*, *republished in* SEC Wire (Apr. 22, 2015) ("[O]ne dominant trend we continue to observe: the intersection of terrorism and crime. Designated terrorist groups … rather easily [] exploit[] existing businesses and levying oppressive taxes and tolls on the populations they dominate. The Islamic State, for example, extracts taxes …"); *Center For Strategic And International Studies Senior Adviser Mr. Juan C. Zarate, Prepared Testimony Before The House Financial Services Committee Hearing On Task Force TO Investigate Terrorism Financing: A Survey Of Global Terrorism And Terrorist Financing, As Released By The Committee*, *republished in* SEC Wire (Apr. 22, 2015) ("Islamic State is able to tax … the local population - raising taxes and fees as pressure mounts… This model of financing is not new. For years, al Qaida in Iraq had … extorted … to raise money …"); Peter R. Neumann, *Don't Follow The Money: The Problem With The War On Terrorist Financing*, Foreign Affairs (July 1, 2017) ("[O]nly one thing can truly revolutionize a terrorist group's finances: the seizure of territory. Until 2013, ISIS made most of its money from protection rackets, Iraq's illicit economy, and, to a much lesser extent, foreign donations. But in 2013 and 2014, the group captured vast swaths of … eastern Syria and northern Iraq. By mid-2014, when ISIS declared its caliphate, some six million to eight million people lived under its rule. The group's finances skyrocketed … ISIS collects taxes, charges fees, and levies tariffs on trade; the group's 2014 revenues from such measures exceeded $300 million."), 2017 WLNR 22264271.

It required cash, denominated in U.S. dollars, delivered inside the territory Islamic State controlled or contested, on a predictable schedule, in amounts large enough to pay fighters and buy weapons. That is precisely and exclusively what Defendants provided.

818. The fit between what Islamic State needed and what Defendants supplied was exact. Islamic State paid its fighters in cash, month by month, and outbid every rival for them; it bought explosives and the components of improvised explosive devices; and it paid bounties for successful attacks on Americans. *See infra* ¶¶ 828–830, 839. Each of those required money that could be moved, divided, and spent anywhere Islamic State chose — and Defendants supplied exactly that, in U.S. dollars, the currency Islamic State preferred above all others. *See supra* ¶ 474; *infra* ¶ 834. Defendants did not supply Islamic State with a product that Islamic State then had to convert into the means of violence. Defendants supplied the means of violence itself.

819. Defendants' assistance was also directed at the wrongdoer itself. Defendants and their agents negotiated their payments face to face with people who openly identified themselves as Islamic State, including high-level representatives of Islamic State's Financial Commission and local Islamic State cell leaders. *See supra* ¶ 695. When Islamic State seized Mosul, Defendants did not withdraw; they wrote to Islamic State asking its permission to keep working, thanked Islamic State for its "cooperation," and sent an engineer to hand-deliver that letter to Islamic State's office in Mosul. *See supra* ¶¶ 328–333. When Islamic State detained that engineer and demanded millions of dollars, Defendants paid. *See supra* ¶¶ 334–337. Defendants routed payments through a named Islamic State terrorist, Haji Saleh, who was responsible for collecting "taxes" and "levies" from telecom firms in northern Iraq. *See supra* ¶ 337. This was a working relationship with a terrorist organization.

820. Defendants had an alternative, and every comparable company took it. Of the large multinational corporations operating on the ground inside Islamic State's caliphate between 2014 and 2017, only two remained: Lafarge and Ericsson. *See supra* ¶¶ 362, 761. Defendants' own senior lawyer for the Middle East urged as strongly as he could that Ericsson refrain from doing business with Islamic State and leave Islamic State-controlled territory; Defendants overruled him because withdrawal would be "premature" and would "destroy [Ericsson's] business." *See supra* ¶¶ 324–326, 412. As the Deputy Attorney General put it, "[m]any companies made the right choice — the only lawful choice: to leave the region rather than join hands with" the terrorists; Lafarge, like Ericsson, "made a different decision." *See supra* ¶ 548. Defendants' assistance to Islamic State was not the unavoidable cost of operating in a dangerous place. It was a choice, made against advice, that almost every peer declined to make.

821. Money supplied the lifeblood of the terrorist campaigns waged by al-Qaeda, al-Qaeda-in-Iraq and Islamic State. Financing gave these FTOs the means to recruit and pay terrorist fighters; to acquire weapons and explosives with which to attack Americans; and to maintain the vast operational infrastructure needed to sustain the global campaign, including their key regional branches, in Iraq, Afghanistan, Syria, Turkey, Europe, and Africa.[410] As Representative Ted Poe, Chair of the U.S. House of Representatives Subcommittee on Terrorism, stated in 2015, "[t]ime and time again we are reminded of the massive damage that terrorists cause even with just a little money" – "precisely why our government" has "been tasked with stemming the flow of money to terrorist groups." Simply put, according to

---

[410] Given Islamic State's assumption of al-Qaeda-in-Iraq's protection money operation, including AQI's tactics techniques, and procedures, the points in this section apply equally to ISIS.

Congressman Poe, "[w]hen we can separate the terrorists from their money, lives can be saved." Defendants did the opposite.

822. Ericsson's conduct aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist enterprises. The very nature of the protection-money demands – backed by violent threats conveyed by the same al-Qaeda, al-Qaeda-in-Iraq, and Islamic State terrorists who were waging a vicious campaign against the United States in Iraq and Afghanistan – ensured a close connection between the payments and subsequent al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks on Americans. Such attacks were a foreseeable, if not necessary, consequence of Defendants' payments. When Defendants paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State protection money, they were not lessening the overall risk of terrorist violence; they were paying al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to redirect their attacks to other targets. One prevailing slogan among private-security contractors in Afghanistan captured the mentality that prevailed in Iraq: contractors often said, "you want them to fight Big Army [*i.e.*, the U.S. Army] before they fight you." Defendants' payments accomplished exactly that. They paid al-Qaeda, al-Qaeda-in-Iraq, and Islamic State to attack Coalition forces rather than Defendants' own businesses.

823. Defendants' protection payments supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with an important stream of revenue that was used to finance and facilitate those FTOs' terrorist attacks against Americans in Iraq, Afghanistan, Syria, Turkey, Europe, and Africa. Defendants' protection payments, which created an income stream overseen directly by leadership of each group, gave al-Qaeda, al-Qaeda-in-Iraq, and Islamic State fungible resources that were vital to their ability to sustain al-Qaeda's and Islamic State's respective terrorist enterprises. For that reason, the Commission on Wartime Contracting observed that, "[i]n Iraq

and Afghanistan, significant … issues include[d]" "diversion of contract funding to the insurgency" through "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects" "as a cost of doing business" at "a significant percentage of a project's cost[,]" which caused "U.S. funds" "[i]n Iraq and Afghanistan" to be "diverted to insurgents" and "directly strengthen[ed] the insurgency" such that Defendants caused "a disproportionate adverse impact on the U.S. effort" to combat terrorism in both countries.

824. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State institutionalized control of their protection money revenue. The extraction of protection payments occurred via a highly regulated process designed to ensure that such payments would benefit the broader insurgency. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State promulgated rules and regulations dictating to local field commanders how to collect (and spend) protection money from foreign businesses. The money flowed both ways – from local commanders up to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's respective financial commissions for use by such FTOs' central leadership, and conversely from the leadership back down to local commanders for use in the field in Iraq, Afghanistan, Syria, Turkey, Europe, and Africa. That discipline allowed protection money collected from all over Iraq and Syria to finance al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist machine in Iraq, Syria, Afghanistan, Turkey, Europe, and Africa.

825. Protection payments supplied al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with the means to buy weapons and explosives for use in terrorist attacks. Weapons capable of killing and injuring Americans cost money, and Defendants' protection payments provided al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with a potent and reliable source of funding to cover the cost of

their globalized terrorist campaigns targeting the United States in Iraq, Afghanistan, Syria, Turkey, Europe, and Africa.

826. Protection money payments, like those made by Defendants, delivered the budget surplus to al-Qaeda-in-Iraq, and later Islamic State "core," that was the direct, but-for cause of (a) al-Qaeda-in-Iraq's substantial financial transfers to al-Qaeda's "core" in Afghanistan and Pakistan from 2004 through 2014, and Islamic State core's transfers to Islamic State's branches in Afghanistan and Pakistan from 2014 through 2022; and (b) al-Qaeda's and al-Qaeda-in-Iraq's ability to consistently attract the best terrorist "talent" from 2004 through 2014, and Islamic State's similar recruitment ability from 2014 through 2022.

827. With respect to finance, the sheer volume of Defendants' protection payments allowed al-Qaeda and al-Qaeda-in-Iraq to generate large budget surpluses that funded al-Qaeda and al-Qaeda-in-Iraq attacks from 2004 through at least 2016, and allowed Islamic State "core" in Iraq and Syria to generate large budget surpluses that funded Islamic State's operations during its caliphate era (2014-2017) and during its post-caliphate, global insurgency era (2018-2022). Among other things, such surpluses gave al-Qaeda, al-Qaeda-in-Iraq, and Islamic State vital "rainy day" money that funded attacks well after Defendants' payments, which such FTOs used to fund their operations and strategic redeployments, such as when al-Qaeda-in-Iraq personnel transferred to Afghanistan from 2006 through 2014, or when Islamic State's core created and operated Islamic State's branch in Afghanistan and Pakistan from 2016 through 2022. Islamic State's core stockpiled its cash haul from the Iraqi and Syrian protection rackets throughout Iraq from 2014 through 2017 in deliberate anticipation of the global insurgency that followed. Those stockpiles totaled hundreds of millions of U.S. dollars and continued to finance Islamic State's attacks through at least 2022.

828. With respect to talent, al-Qaeda-in-Iraq (and later, Islamic State) leveraged budget power to outspend rival Sunni insurgents as al-Qaeda-in-Iraq consolidated its grip on the entire Sunni insurgency in Iraq (which tactic Islamic State replicated a decade later). Al-Qaeda-in-Iraq generally paid its rank-and-file members around $40-$50 per month (in the 2000s) and $100 per month (in the 2010s, as did Islamic State) and paid its mid-level fighters – the center of gravity for al-Qaeda's terrorist campaign in Iraq – around $200-$400 per month (as did Islamic State). Al-Qaeda-in-Iraq's and Islamic State's respective budget surpluses due to their protection money riches, however, allowed al-Qaeda-in-Iraq and ISIS commanders to win the struggle for terrorist talent by outspending all challengers and going up to $1,000 per month per fighter; the next-closest Sunni insurgent group, in contrast, could not afford to spend more than $250. To put that in context, Iraq's soldiers and police were paid about $150 a month.

829. Al-Qaeda-in-Iraq's and Islamic State's budget surpluses also funded bonuses that incentivized attacks against Americans in Iraq including rewards of: $10 per day for spies who supported attacks with intelligence; $100 to $200 for a successful IED attack; $500 to $700 for destroying an American vehicle; and $7,000 for shooting down a helicopter.

830. The effect of protection payments was especially pronounced because they enabled al-Qaeda, al-Qaeda-in-Iraq, and Islamic State cell leaders to pay recruits who fought against the Coalition in Iraq and Afghanistan for financial (rather than ideological) reasons. Al-Qaeda, al-Qaeda-in-Iraq, and Islamic State cell leaders typically operated on thin margins and faced constant pressure to raise enough money both to pay fighters and to launch attacks. Protection money was essential to fulfilling both needs. Had Defendants refused to pay and cut off that source of revenue, it would have forced al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commanders to, as one U.S. official put it, "deci[de] between paying and feeding [their] troops

and launching attacks." Defendants' payments freed al-Qaeda, al-Qaeda-in-Iraq, and Islamic State commanders from that choice and enabled them to retain their fighters while continuing with well-funded attacks on Coalition forces in Iraq and Afghanistan.

831. This financial link applied to protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in all their types. Due to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's fundraising apparatus, cash payments to local commanders (or the FTO's Financial Commission) flowed to the FTO's leadership for use wherever the terrorists decided to focus their resources.

832. Protection payments by Western multinational corporations like Ericsson supplied one of the most quantitatively significant sources of terrorist finance for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For each FTO, protection payments were always one of the top two fundraising tactics, and for most of al-Qaeda-in-Iraq's and Islamic State's existence, protection money ranked number one. The systematic payments effected by large international companies swamped other, smaller-scale protection rackets.

833. Protection payments also strengthened al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by allowing such FTOs to diversify their income. For designated terrorist groups subject to crippling international sanctions, diversification was critical because it offered al-Qaeda, al-Qaeda-in-Iraq, and Islamic State a degree of financial resiliency that made each less susceptible to American counterterrorism efforts. That is why, as the U.S. military began to successfully interdict al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's other revenue sources (such as oil smuggling), al-Qaeda, al-Qaeda-in-Iraq, and Islamic State relied increasingly on their burgeoning protection rackets. That stream of protection money – particularly from larger, well-financed corporations, including Corporate Defendants – supplied reliable funding for the FTOs

and, almost as importantly, offered insurance against the risk of other funding sources drying up on a moment's notice.

834. Protection payments from Western companies, including Corporate Defendants, were also qualitatively material to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist enterprise because of their unique link to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's leadership. Unlike funding from other sources (such as smaller businesses) that were more often spent locally, Corporate Defendants' protection payments generally flowed up al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's organizational chain – or were made directly to top-level al-Qaeda, al-Qaeda-in-Iraq, or ISIS institutions – and supplied fungible U.S. dollars that leadership could use wherever it saw fit. In addition, the payments often conferred intelligence benefits to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State by providing details about U.S. government, military, and contractor operations in the area. Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's high-level commanders then used the money and intelligence supplied by Defendants to finance their campaign against the United States in Iraq, Afghanistan, Syria, Turkey, Europe, and Africa.

835. Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's top-down organizational hierarchy ensured that protection money collected locally in one province or country helped to finance al-Qaeda, al-Qaeda-in-Iraq, and Islamic State operations throughout the country or in other key theaters – including areas miles away from the site of the payment. That was a core reason why al-Qaeda, al-Qaeda-in-Iraq, and Islamic State moved to institutionalize the collection of protection money from large firms, including Corporate Defendants; rather than have commanders spend their protection money locally, al-Qaeda, al-Qaeda-in-Iraq, and Islamic State directed the funds into the group's central coffers for use on a nationwide, or even global scale.

Accordingly, Defendants' payments did not merely fund attacks in the immediate areas of their projects; al-Qaeda's, al-Qaeda-in-Iraq's, and ISIS's process for redistributing those payments made sure that they financed terrorism throughout Iraq, Afghanistan, Syria, Turkey, Europe, and Africa.

### B. The Amount Of Protection Money, Fraudulent Concealment Of Defendants' Relationship With Terrorists, And Obstruction Of United States Counterterrorism Operations, Were All Significant

836. As explained above, money is the lifeblood of terrorism—especially for al-Qaeda and its progeny, al-Qaeda-in-Iraq and Islamic State. And as the United States explained in a criminal case targeting a member of al-Qaeda's Syndicate in Afghanistan, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."

837. Each year from 2004 through at least 2014, Ericsson caused at least several million U.S. dollars in terrorist finance to flow to al-Qaeda (which funded al-Qaeda's and the Haqqani Network's attacks, and also funded al-Qaeda's aid to al-Qaeda-in-Iraq), and at least several million U.S. dollars in terrorist finance to flow to al-Qaeda-in-Iraq (which funded al-Qaeda-in-Iraq's attacks and its aid to al-Qaeda and the Haqqani Network). From 2014 through at least 2019, Ericsson caused at least several million dollars in terrorist finance to flow to Islamic State, which funded Islamic State's attacks. Islamic State was al-Qaeda-in-Iraq under a new name, and the organization Ericsson financed from 2014 onward had been capitalized over the preceding decade by the same Ericsson money — first and foremost the protection payments Ericsson made directly to al-Qaeda-in-Iraq, and in addition the value Ericsson caused to flow to al-Qaeda core in Afghanistan, which al-Qaeda core passed down to al-Qaeda-in-Iraq as part of the at least $1,000,000 per month in total value al-Qaeda provided to its Iraqi branch, through a financial infrastructure al-Qaeda and al-Qaeda-in-Iraq had purpose-built so that protection

money collected in one geography could be redirected to another. *See supra* ¶¶ 169–171, 180, 277, 486, 583. Because al-Qaeda-in-Iraq was al-Qaeda's branch until February 2014, and because aid to one necessarily benefited the other, Ericsson's payments to al-Qaeda in Afghanistan before that date also strengthened the organization that became Islamic State. *See supra* ¶¶ 92, 122, 134, 170.

838. From 2004 through 2022, Defendants' protection payments likely served as one of the largest funding sources for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

839. Although al-Qaeda, al-Qaeda-in-Iraq, and Islamic State needed a large amount of money to sustain their terrorist campaign as a whole, each individual attack required less. Although estimates vary, each group often paid many of its rank-and-file fighters $40-$50 per month (during the 2000s) and about $100 per month (during the 2010s), while mid-level commanders were paid between $200-$400 per month. As for many of the signature al-Qaeda-inspired IED types (used by all three FTOs), they usually cost a mere $100 to make.

840. At those rates, even a single protection payment of $2,000 to al-Qaeda, al-Qaeda-in-Iraq, or Islamic State could finance substantial terrorist violence: in Afghanistan, Iraq, and Syria. A $2,000 payment made in 2007 to al-Qaeda or al-Qaeda-in-Iraq could put twenty terrorists (at $50 per fighter) and a commander in the field in Iraq, Syria, or Afghanistan for a month, and supply them with five IEDs.[411] Even in the late 2010s, after rank-and-file salaries doubled to $100, a $2,000 payment made in 2017 to Islamic State could put ten terrorists (at $100 per fighter) and a commander in the field in Iraq, Syria, or Afghanistan for a month, and supply them with five IEDs. Or the terrorists could spend their $2,000 to purchase large

[411] In Iraq, Afghanistan, Syria, and Turkey, the costs per fighter, rifle, IED, and suicide bomb were substantially similar.

quantities of bomb components. For example, $2,000 could purchase roughly 60 bags of calcium ammonium nitrate ("CAN") fertilizer, which terrorist bombmakers could convert into enough explosive material for approximately 260 large CAN fertilizer bombs (designed by al-Qaeda and its progeny to defeat an American armored vehicle) or 650 smaller CAN fertilizer bombs (designed by al-Qaeda and its progeny to defeat American body armor). Defendants regularly facilitated protection payments that were many orders of magnitude higher. -Those payments materially strengthened the ability of alQaeda, al-Qaeda-in-Iraq, and Islamic State to finance terrorist violence, and materially strengthened Islamic State's ability to finance the attacks that killed and injured Plaintiffs and their loved ones.

841. U.S. government studies confirm the dramatic impact that even marginal financial contributions produced for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. For example, one 2010 study by DOD concluded that there was a statistically significant relationship between al-Qaeda-in-Iraq terrorist finance, on the one hand, and successful AQI attacks against targets in Iraq, on the other, concluding that each successful attack in Iraq required an approximately $2,700 expenditure from al-Qaeda-in-Iraq. Indeed, this $2,700 figure was conservative, as another methodology projected a cost of approximately $1,200 per attack. The same study concluded that even marginal reductions in al-Qaeda-in-Iraq's terrorist funds corresponded with a statistically significant reduction in AQI's successful terrorist attacks.

842. Al-Qaeda generally agreed. In 2010, for example, al-Qaeda publicly boasted in an English language publication that, by al-Qaeda's own accounting, a complex transnational al-Qaeda bomb attack against U.S. targets could be funded for as little as one "$4,200" payment.

843. Ericsson's successful and purposeful concealment of their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State from 2004 through February 15, 2022, was also

significant—not only with respect to its duration, but also in terms of the amount of effort required to avoid detection or discovery of those illegal payments and the benefit realized by those FTOs from the lack of governmental detection (most notably, by the U.S.) of Defendants' illegal payments and other value transfers to terrorists.

### C. Defendants Had Culpable Mental States

844. Defendants had highly culpable mental states because LM Ericsson, Ericsson AB, and Ericsson Inc. occupied sophisticated positions as, respectively, one of the world's largest, most well-connected companies, that company's primary operating company in Iraq and Afghanistan, and its U.S. subsidiary, and knew full well that their protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would aid anti-American terrorism. Indeed, according to leaked Ericsson documents, Ericsson knew that merely doing business in Iraq "may in itself pose significant political, financial and legal risks and requires diligent controls." Thus, Ericsson's decision to pay al-Qaeda, al-Qaeda-in-Iraq, and Islamic State was highly culpable.

845. Defendants' robust culpability is also demonstrated by LM Ericsson's pattern and practice of rewarding its in-house terrorist financiers while retaliating against whistleblowers. After they approved aiding Islamic State, for example, LM Ericsson named Ms. Ibrahim a senior vice president in 2017, and she became an advisor to its CEO, Defendant Ekholm, in 2019. Mr. Moubarak, for his part, was promoted to Iraq country manager in 2019. On information and belief, both remain employed by LM Ericsson to this day. In contrast, Ericsson fired whistleblower Roger Antoun in 2019. Such disparate treatment between involved employees also demonstrated Defendants' intent to seek profit rather than prevent terrorist finance or even follow basic compliance norms.

846. Defendants' behavior was especially culpable because a substantial portion of the payments – i.e., those from 2013 through on or about at least December 2019 – occurred while

LM Ericsson was in active discussions with the U.S. government (first SEC, and later DOJ as well) in which Ericsson pledged good corporate citizenship, cooperation, and respect for anti-corruption while simultaneously scheming to route protection payments to al-Qaeda and al-Qaeda-in-Iraq (from 2013 through February 2014) and Islamic State (from February 2014 until LM Ericsson's DPA in December 2019).

847. Indeed, LM Ericsson has a longstanding history of directly lying about its bribery schemes when confronted, only admitting the truth after all its avenues of escape are closed. A 2016 exchange that occurred in one of Sweden's leading newspapers, *Dagens Nyheter*, offers but one example of this longstanding Ericsson tactic:

> Former executives with … Ericsson say the firm shelled out tens of millions of dollars in bribes between 1998 and 2001, [] Swedish media reported … A former executive … handed the [SEC] documents relating to the alleged kickbacks, *Dagens Nyheter* daily and Swedish public radio SR said. "Enormous sums were sent via Zurich from the company headquarters in Sweden to secret recipients around the world," *Dagens Nyheter* said … The newspaper said the biggest bribes included 1.4 billion kronor (140 million euros, $150 million), sent to bank accounts in Malaysia, and 763 million kronor sent to Poland, via the British offshore banking haven of Jersey. … Denying any wrongdoing, Ericsson said the radio documentary reported on a period when the company used commercial agents to a greater extent 15-20 years ago. "Ericsson has, just like many other companies that are active in the international market, used commercial agents," the spokeswoman told AFP. "This work approach can be attractive as it can be more cost effective than building a large local sales organisation," she said, adding that the group only has "a few agency agreements left" in countries where it's a requirement. …. Quoted by Dagens Nyheter, [Ericsson] said Wednesday it never found "any evidence that bribes were allegedly paid."[412]

As demonstrated by LM Ericsson's subsequent guilty plea, LM Ericsson's response to *Dagens Nyheter*, as reported above, was replete with lies: Ericsson denied that it operated a global corruption scheme (a lie); Ericsson implied that it no longer relied upon consultants who served

[412] Ilgin Karlidag, *Ex-Ericsson Executives Tell Of Massive Bribery: Report*, Agence France Presse English Wire (Nov. 23, 2016).

as cutouts to route bribes (another lie); and Ericsson implied that its reason for using consultants as buffers in high-risk jurisdictions was to "be more cost effective" (a material omission because, while bribery was more cost effective than honest sales, it remained illegal).

848. LM Ericsson and Ericsson AB were also culpable because they were anti-corruption recidivists.

**D. Defendants Had A Close Relationship To The Tortfeasors**

849. Each Defendant had close relationships to the relevant tortfeasors. LM Ericsson and Ericsson AB, through their own personnel and their Iraqi partners, consultants, and contractors, had direct relationships with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Ericsson Inc., through LM Ericsson and Ericsson AB, had direct relationships with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

850. LM Ericsson, Ericsson AB, and Ericsson Inc. also structured their transactions with knowledge of the closeness of their relationship to the tortfeasor. Defendants' attempts to interpose intermediaries between themselves and the al-Qaeda, al-Qaeda-in-Iraq, and Islamic State operatives to whom Defendants' protection money was ultimately paid only highlights the closeness of Defendants' relationship to the tortfeasors.

851. Defendants' relationship to Islamic State was direct, bilateral, and conducted between identified people. Defendants asked Islamic State in writing for permission to work in the territory Islamic State held; they sent a man to carry that request to Islamic State's office in Mosul; they negotiated with a named Islamic State officer over the price of continuing to do business; and they paid the price Islamic State set.

852. Defendants sought the relationship out. On July 14, 2014, Ericsson asked its Iraqi "partner" Asiacell to obtain "permission from 'local authority ISIS'" for Ericsson to keep working in Mosul, and later that summer LM Ericsson, Ericsson AB, and Asiacell prepared a

letter to Islamic State requesting the organization's permission to continue working in northern Iraq — a letter asking Islamic State to "[p]lease facilitate the mission of the technical team … of Ericsson" and "thank[ing]" Islamic State for its "cooperation." *See supra* ¶¶ 328–329. Defendants then caused an engineer working for their subcontractor to hand-deliver that letter to the terrorists at Islamic State's office in Mosul, having instructed him directly to do so and having pressed his employer to see that he did, and knowing that Islamic State had already detained other workers performing services under the same contract. *See supra* ¶¶ 330–333. A party that applies to a designated Foreign Terrorist Organization for permission to operate, and thanks that organization for its cooperation, is dealing with it, not around it.

853. Defendants dealt with a specific Islamic State officer whose function within Islamic State they understood. Islamic State's response to Ericsson's letter came from Haji Saleh, a sheikh who was an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecommunications businesses in northern Iraq — an Islamic State official whose assigned work was extracting money from companies in Defendants' own industry, in the territory where Defendants operated. Haji Saleh told Ericsson's senior manager in Iraq that Ericsson would have to pay Islamic State millions of U.S. dollars in order to continue its work in northern Iraq. *See supra* ¶ 334.

854. Islamic State's demand was made to Defendants' own personnel, and Defendants met it. According to leaked Ericsson internal documents, an Islamic State "sheikh" — on information and belief, Haji Saleh — telephoned Rabbah Dannawi, an Ericsson project manager in Iraq, told Mr. Dannawi that Ericsson and its employees were "infidels" and that Islamic State was demanding that Ericsson pay a religious tax of millions of U.S. dollars, and warned Mr. Dannawi that he was "reachable" even in Oman or Lebanon. *See supra* ¶ 335. Ericsson thereafter

facilitated the payment of millions of U.S. dollars to Islamic State as a "business tax," and an Ericsson manager admitted, in a document later leaked, that Ericsson worked through Asiacell to make "arrangements to obtain the release of the hostage and to let Ericsson continue the work in Mosul." On information and belief, Ericsson routed some of those payments to Islamic State through Haji Saleh himself. *See supra* ¶ 337. Defendants thus transacted with Islamic State through a named Islamic State revenue official, on terms Islamic State set, for a benefit that only Islamic State could confer.

855. Defendants dealt directly with the terrorist organizations they financed on other occasions as well. With respect to the large-scale payments negotiated directly with al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, LM Ericsson, Ericsson AB, and Ericsson Inc., or their agents, met with high-level representatives acting on behalf of those organizations who openly represented their respective Financial Commissions, each of which maintained one; and the payments to local Islamic State regional cell leaders were negotiated with cell leaders who openly identified themselves as Islamic State members. *See supra* ¶ 695. Defendants therefore sat across the table from the terrorist organizations' own finance officials.

856. The relationship ran continuously from at least 2014 onward. Defendants' dealings with Islamic State continued past the Mosul letter and past the payment that secured the release of Ericsson's engineer: Ericsson went on facilitating the payment of "customs taxes" to Islamic State on its transport routes from at least 2014 through at least 2017, regularly paying thousands of U.S. dollars per truck, and collectively facilitated at least several million U.S. dollars' worth of such payments from at least 2014 through at least 2019. *See supra* ¶¶ 338, 341–342. Defendants maintained that relationship with Islamic State across successive contracts and successive years, after learning first-hand who was on the other side of it.

### E. The Duration Of Support Was Long

857. Defendants facilitated the flow of protection payments to al-Qaeda and its progeny for at least fifteen years. Ericsson aided al-Qaeda and al-Qaeda-in-Iraq from at least 2004 through at least 2015. Ericsson aided Islamic State from at least 2014 through at least 2019. Indeed, even Ekholm candidly admitted to the *Financial Times*, "I don't think the bad conduct [in Iraq] changed on January 16, 2017."

858. Defendants also obstructed U.S. counterterrorism policy for nearly a decade. From at least 2014 through 2022, Ericsson actively lied to the U.S. government in a manner calculated to impede American counterterrorism efforts by concealing the details of the protection racket in which they participated, the payments they had made, and the associated logistics – all of which was actionable information of the sort upon which American counterterrorism strategy depended.

## VII. ISLAMIC STATE USED DEFENDANTS' ASSISTANCE TO COMMIT ACTS OF INTERNATIONAL TERRORISM THAT KILLED AND INJURED PLAINTIFFS IN IRAQ, SYRIA, TURKEY, EUROPE, AND AFRICA

### A. Islamic State Committed, Planned, And Authorized The Attacks That Injured Plaintiffs In Iraq, Syria, Turkey, Europe, And Africa From 2014 Through 2017

859. Islamic State committed, planned, and authorized the attacks in Iraq, Syria, Turkey, Belgium, and Niger that killed or injured Plaintiffs and their loved ones there from 2014 through 2017.

### B. Al-Qaeda Polyterrorists Facilitated Al-Qaeda's Acts Of International Terrorism In Iraq, Afghanistan, Pakistan, Syria, and Turkey

860. Al-Qaeda relied heavily upon multi-hatted terrorists – known as **"polyterrorists"** to accomplish each of the four modalities of circular value transfer between Iraq/Syria and Afghanistan/Pakistan – funds, personnel, training, and logistics.

861. For al-Qaeda, al-Qaeda-in-Iraq, and the Taliban, polyterrorists who served as members of more than one terrorist organization – *e.g.*, a terrorist who served in both al-Qaeda and the Taliban's Haqqani Network – typically played transnational roles and fueled the interconnections between al-Qaeda's core in Afghanistan and Pakistan and al-Qaeda's branches, al-Qaeda-in-Iraq and its Syrian alias, Jabhat al-Nusra.

862. As another manifestation of its multinational corporate-inspired approach to terror, al-Qaeda core routinely shared polyterrorist finance facilitators and logistics specialists, ratlines,[413] as well as safe houses, with operatives from its branches in Iraq, Syria, and Afghanistan, including al-Qaeda-in-Iraq (in Iraq, Syria, Afghanistan, and Pakistan), Jabhat al-Nusra (in Syria), and with the Taliban, including its Haqqani Network (in Afghanistan, Pakistan, the U.A.E., Iraq, and Syria).

863. Al-Qaeda's and its branches' reliance on polyterrorists after 9/11 was another reflection of al-Qaeda's franchise-approach to terrorism. At all times, al-Qaeda's and its branches' terrorist enterprise benefited from al-Qaeda operatives who were polyterrorists. By design, Pakistan-based al-Qaeda operatives were often members of other al-Qaeda branches, most commonly, al-Qaeda-in-Iraq (in Iraq and Syria) or al-Qaeda affiliates like the Haqqani Network and Lashkar-e-Taiba (in Afghanistan and Pakistan). Typically, al-Qaeda's and its affiliates' polyterrorist operatives or agents served al-Qaeda's transnational terrorist activities in

[413] A "ratline" is comprised of the combination of a vetted and safe covert transport route between two key terrorist geographies (e.g., a route that permits terrorists to move people between Afghanistan and Iraq), safehouses throughout such route, and facilitators who enable the flow of personnel, goods, and communications throughout such route. It is a universal truth for every FTO that such FTOs' "ratlines" serve as an enormously valuable asset to the FTO, analogous in some respects (in value terms) to the value a company derives from its vital, hard-to-replicate trade secrets. As such, the sharing of ratlines between FTOs represented an enormously important, and valuable, form of value transfer between FTOs, including value transfer between al-Qaeda and al-Qaeda-in-Iraq.

support of attacks against Americans in Afghanistan, Iraq, Syria, and other al-Qaeda-targeted areas. Some examples of al-Qaeda's most important polyterrorists include the following.

### 1. Abu Musab al-Zarqawi

864. Abu Musab al-Zarqawi was a Jordanian national and a known senior member of al-Qaeda since the 1990s who founded and originally led al-Qaeda-in-Iraq. Until his death, Zarqawi was a notorious anti-American terrorist who, among other things, was known to have personally decapitated at least one American hostage in Iraq on camera.

865. Zarqawi was an al-Qaeda polyterrorist who served as a member of, among other groups, al-Qaeda and al-Qaeda-in-Iraq. Introduced to bin Laden in 1998, Zarqawi rose quickly through the ranks. By 2000, Zarqawi had established himself as al-Qaeda's most indispensable terrorist operator and was a critical al-Qaeda leader in Afghanistan. In 2001, Zarqawi took the oath of allegiance to al-Qaeda and to Osama bin Laden personally. Written by bin Laden himself, Zarqawi declared: "I recall the commitment to God, in order to listen to and obey my superiors, who are accomplishing this task with energy, difficulty, and giving of self, and in order that God may protect us so God's words are the highest and his religion victorious." Zarqawi adhered to this oath until his death in 2006.

866. By the summer of 2001, Zarqawi was a well-known senior al-Qaeda operative, and was equally well-versed in every aspect of the al-Qaeda terrorist playbook that he later imported into Iraq. Indeed, he was so well-established that a 30-page guide to al-Qaeda in Afghanistan for new recruits specifically identified Zarqawi as one of the al-Qaeda leaders there who could be contacted by recruits for aid regarding religious, logistical, or lodging needs.

867. Less than a year after joining al-Qaeda, Zarqawi had so demonstrated his terrorist talent and trustworthiness that he was permitted to establish, with al-Qaeda's financial and logistical support, his own al-Qaeda training camp near the border with Iran in Herat,

Afghanistan. After he set up al-Qaeda's camp in Herat, Zarqawi regularly traveled between Herat and Kabul on behalf of al-Qaeda. Herat was known then (and now) as a key site of terrorist activity, as the hub that opens the way to Iraqi Kurdistan through Iran. Zarqawi frequently travelled via Iran between Herat, Afghanistan and Iraqi Kurdistan to secure al-Qaeda's survival after 9/11. Bin Laden correctly anticipated that the United States would expel al-Qaeda and its Taliban protectors from Afghanistan after 9/11 and planned for a "progressive redeployment" of al-Qaeda to two locations: Pakistan (where bin Laden and Zawahiri planned to regroup) and Iraqi Kurdistan (where bin Laden contemplated Zarqawi would regroup).

868. During the U.S. invasion of Afghanistan in the months after 9/11, it became apparent to al-Qaeda that it needed to strategically redeploy to Pakistan, Iran, and Iraq. Al-Qaeda instructed Zarqawi to flee Afghanistan through Iran into Iraq to set up al-Qaeda-in-Iraq. Zarqawi did so in early 2002 once he eluded capture by American forces and obtained urgent medical care in an escape that was organized by Iran. Soon after, at the direction of al-Qaeda core and with the aid of IRGC leader Qassem Soleimani, Zarqawi founded what became al-Qaeda-in-Iraq.

869. By the onset of the U.S. presence in Iraq in 2003, Zarqawi turned al-Qaeda-in-Iraq into the primary Sunni terrorist threat against Americans there by working with al-Qaeda to mobilize the coalition of anti-American Sunni terrorists in Iraq under al-Qaeda's banner – carried in Iraq by al-Qaeda-in-Iraq – and conducting a series of mass-casualty strikes against prominent U.S. and international targets in Iraq in 2003.

870. On September 24, 2003, the United States and United Nations both designated Zarqawi as a terrorist based upon his relationship with al-Qaeda. Both designations recognized Zarqawi's al-Qaeda membership, the global nature of Zarqawi's network, and the key terrorist

threat that Zarqawi and al-Qaeda posed to Americans in Iraq. Among other things, the Treasury Department determined that Zarqawi and his al-Qaeda-affiliated terrorists "[m]aintain[ed] contacts throughout Europe, the Middle-East, and Western Asia - in Pakistan, Iran, Yemen, Iraq, Malaysia, Afghanistan" and "acted for or on behalf of Al-Qaeda."

871. Until his death in 2006, Zarqawi and the al-Qaeda terrorists he led in Iraq targeted Americans. According to Zarqawi, "[t]he Americans" were al-Qaeda's first "enemy" because they "are the most cowardly of God's creatures" and "are an easy quarry, praise be to God. We ask God to enable us to kill and capture them to sow panic among those behind them …."

872. On June 7, 2006, Zarqawi was killed in an American military strike. In his comments thereafter, President Bush stated that Zarqawi's death was "a severe blow to al Qaeda, and … a significant victory in the war on terror."

**2. Sulayman Khalid Darwish**

873. At all relevant times, Sulayman Khalid Darwish was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Darwish provided financial and material support to both as a key al-Qaeda and al-Qaeda-in-Iraq fundraiser and recruiter.

874. On January 25, 2005, the United States designated Darwish as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department publicly stated, among other things, that Darwish: enabled "cash flows to the Iraqi insurgency and al Qaida"; "was designated … for providing financial and material support to the al-Zarqawi Network and al Qaida"; was a " terrorist financier" who "support[ed] Zarqawi, who has launched violent acts against [U.S.] troops"; was part of "the financial backbone of the Iraqi insurgency and al Qaida"; was "a member of the Advisory (Shura) Council of the Zarqawi organization and served as one of Zarqawi's operatives"; was "involved in fundraising and recruiting for the

organization"; was "a close associate of Zarqawi and one of the most prominent members of the Zarqawi Network in Syria"; "received training on Zarqawi's orders in the following areas: weapons, topography, artillery training, electronics training, explosives production and the use of explosives" "[w]hile in Afghanistan"; "received training in Afghanistan, Iran, Turkey and Lebanon in document forging and is considered an expert in preparing forged documents for the Zarqawi Network"; "handle[d] mostly financial issues for Zarqawi, collecting, and distributing funds for him" including "donations of $10,000-$12,000 to Zarqawi in Iraq every 20-25 days"; and "was essential to recruiting and dispatching terrorist operatives … for operations [], particularly [in] Iraq. For example, Darwish contacted jihadists who had been in Afghanistan and who were, by 2004, scattered in different countries; he recruited among these jihadists for fighters to join Zarqawi in Iraq."

875. On January 25, 2005, the United Nations followed the U.S. lead and designated Darwish pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime.

876. On October 26, 2008, Darwish was killed by a U.S. military strike in Syria.

**3. Muhsin al-Fadhli**

877. From the early 2000s until his death in 2015, Muhsin al-Fadhli was a veteran al-Qaeda polyterrorist who served as a member of al-Qaeda and al-Qaeda-in-Iraq. In that polyterrorist role, Fadhli served as a key Persian Gulf-based leader for al-Qaeda and al-Qaeda-in-Iraq and a major facilitator for Zarqawi personally. Fadhli supported Iraq-based al-Qaeda and al-Qaeda-in-Iraq operatives to facilitate attacks against U.S. forces. Fadhli also served as one of al-Qaeda's and al-Qaeda-in-Iraq's Iran-based facilitators and helped enable the free flow of al-Qaeda operatives, funds, and material between Afghanistan, Pakistan, Iran, Iraq, and Syria.

878. On February 15, 2005, the United States designated Fadhli as a Specially Designated Global Terrorist based on Fadhli's service as an operative for al-Qaeda and al-

Qaeda-in-Iraq. Announcing the designation, the Treasury Department publicly stated, among other things, that Fadhli "was designated under Executive Order 13224 for providing financial and material support to the al-Zarqawi Network and al Qaida" because, among other things, Fadhli was "helping to finance the Iraqi insurgency, as well as al Qaida," provided "financial ties" that "the al-Zarqawi Network depend[ed] on to perpetrate acts of horror and violence," was "an al Qaida leader in the Gulf countries," "fought alongside the Taliban and al Qaida in Afghanistan where he served as a bodyguard and second-in-command for an al Qaida leader," "fought against Russian forces in Chechnya, where he trained in the use of firearms, antiaircraft guns and explosives," was among the select few al-Qaeda operatives who "in early September, 2001, … received forewarning that U.S. interests would be struck," and his "support for terrorism extend[ed] to Iraq where he … provid[ed] support to fighters against U.S. … forces and [was] considered a major facilitator connected to the brutal terrorist, Abu Musab al-Zarqawi," including "solidify[ing] the support of key financial backers sponsoring attacks," through "tapes … showing evidence of successful attacks in Iraq."

879. On February 17, 2005, the United Nations followed the U.S. lead and sanctioned Fadhli pursuant to paragraphs U.N. Security Council Resolution 1526 (2004) based upon his status as a key operative for al-Qaeda and al-Qaeda-in-Iraq and his being associated with al-Qaeda, Osama bin Laden or the Taliban for participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of Al-Qaida. In so doing, the U.N. made findings consistent with those made by the United States in its SDGT designation.

880. On October 18, 2012, the United States government announced a $7 million bounty on Fadhli under its Rewards for Justice program. In so doing, the U.S. determined,

among other things, that Fadhli: “facilitate[d] the movement of funds and operatives through Iran on behalf of the al-Qaida terrorist network,” was “wanted by Saudi authorities” and “authorities in Kuwait” “in connection with [his] terrorist activities,” had “replaced Ezedin Abdel Aziz Khalil (better known as Yasin al-Suri) as al-Qaida’s senior facilitator and financier in Iran,” “was among the few trusted al-Qaida leaders who received advance notification that terrorists would strike the United States on September 11, 2001,” “led” “Al-Qaida elements in Iran” that were “working to move fighters and money through Turkey to support al-Qaida-affiliated elements in Syria,” “assisted al-Qaida in moving multiple operatives from Pakistan via Iran and Turkey to destinations in Europe, North Africa, and Syria, and [was] believed likely to continue moving experienced al-Qaida operatives to reinforce and gain influence in these areas.”

881. On July 8, 2015, Fadhli was killed in an American airstrike in Syria, after being deployed there by al-Qaeda core to play a similar role to the one he played in Iraq the decade prior. Announcing the strike, the Department of Defense stated, among other things, that “Muhsin al-Fadhli” was “a longtime al-Qaida operative” and “a senior al-Qaida facilitator who was among the few trusted al-Qaida leaders who received advance notification of the Sept. 11, 2001, terrorist attacks,” whose “death” “degrade[d] and disrupt[ed] ongoing external operations of al-Qaida against the United States.”

**4. Abu Hamza al-Muhajir (aka Abu Ayyub al-Masri)**

882. Abu Hamza al-Muhajir, aka Abu Ayyub al-Masri (“Masri”), was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Masri provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Masri was an al-Qaeda core member who learned his terrorist tradecraft at al-Qaeda camps in Afghanistan. Masri was also a long-standing confidante of Ayman al-Zawahiri, having been one of Zawahiri’s best students (and a former member of Zawahiri’s organization Egyptian Islamic Jihad before its

merger with al-Qaeda in the 1990s). Among other roles he served for al-Qaeda core, Masri coordinated all al-Qaeda jihad volunteer operations from Europe and the Middle East before al-Qaeda deployed him from Afghanistan to Iraq to assume the executive officer position under Zarqawi. His *nom de guerre* meant "Abu Hamza, the Migrant," referencing his transnational role and identity.

883. In 2006, Masri replaced Zarqawi as leader (*emir*) of al-Qaeda-in-Iraq, which role he continued to serve until his own death in 2010. As a Zawahiri lieutenant, Masri's elevation to emir of al-Qaeda-in-Iraq reinforced al-Qaeda's control of al-Qaeda-in-Iraq. Like Zarqawi, Masri pledged allegiance to al-Qaeda in his own personal capacity and in his role as leader of al-Qaeda-in-Iraq.

884. On April 18, 2010, Masri was killed in a U.S. military strike. Commenting on the event, General Raymond Odierno, commander of U.S. Forces-Iraq, stated that Masri's death was "potentially the most significant blow to al Qaeda in Iraq since the beginning of the insurgency" because Masri directly linked al-Qaeda-in-Iraq to al-Qaeda "core" in Afghanistan and represented "the foreign element of al Qaeda that was established here," i.e., in Iraq.

### 5. Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani

885. Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani, aka Abu Shaheen, was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Mashhadani provided logistical and material support to both groups.

886. From 2003 through at least 2007, Mashhadani served as the highest-ranking Iraqi in al-Qaeda core's senior management team in Afghanistan and Pakistan and played a key role helping al-Qaeda and al-Qaeda-in-Iraq fulfill bin Laden's vision of bringing all al-Qaeda-affiliated groups into a unified jihadi structure. Mashhadani helped Zarqawi and his successor, Masri, create a truly integrated terrorist force in Iraq through a global jihadist collective

commanded by al-Qaeda but with local Iraqis being given leading roles due to their knowledge of the terrain. Mashhadani's efforts also helped al-Qaeda and al-Qaeda-in-Iraq vertically integrate key operations, including their suicide bombing network, to maximize the potency of their attacks against Americans in Iraq.

887. On July 4, 2007, Mashhadani was captured by U.S. forces during a raid in Mosul. Announcing the capture, the Department of Defense observed that Mashhadani served as a link between al-Qaeda core and al-Qaeda-in-Iraq. According to Brigadier General Kevin Bergner, who served as the U.S. military's spokesperson in Iraq at the time: Mashhadani was the highest-ranking Iraqi in the al-Qaeda in Iraq leadership when captured; Mashhadani carried messages from bin Laden and Zawahri to the head of al-Qaeda in Iraq, Masri; Mashhadani admitted to interrogators that al-Qaeda's global leadership provided "directions," and "continue[d] to provide a focus for operations" and "continue[d] to flow foreign fighters into Iraq, foreign terrorists," all to facilitate al-Qaeda's terrorist campaign against America there through al-Qaeda-in-Iraq; and Mashhadani's role demonstrated that there was "a clear connection between al-Qaida in Iraq and al-Qaida senior leadership outside Iraq," because "[w]hat we've learned from not just from the capture of al-Mashhadani but from other al-Qaida operatives is that there [was] a flow of strategic directions of prioritization, of messaging and other guidance that [came] from al-Qaida senior leadership to the al-Qaida in Iraq leadership."

### 6. Ezedin Abdel Aziz Khalil (aka Yasin al-Suri)

888. At all relevant times, Ezedin Abdel Aziz Khalil (aka Yasin al-Suri) was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Khalil provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other roles, Khalil served as a key Iran-based facilitator for al-Qaeda and al-Qaeda-in-Iraq.

889. On July 28, 2011, the United States designated Khalil as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department publicly stated, among other things, that Khalil: was "a prominent Iran-based al-Qa'ida facilitator, operating under an agreement between al-Qa'ida and the Iranian government" who led a "key" "al-Qa'ida network" in "Iran" "since 2005" that "serve[d] as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia" and was "a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan" that "al-Qa'ida" operated pursuant to the "secret deal" between "Iran" and "al-Qa'ida" that "allow[ed] [al-Qa'ida] to funnel funds and operatives through [Iran's] territory" and "much-needed support" to "al-Qa'ida's senior leadership"; "move[d] money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of al-Qa'ida senior leaders"; "collected funding from various donors and fundraisers throughout the Gulf and is responsible for moving significant amounts of money via Iran for onward passage to al-Qa'ida's leadership in Afghanistan and Iraq"; and "facilitated the travel of extremist recruits for al-Qa'ida from the Gulf to Pakistan and Afghanistan via Iran."

**7. Umid Muhammadi**

890. At all relevant times, Umid Muhammadi was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Muhammadi provided financial and material support to both groups. Among other roles, Muhammadi was a key facilitator for al-Qaeda and al-Qaeda-in-Iraq.

891. On July 28, 2011, the United States designated Muhammadi as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department publicly stated, among other things, that Muhammadi: was "an al-Qa'ida facilitator and key supporter of al-Qa'ida in Iraq (AQI)"; "petitioned Iranian officials on al-Qa'ida's behalf"; had "been involved

in planning multiple attacks in Iraq"; had "trained extremists in the use of explosives"; and had "received training in Afghanistan on the use of rockets and chemicals."

**8. Mustafa Hajji Muhammad Khan**

892. Mustafa Hajji Muhammad Khan was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Khan provided financial and material support to both from 2003 until his death in 2012. Among other roles, Khan was a key facilitator for al-Qaeda and al-Qaeda-in-Iraq, in which role he enabled the movement of fighters and funds amongst Iraq, Afghanistan, Pakistan and the Persian Gulf.

893. On March 14, 2011, the United Nations sanctioned Khan pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime. According to the U.N.'s designation, among other things, "Mustafa Hajji Muhammad Khan" was "an Al-Qaida [] facilitator, courier and operative since at least 2003" and "serve[d] as a representative of the Al-Qaida leadership to the former head of Al-Qaida in Iraq [], … Abu Musab al-Zarqawi."

894. On September 7, 2011, the United States designated Khan as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department publicly stated, among other things, that Khan: "acted as an al-Qa'ida facilitator, courier and operative since at least 2003"; "facilitated activities for senior Pakistan-based al-Qa'ida operatives"; had "also been active in facilitating the travel of al-Qa'ida members, including escorting an individual to meet with another al-Qa'ida member in 2009"; "recruited a facilitator" "[o]n al-Qa'ida's behalf," "who helped [Khan] move people and money between Gulf countries and Pakistan"; "helped al-Qa'ida reestablish logistic support networks in Pakistan"; and "served as a messenger between al-Qa'ida and former al-Qa'ida in Iraq leader Abu Musab al-Zarqawi."

895. On October 1, 2012, Khan was killed in a U.S. military strike in Pakistan.

### 9. Adel Radi Saqr al-Wahabi al-Harbi

896. At all relevant times, Adel Radi Saqr al-Wahabi al-Harbi was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Harbi provided financial and material support to both. Among other roles, Harbi served al-Qaeda and al-Qaeda-in-Iraq through his role as Muhsin al-Fadhli's deputy. In such capacity, Harbi connected al-Qaeda operatives in Iraq and Afghanistan.

897. On October 18, 2012, the United States designated Harbi as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department publicly stated, among other things, that Harbi was a "key member of an al-Qa'ida network operating in Iran and led by Iran-based al-Qa'ida facilitator Muhsin al-Fadhli" and "serve[d] as the deputy to al-Fadhli," "facilitate[d] the travel of extremists to Afghanistan or Iraq via Iran on behalf of al-Qa'ida" by helping "operate a core pipeline that moves al-Qa'ida money and fighters through Iran to support al-Qa'ida activities in South Asia," was "believed to have sought funds to support al-Qa'ida attacks," and "travel[ed] to Afghanistan to join al-Qa'ida and provid[ed] technical support … to the terrorist group" "[b]efore joining the Iran-based al-Qa'ida network."

898. On October 18, 2012, the United States government announced a $5 million bounty on Harbi under its Rewards for Justice program. In so doing, the U.S. determined, among other things, that Harbi was "an Iran-based al-Qaida facilitator and deputy to al-Fadhli" who "facilitate[d] the movement of funds and operatives through Iran on behalf of the al-Qaida terrorist network," "facilitate[d] the travel of extremists to Afghanistan or Iraq via Iran on behalf of al-Qaida," "sought funds to support al-Qaida attacks," and was "wanted by Saudi authorities" for "traveling to Afghanistan to join al-Qaida and providing technical support" to it.

899. Harbi currently facilitates al-Qaeda operations from his haven in Iran.

**10. Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni**

900. At all relevant times, Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Juhni provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other roles, Juhni performed various logistics and leadership functions for al-Qaeda in Afghanistan and Pakistan, including arranging the payment of funds, passing messages and arranging meetings for senior al-Qaeda figures. In 2013, al-Qaeda assigned Juhni to al-Qaeda-in-Iraq, and Juhni relocated from Pakistan to Syria to support al-Qaeda efforts in Syria. During this time, he maintained an affiliation with al-Qaeda's leadership in Afghanistan and Pakistan.

901. On May 14, 2014, the United States designated Juhni as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department stated, among other things, that Juhni was "designated for acting for or on behalf of al-Qa'ida"; had "performed various administrative duties for al-Qa'ida, including arranging the payment of funds, passing messages, and arranging meetings for senior al-Qa'ida figures"; "provided logistical support to al-Qa'ida in Afghanistan" "[b]etween 2006 and 2009"; "was responsible for al-Qa'ida's communications courier network in Waziristan in late 2008, and by mid-2009, was in charge of al-Qa'ida administrative affairs for several areas in North and South Waziristan"; "served on al-Qa'ida's Central Shura Council and as the al-Qa'ida Chief of Security responsible for counterintelligence"; "traveled to Syria accompanied by several individuals to … support al-Qa'ida efforts in Syria" while "he maintained an affiliation with al-Qa'ida leadership in the Federally Administered Tribal Areas of Pakistan."

**11. Abd al-Rahman Mustafa al-Qaduli**

902. At all relevant times, Abd al-Rahman Mustafa al-Qaduli was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Qaduli

provided financial and material support to both. Qaduli was an Islamic cleric who lived in Northern Iraq. He joined Al-Qaeda in 2004, and rapidly rose through the ranks, working with al-Qaeda leader Zarqawi and eventually becoming al-Qaeda's liaison for operations with Afghanistan and Pakistan, in which capacity he coordinated between al-Qaeda's leadership and its branch in Iraq.

903. On May 14, 2014, the United States designated Qaduli as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department publicly stated, among other things, that Qaduli: "joined al-Qa'ida in 2004 under the command of now-deceased AQI leader Abu Musab al-Zarqawi and served as Zarqawi's deputy and the AQI emir of Mosul, Ninawa Province, Iraq"; "was an assistant to al-Zarqawi while in al-Qa'ida and previously served as AQI's representative to al-Qa'ida senior leadership in Pakistan"; and "traveled … to Pakistan on behalf of al-Zarqawi to conduct an interview, which was then to be provided to al-Qa'ida leaders in Afghanistan."

**12. Abu Afghan al-Masri**

904. Abu Afghan al-Masri was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra, in which role Abu Afghan al-Masri provided financial and material support to all three groups. Among other roles, he was a key facilitator for al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra. Like al-Qaeda leader Ayman al-Zawahiri, Abu Afghan al-Masri was an Egyptian who originally joined al-Qaeda in Afghanistan. While serving al-Qaeda in Afghanistan, Abu Afghan al-Masri facilitated ties to terrorist groups operating throughout the Middle East, including groups responsible for attacking U.S. forces in Afghanistan and Iraq. After the conflict erupted in Syria, al-Qaeda "core" redeployed Abu Afghan al-Masri to Syria to facilitate al-Qaeda-in-Iraq's expansion in Syria, and to convert Syria into another haven from which al-Qaeda could launch attacks against the United States.

905. On November 18, 2016, U.S. forces killed Abu Afghan al-Masri in an airstrike in Syria. Commenting on the event, the Department of Defense publicly stated that "Abu Afghan al-Masri" was "a senior Al Qaeda leader" who "originally joined Al Qaeda in Afghanistan [and] later moved to its Syrian affiliate"; "had ties to terrorist groups operating throughout Southwest Asia, including groups responsible for attacking U.S. and coalition forces in Afghanistan and those plotting to attack the West"; "had a senior leadership role in Al Qaeda"; "helped organize Al Qaeda activities and was directly affiliated with senior [Qaeda] leaders" in Afghanistan; and was so important that his "removal from the battlefield represent[ed] another blow to Al Qaeda in Syria and demonstrate[ed] continued U.S. determination to target Al Qaeda leaders wherever they pose[d] a threat to the U.S."

## VIII. ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST AMERICANS IN IRAQ, SYRIA, TURKEY, EUROPE, AFRICA, AND AFGHANISTAN AS PART OF ISLAMIC STATE'S AND AL-QAEDA'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST

### A. Islamic State Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East

906. On February 3, 2014, al-Qaeda-in-Iraq split from al-Qaeda core and Jabhat al-Nusra and asserted its identity as ISIS, which was led by former al-Qaeda/al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi.

907. On June 29, 2014, Abu Bakr al-Baghdadi announced from Mosul – long Islamic State's Iraq headquarters – that the group known as al-Qaeda-in-Iraq and ISIS was now a caliphate that would henceforth be known as "Islamic State."

908. Powered by its rapid expansion and burgeoning protection rackets in Iraq and Syria, Islamic State quickly established a branch in Afghanistan, using at least hundreds of Islamic State fighters from Iraq, as well as substantial Islamic State resources from Iraq.

909. Since its formation in 2014, Islamic State has sought to expel Americans from the Middle East through a campaign of terrorist violence targeting Americans worldwide, all of which was in service of Islamic State's existence as a purported "caliphate" dedicated to propagating its radical Salafist Sunni terrorist ideology. David S. Cohen, Under Secretary for Terrorism and Financial Intelligence at the Treasury Department, publicly stated in 2014 that Islamic State "terrorists have slaughtered thousands of innocent people" and "threaten[ed]" "American personnel and facilities in Iraq," and "could ultimately pose a direct threat to [U.S.] citizens … outside of the Middle East."

910. The U.S. State Department designated Islamic State's predecessor, al-Qaeda-in-Iraq, as an FTO on December 17, 2004, and it has maintained that designation ever since, which has at all times applied to Islamic State. The U.S. State Department has also designated Islamic State's branches as FTOs. On January 14, 2016, for example, the U.S. designated Islamic State's Afghanistan branch, known as Islamic State's Khoroson Province or "ISIS-K" as an FTO. Although ISIS-K is sometimes referred to as Islamic State's Afghanistan branch, ISIS-K is headquartered in Afghanistan and, to a lesser extent, Pakistan, and it operates throughout Central and South Asia, including in Afghanistan, Pakistan, Tajikistan, and Uzbekistan.

911. In the summer of 2014, Islamic State rapidly surged throughout Iraq. On June 10, 2014, it completed its seizure of long-standing al-Qaeda-in-Iraq/Islamic State stronghold Mosul in Ninewa Province. On June 11, 2014, Islamic State seized Tikrit. On June 18, 2014, the Iraqi government formally requested that the United States military conduct strikes against Islamic State terrorists in Iraq. On June 21, 2014, Islamic State seized three pivotal towns touching upon key Iraqi transportation routes from Turkey, Jordan, and Syria to the rest of Iraq, including the strategic border crossing between Syria's Deir Ezzor Province and Iraq. On August 2, 2014,

Islamic State conquered the towns of Sinjar and Zumar, which forced thousands of Yazidi civilians to flee. On August 3, 2014, Islamic State captured the strategically critical Mosul Dam, and a few weeks later, Islamic State completed its seizure of Raqqa province in Syria.

912. On August 7, 2014, President Obama announced an escalation of the American military response to Islamic State, including airstrikes designed to weaken Islamic State's ability to terrorize civilians, including Yazidis, in the vicinity of Sinjar, Iraq. The U.S. counterterrorism campaign against Islamic State would eventually be known as Operation Inherent Resolve.

913. About six weeks later, on September 22, 2014, Islamic State spokesman Abu Muhammad al-Adnani called for attacks on U.S. citizens around the world in retaliation for Operation Inherent Resolve.

914. By the end of October 2014, Islamic State had seized control of territory in Iraq and Syria equal in size to the United Kingdom, and in which more than ten million people resided. Such geographies included Aleppo, Raqqah and Deir es-Zor governorates in Syria, and Anbar, Diyala, Ninewa, and Salah al-Din Provinces in Iraq. As a result, Islamic State's profile and power were a first in the history of contemporary terrorism, and Islamic State exercised authority over a wide array of industrial and commercial activities in Iraq and Syria.

915. Powered by its protection rackets and afforded ample freedom of movement through their deal with Iraqi Kurdish leaders, *supra* II.A.1.b, Islamic State continued its advance in Iraq and Syria during the rest of 2014 through most of 2016.

916. In 2016, Islamic State ranked as the world's deadliest terrorist organization, having carried out more than 1,400 attacks that killed more than 7,000 people that year.

917. On October 16, 2016, U.S.-supported Iraqi forces began their attempt to expel Islamic State from Mosul. The resulting campaign would last more than eight months and entail intense waves of terrorist attacks by Islamic State.

918. On June 29, 2017, the Iraqi government declared victory over Islamic State in the final major contested sector in Mosul, and Iraqi Prime Minister Haider al-Abadi officially declared victory over Islamic State in Mosul ten days later. Within weeks, Islamic State was also defeated in its Syrian redoubt in Raqqa.

919. In December 2017, Islamic State's caliphate in Iraq substantially collapsed, as most Islamic State terrorists melted away to either resume their more traditional insurgent tactics in Iraq and Syria (where there were more nearly 10,000 Islamic State operatives or supporters as of early 2018), or, alternatively, re-deploy to Afghanistan (where Islamic State was still experiencing rapid growth). Many chose the latter.

920. On October 26, 2019, American special forces killed Islamic State's leader, Abu Bakr al-Baghdadi, in a U.S. raid in Idlib, Syria. Five days later, Islamic State confirmed Baghdadi's death and announced Ibrahim al Hashemi al-Qurayshi as his successor.

### B. Islamic State Adopted Al-Qaeda's And Al-Qaeda-In-Iraq's Networks, Infrastructure, Ideology, Tactics, Techniques, And Procedures, And Followed Al-Qaeda's Model As A Globally Integrated Terror Network That Facilitated Cooperation Between Islamic State Branches

921. Islamic State's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, Islamic State's: (1) emulation of al-Qaeda and al-Qaeda-in-Iraq, and absorption of their networks, personnel, funds, and relationships; (2) operating as an integrated global network, which disregarded national boundaries; (3) following al-Qaeda's multinational corporation model, which emphasized partnership between Islamic State branches; (4) reliance upon

protection money payments extracted from companies to finance terrorist operations; and (5) the practice of flowing value from Islamic State terrorists in Iraq and Syria to Islamic State terrorists in Afghanistan and Pakistan.

### 1. Islamic State Emulated Al-Qaeda

922. Islamic State self-identified as the heir to bin Laden's legacy.

923. Islamic State relied upon al-Qaeda and al-Qaeda-in-Iraq operatives who switched allegiance to Islamic State to fuel its rapid growth.

924. Islamic State copied (or otherwise absorbed) al-Qaeda's: hatred of the United States and targeting of Americans in the Middle East to drive the U.S. from the region; Salafist ideology; organizational structure; specific bureaucracies; and policies and procedures.

925. Islamic State also assumed possession of al-Qaeda-in-Iraq's weapons stockpiles, cash reserves, safe houses, logistics pipelines, facilitators, and protection rackets (including the associated relationships with business and their agents) in Iraq and Syria.

926. Islamic State fully adopted and applied the terrorist logistics, finance, and operational infrastructure and practices of its predecessor, al-Qaeda-in-Iraq. For example, Islamic State's finance apparatus was structurally similar to that of al-Qaeda-in-Iraq, and Islamic State operated similar internal bureaucracies dedicated to the raising and movement of funds, especially U.S. dollars.

927. Islamic State was devoted to the al-Qaeda-in-Iraq protection money framework and strategy. Like its predecessor, Islamic State relied upon protection money payments from Ericsson and other Western corporations and contractors. As Under Secretary Cohen publicly explained in 2014, Islamic State "mimic[ked]" "AQI's extortion networks" in order to finance its attacks. Indeed, leveraging al-Qaeda in Iraq's experience running protection rackets, Islamic State extracted protection payments even in territories that it did not control.

928. Like al-Qaeda and al-Qaeda-in-Iraq, Islamic State also embraced the use of polyterrorists. Indeed, Islamic State professed to be *even more willing* than other organizations to embrace such terrorists, as Islamic State attempted to position itself as a "catchall" pan-Islamist organization that welcomed the involvement of terrorists from other groups, whom Islamic State used to further augment their ranks through "hybridized" cells.

### 2. Islamic State Operated As An Integrated Global Network

929. Like al-Qaeda, Islamic State operated as a globally integrated terrorist network, led by a "core" but operationalized by terrorists in dozens of countries, including branches throughout the Middle East.

930. Terrorists from Islamic State's "core" in Iraq and Syria committed attacks against Americans in Iraq, Syria, Turkey, and Afghanistan, and on a few occasions in Europe and Africa.

931. Islamic State's globally integrated network was always led by Islamic State's emir, who was also known as the "caliph" at certain times.

932. Under Islamic State's globally integrated approach, every Islamic State terrorist associated with any Islamic State branch pledged allegiance to the emir, who was sometimes known as the caliph.

### 3. Islamic State Followed A Multi-National Corporate Model

933. Islamic State generally embraced, often to the letter, al-Qaeda's and al-Qaeda-in-Iraq's multinational corporate-inspired governance and business models, including al-Qaeda's use of branches, its command-and-control system, organizational structures, and ideological mission.

934. Islamic State also continued al-Qaeda-in-Iraq's tactic of undercutting their competition in the illicit marketplace, *e.g.*, by competing on "price" by providing security at a

cheaper rate than any legal alternative, as well as all illegal alternatives like another competing route that transited through Shia terrorist-controlled territory.

935. Confiscated Islamic State terrorist training manuals revealed that Islamic State, like al-Qaeda-in-Iraq, aimed to build out a formal and centralized terrorist-run state, supported by an array of administrative functions that focused on collecting "taxes" from companies with business interests in Islamic State's territory and creating terrorist training camps to grow Islamic State's caliphate beyond Iraq and Syria, with a particular emphasis on Afghanistan.

936. Islamic State's "Military Council" was charged with the defense of the Caliphate, i.e., conducting terrorist attacks against America and its Iraqi allies.

937. Islamic State's "Fighters Assistance Council" used Islamic State revenues from Iraq and Syria to fund foreign fighters and to flow such fighters between Islamic State's Iraq/Syria core and its branch in Afghanistan.

938. Islamic State had a sophisticated, well-developed, and complex financial structure. Islamic State's Finance Council was a cabinet -level entity that managed Islamic State's revenue and expenditures derived from illicit proceeds from occupation of territory, including from its protection rackets and illicit taxation of goods and cash that transited territory where Islamic State operated. The "Finance Council" governed all revenue and expenditure streams, established and approved annual budgets, and even had a "Chief Financial Officer" to manage it all. Islamic State's Finance Council oversaw the financial infrastructure of the organization and managed Islamic State's cash-based finances via "finance distribution and tax collection centers" in Mosul and "finance storage centers" or cash storage sites in Al Qaim, near the Iraqi-Syrian border. Islamic State also operated multiple "taxation offices" replete with financial auditors.

### C. Al-Qaeda-in-Iraq And Islamic State Committed, Planned, And Authorized Attacks Against Americans Throughout Iraq

939. Al-Qaeda-in-Iraq (and later Islamic State) also maintained notorious cells in and around two other key Iraqi provinces: Baghdad Province, where the terrorists targeted Americans in the capital city, Baghdad, and Diyala Province, where the terrorists targeted Americans in order to secure their own supply lines. In 2006, for example, al-Qaeda-in-Iraq leader Abu Musab al-Zarqawi was killed in Diyala Province.

940. From 2007 through 2014, al-Qaeda-in-Iraq (and later Islamic State) accounted for nearly all the terrorist attacks committed against Americans in Baghdad Province and Diyala Province, other than those which were committed by joint cells of Shiite terrorists comprised of Lebanese Hezbollah and Jaysh al-Mahdi.[414]

941. A host of sources documented how al-Qaeda-in-Iraq was responsible for approximately ninety percent (90%) of all suicide bomb attacks committed against Americans in Iraq from 2003 through present. Among others, the U.S. government concluded that al-Qaeda-in-Iraq was responsible for nearly all the suicide bomb attacks that occurred in Iraq between 2005 and 2008. These trends continued at all relevant times. On information and belief, al-Qaeda-in-Iraq and Islamic State are collectively responsible for every successful suicide attack committed against Americans in Iraq and Syria between 2005 and 2022.

## IX. THE ISLAMIC STATE ATTACKS

[414] While al-Qaeda-in-Iraq and Jaysh al-Mahdi contested overlapping parts of Baghdad Province and Diyala Province, the specific geographies and attack types favored by these terrorist groups make their attacks easily distinguishable. In general, AQI relied upon suicide bomb attacks and large ammonium-nitrate-fertilizer-based IEDs, while Jaysh al-Mahdi relied upon specialized IEDs known as explosively formed penetrators, complex attacks, and 107mm rockets provided by Hezbollah. With respect to geographies, AQI targeted Americans in Sunni strongholds in Baghdad like Dora in western Baghdad, while Jaysh al-Mahdi targeted Americans in Shiite strongholds in Baghdad like Rustamiyah in eastern Baghdad.

**Islamic State's July 1, 2014 Insurgent Attack in Nineveh, Iraq (Najjaw Mansoor)**

942. On July 1, 2014, Islamic State authorized, planned, and committed an insurgent attack on the town of Qaraqosh, Nineveh Governorate, Iraq (the "July 1, 2014 Attack"). The July 1, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

943. Najjaw Mansoor was residing in Iraq at the time of the attack. Islamic State terrorists infiltrated her hometown. As Najjaw Mansoor ran from the terrorists, she fell multiple times including out of a vehicle in her attempt to escape. The July 1, 2014 Attack severely wounded Najjaw Mansoor, who suffered from a fractured right leg, damage to both knees requiring two surgeries, frequent pain shots, and weeks of hospitalization. Najjaw Mansoor also suffers from telogen effluvium or complete hair loss, severe depression, and depression-related dementia, which requires continuous homecare.

944. Plaintiff Najjaw Mansoor is a U.S. national.

945. As a result of the July 1, 2014 Attack and her injuries, Najjaw Mansoor has experienced severe physical and emotional pain and suffering.

**Islamic State's February 23, 2015 Kidnapping Attack in Syria (Abdal, Amo, Lazar, Odicho, Younan, and Enwiya Families)**

946. On February 23, 2015, Islamic State authorized, planned, and committed a mass kidnapping attack in the Khabur River region, near Tel Shamiram and Hasakah, in Al Hasakah Governorate, Syria (the "February 23, 2015 Attack").

947. The February 23, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not

taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

948. Iniar Abdal was residing in Syria at the time of the attack. Iniar Abdal was kidnapped and held by Islamic State terrorists until November 7, 2015. The February 23, 2015 Attack severely wounded Iniar Abdal, who suffered from depression, lack of appetite, and heart issues. Iniar Abdal ultimately died as a result of her injuries on June 25, 2018.

949. Plaintiff Madlen Tammo is the daughter of Iniar Abdal and a U.S. national.

950. As a result of the February 23, 2015 Attack and Iniar Abdal's injuries and death, Plaintiff Madlen Tammo has experienced severe mental anguish, emotional pain and suffering, and the loss of Iniar Abdal's society, companionship, and counsel.

951. Youkhna Amo was residing in Syria at the time of the attack. Youkhna Amo was kidnapped and held by Islamic State terrorists until December 9, 2015. The February 23, 2015 Attack severely wounded Youkhna Amo, who suffers from attack-related chronic anemia and osteoarthritis that requires ongoing treatment and monitoring, nicotine dependence developed as a coping mechanism, and severe PTSD symptoms from prolonged captivity and torture, including persistent nightmares, insomnia, hypervigilance, irritability, intrusive memories, emotional distress, and anxiety.

952. Plaintiff Youkhna Amo is a U.S. national.

953. As a result of the February 23, 2015 Attack and his injuries, Youkhna Amo has experienced severe physical and emotional pain and suffering.

954. Dr. Abdulmasih Enwiya was residing in the village of Tel Jazira, in the Khabur River region of Al Hasakah Governorate, Syria, at the time of the attack. Islamic State terrorists

kidnapped Dr. Enwiya in the February 23, 2015 Attack and held him hostage for approximately seven months. On or about September 23, 2015, Islamic State terrorists murdered Dr. Enwiya, together with two other Assyrian hostages, by forcing him to state his name and village on camera and then shooting him in the back of the head while he was on his knees. In early October 2015, Islamic State publicly released a video of the murders in which it threatened to execute the remaining Assyrian hostages unless ransoms were paid for their release.

955. Plaintiff Shameran Barnabas is the sister of Dr. Enwiya and a U.S. national. She is Dr. Enwiya's only living immediate family member.

956. As a result of the February 23, 2015 Attack and Dr. Enwiya's abduction, captivity, and murder, Plaintiff Shameran Barnabas has experienced severe mental anguish, emotional pain and suffering, and the loss of Dr. Enwiya's society, companionship, and counsel.

957. Chamoun Lazar was residing in Syria at the time of the attack. Chamoun Lazar was kidnapped and held by Islamic State terrorists until December 9, 2015. The February 23, 2015 Attack severely wounded Chamoun Lazar, who suffers from chest pains due to stress from months of torture, trouble sleeping, flashbacks, and depression.

958. Plaintiff Chamoun Lazar is a U.S. national.

959. As a result of the February 23, 2015 Attack and his injuries, Chamoun Lazar has experienced severe physical and emotional pain and suffering.

960. Lazar Odicho was residing in Syria at the time of the attack. Lazar Odicho was kidnapped and held by Islamic State terrorists until August 11, 2015. The February 23, 2015 Attack severely wounded Lazar Odicho, who suffered from malnutrition, dehydration, and constant emotional abuse during captivity, which has manifested into lasting anxiety and depression.

961. As a result of the February 23, 2015 Attack and his injuries, Lazar Odicho has experienced severe physical and emotional pain and suffering.

962. Plaintiff Lazar Odicho is a U.S. national.

963. Plaintiff Cherina Younan is the wife of Lazar Odicho and a U.S. national.

964. As a result of the February 23, 2015 Attack and Lazar Odicho's injuries, Cherina Younan has experienced severe mental anguish as well as emotional pain and suffering.

965. Cherina Younan was residing in Syria at the time of the attack. Cherina Younan was kidnapped and held by Islamic State terrorists until August 11, 2015. The February 23, 2015 Attack severely wounded Cherina Younan, who suffered from malnutrition, dehydration, and constant emotional abuse during captivity, which has manifested into lasting anxiety and depression.

966. As a result of the February 23, 2015 Attack and her injuries, Cherina Younan has experienced severe physical and emotional pain and suffering.

967. Plaintiff Cherina Younan is a U.S. national.

968. Plaintiff Lazar Odicho is the husband of Cherina Younan and a U.S. national.

969. As a result of the February 23, 2015 Attack and Cherina Younan's injuries, Lazar Odicho has experienced severe mental anguish as well as emotional pain and suffering.

970. George Younan was in Syria as a resident at the time of the attack. When Islamic State came to his village, George Younan attempted to run away but was immediately captured and shot by Islamic State terrorists. George Younan was injured in the February 23, 2015 Attack and died on February 23, 2015, as a result of injuries sustained during the attack. His body was not recovered until three months later after the town was liberated.

971. Plaintiff Jamila Isaak, a U.S. national, is the widow of George Younan.

972. Plaintiff Sharlet Younan, a U.S. national, is the daughter of George Younan.

973. As a result of the February 23, 2015 Attack and George Younan's injuries and death, each member of the Younan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of George Younan's society, companionship, and counsel.

974. As a result of the February 23, 2015 Attack, George Younan was injured in his person and/or property. The Plaintiff members of the Younan Family are the survivors and/or heirs of George Younan and are entitled to recover for the damages George Younan sustained.

**Islamic State's March 22, 2016 Complex Suicide Bombing Attack at Brussels Airport in Belgium (Northshield Family)**

975. On March 22, 2016, Islamic State authorized, planned, and committed a complex attack involving coordinated suicide bombings at Brussels Airport in Zaventem, Belgium, and at the Maelbeek metro station in Brussels, Belgium (the "March 22, 2016 Attack").

976. The March 22, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not taking part in hostilities. Further, the terrorists who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

977. Two Islamic State suicide bombers detonated their explosives in the departure hall of Brussels Airport, and a third detonated his explosive on a metro train at Maelbeek station about an hour later. The March 22, 2016 Attack killed 32 people, including four U.S. citizens, and injured more than 250 others.[415] Islamic State promptly claimed responsibility for the attack through its Amaq news agency and later celebrated the attackers by name in its English-language

---

[415] U.S. Dep't of State, Bureau of Counterterrorism, *Country Reports on Terrorism 2016* (July 2017), https://www.state.gov/wp-content/uploads/2019/04/crt_2016.pdf.

magazine, Dabiq, boasting that the "raid in Paris" had also been the work of two of the same operatives.[416]

978. Unlike most terrorist attacks in Western Europe that were attributed to Islamic State – which were generally locally funded and organized by Islamic State's European cells – Islamic State "core" committed, planned, and authorized the March 22, 2016 Attack. The attack was carried out by an Islamic State cell that Islamic State's leadership in Raqqa, Syria organized, trained, funded, and dispatched to Belgium, and that Islamic State's external-operations commanders in Syria directed throughout the plot. The same cell was responsible for Islamic State's November 13, 2015 attacks in Paris, France, and each of the Islamic State operatives who executed the March 22, 2016 Attack was connected to the network that organized and executed the Paris attacks.[417]

979. The March 22, 2016 Attack was carried out by three Islamic State suicide bombers – Ibrahim el Bakraoui and Najim Laachraoui at the airport, and Khalid el Bakraoui at the metro station – and a fourth Islamic State operative, Mohamed Abrini, who fled the airport before his bomb detonated. Each had direct ties to Islamic State's core in Syria.[418] Laachraoui traveled to Syria and joined Islamic State in February 2013, where he served in an Islamic State battalion that included a significant number of European foreign fighters, guarded Western hostages held by Islamic State, and, according to Islamic State's own eulogy of him, was one of the first to pledge

---

[416] Dabiq, Issue 14, *The Knights of Shahadah in Belgium* (Apr. 2016), as quoted in Brisard & Jackson, *The Islamic State's External Operations and the French-Belgian Nexus*, CTC Sentinel (Nov./Dec. 2016), at n.57, https://ctc.westpoint.edu/the-islamic-states-external-operations-and-the-french-belgian-nexus/; *see also Estate of Shults v. Syrian Arab Republic*, No. 1:21-cv-02417 (D.D.C.), ECF No. 22-1, at 10.
[417] Europol, *European Union Terrorism Situation and Trend Report 2017*, at 24 (2017), https://www.europol.europa.eu/sites/default/files/documents/tesat2017.pdf.
[418] Expert Report of Dr. Matthew Levitt at 7, *Estate of Shults v. Syrian Arab Republic*, No. 1:21-cv-02417 (D.D.C. Nov. 15, 2024), ECF No. 22-2 ("Levitt Report").

allegiance to Islamic State.[419] He later returned to Europe and is believed to have built the bombs used in both the Paris and Brussels attacks.[420] Abrini traveled to Turkey on June 23, 2015, and from there to Raqqa, where he met Abdelhamid Abaaoud – the Islamic State operative who organized the Paris attacks and headed an Islamic State external-operations branch that selected and trained foreign operatives to carry out attacks in the West – and, at Abaaoud's direction, traveled to the United Kingdom to collect funds from Islamic State supporters in Birmingham.[421] Ibrahim el Bakraoui attempted to travel to Syria to join Islamic State in 2015 and was detained near the Syrian border and deported by Turkish authorities. In August 2016, the U.S. Department of State designated Abrini as a Specially Designated Global Terrorist, describing him as "a member of the Europe-based [ISIS] cell responsible for the November 2015 Paris attacks and March 2016 Brussels attacks."[422]

980. Islamic State's external-operations commanders in Syria directed the March 22, 2016 Attack. Belgian investigators recovered a laptop discarded by the Brussels cell that contained audio recordings in which Laachraoui briefed Oussama Atar – a senior Islamic State external-

---

[419] Levitt Report at 8 (citing Dabiq, Issue 14, *The Knights of Shahadah in Belgium* (Apr. 2016)); *Brussels Bomber Najim Laachraoui Identified as ISIS Jailer of Foreign Hostages*, Guardian (Apr. 22, 2016); *Brussels Bomber Najim Laachraoui Identified as Prison Guard of Islamic State Hostages: Sources*, ABC News (Austl.) (Apr. 22, 2016), https://www.abc.net.au/news/2016-04-22/brussels-bomber-identified-as-guard-of-foreign-is-hostages/7352322.

[420] Paul Cruickshank, *Discarded Laptop Yields Revelations on Network Behind Brussels, Paris Attacks*, CNN (Jan. 25, 2017), https://www.cnn.com/2017/01/24/europe/brussels-laptop-revelations/index.html.

[421] Levitt Report at 9; Duncan Gardham, *The "Man in the Hat" Spills Terror Gang's Secrets*, NBC News (Dec. 7, 2016); Rukmini Callimachi, *How ISIS Built the Machinery of Terror Under Europe's Gaze*, N.Y. Times (Mar. 29, 2016); *Sole Survivor of Brussels Attack Told Police He "Hung Out at a Park" for Days*, CNN (July 6, 2016), https://www.cnn.com/2016/07/06/europe/brussels-terror-isis/index.html.

[422] Levitt Report at 7–8; U.S. Dep't of State, *State Department Terrorist Designations of Jamaat-ul-Ahrar and Mohamed Abrini* (Aug. 3, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/08/260790.htm.

operations commander who oversaw the operation from Syria – on every aspect of the cell's attack planning, and in which Laachraoui consulted an Islamic State bombmaker linked to Islamic State's external-operations division in Syria to improve on the explosives used in Paris.[423] The cell communicated with Islamic State in Syria through encrypted applications, which, in the words of one account of the Belgian investigation, provided "an umbilical cord between the terrorist organization and the Paris and Brussels attack teams that allowed ISIS operatives in the vicinity of Raqqa to guide the plotters every step of the way and significantly enhance their capabilities."[424] Less than a month before the attacks, the cell reported to a commander in Syria that "[i]f you want to work on long term, we shouldn't strike in Belgium but keep it as a fallback base."[425] French and Belgian authorities later identified Atar as one of the senior Islamic State operatives behind both the Paris and Brussels attacks.[426] Another senior Islamic State external-operations figure in Syria, Abdelilah Himich, whom the State Department designated in November 2016 as "reportedly involved in the planning of ISIL's November 2015 Paris attacks and March 2016 Brussels attacks," created a European foreign-fighter battalion within Islamic State that "has provided operatives for ISIL attacks in Iraq, Syria, and abroad."[427]

---

[423] Levitt Report at 9–12; *see also Winternitz v. Syrian Arab Republic*, No. 1:17-cv-02104 (TJK), Mem. Op. at 11 (D.D.C. Mar. 31, 2022), ECF No. 17 (crediting Dr. Levitt's identification of "the ISIS commanders in Syria who oversaw the attack").

[424] Levitt Report at 11; Paul Cruickshank, *Discarded Laptop Yields Revelations on Network Behind Brussels, Paris Attacks*, CNN (Jan. 25, 2017), https://www.cnn.com/2017/01/24/europe/brussels-laptop-revelations/index.html.

[425] Guy Van Vlierden, Jon Lewis & Don Rassler, *Beyond the Caliphate: Islamic State Activity Outside the Group's Defined Wilayat – Belgium*, Combating Terrorism Center at West Point (2018), https://ctc.usma.edu/wp-content/uploads/2018/02/CTC-Beyond-the-Caliphate-Belgium.pdf.

[426] Levitt Report at 10, 12–13.

[427] Levitt Report at 12; U.S. Dep't of State, *State Department Terrorist Designations of Abdullah Ahmed al-Meshedani, Basil Hassan, and Abdelilah Himich* (Nov. 22, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/11/264498.htm.

981. Karen Northshield was at Brussels Airport at the time of the March 22, 2016 Attack, standing in line at the Delta Air Lines check-in counter for a flight to the United States to visit family. One of the bombs detonated near her. The March 22, 2016 Attack severely wounded Karen Northshield, who suffered open fractures of the pelvis, left hip, femur, and ankle with massive loss of bone and muscle; a perforated colon; burns to her face and hands; and countless embedded shrapnel wounds. She went into cardiac arrest on arrival at the hospital and had to be resuscitated. She spent 79 days in intensive care and more than three years in hospitals and rehabilitation facilities, underwent more than 50 surgeries, and lost her stomach and spleen to infection. She has permanent bilateral hearing loss, which requires hearing aids, and tinnitus; a non-functional left leg, permanently shortened by 10 centimeters, that requires her to use crutches, an orthopedic shoe, and a brace; permanent scarring and disfigurement; and chronic pain, and she suffers from post-traumatic stress disorder and major depression.

982. Plaintiff Karen Northshield was a U.S. national at the time of the attack and remains one today.

983. As a result of the March 22, 2016 Attack and her injuries, Karen Northshield has experienced severe physical and emotional pain and suffering.

984. Plaintiff Thomas Northshield is the father of Karen Northshield and a U.S. national.

985. Plaintiff Dena Northshield is the mother of Karen Northshield and a U.S. national.

986. Plaintiff Anne Northshield is the sister of Karen Northshield and a U.S. national.

987. Plaintiff Benjamin Northshield is the brother of Karen Northshield and a U.S. national.

988. Plaintiff Tammy Northshield is the sister of Karen Northshield and a U.S. national.

989. Plaintiff Heidi Northshield is the sister of Karen Northshield and a U.S. national.

990. Plaintiff Susan Northshield is the sister of Karen Northshield and a U.S. national.

991. Eric Joseph Northshield was the brother of Karen Northshield and a U.S. national. After the March 22, 2016 Attack, Eric left his studies to care for Karen and devoted himself to her care through years of hospitalization, surgeries, and rehabilitation, living with her as her primary caregiver until August 2022. Eric died on July 19, 2023, at the age of 32. In the years before his death, he experienced severe emotional distress over the grievous injuries sustained by his sister, to which he bore firsthand witness over years of attentive care. Eric resided in Belgium at the time of his death, and a Belgian notary has been instructed to open his estate.[428] Plaintiff Thomas Northshield, a U.S. national, brings claims in both his individual capacity and his representative capacity on behalf of Eric Joseph Northshield's estate. In addition, and in the alternative, Plaintiffs Thomas Northshield, Dena Northshield, Karen Northshield, Anne Northshield, Benjamin Northshield, Tammy Northshield, Heidi Northshield, and Susan Northshield, who are Eric Joseph Northshield's surviving parents and siblings and, on information and belief, his heirs under Belgian law, bring Eric Joseph Northshield's claims as his survivors and heirs, and are entitled to recover for the damages he sustained.

992. As a result of the March 22, 2016 Attack and Karen Northshield's injuries, each member of the Northshield Family has experienced severe mental anguish and emotional pain and

[428] The term "estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

suffering, and Eric Joseph Northshield experienced severe mental anguish and emotional pain and suffering from the day of the attack until his death.

**Islamic State's June 28, 2016 Complex Suicide Bombing Attack at Atatürk Airport in Turkey (Steven Isaac and Nareem Shorees)**

993. On June 28, 2016, Islamic State authorized, planned, and committed a complex attack involving suicide bombing, IEDs, and small arms fire at Atatürk Airport, Istanbul Province, Turkey (the "June 28, 2016 Attack"). The June 28, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

994. Steven Isaac and his wife, Nareem Shorees, were traveling from Rome to the United States for their honeymoon and were at the Atatürk Airport for a five-hour layover at the time of the attack. The June 28, 2016 Attack severely wounded Steven Isaac, who suffers from severe PTSD with symptoms including anxiety, hypervigilance, sleep disturbances, and recurring traumatic memories. The June 28, 2016 Attack also severely wounded Nareem Shorees, who suffered severe bruising to the left leg due to being knocked to the ground and trampled by a crowd, and PTSD, for which her symptoms include anxiety, panic attacks, sleep disturbances, recurring traumatic memories, emotional distress, and heightened fear responses.

995. Plaintiffs Steven Isaac and Nareem Shorees are U.S. nationals.

996. As a result of the June 28, 2016 Attack and his injuries, Steven Isaac has experienced severe emotional pain and suffering.

997. As a result of the June 28, 2016 Attack and her injuries, Nareem Shorees has experienced severe physical and emotional pain and suffering.

998. As a result of the June 28, 2016 Attack and Steven Isaac's injuries, Plaintiff Nareem Shorees has experienced severe mental anguish as well as emotional pain and suffering.

999. As a result of the June 28, 2016 Attack and Nareem Shorees's injuries, Plaintiff Steven Isaac has experienced severe mental anguish as well as emotional pain and suffering.

**Islamic State's October 4, 2017 Complex Attack in Tongo Tongo, Niger (Samara Johnson)**

1000. On October 4, 2017, Islamic State committed a complex attack involving small arms, vehicle-mounted heavy machine guns, rocket-propelled grenades, and mortars in Tongo Tongo, Niger (the "October 4, 2017 Attack") that targeted American service members in Africa. Islamic State, an FTO, planned and authorized the October 4, 2017 Attack.

1001. The October 4, 2017 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1002. Critical to Islamic State's desire to establish a global caliphate was establishing and fortifying a substantial presence in Libya, which Islamic State referred to in a report as its "Strategic Gateway" to Africa, including the Maghreb and Sahel regions.[429]

1003. During the 2014-2015 time period, Islamic State's nascent operations in Libya relied upon seed capital from Islamic State "core" in Iraq and Syria so that it could, in turn, serve as a financing hub for the wider region. That same Islamic State "core" also provided funding,

---

[429] BBC Monitoring Middle East – Political, *ISIL report stresses Libya's strategic importance - Algerian paper*, (January 29, 2015) ("The terrorist organization released a report on one of its websites entitled "Libya, the Strategic Gateway of the Islamic State" which explained the reasons for its [ISIL's] interest in Libya and the most important characteristics that made it an important launch pad for the realization of the Caliphate State. In a message addressed to the Da'ish elements, it claimed and imagined that Libya was the key to Egypt, Tunisia, Sudan, Mali, Algeria and Niger as well as a base from where to spread towards Africa and the Islamic Maghreb.").

terrorists, weapons, and training directly to Islamic State branches in Africa, including the branch in Niger, which became known as ISIS-GS. Through that mechanism, the resources Islamic State derived from its Iraqi protection racket funded Islamic State's terrorist violence in Niger.

1004. The U.S. government confirmed that Islamic State's fundraising in Syria facilitated Islamic State attacks against Americans in Africa. For example, in 2022, the Lead Inspector General for Operation Inherent Resolve reported to Congress that Islamic State "core" managed the "global caliphate" and supplied its African branches with "financial support" for terrorist attacks:

> **ISIS-Core Leads a Global Organization**[.] The DIA reported ISIS-Core leaders in Iraq and Syria continued to manage the group as a global caliphate, maintaining ***an element in Iraq and Syria dedicated to overseeing the group's branches around the world***. ***Since 2014, ISIS has incorporated existing jihadist groups or upstart elements into its global organization, expanding into*** the Arabian Peninsula, South and Southeast Asia, Eurasia, Turkey, and ***Africa***. The DIA said that ***ISIS leaders provided the group's branches with guidance, media support, and funding***. For example, ISIS-Somalia and ***ISIS-West Africa received resources and financial support from ISIS-Core*** leadership in Iraq and Syria.[430]

Many documented examples of this relationship exist, showing that Islamic State's core leadership repeatedly transferred money to other branches of its caliphate, including in Niger.[431]

1005. When Defendants provided money to Islamic State's core in Iraq, they knew they were contributing to Islamic State's ability to launch terrorist attacks not only in Iraq and Syria, but also in places like Turkey and Niger. Many sources alerted Defendants that payments to

---

[430] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve: Report to the United States Congress, October 1, 2021–December 31, 2021*, Pursuant to § 8L of the Inspector General Act of 1978 at 23 (Feb. 8, 2022) (emphases added; footnotes omitted).

[431] *See*, *e.g.*, U.S. State Dep't, *Country Reports on Terrorism 2019* at 269 (June 2020) (noting that even in 2019, ISIS still maintained stockpiles of dollars "scattered across Iraq and Syria" that it had amassed from activities going as far back as 2013, and that "ISIS continues to rely on trusted courier networks and money services businesses to move its financial resources within and outside of Iraq and Syria"), https://www.state.gov/wp-content/uploads/2020/06/Country-Reports-on-Terrorism-2019-2.pdf.

Islamic State's core in Iraq foreseeably aided Islamic State's attacks against the United States in countries neighboring Islamic State's caliphate in Iraq and Syria and countries in African conflict zones, including Niger. Such sources included, but were not limited to: (a) about a decade of media reports confirming that Islamic State, like AQI before it, had a long history of planning and executing external attacks, including in Africa, from the terrorists' safe havens in Iraq and Syria;[432] and (b) public U.S. government warnings that Islamic State could commit such external attacks from its "core" in Iraq and Syria, including warnings published by Lieutenant General Joseph L. Votel, Secretary of State John Kerry, and the *Voice of America*, in 2014.[433]

1006. Islamic State committed, planned, and authorized the October 4, 2017 Attack, acting through its "Core" branch in Iraq and Syria and its "external" Islamic State branch in Niger (ISIS-GS). Adnan Abu Walid al-Sahrawi led ISIS-GS. Al-Sahrawi, on behalf of himself and Islamic State terrorists he led, pledged bayat to Islamic State and Baghdadi in May 2015, and their pledge was "accepted" in October 2016 when Islamic State posted the video of the pledge to its propaganda channel on Telegram.

---

[432] *See*, *e.g.*, Ewen MacAskill and Rory McCarthy, *A Thug Who Will Stop At Nothing To Create Pure Islamic Zone In Middle East*, Guardian (UK) (Sept. 23, 2004), 2004 WLNR 23628883 ("Abu Musab al-Zarqawi, leader of [AQI], is regularly portrayed by the US government as a terrorist mastermind, responsible for activity in places as widespread as Hamburg, Chechnya, Madrid and Mombasa[, Kenya]"; "Zarqawi is probably responsible" for a broad range of "[a]ttacks" against the United States in the Middle East and Africa from his safe-havens in Iraq and Syria, including, but not limited to AQI's: (1) "October 2002" attack against "Laurence Foley, a US diplomat, assassinated in Amman[, Jordan]"; (2) "November 2002 Attack on Mombasa[, Kenya] hotel"; (3) "November 2003" "attack on a synagogue in Turkey").

[433] *See, e.g.*, Lieutenant General Joseph L. Votel, *Armed Forces Nominations: Statement of Lieutenant General Joseph L. Votel, USA Nominee, Commander United States Special Operations Command, U.S. Senate, Committee on Senate Armed Services*, Congressional Testimony via FDCH (July 10, 2014), 2014 WLNR 18705318; Secretary of State John Kerry, *quoted in* States News Service, *Secretary Kerry: Remarks With Secretary Of Defense Chuck Hagel, Australian Minister Of Foreign Affairs Julie Bishop, And Australian Minister Of Defense David Johnston* (Aug. 12, 2014); William Eagle, *Islamic State Declaration Spreads To Nigeria*, Voice of America (Aug. 25, 2014), 2014 WLNR 23409988.

1007. Islamic State "core" planned, authorized, and contributed to the October 4, 2017 Attack by (among other things) accepting Sahrawi's pledge of allegiance – which gave ISIS-GS vital credibility – and transferring substantial money, fighters, and weapons to ISIS-GS for use in attacks against Americans, including SGT Johnson. Indeed, Islamic State core leadership published propaganda celebrating the attack and linking its commission to Islamic State's caliphate in Iraq and Syria, and Baghdadi in particular. Without the role of Islamic State core, including its leadership, ISIS-GS would have lacked the funds, trainers, and logistical support needed to execute external attacks, including the October 4, 2017 Attack.

1008. **Sergeant LaDavid Johnson** served in Niger as a member of the U.S. Army. SGT Johnson was injured in the October 4, 2017 Attack. SGT Johnson died on October 4, 2017 as a result of injuries sustained during the attack.

1009. SGT Johnson was a U.S. national at the time of the attack and his death.

1010. Plaintiff Samara Johnson is the foster sister of SGT Johnson and a U.S. national. Ms. Johnson lived in the same household as SGT Johnson for a substantial period of time and considered SGT Johnson the functional equivalent of a biological brother.

1011. As a result of the October 4, 2017 Attack and SGT Johnson's injuries and death, Plaintiff Samara Johnson has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Johnson's society, companionship, and counsel.

1012. As a result of the October 4, 2017 Attack, SGT Johnson was injured in his person and/or property. Plaintiff Samara Johnson is among the survivors and/or heirs of SGT Johnson who are entitled to recover for the damages SGT Johnson sustained.

**Accrual of Plaintiffs' Claims Under 18 U.S.C. § 2333(d)**

1013. The ATA provides that suits for damages must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335. This statute of limitations applies to all

ATA claims, including claims for aiding and abetting under JASTA. JASTA, however, was not enacted until September 28, 2016. Accordingly, Plaintiffs' claims under 18 U.S.C. § 2333(d) arising from the July 1, 2014 Attack, the February 23, 2015 Attack, the March 22, 2016 Attack, and the June 28, 2016 Attack could not have accrued before September 28, 2016, and those claims are all timely because they are being brought within 10 years after September 28, 2016, the date they accrued.

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants: Aiding and Abetting Liability, Attack Predicate]

1014. Plaintiffs incorporate their factual allegations above. Count One is brought on behalf of all Plaintiffs.

1015. The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed, planned, and authorized by Islamic State, which the United States designated an FTO under 8 U.S.C. § 1189 in 2004.

1016. The terrorist attacks committed, planned, and authorized by Islamic State, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States. In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public

use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

1017. Islamic State's terrorist attacks appear to have been intended to: (a) intimidate or coerce the civilian populations of Iraq, Syria, Turkey, Belgium, Niger, the United States, and other Coalition nations; (b) influence the policy of the U.S., Iraqi, Turkish, and other Coalition governments by intimidation and coercion; and (c) affect the conduct of the U.S., Iraqi, Turkish, and other Coalition governments by mass destruction, assassination, and kidnapping.

1018. Islamic State's terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

1019. Defendants aided and abetted and knowingly provided substantial assistance to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State – and aided and abetted and knowingly provided substantial assistance to Islamic State's attacks on Plaintiffs – by:

(a) making, or causing to be made, cash payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed those attacks;

(b) transferring important technology that both facilitated and financed those attacks; and

(c) obstructing United States counterterrorism policy through their fraudulent concealment of those protection payments and technology transfers to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State for fifteen years.

1020. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed, planned, and/or authorized by Islamic State. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1021. Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing each form of assistance to al-Qaeda, al-Qaeda-in-Iraq, and the Islamic State, and to those organizations' terrorist attacks.

1022. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages, and the costs of this action, including their attorneys' fees.

**COUNT TWO: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)**
**[All Defendants: Aiding-and-Abetting Liability, RICO predicate]**

1023. Plaintiffs incorporate their factual allegations above. Count Two is brought on behalf of all Plaintiffs.[434]

1024. From 2014 through 2022, terrorists from Islamic State conspired with others to conduct and maintain Islamic State as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Iraq, Syria, Turkey, Belgium, Niger, and elsewhere. Throughout that time, Islamic State was a group of associated individuals that functioned as a continuing unit, and Islamic State's express purpose at all times included violence against, and the expulsion of, Americans in Iraq, Syria, Turkey, Europe, and Africa. Islamic State engaged in, and its activities affected, foreign commerce.

1025. From 2014 through 2022, Abu Bakr al-Baghdadi and other terrorists employed by or associated with Islamic State (including without limitation Abu Muhammad al-Adnani, Ibrahim al Hashemi al-Qurayshi, and other terrorists described in this Complaint) have maintained interests in and conducted the affairs of Islamic State as an enterprise by engaging in a campaign to expel Americans from Iraq, Syria, Turkey, Europe, Africa, and Afghanistan through crime and anti-American violence (the "Islamic State Campaign").

---

[434] Plaintiffs and the attacks that injured them are set forth in Part IX *supra*.

1026. Specifically, Abu Bakr al-Baghdadi and other terrorists employed by or associated with Islamic State conducted and participated in the conduct of Islamic State's affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. The same terrorists also maintained interests in and control of Islamic State (and conspired to do so) through this pattern of racketeering activity.

1027. The Islamic State Campaign was an act of international terrorism. It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States. The Islamic State Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, Iraq, Turkey, Belgium, and Niger, (b) to influence the policy of the U.S., Iraqi, Turkish, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, Turkish, and other governments by mass destruction, assassination, and kidnapping.

1028. The Islamic State Campaign occurred primarily outside the territorial jurisdiction of the United States.

1029. The Islamic State Campaign was committed, planned, and/or authorized by Islamic State, which the U.S. has designated as an FTO under 8 U.S.C. § 1189 since 2004.

1030. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Islamic State Campaign. Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Abu Bakr al-Baghdadi and other terrorists associated with Islamic State conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of Islamic State. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Islamic State Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1031. Defendants aided and abetted and knowingly provided substantial assistance to Islamic State, its members, and the Islamic State Campaign. Defendants did so by making payments to Islamic State that financed the Islamic State Campaign, including the campaign's terrorist attacks, and by obstructing U.S. counterterrorism efforts to provide cover and concealment to Islamic State as it prosecuted the Islamic State Campaign.

1032. Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing each form of assistance to Islamic State, and to the Islamic State Campaign.

1033. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT THREE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)**
**[All Defendants: Primary Liability, 18 U.S.C. § 2339A Predicate]**

1034. Plaintiffs incorporate their factual allegations above. Count Three is brought on behalf of all Plaintiffs.

1035. Defendants provided material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in violation of 18 U.S.C. § 2339A. They did so by making payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks in Iraq, Syria, Turkey, Belgium, and Niger, and by obstructing U.S. counterterrorism efforts to provide cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State as such FTOs targeted Americans in Iraq, Syria, Turkey, Europe, and Africa. Defendants' payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1). Defendants' obstruction of U.S. counterterrorism efforts for al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's benefit also provided a service; assistance derived from scientific, technical, or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the obstruction), which likewise qualified as material support.

1036. Defendants knew that their material support would be used by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from FTOs. Those acts by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, in turn, violated the criminal laws of the United States, or would have violated

those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. Defendants also disguised the nature of their support, in further violation of 18 U.S.C. § 2339A.

1037. Defendants' conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United States, Iraq, Turkey, Belgium, Niger, and other nations, (b) to influence the policy of the U.S., Iraqi, Turkish, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, Turkish, and other governments by mass destruction, assassination, and kidnapping.

1038. Defendants' provision of material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State occurred primarily outside the territorial jurisdiction of the United States.

1039. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1040. Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing material support and resources to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, knowing that those organizations would use that support to prepare for or carry out violations of U.S. terrorism laws.

1041. As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339A, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT FOUR: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)**
**[All Defendants: Primary Liability, 18 U.S.C. § 2339B Predicate]**

1042. Plaintiffs incorporate their factual allegations above. Count Four is brought on behalf of all Plaintiffs.

1043. LM Ericsson, Ericsson AB, and Ericsson Inc. provided material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in violation of 18 U.S.C. § 2339B. Defendants did so by making cash and in-kind payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and by obstructing U.S. counterterrorism efforts to provide cover and concealment to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State as such FTOs targeted Americans in Iraq, Syria, Turkey, Europe, and Africa. Defendants' protection payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1). Defendants' obstruction of U.S. counterterrorism efforts for al-Qaeda's al-Qaeda-in-Iraq's and Islamic State's benefit also provided al-Qaeda, al-Qaeda-in-Iraq, and Islamic State with a service; assistance derived from scientific, technical or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the obstruction), all of which likewise qualified as material support. Defendants further disguised the nature of its support, in further violation of 18 U.S.C. § 2339B.

1044. The United States has designated al-Qaeda, al-Qaeda-in-Iraq, and Islamic State as an FTO under 8 U.S.C. § 1189 since 1999 (in the case of al-Qaeda) and 2004 (in the case of al-Qaeda-in-Iraq and Islamic State). At all times since that designation, Defendants knew that al-

Qaeda, al-Qaeda-in-Iraq, and Islamic State were each a designated FTO and/or that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State had engaged in acts of terrorism against the United States.

1045. Defendants' conduct, by providing material support to a designated FTO, involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United States, Iraq, Turkey, Belgium, Niger, and other nations, (b) to influence the policy of the U.S., Iraqi, Turkish, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, Turkish, and other governments by mass destruction, assassination, and kidnapping.

1046. Defendants' provision of material support to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State occurred primarily outside the territorial jurisdiction of the United States.

1047. Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing material support and resources to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, knowing that those organizations were designated FTOs and that they engaged in terrorist acts.

1048. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct, which proximately caused Plaintiffs' injuries by providing FTOs with the resources and concealment they needed to carry out the terrorist attacks that injured Plaintiffs. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1049. As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339B, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT FIVE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)**
**[All Defendants: Primary Liability, 18 U.S.C. § 2339C Predicate]**

1050. Plaintiffs incorporate their factual allegations above. Count Five is brought on behalf of all Plaintiffs.

1051. Defendants, by making payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A). Defendants knew that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

1052. Defendants, by making payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State that financed al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B). Defendants knew that al-Qaeda, al-Qaeda-in-Iraq, and Islamic State would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's purpose was to intimidate the U.S., Iraqi, Turkish, Belgian, and Nigerien populations and to compel the U.S. and allied governments to

effect a withdrawal of U.S. forces from Iraq, Syria, Turkey, and Niger and to abandon the military campaign against Islamic State.

1053. Defendants' provision of funds to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for al-Qaeda, al-Qaeda-in-Iraq, and Islamic State appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United States, Iraq, Turkey, Belgium, Niger, and other nations, (b) to influence the policy of the U.S., Iraqi, Turkish, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, Turkish, and other governments by mass destruction, assassination, and kidnapping.

1054. Defendants' provision of funds to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State occurred primarily outside the territorial jurisdiction of the United States.

1055. Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing funds to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.

1056. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1057. As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

1058. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

1059. Plaintiffs request that the Court:

(a) Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b) Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c) Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d) Award Plaintiffs prejudgment interest; and

(e) Award Plaintiffs any such further relief the Court deems just and proper.

Dated: September 27, 2026

Respectfully submitted,

*/s/ Geoffrey P. Eaton*

Geoffrey P. Eaton (D.C. Bar No. 473927)
Ryan R. Sparacino (D.C. Bar No. 493700)
Eli J. Kay-Oliphant (D.C. Bar No. 503235)
Tejinder Singh (D.C. Bar No. 1012396)
Shuman Sohrn (D.C. Bar No. 90010140)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com
tejinder.singh@sparacinopllc.com
shuman.sohrn@sparacinopllc.com

*Counsel for Plaintiffs*